# EXHIBIT A

## PART 1 OF 2

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

---

AMBASE CORPORATION, 111 WEST 57TH
MANAGER FUNDING LLC, and 111 WEST 57TH
INVESTMENT LLC, on behalf of itself and
derivatively on behalf of 111 WEST 57TH
PARTNERS LLC,

                              Plaintiffs,

    -against-

111 WEST 57TH SPONSOR LLC, 111 WEST 57TH
JDS LLC, PMG WEST 57TH STREET LLC, 111
WEST 57TH CONTROL LLC, 111 WEST 57TH
DEVELOPER LLC, 111 WEST 57TH KM EQUITY
LLC, 111 WEST 57TH KM GROUP LLC, KEVIN
MALONEY, MATTHEW PHILLIPS, MICHAEL
STERN, NED WHITE, 111 CONSTRUCTION
MANAGER LLC, PROPERTY MARKETS
GROUP, INC., JDS DEVELOPMENT LLC, and
JDS CONSTRUCTION GROUP LLC,

                            Defendants,

111 WEST 57TH PARTNERS LLC,

                           Nominal Defendant.

---

Hon. Eileen Bransten
Index No. 652301/2016

**SUPPLEMENTAL SUMMONS**

**TO DEFENDANTS 111 CONSTRUCTION MANAGER LLC, JDS CONSTRUCTION
GROUP LLC, JDS DEVELOPMENT LLC, AND PROPERTY MARKETS GROUP,
INC.:**

      **YOU ARE HEREBY SUMMONED** to answer the amended complaint in this action

and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve

a notice of appearance, on the Plaintiffs' attorneys the later of June 1, 2018, or within 20 days

after the service of this summons, exclusive of the day of service (or within 30 days after the

service is complete if this summons is not personally delivered to you within the State of New

1

York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

The basis for venue is multiple parties' residence in New York County.

Dated:  April 26, 2018
        New York, New York

**MEISTER SEELIG & FEIN LLP**

By:_____
       Stephen B. Meister, Esq.
       Stacey M. Ashby, Esq.
       Kevin A. Fritz, Esq.
       Eugene Meyers, Esq.
125 Park Avenue, 7th Floor
New York, New York 10017
Phone: (212) 655-3500
sbm@msf-law.com
*Attorneys for Plaintiffs*

**COOPER & KIRK, PLLC**
David H. Thompson*
Peter A. Patterson*
Brian W. Barnes**
Nicole J. Moss*
Haley N. Proctor*
*Pro Hac Vice*
**Pro Hac Vice Forthcoming*
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Phone: (202) 220-9600
dthompson@cooperkirk.com
*Attorneys for Plaintiffs*

2

Case 1:18-cv-05482-AT   Document 1-1   Filed 06/18/18   Page 4 of 238

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

AMBASE CORPORATION, 111 WEST 57TH
MANAGER FUNDING LLC, and 111 WEST 57TH
INVESTMENT LLC, on behalf of itself and
derivatively on behalf of 111 WEST 57TH
PARTNERS LLC,

                     Plaintiffs,

    -against-

111 WEST 57TH SPONSOR LLC, 111 WEST 57TH
JDS LLC, PMG WEST 57TH STREET LLC, 111
WEST 57TH CONTROL LLC, 111 WEST 57TH
DEVELOPER LLC, 111 WEST 57TH KM EQUITY
LLC, 111 WEST 57TH KM GROUP LLC, KEVIN
MALONEY, MATTHEW PHILLIPS, MICHAEL
STERN, NED WHITE, 111 CONSTRUCTION
MANAGER LLC, PROPERTY MARKETS
GROUP, INC., JDS DEVELOPMENT LLC, and
JDS CONSTRUCTION GROUP LLC,

                     Defendants,

111 WEST 57TH PARTNERS LLC,

                     Nominal Defendant.

Hon. Eileen Bransten
Index No. 652301/2016

**THIRD AMENDED COMPLAINT**

        Plaintiffs AmBase Corporation, 111 West 57th Manager Funding LLC, 111 West 57th

Investment LLC, on behalf of itself and derivatively on behalf of 111 West 57th Partners LLC

(collectively, "Plaintiffs"), by their undersigned attorneys, for their Third Amended Complaint

against Defendants 111 West 57th Sponsor LLC, 111 West 57th JDS LLC, PMG West 57th

Street LLC, 111 West 57th Control LLC, 111 West 57th Developer LLC, 111 West 57th KM

Equity LLC, 111 West 57th KM Group LLC, Kevin Maloney, Matthew Phillips, Michael Stern,

Ned White, 111 Construction Manager LLC, Property Markets Group, Inc., JDS Development

LLC, and JDS Construction Group LLC (collectively, "Defendants") and against the 111 West

57th Partners LLC, as a nominal defendant, allege as follows:

Plaintiffs are investors in a joint venture to acquire and develop luxury residential real estate in Manhattan. They are the victims of an elaborate and long-running fraudulent scheme by the developers of that project aimed at depriving Plaintiffs of their entire $70 million investment. Defendants engaged in a pattern and practice of fraud that included the following: creating fictitious contracts to obtain bank financing; maintaining two sets of books and providing fraudulent budgets to both the debt and equity investors; making false statements month after month that the project was on budget and properly funded; padding their bills with phantom employees; lying about the nature of the cost overruns; and siphoning $16 million out of the joint venture into an insurance policy for their own benefit. Under the Racketeer Influenced and Corrupt Organizations Act (RICO), Plaintiffs seek treble damages, costs, and attorney's fees against the participants in the enterprise who perpetrated that scheme. Plaintiffs also seek a declaration of their rights under the relevant agreements, damages and indemnification for various breaches of contract, breaches of fiduciary duty, and fraud.

## INTRODUCTION

1.      In 2013, Defendants Michael Stern and Kevin Maloney were under "enormous pressure" to close on a deal acquiring property at 105–111 West 57th Street in Manhattan. They did not have the funds necessary to complete the transaction alone, and they were therefore "desperate" to obtain help from an outside investor by whatever means necessary. In their search for cash, Stern and Maloney targeted AmBase Corporation. The pair induced AmBase to act as the primary investor in a joint venture to acquire the property in question and to develop a building that would tower over the New York skyline and offer panoramic views of Central Park.

2.      To induce AmBase's investment, Stern and Maloney promised that they would

manage the project for the benefit of all involved. Stern and Maloney insisted that they had the

expertise to construct the contemplated structure, that they could do so at comparatively low

cost, and that they had the net worth and liquidity that would be necessary to secure financing for

such a large project. But from the beginning, it was a set up job as Stern and Maloney were not

in a position to deliver nor did they intend to deliver on their promises.

3.      Unaware of Stern's and Maloney's true intentions, AmBase entered into a joint

venture agreement that sought to align the interests of all involved and to protect AmBase. For

example, the joint venture agreement included the following features:

     a.     While Stern and Maloney generally were supposed to manage the project's day-

to-day operations through 111 West 57th Sponsor LLC ("Sponsor"), an entity

under their control, the agreement subjected Sponsor's actions on certain "major

decisions" to AmBase's express agreement through 111 West 57th Investment

LLC ("Investment"), an entity under AmBase's control. These major decisions

included matters such as updating the project budget.

     b.     Stern and Maloney were required to propose updates to the project budget both at

regular intervals and in certain circumstances when it became apparent that the

current budget no longer accurately reflected the costs necessary to complete the

project.

     c.     If Investment declined to approve any proposed budget with cost increases

exceeding a specified threshold, Investment was entitled to exercise an "equity

put right" that would require Sponsor to purchase its equity interests at a price that

would give Investment a 20% return on the capital it had contributed.

     d.     While AmBase was the principal investor in the venture through Investment, Stern and Maloney were required to make capital contributions through Sponsor with their own funds to ensure that they had a financial stake in the success of the venture.

     e.     Sponsor was required to fund any budget overruns that should have been anticipated and budgeted for by a reasonable developer acting in good faith, regardless of whether they were actually anticipated by Sponsor.

     f.     Sponsor was required to provide certain information about the project—including budget analyses and information about any developments that could adversely affect the business plan—to Investment at regular intervals and upon request.

4.     Relying on Stern's and Maloney's assurances and contractual commitments, AmBase agreed to invest in the project and made an initial capital contribution of $57 million, giving it an aggregate stake of over 60%. At Stern and Maloney's urging, AmBase would later make additional contributions that brought its total investment in the project to nearly $70 million.

5.     Unbeknownst to AmBase, however, Stern's and Maloney's inducements were fraudulent. Rather than managing the venture to promote the interests of all involved, Stern and Maloney consistently have sought to derive profit at the expense of AmBase's investment. Stern and Maloney carried out their fraudulent scheme in a multitude of ways, including the following:

     a.     Stern and Maloney have consistently attempted to manipulate the project budget for a variety of reasons, including to hide massive and foreseeable cost overruns that have resulted from their deception of the lenders and mismanagement of the project and to frustrate Investment's equity put right. The costs for the project

have shot past the original $640 million budget to well over $900 million and
counting.

b.    Stern and Maloney have consistently sought to conceal information by
maintaining two sets of books and misrepresenting to Plaintiffs and the projects'
lenders the true state of its financial affairs. They have also repeatedly refused to
supply AmBase and its consultants with information to which they are entitled,
and have made many false and misleading representations. Stern and Maloney
have denied Ambase access to the books and records that would have revealed
this fraud early on.

c.    Stern and Maloney falsely stated that they had the financial net worth and
liquidity necessary to obtain financing for the construction of the project. As a
result of their inadequate net worth and liquidity, the project was subjected to a
one-year delay in obtaining construction financing. This delay imposed significant
unnecessary costs on the venture, including over $25 million just to pay for fees
and interest to extend the acquisition loan for the property.

d.    In large part because of Stern's and Maloney's failure to obtain construction
financing in a timely manner, Sponsor issued a series of capital calls exceeding
$60 million dollars between March 2014 and April 2015. Many of the costs these
capital calls were designed to cover were highly suspect, including payments on
an insurance policy that named an affiliate of Stern as the beneficiary of a $16.5
million loss reserve fund. Sponsor also engaged in improper tactics to attempt to
get Investment to fund its portion of the capital calls, including by falsely
representing the urgency of the venture's needs for the funds. When Investment

exercised its right not to fund its portion of two capital calls, Sponsor purportedly made up the shortfall (relying on undisclosed third-party financing), thereby claiming to punitively dilute AmBase's equity interest in the project. Sponsor then sought to profit from its activities by securing excess funds in the construction loan—a loan that was only issued in reliance on "fictional" construction contracts and a woefully inadequate budget that the Defendants submitted to the lenders. These excess funds were then distributed to the project's investors subject to the improper dilution of AmBase's interest. AmBase believes that Stern and Maloney fraudulently induced the company to approve the loan, and that they used tens of millions of dollars of the loan proceeds which were immediately paid out to fund other projects that Stern and Maloney were working on.

e.     Stern and Maloney have managed the project for their own personal benefit in other ways, too. For example, they deliberatively drove up their own payrolls by sending unneeded employees to the worksite and billing the project for work that was not done. They also leveraged the bidding process for 111 West 57th Street to obtain favorable deals with contractors on their other projects.

6.     As a direct consequence of the Defendants' malfeasance, the project defaulted on its construction loans and the value of AmBase's investment was wiped out. Meanwhile, Defendants have extracted and continue to extract substantial sums of money from the project.

7.     Absent the intervention of this Court, Stern and Maloney, together with the other Defendants, will have successfully executed a scheme to induce AmBase to invest tens of millions of dollars in the project and then, in their words, "screw" it out of that investment. Defendants committed many acts of mail and wire fraud in furtherance of their fraudulent

scheme, in violation of RICO. Defendants also have breached their contractual and fiduciary

obligations to Plaintiffs. Plaintiffs therefore have instituted this action to hold Defendants

responsible for their wrongdoing.

8.      In short, the scheme to defraud AmBase was both sinister and comprehensive:

Defendants induced AmBase to invest tens of millions of dollars in the project under false

pretenses; kept AmBase in the dark as to the project's financial status by withholding books and

records; diverted funds from the project to the benefit of the developers; obtained additional

funds through bogus capital calls and false representations to the project's lenders; and

ultimately froze AmBase out of the project. This wide-ranging and extended pattern of

fraudulent conduct plainly violates RICO as set forth in more detail below.

## JURISDICTION AND VENUE

9.      This Court has personal jurisdiction and subject matter jurisdiction over this

action under CPLR §§ 301 and 302(a)(1).

10.     Venue is proper in New York County pursuant to CPLR § 501 because an

agreement between the parties fixes New York County as the place for trial and pursuant to

CPLR § 503(a) because Defendant JDS Development maintains its principal place of business in

New York County.

## PARTIES

11.     Plaintiff AmBase Corporation ("AmBase") is a corporation organized under the

laws of the state of Delaware with offices at 1 South Ocean Boulevard, Suite 301, Boca Raton,

Florida 33432.

12. Plaintiff 111 West 57th Investment LLC ("Investment") is a limited liability company organized under the laws of the state of Delaware. Investment is a subsidiary of AmBase.

13. Plaintiff 111 West 57th Manager Funding LLC ("Manager Funding") is a limited liability company organized under the laws of the state of Delaware. Manager Funding is a subsidiary of AmBase.

14. Defendant Michael Z. Stern ("Stern") is an individual who, upon information and belief, resides in New York, New York.

15. Defendant Kevin P. Maloney ("Maloney") is an individual who, upon information and belief, resides in Florida but conducts business and owns property in New York, New York.

16. Defendant 111 West 57th Sponsor LLC ("Sponsor") is a limited liability company organized under the laws of the state of Delaware.[1] Defendants Stern and Maloney are Principals of Sponsor.

17. 111 West 57th Manager LLC ("Manager") is a limited liability company organized under the laws of the state of Delaware. Manager is a member and the manager of Defendant Sponsor.

18. Defendant 111 West 57th Control LLC ("Control") is a limited liability company organized under the laws of the state of Delaware. Along with Plaintiff Manager Funding, Control is a member of Manager, of which it is also the manager. Defendants Stern and Maloney are Principals of Control.

---

[1] Plaintiffs AmBase and Manager Funding hold non-controlling indirect interests in Sponsor.

8

Case 1:18-cv-05482-AT    Document 1-1    Filed 06/18/18    Page 12 of 238

19.    Defendant 111 West 57th JDS LLC ("JDS LLC") is a limited liability company organized under the laws of the state of Delaware. Defendant Stern is a member and the manager of JDS LLC.

20.    Defendant PMG West 57th Street LLC ("PMG LLC") is a limited liability company organized under the laws of the state of New York. Defendant Maloney indirectly controls PMG LLC.

21.    Defendant 111 Wet 57th KM Group LLC ("KM Group") is a limited liability company organized under the laws of the state of New York. KM Group is a member and the manager of PMG LLC. Defendant Maloney indirectly controls KM Group.

22.    Defendant 111 West 57th KM Equity LLC ("KM Equity") is a limited liability company organized under the laws of the state of New York. KM Equity is a member and the manager of KM Group. Defendant Maloney is a member and the manager of KM Equity.

23.    Defendant 111 West 57th Developer LLC ("Developer") is a limited liability company organized under the laws of the state of Delaware. Defendant Control is a member and the manager of Developer.

24.    Defendant 111 Construction Manager LLC ("Construction Manager") is a limited liability company.  Upon information and belief, it is organized under the laws of the state of Delaware and controlled—directly or indirectly—by Defendants Stern and Maloney and/or their companies.

25.    Defendant Property Markets Group, Inc. ("PMG") is a privately-held real estate development and acquisition firm incorporated in the State of New York, with its principal place of business at 111 Fifth Avenue, New York, New York 10003.  Defendant Maloney is the Chief Executive Officer and a Principal of PMG.

9

26.     Defendant JDS Development LLC ("JDS Development") is a privately-held real estate development, construction, and acquisition firm organized under the laws of the State of New York, with its principal place of business at 104 Fifth Avenue, New York, New York 10011. Upon information and belief, Defendant Stern is the Chief Executive Officer of JDS Development.

27.     Upon information and belief, Defendant JDS Construction Group LLC ("JDS Construction," and together with "JDS Development," "JDS") is a limited liability company organized under the laws of the State of New York, with its principal place of business at 104 Fifth Avenue, New York, New York 10011. Also upon information and belief, it is controlled by Defendant Stern and affiliated with JDS Development.

28.     Defendant Ned White is an individual who, upon information and belief, resides and works in New York, New York.  He is a Principal of PMG, an indirect owner of Defendant Sponsor by way of his membership interest in Defendant KM Group, and is one of the individuals who is responsible for the development, construction management, asset management, and operation of the Property (as defined below). As a senior figure at PMG, White served as Maloney's closest confidant and advisor on matters relating to the project.

29.     Defendant Matt Phillips is an individual who, upon information and belief, resides and works in New York, New York.  He is a Director at JDS Development. As a senior figure at JDS, Phillips was directly or indirectly responsible for many of the accounting and budgeting manipulations described in this complaint and a key advisor to Stern on matters relating to the project.

30.     Nominal Defendant 111 West 57th Partners LLC ("the Company") is a limited liability company organized under the laws of the state of Delaware. Plaintiff Investment and

Defendant Sponsor are members of the Company, Defendants Stern and Maloney are its principals, and Sponsor is its manager. Although Defendant White is not a principal of the Company, he is authorized by the organizational papers to act on behalf of the Company in Defendant Maloney's stead.

## FACTUAL ALLEGATIONS

### Defendants Induce Plaintiffs to Form a Joint Venture and Invest in the Project

31.     In June 2013, Stern and Maloney induced AmBase to enter into a joint venture (the "Joint Venture") with them to acquire and develop property at 105–111 West 57th Street, New York, New York 10019 (the "Property"), into a luxury residential tower with retail space (the "Project"). Stern and Maloney were desperate for the funds that AmBase would bring to the project as principal investor.

32.     To facilitate the Joint Venture, the parties entered into a series of limited liability company agreements.

33.     Most relevant here, Investment, a subsidiary of AmBase, joined with Sponsor, an entity controlled by Stern and Maloney, to form the Company. Investment's and Sponsor's rights and obligations with respect to the Company were governed by a limited liability company agreement dated June 28, 2013 (as amended and restated on December 17, 2013, "the Joint Venture Agreement," attached hereto as **Exhibit A**).

34.     Although Sponsor was controlled by Stern and Maloney, AmBase also had a "sponsor-side" stake. Specifically, Manager Funding, a subsidiary of AmBase, joined with Control, an entity controlled by Stern and Maloney, to form Manager, the entity that manages and controls Sponsor. Manager Funding's and Control's rights and obligations with respect to Manager are governed by a limited liability company agreement dated June 28, 2013.

11

35.     Investment initially contributed $56 million in cash to the Joint Venture in exchange for a 59% interest in the Company. Sponsor purportedly contributed $39 million in property interests and cash to the Joint Venture in exchange for a 41% interest in the Company. (Collectively, these contributions are referred to herein as the "Initial Capital Contribution(s)").

36.     $1.25 million of Sponsor's $39 million Initial Capital Contribution came from AmBase, which contributed that amount in exchange for its 83.3% interest in Manager Funding, which in turn held a 10.7% in Manager, which in turn held a 36% interest in Sponsor.[2] In other words, in addition to its 59% interest by way of Investment, AmBase held a 1.3% indirect interest in the Company by way of Manager Funding.

37.     Control purportedly contributed $25 million in cash as part of Sponsor's Initial Capital Contribution, and the remainder of Sponsor's capital contribution consisted of the value of property rights Stern, Maloney, and/or their affiliates owned prior to approaching AmBase to invest in the project.

38.     Stern and Maloney had to take out a loan for all or most of their initial cash contribution, raising serious questions about their net worth and liquidity at the time.

39.     In December 2013, Atlantic acquired a 26.3% interest in the Company for a "deemed" Initial Capital Contribution of $25 million. At that point, Sponsor's interest in the Company was commensurately reduced to 14.7%.

40.     Because Atlantic's deemed capital contribution was made exclusively to the benefit of Control and/or its owners, Control's direct or indirect interest in Sponsor should also have been reduced to preserve AmBase's "sponsor-side" Joint Venture interest of 1.3%.

---

[2] The remainder of Manager Funding's Initial Capital Contribution was made by non-party investor Masood Bhatti, in exchange for a 16.7% interest in Manager Funding.

However, the organizational charts that Stern and Maloney have created and certified at various points throughout the period that is relevant to this litigation do not reflect this adjustment. For example, the organizational chart attached to the Joint Venture Agreement suggests that AmBase held only a .47% "sponsor-side" interest as of December 17, 2013. Subject to this and other disputes described below, an organizational chart reflecting the relationships between the parties is attached hereto as **Exhibit B**.

41.     Simultaneously with the formation of the Joint Venture, the Company entered into a development agreement (the "Development Agreement") with Developer, a wholly owned subsidiary of Control, "to manage and supervise the completion of the Project." The Development Agreement is attached as Exhibit B to the Joint Venture Agreement.

42.     Also on or about June 28, 2013, the Company obtained a $230 million acquisition loan from Annaly CRE LLC (the "Acquisition Loan"). The loan was intended to cover property acquisition costs and pre-development expenses and to provide funding for the Company until Sponsor could obtain construction financing (the "Construction Loan"). The Acquisition Loan was for a term of one year, with an option to extend for two six-month periods upon payment of additional interest and fees.

**The Joint Venture Agreement Purports to Protect AmBase's Rights**

43.     Under the Joint Venture Agreement, Sponsor serves as the Manager of the Company, which means that it exercises "day-to-day authority to act for the Company." Joint Venture Agreement § 7.2.

44.     Sponsor's control, however, is subject to Investment's enumerated approval rights set forth in the Joint Venture Agreement, known as "Major Decision" rights. *Id.* § 7.2(a).

Specifically, the Joint Venture Agreement requires Sponsor to seek and obtain Investment's

advance, written approval for any of the following matters, among others:

a.     "[s]ubject to Permitted Variance, any Budget, including such amendments to any Budget as may be proposed by Manager from time to time, provided to the Members in accordance with Section 8.2(b);" *id.* § 7.2(a)(ii);

b.     "any sale, transfer or other disposition (other than pursuant to Article 11 and other than sales of individual residential condominium units in accordance with the Business Plan and Budget, any loan documents and the condominium documents), any financing or refinancing, or any payment or other discharge of indebtedness by the Company or any Subsidiary relating to any material portion of any of the Assets, or securitized transactions involving the Property (as well as all terms and documentation relating to such transactions), and any modification of documents evidencing the foregoing," *id.* § 7.2(a)(iii);

c.     "expenditures in excess of . . . the Permitted Variance with respect to the matters contained in any Budget as updated from time to time, other than on account of Protective Company Overruns or Manager Overruns;"

45.     Finally, in the event that one of several enumerated "Cause[s]" occurs, Investment

may remove Sponsor as manager of the Company and appoint a replacement manager in its

place. *Id.* § 8.10.

46.     In order to facilitate Investment's Major Decision and other contractual rights, the

Joint Venture Agreement requires Sponsor to share certain information with Investment, on a

regular basis and upon request. *See, e.g.*, Joint Venture Agreement §§ 4.1, 4.2.

47.     In addition, the Agreement requires Sponsor to provide regular amendments and

updates to the Business Plan and Budget, no less frequently than within sixty days of the end of

each fiscal year, which ends on December 31. *Id.* §§ 4.4., 8.2(b). As noted above, these Budget

revisions are subject to Investment's approval as Major Decisions. *Id.* § 7.2(a)(iii). If Investment

either disapproves of a proposed budget or fails to respond within ten days, then Sponsor is

required to continue to operate under the last approved budget. *Id.* § 8.2(b).

14

48.     The Joint Venture Agreement contemplates that the majority of expenses associated with the Project will be covered by a Construction Loan, to be entered into after a pre-development period during which plans for the building are finalized, licenses obtained, and financing negotiated. *Id.* § 3.2(d), Ex. A.

49.     The Agreement also permits the Company to raise equity through Additional Capital Contributions. Sponsor may call for these contributions "in accordance with the Budget," or "on account of any Company Overrun." *Id.* § 3.2(a).  A "Company Overrun" is any budget overrun that would *not* have been "reasonably expected to have been anticipated and budgeted for by a developer acting in good faith and in a commercially reasonable and prudent manner in the planning and oversight of projects similar in size, type, and scope as the development of the Property." *Id.* §§ 1.35, 1.41, 1.83.

50.     Any budget overrun that should have been anticipated and budgeted for by a reasonable and prudent developer acting in good faith is a "Manager Overrun." *Id.* § 1.83. Funding for Manager Overruns must be provided by Sponsor, without adjusting its ownership interest, "and no other Member shall be required to contribute additional funds on account of such Manager Overrun." *Id.* § 3.2(e).

51.     A final type of contribution that can be made by members of the Company is a "Shortfall Contribution." In the event that one member fails to contribute its entire share of an Additional Capital Contribution by the tender date, any other member that has contributed its full share as of the tender date may make a capital contribution to cover the shortfall. *Id.* § 3.3(a). Shortfall Contributions treated as "dilutive capital" have the effect of disproportionately (or punitively) increasing the contributing member's ownership stake, and decreasing the non-contributing member's ownership stake, at a ratio of 1.5 to 1. *See id.* § 3.7.

15

52.	In order to ensure that Sponsor maintained an adequate stake in the Project, and to provide AmBase transparency into and control over the identity of its business partners and potential encumbrances on its investment, Sponsor made the following covenants about the various capital contributions it would make to the Company: "all Initial Capital Contributions made by Sponsor to the Company have been funded by Sponsor out of personal assets and resources indirectly contributed to Sponsor by the Principals, including any such personal assets and resources obtained by a loan that is not secured directly or indirectly by the Property; (2) all Capital Contributions made by Sponsor to the Company have not, and will not, include any capital contributions to Sponsor from third parties or managed funds; and (3) Sponsor shall disclose to Investor and Atlantic any changes to the direct and indirect investors in its holdings." *Id.* § 2.8(a)

53.	Sponsor also promised that it would "not make, suffer, or permit (i) any Transfer, encumbrance or lien upon [its] interest in the Company, (ii) any Transfer, encumbrance or lien upon the direct or indirect shares of stock, membership interest, partnership interest or other equity interest in [it], or (iii) any involuntary Transfer of any such direct or indirect shares or interests by reason of merger, death or divorce of, or any other event affecting, a constituent Person of a Member without, in each instance, obtaining the prior written approval of the Members, which approval may be withheld in such Member's absolute discretion." *Id.* § 9.1(a). Control made a similar promise under Section 9.1 of the Manager Funding LLC Agreement.

54.	As a further incentive for Sponsor to keep costs in check, and as a means for protecting AmBase's investment, Section 11.5 of the Joint Venture Agreement entitles Investment, in the face of significant overruns, to require Sponsor to purchase its equity interest in the Company for a purchase price equal to an amount that would give Investment a 20%

16

internal rate of return on its investment (the "Equity Put Right"). The right becomes available if, at any time *before* the closing of the construction loan, Investment declines to approve a proposed Budget in which, with certain caveats not applicable here, total aggregate costs exceed total aggregate costs set forth in the prior approved Budget by more than 7.5%. The right also becomes available if, any time *after* the closing of the construction loan, Investment declines to approve a proposed budget in which the hard costs exceed an amount equal to 110% of the hard costs set forth in the prior approved budget.

55.     As the Company's manager, Sponsor was entitled to reimbursement "for its reasonable out-of-pocket expenditures incurred in connection with the performance of its duties . . . , including all *third-party* asset-specific and administrative costs such as legal, accounting, appraisal, environmental and structural review, and including in-house legal expense at actual cost." *Id.* § 8.3(b). It was entitled to seek reimbursement only for expenses included in an approved Budget and could not include payroll or overhead costs. *Id.*

56.     In addition to controlling Sponsor as the Manager of the Company, Stern and Maloney jointly control Developer. In that capacity, they collect a fee that is equal to 4% of all hard costs expended on the Project. Development Agreement § 8.1. (This fee was subsequently capped at $9,852,000.00 in connection with the Construction Loan.) As developers, they undertook, among other things, to "use Commercially Reasonable Efforts to carry out in a timely manner the Project in its entirety in accordance with the Requirements" and "to perform all development functions necessary to complete the Project in accordance with the Requirements." *Id.* § 4.1.1; *see also id.* §§ 4.1, 4.2 (specifying other duties). In doing so, they represented that they were "qualified to perform the services that are the subject matter of this Agreement." *Id.*

§ 3.1.3. As explained below, despite these representations the project consistently has been significantly behind schedule and over budget.

57.     Finally, since June 30, 2015, 111 Construction Manager LLC, an affiliate of Sponsor that is also controlled by Stern and Maloney, has served as the construction manager for the project.  The construction manager is entitled to a quarterly fee of $641,235.90, with total payments capped at $6,412,359.00. Construction Management Agreement § 8.1.14. It is also entitled to seek reimbursement for specified payroll and other expenses.  *Id.* § 8.1. Otherwise, the Joint Venture Agreement provided that Sponsor may not be reimbursed for "any expenses representing payroll (except actual in-house legal costs)." Joint Venture Agreement §§ 8.3, 8.8. Under the Joint Venture Agreement, payroll and other fees must be "agreed upon in advance" by Sponsor and the joint venture's other members "in accordance with the Budget," and these expenses must be "invoiced monthly." *Id.* § 8.8.

**Pre-Development Phase: Sponsor Mismanages Project and Schemes to Defraud AmBase**

58.     In the weeks leading up to when the parties entered into the Joint Venture, Stern and Maloney repeatedly met with Bianco and other AmBase personnel and made certain representations to Plaintiffs about their ability to develop and secure financing for the Project. These included representations that:

     a.    They would be able to obtain the necessary zoning variances, air rights, and landmarks certificate, and to construct the building at comparatively low costs;

     b.    They had the engineering expertise to construct the contemplated structure;

     c.    They had the net worth and liquidity necessary to provide guaranties on the Construction Loan and would therefore be able to obtain construction financing required for the project.

59.     Despite these representations, over the course of the next two years, during the pre-development phase of the project, the Company, and Plaintiffs' investment in it, began to

suffer as a consequence of Stern and Maloney's mismanagement and scheme to dilute Plaintiffs'

equity in the Company.

60.     Stern and Maloney made material misrepresentations that induced AmBase to

invest in the project, and AmBase's investment was consummated by directing John Ferrara of

AmBase on June 26, 2013 to send original signature pages of the relevant contracts via Federal

Express. Defendants' use of Federal Express in furtherance of a scheme to defraud constituted

mail fraud under 18 U.S.C. § 1341.

61.     Unbeknownst to Plaintiffs at the time, the troubles began within months of the

parties executing the Joint Venture Agreement, as Stern and Maloney endeavored to obtain a

landmarks certificate for the building.

62.     The landmarks process was a critical step in the development of the Property, as a

failure to obtain the necessary certificate would scuttle the entire Project.

63.     In October 2013, a dispute erupted between Stern and Maloney concerning their

application before the Landmarks Preservation Commission. Their resulting exchange reveals

the degree of dysfunction between the two Principals of the Company, exposes a history of

unlawful and fraudulent dealings, and suggests that they schemed to draw the investors in 111

West 57th into yet another fraudulent scheme.

64.     The exchange begins when Stern complains that Maloney alienated a member of

the Commission and placed the project in "peril." Maloney reminded Stern that the

commissioner in question "works for me" and that they had paid a lobbyist "to find enough

commissioners to vote."

65.  The co-managers of the Company proceed to trade insults and vulgarities in a string of emails that reveals incompetence and fraud on previous projects, of which Stern and Maloney were aware when they induced AmBase to invest over $57 million in the Joint Venture:

     a.  Maloney tells Stern that he "can not have the job turn out like Walker [Tower]. 50% over budget and [a] year late. You not paying attention. 6 months wasted w no staff on the job. I can not have it turn out like Brooklyn w hidden banks [sic] accounts, overruns everywhere, no back up."

     b.  In turn, Stern accuses Maloney of running a "two-bit 'organization'" composed of "[c]riminals and morons and secretaries."

66.  The conversation returns to the Project with accusations that Stern plans to "screw . . . over" the investors.  It comes out that at the time the Joint Venture was formed, Stern and Maloney—who owned part of the property on which the Project would be constructed—were "desperate" and under "enormous pressure" to close. Under these circumstances, Stern and Maloney worked with intermediaries to bring AmBase (specifically, Richard "Dick" Bianco, AmBase's CEO ("Bianco")) to the table to provide the critical cash investment needed to close. Reminding him of these circumstances, Maloney accuses Stern of concluding that "its ok to screw them."

67.  Ultimately, according to Stern and Maloney, the landmarks review process necessitated a redesign of the building.

68.  In connection with the redesign, Stern and Maloney proposed and Investment approved a new, significantly higher budget.

69.  The process of negotiating the new budget took a little over six months. In the meantime, in violation of the Joint Venture Agreement and contrary to representations they made to Plaintiffs to induce capital contributions to the project, Defendants operated the project in accordance with the new budget.  As Defendant Phillips explained in an internal JDS email on April 2, 2014: "right now there are two budgets, the original which is reflected in the cap call and

20

the increased budget which we are basically using for everything but that has not yet been approved by the partners." [JDS_0083983] As set forth in greater detail below, Defendants continued this practice of maintaining two sets of books for the duration of the project to date, and it facilitated numerous acts of mail and wire fraud—including acts of mail and wire fraud that induced Plaintiffs to invest additional funds in the project.

### *Delay in Construction Financing*

70.     In the meantime, however, Stern and Maloney were no closer to securing financing to pay for that high budget.

71.     The parties contemplated that Stern and Maloney would serve as guarantors on the Construction Loan. *See* Joint Venture Agreement § 8.2(c). Upon information and belief, despite their representations about their financial net worth and liquidity, Stern and Maloney were unable to satisfy the financial net worth and liquidity covenants that typically accompany such loans during the period when the Joint Venture was supposed to be obtaining construction financing, with the result that construction financing was delayed by one year.

72.     Stern and Maloney were aware that they were unable to meet these requirements and were in fact soliciting purchasers who could provide the requisite guaranties in June 2014, [BECK0007379] when the Joint Venture was supposed to be closing on construction financing.

73.     Defendants also repeatedly dodged request for certifications that they could meet financial covenants under the acquisition loan. [JDS_0086745]

74.     Maloney in particular has repeatedly undertaken obligations he lacks the net worth and liquidity to fulfill.

75.     During the relevant period, for example, he is alleged to have entered into an off-the-books loan to make an equity investment in connection with another project in Queens.

76.     Upon information and belief, he did so in order to keep his books clear enough to obtain a $113 million construction loan on a project in Long Island City. *See* Rich Bockmann, *Property Markets Group gets $130M financing for LIC tower*, THE REAL DEAL (Oct. 31, 2014), http://goo.gl/8gok8V. Upon information and belief, this commitment, in turn, prevented him from guaranteeing a construction loan for the Joint Venture.

77.     This strategy eventually backfired in the Queens Plaza Park project in September 2016, when he defaulted on a recourse guarantee he signed in June 2015. Maloney has been accused of conspiring to hide these financial problems from his business partners in that deal. In a June 2016 email that appears to refer to that project, Maloney's associate reassured him: "I wouldn't worry about [them] looking for anything. We hid it pretty well. They won't be able to find anything."

78.     Upon information and belief, another reason for Sponsor's failure to secure construction financing was that Stern was in the process of obtaining financing for another, unrelated project, and he could not meet the net worth and liquidity requirements for both loans at the same time. *See* Daniel Geiger, *Brooklyn landmark could become $100M-plus buy*, CRAIN'S NEW YORK BUSINESS (Dec. 18, 2014), http://goo.gl/CBvBcA.

*Insurance*

79.     One of Stern and Maloney's responsibilities as managers of the Joint Venture was to obtain suitable insurance coverage for the Project.

80.     Through its Massachusetts-based agent, Elizabeth Lowe, Stern and JDS negotiated the primary coverage for the Project in 2014.

22

81.     Maloney and PMG either neglected their responsibilities to the Joint Venture by failing to participate in this process, or Stern excluded them from it in an effort to carry out his scheme to defraud the Company of millions of dollars.

82.     Although the Company paid the premiums for that coverage, Stern obtained the policy in JDS Construction's name, rather than in the name of the Company or another entity jointly controlled by Maloney.  He did so by falsely representing that JDS alone "would be contracting with the subcontractors and managing the relationships and the project." [JDS_0096269]

83.     By means of these false representations, Stern obtained complete control of the administration of the policy. His control was so complete that no other members of the joint venture—not even Maloney, who supposedly jointly managed the project—could obtain copies of the policies to review their terms or the scope of their coverage. [JDS_0096318]

84.     And despite the fact that the Joint Venture was structured to ensure that Stern and Maloney would share day-to-day control of the project, the insurance program also allowed him to gain the upper hand in construction decisions: as the contracting entity under the policies, JDS Construction's name would appear on building permits and trade contracts. [JDS_0091580]

85.     A key feature of the insurance coverage JDS Construction purchased with Joint Venture Funds is a pre-funded deductible program ("Loss Fund"). The program provided for the Joint Venture to make quarterly payments to Liberty Mutual, which would be held as collateral and applied toward the insured's deductible in the event that any claims were filed. Any money remaining in the Loss Fund after all claims were settled would be returned to the owner of the account: in this case, JDS Construction. [JDS-PMG_0030558]

86.     At Stern's direction, Lowe negotiated coverage with lower fixed costs, but the largest possible Loss Fund. Stern gave these instructions over the wires while he was in New York to Lowe while she was in Massachusetts in August 2014, thus committing wire fraud under 18 U.S.C. § 1343. [JDS_0085185] Fixed costs on the primary and excess policies totaled approximately $███████, but the Joint Venture was required to pay an additional $███ ███ into the Loss Fund on which JDS Construction was a beneficiary. [JDS_0014839]

87.     As set forth in greater detail below, because it required large expenditures in the near term and provided for the return of funds (if any) only at the end of the coverage, this cost structure created significant cash flow problems for the Joint Venture and ultimately contributed to the alleged default on the junior mezzanine loan. But it offered a substantial advantage to Stern: by having JDS Construction as the beneficiary, Stern would be able to use payments from the loss fund for the benefit of any of the projects in which JDS Construction was involved.

88.     In other words, Stern converted the insurance policy into a siphon to channel up to $16.5 million of Joint Venture money into his own company's pockets. Stern and JDS carried out this fraudulent scheme by causing the Company to pay monthly insurance premiums through the interstate wires, including transmissions of funds on June 9, 2015, and November 18, 2015 from the Company's bank in New York to a bank in Illinois. [JDS_0080770, JDS_0045179, JDS_0078619] Each of these transmissions violated the federal wire fraud statute. *See* 18 U.S.C. § 1343.

89.     Stern managed to hide this scheme from his partners through a series of fraudulent statements and omissions.

90.     At the time the insurance policies were negotiated, JDS and PMG were both represented by the same risk management company, Robert M. Currey & Associates ("RMC"), of which Lowe was an employee. [JDS_0093617]

91.     Shortly before the conclusion of negotiations over the insurance policy, however, Lowe left RMC, keeping JDS as her client.  Acting on behalf of JDS, Lowe bound the policies without notifying RMC or PMG. [JDS_0093617]

92.     Plaintiffs first became suspicious about insurance costs a few months after the policies were finalized in August 2014.

93.     Although the operative budget at the time called for only approximately $11 million in expenditures for Insurance, in line with industry practice, a cash flow forecast and projected capital call schedule Defendant Phillips provided to AmBase around November 2014 showed the Joint Venture spending over $24 million on insurance over just two years.

94.     In a November 25, 2014, email to Phillips, AmBase VP Ferrara inquired about this discrepancy. That afternoon, Phillips responded by email, explaining that "[w]e are required to pay into a loss fund (Cash collateral) as part of each quarterly payment for a total loss fund of $16.5M. Please note that if there are no claims, we would get this entire value back as it essentially functions as a deductible reserve. Our total non refundable insurance premium payments are about $7.6M which is considerably lower than what was initially projected." He downplayed potential cashflow problems by explaining that money could be reallocated from the trade line items to the insurance line item when the project received "deducts from trades that will not need to carry their own full insurance policies on this project." He directed Ferrara to Lowe for further information. This use of the interstate wires in furtherance of a scheme to defraud constituted wire fraud under 18 U.S.C. § 1343.

25

95.     On or around December 3, 2014, John Ferrara spoke by phone from New York with Lowe, who was in Massachusetts. Lowe explained the structure of the insurance policy and the benefits it provided to the Joint Venture. In particular, she represented that money left over in the Loss Fund "comes back to the project." Lowe, acting as an agent for JDS, thus committed wire fraud under 18 U.S.C. § 1343.

96.     At no point did either Phillips or Lowe provide the requested copies of the policies or disclose that JDS Construction was the named beneficiary of the $16.5 million Loss Fund.

97.     In reliance on these fraudulent representations and omissions, AmBase paid capital for or authorized the use of partnership resources for $█████ of additional payments on the policy, including more than $█████ of additional payments into the Loss Fund. [JDS_0014839]

98.     Around the same time, PMG also began to raise concerns with Lowe and JDS about the fact that the insurance policy had been surreptitiously placed in JDS Construction's name.

99.     In a series of emails and phone calls to individuals at RMC, which continued to serve as PMG's risk management consultant, Lowe (with Stern's knowledge and blessing) acknowledged that JDS Construction was the First Named Insured, but made a series of false or misleading statements in an effort to persuade PMG to leave the insurance in place. [JDS_0096157, JDS_0090777, JDS_0090853, JDS_0090884]

100.     For example, on December 14, 2014, Lowe represented that a policy in JDS's name "was unquestionably in the best interest of the Steinway project," that JDS's insurance experience resulted in a lower fixed premium and greater control over profitability, and that any

other structure would have been more costly, if not impossible, to bind. Lowe made this representation in an email she sent from Massachusetts and that went to several individuals in New York, including Stern, White, and Kaiman, thus committing wire fraud under 18 U.S.C. § 1343. [JDS_0096318]

101.    In fact, however, Lowe and JDS had not even considered the most appropriate alternative structure: an insurance policy owned by the Company. [JDS_0096269]

102.    Moreover, JDS had obtained a lower fixed premium by agreeing to a larger Loss Fund, resulting in higher overall exposure for the Project. [JDS_0085185] The Company would exercise no control over profitability, as JDS Construction retained the ability to abscond with the proceeds of the Loss Fund, over which it exercised and continues to exercise exclusive and unchecked control.

103.    Finally, it appears that JDS's experience in the industry may have *impaired*, rather than benefitted, the Project's prospects on the insurance market. At the time Lowe began marketing the policy, ███████████████████████████████████████ ████████████████████████████████████ [JDS_0094571] JDS's dispute with Ace delayed negotiations on the Joint Venture policy. And once negotiations were finally underway, Stern and Lowe sought to leverage the opportunity of providing insurance for the Joint Venture to obtain a better deal from Ace on its other project. Presumably in exchange for that deal, JDS purchased excess insurance for the Project with Joint Venture funds. [JDS_0085185]

104.    When pressed about the proceeds of the Loss Fund, Lowe falsely represented in the December 15 email to RMC referenced above that "[t]he partnership controls how the

remaining loss funds are handled and yes it is for the benefit of the ownership structure."
[JDS_0096318]

      105.    In an effort to hide these misrepresentations, Stern, JDS, and Lowe repeatedly refused to provide or authorize the release of copies of policy documents to PMG or its agent, RMC. In particular, they refused to provide information about how funds remaining in the Loss Fund would be dispersed once the Project was completed. [JDS_0091484]

      106.    Maloney was evidently unmoved by Lowe's "erroneous and misleading information," but instead of immediately notifying his joint venture partners, he sought to get in on the deal by having JDS put the insurance in the name of Developer, an entity jointly owned and controlled by JDS LLC and PMG LLC. [JDS_0091484]

      107.    During a March 16, 2015 negotiation organized over the wires, Stern represented to White and Kaiman that he would direct the Joint Venture's insurance broker, Willis of New York ("Willis"), to put the insurance in the name of Defendant Developer. [JDS_0091484]

      108.    In an April 2, 2015, email from New York to David Curry at RMC in Massachusetts, Stern responded to inquiries about the progress of the name change that "[o]ur insurance consultants are looking at the issue." [JDS_0091532]

      109.    Stern made additional representations via the interstate wires over the next month that he would direct the name change. These transmissions were acts of wire fraud.
[PMG00016506]

      110.    In fact, Stern had no intention of changing the insurance policies.  [JDS_0090777] At Stern's direction, Lowe communicated with Willis to ensure that they took no action and stayed on script. [JDS_0091049, JDS_0091246, JDS_0091532, JDS_0091484] Also at Stern's

direction, Lowe tried to persuade Liberty Mutual to represent that it would be unwilling to change the name on the insurance policy. [JDS_0091313]

111.     By holding PMG off in this manner, Stern was locking the Joint Venture into an insurance policy controlled by JDS Construction. By March, prices for insurance of the sort the project required had gone up so "massively" that Stern believed it would not be possible for the joint venture to obtain an affordable replacement policy, and he used this as an excuse for refusing to alter the existing coverage. [JDS_0091507]

112.     The insurance disagreement and other related incidents of self-dealing and unilateral action by Stern and JDS prompted Maloney to insist on a side agreement pursuant to which representatives of both JDS LLC and PMG LLC would have to co-sign for any banking transactions by Control, Sponsor, or the Company, and PMG would be solely responsible for issuing or processing checks on behalf of Control, Sponsor, or the Company. This side agreement was executed on June 30, 2015, in connection with the closing of the Construction Loan. Although attorney Douglas Heitner of Kasowitz Benson Torres LLP purportedly represented the entire Joint Venture in connection with the closing of the Construction Loan, Stern directed him not to provide a copy of this side agreement to AmBase. After repeated requests, Maloney eventually provided a copy to Bianco and non-party investor Arthur Becker, having observed that "[c]learly Doug does not represent anyone[s'] interest other than [S]tern." [PMG00059861]

113.     Apart from the side agreement, it appears that no immediate action was taken to resolve or disclose the insurance problem.

114.     In August 2015, Stern choreographed an exchange with Willis and Liberty Mutual intended to shut down Maloney's efforts to change the insurance coverage.

Case 1:18-cv-05482-AT   Document 1-1   Filed 06/18/18   Page 33 of 238

115.    In a letter dated August 12, 2015, Stern, acting on behalf of JDS Construction, finally sent a letter to Willis directing them to request that Liberty Mutual change the First Named Insured on the insurance policies from JDS Construction to Construction Manager— another entity owned and controlled exclusively by JDS LLC and PMG LLC. [PMG00060294]

116.    On August 17, an employee of the broker sent an email to an employee of Liberty Mutual requesting the change.  After a phone call with the broker, Liberty Mutual declined to make the change on the ground that it had underwritten the program based on JDS's false representation that JDS Construction, rather than a partnership entity, was responsible for making payments and managing construction. [JDS_0075989]

117.    Maloney finally informed Bianco that Stern had named JDS Construction instead of a Joint Venture entity as the beneficiary on the Loss Fund.

118.    In late October 2015, Stern sent a letter to members of the Joint Venture claiming JDS Construction directed Liberty Mutual to return any proceeds of the Loss Fund to the Company (attached as **Exhibit C**).

119.    Despite repeated requests, Stern failed to provide documentation for the purported change, and Maloney failed to confirm that the problems with the insurance policy had been resolved.

120.    After AmBase was unable to obtain answers from Stern and Maloney, Ferrara followed up with Lowe, but at Defendants' direction, she refused to provide further information.

121.    When Plaintiffs finally obtained a copy of the direction JDS Construction gave to Liberty Mutual through discovery, they discovered that it was in the form of a non-binding letter that had not been countersigned by Liberty Mutual or PMG and could therefore be unilaterally overridden by Stern at any time. [JDS-PMG_0000657]

122.    Through discovery, Plaintiffs have further determined that PMG LLC and various entities jointly owned by Stern, Maloney, JDS, PMG, and/or JDS LLC and PMG LLC were added to the Liberty Mutual policy as named insureds, and that PMG, Inc. is jointly named on the excess policies. [JDS_0078118, and documents attached thereto]

### *AmBase Satisfies Sponsor's Initial Series of Capital Calls*

123.    Evidently, bringing in AmBase's initial cash investment was not enough to satisfy the objectives of Defendants' fraudulent scheme. Over the next year and a half, Defendants issued repeated capital calls for overruns that exceeded the pre-development budget by more than 20%. Many of the costs that the capital calls were designed to cover were at best suspect, including payments on the insurance program discussed above.

124.    The first three such capital calls were as follows:

a.   On March 19, 2014, by notice sent via interstate wire and mail carrier from New York to Connecticut, Stern and Maloney, acting on behalf of Sponsor and Control, called for $1.8 million of additional capital to cover expenses attributable to their delayed acquisition of air rights for the Property. ("March 2014 Capital Call," attached hereto as **Exhibit D**.)

b.   On June 9, 2014, by notice sent via interstate wire and mail carrier from New York to Connecticut, Stern and Maloney, acting on behalf of Sponsor and Control, called for $9,276,653 of additional capital to cover expenses attributable to their failure to obtain construction financing within the one-year term of the Acquisition Loan, including interest and fees associated with extending the Acquisition Loan. ("June 2014 Capital Call," attached hereto as **Exhibit E**.)

c.   On July 14, 2014, by notice sent via interstate wire and mail carrier from New York to Connecticut, Stern and Maloney, acting on behalf of Sponsor and Control, called for $9,686,000 of additional capital to cover "hard and soft costs required to construct the project." These costs were excessive for the pre-development phase and are once again traceable to a delay in construction financing. ("July 2014 Capital Call," attached hereto as **Exhibit F**.)

125.    Whether the result of Stern and Maloney's insufficient net worth and liquidity, the result of the redesign necessitated by the landmarks review process, or the result of market conditions, the delay in obtaining financing and the resulting overruns would have been

"reasonably expected to have been anticipated and budgeted for by a developer acting in good faith and in a commercially reasonable and prudent manner in the planning and oversight of projects similar in size, type, and scope as the development of the Property." Joint Venture Agreement § 1.83. Cost Overruns attributable to the delay therefore constituted Manager Overruns for which Sponsor bore exclusive responsibility.

126.   Defendants Sponsor, Control, Stern, and Maloney nevertheless falsely represented in each capital call notice that the capital calls were for purposes permitted under Section 3.2(a) of the Joint Venture Agreement: namely, that they were made in accordance with the budget or on account of a Company Overrun rather than a Manager Overrun. The knowing transmission of capital call notices that sought to cover Manager Overruns by Stern, Maloney, JDS, and PMG constituted mail fraud under 18 U.S.C. § 1341.

127.   In each instance, in reliance on Defendants' representations that the capital calls were made in accordance with Section 3.2(a) of the Joint Venture Agreement, Investment and Manager Funding fully funded the capital calls in proportion to their percentage interests in the Project.

128.   At some point during this period, AmBase discovered Sponsor's error in calculating Manager Funding's percentage interest after Atlantic's entry into the project. In July 2014, Ferrara contacted Stern about the discrepancy. On July 21, 2014, Matt Phillips provided a revised ownership chart to John Ferrara over email and requested that AmBase contribute additional capital to reflect Manager Funding's correct share of the earlier capital calls. [JDS_0030231] AmBase did so.

### The October 2014 Capital Call and February 2015 Shortfall Contribution Call

129.   On October 21, 2014, by notice sent via interstate wire and mail carrier from New York to Connecticut, Stern and Maloney, acting on behalf of Sponsor and Control, made a fourth

call to members of the Company for an Additional Capital Contribution of $12,431,236.00 (the "October 2014 Capital Call," attached hereto as **Exhibit G**) purportedly to cover "hard and soft costs" of construction. Approximately $4.5 million of these purported costs related to insurance. These costs were excessive for the pre-development phase and are once again traceable to a delay in construction financing. As set forth above, the Cost Overruns reflected in the calls therefore constituted Manager Overruns, and Defendants' representation that the call was for a purpose permitted by Section 3.2(a) of the Joint Venture Agreement was false.

130.    Due to its concerns about Sponsor's management of the Joint Venture's budget, spending, and capital raising, as it was entitled to do under Section 3.2 of the Joint Venture Agreement, Investment elected not to contribute its full share of the October 2014 Capital Call.

131.    Atlantic also did not pay its full share of the October 2014 Capital Call.

132.    On February 24, 2015, by notice sent via interstate wire and mail carrier from New York to Connecticut, Stern and Maloney, acting on behalf of Sponsor, represented to Investment that Sponsor was entitled under the Joint Venture Agreement to fund a Shortfall Contribution to make up the shortfall caused by Investment's and Atlantic's failure to pay their full shares of the October 2014 Capital Call.

133.    Because the right to make a Shortfall Contribution belongs only to "Contributing Members"—defined in the Joint Venture Agreement as Members who tender their full Capital Contribution by the tender date—Stern and Maloney implicitly represented that Sponsor had tendered its full contribution by November 3, 2014, the tender date for the October 2014 Capital Call.

134.    In fact, however, Stern and Maloney were aware that Sponsor had not tendered its full share by the tender date. Sponsor therefore could not qualify as a Contributing Member

33

under the Joint Venture Agreement and did not have a right to make a Shortfall Contribution. In representing otherwise in notices sent via mail carrier from New York to Connecticut, Stern, Maloney, JDS, and PMG committed mail fraud under 18 U.S.C. § 1341. [JDS_0024066]

135.     In March 2015, Sponsor nevertheless purportedly funded the balance owed on Investment and Atlantic's shares as a Shortfall Contribution under the terms of the Joint Venture Agreement (the "February 2015 Shortfall Contribution"), using money from undisclosed Russian investors. [PMG00051005]

136.     Sponsor notified Investment that it was electing to treat the February 2015 Shortfall Contribution as dilutive capital, but because it was not a Contributing Member, it was not entitled to do so under the Joint Venture Agreement. [JDS_0024066]

137.     In violation of Section 9.1 of the Joint Venture Agreement, the Defendants relied on undisclosed financing from third parties that encumbered their direct or indirect interests in the Company to fund their portions of the October 2014 Capital Call and the February 2015 Shortfall Capital Call.

138.     In further violation of Section 9.1 of the Joint Venture Agreement, PMG LLC transferred some of its indirect interests in Sponsor and Partners to JDS LLC when JDS LLC paid a portion of PMG LLC's capital contribution. Investment did not authorize this transfer. Had JDS LLC not made up a portion of PMG LLC's capital contribution, Control would have had a shortfall, which Manager Funding would have been entitled to make up.

139.     This unapproved and invalid transfer was orchestrated for the purpose of depriving AmBase of its opportunity to obtain a portion of Sponsor's interest in the venture's profits. [JDS_0024711] It further injured AmBase by lessening Maloney's financial stake in the project—a financial stake on which AmBase repeatedly relied to align the parties' interests as

AmBase continued to permit Stern and Maloney to manage its multi-million-dollar investment in the project.

### The December 2014 Capital Call

140.    Less than six weeks after the October 2014 Capital Call, on December 4, 2014, by notice sent via interstate wire and mail carrier from New York to Connecticut, Stern and Maloney, acting on behalf of Sponsor and Control, made a fifth call to members of the Company for an Additional Capital Contribution of $17,099,802 (the "December 2014 Capital Call," attached as **Exhibit H**). One purported basis for the December 2014 Capital Call was once again to cover fees and interest payments associated with a second extension of the Company's acquisition loan, as well as development costs attributable to the delay in construction financing. This extension, in turn, was necessary because Sponsor had not yet secured a construction loan on behalf of the Company. As set forth above, these costs therefore constituted Manager Overruns, and Defendants' representation that the call was for a purpose permitted by Section 3.2(a) of the Joint Venture Agreement was false. Transmission of this capital call notice therefore constituted mail fraud under 18 U.S.C. § 1341.

141.    Additionally, approximately $2.5 million of these purported costs related to insurance.

142.    Because Investment remained concerned about Sponsor's performance as Manager of the Company and the resulting risk associated with the Joint Venture, Investment decided not to increase its investment in the Company and, as it was entitled to do under Section 3.2 of the Joint Venture Agreement, declined to pay its share of the December 2014 Capital Call.

143.    Atlantic also did not pay its entire share of the December 2014 Capital Call.

144.    Even one of PMG's own investors objected to making the capital call on the

ground that Stern and Maloney were not "conduct[ing themselves] consistently with a project of this size and complexity," and were failing to keep their business partners properly informed on strategy and planning. [PMG00008754]

145.    On December 29, 2014, by notice sent via interstate wire and mail carrier from New York to Connecticut, Stern and Maloney, acting on behalf of Sponsor, represented to Investment that it was entitled under the Joint Venture Agreement to fund a Shortfall Contribution to make up the shortfall caused by Investment's and Atlantic's failure to pay their full shares of the December 2014 Capital Call.

146.    As noted above, the right to make a Shortfall Contribution belongs only to "Contributing Members"—defined in the Joint Venture Agreement as Members who tender their full Capital Contribution by the tender date.

147.    In fact, however, Sponsor had not tendered its full share by the tender date. Sponsor therefore could not qualify as a Contributing Member under the Joint Venture Agreement and did not have a right to make a Shortfall Contribution.

148.    Sponsor nevertheless purportedly funded the amounts remaining on Investment's and Atlantic's Capital Contributions for the December 2014 Capital Call.

149.    In violation of Section 9.1 of the Joint Venture Agreement, the Defendants relied on undisclosed financing from third parties that encumbered their direct or indirect interests in the Company to fund their portions of the December 2014 Capital Call and the December 2014 Shortfall Capital Call.

150.    In further violation of Section 9.1 of the Joint Venture Agreement, PMG LLC transferred some of its indirect interests in Sponsor and Partners to JDS LLC when JDS LLC paid a portion of PMG LLC's capital contribution.  Investment did not authorize this transfer.

Had JDS LLC not made up a portion of PMG LLC's capital contribution, Control would have had a shortfall, which Manager Funding would have been entitled to make up.

151.    This unapproved and invalid transfer was orchestrated for the purpose of depriving AmBase of its opportunity to obtain a portion of Sponsor's interest in the venture's profits. [JDS_0024711] It further injured AmBase by lessening Maloney's financial stake in the project—a financial stake on which AmBase repeatedly relied to align the parties' interests as AmBase continued to permit Stern and Maloney to manage its multi-million-dollar investment in the project.

152.    On January 9, 2015, Sponsor delivered to Investment a letter[3] stating that Sponsor was electing to treat the December 2014 Shortfall Contribution as dilutive capital.

153.    Because it was not a Contributing Member, it was not entitled to do so under the Joint Venture Agreement.

154.    Thereafter, Sponsor contended that, as a result of both the December 2014 Shortfall Contribution and the February 2015 Shortfall Contribution, Investment's Interest Percentage in the Joint Venture decreased from its original 59% to 44%.

155.    AmBase did not learn of the source of the additional ownership interest adjustments that resulted from the two Shortfall Capital calls—namely, between JDS LLC and PMG LLC—until many months later.

---

[3] Although this letter reflects a date of January 2, 2015, it was sent from Sponsor's address in New York, New York to Investment's address in Greenwich, Connecticut by "DirectRush" service from Dutch Express LLC on January 9, 2015, at least nine days after the December Shortfall Contribution was funded.

Case 1:18-cv-05482-AT    Document 1-1    Filed 06/18/18    Page 41 of 238

*April 2015 Capital Call*

156.     Despite representing during the fall of 2014 that construction financing would close by March 2015, Stern and Maloney had yet to secure the Construction Loan by April. On April 13, 2015, they called for an additional contribution of $13,256,235.90, once again purportedly to cover hard and soft costs of construction until construction financing could be secured ("April 2015 Capital Call," attached as **Exhibit I**). Approximately $2.8 million of these purported costs related to insurance.

157.     After millions of dollars of capital calls over and above AmBase's initial $57 million investment, AmBase was no longer in a financial position to fund this capital call, nor did AmBase want such a concentration of risk. Also, under the Joint Venture Agreement, AmBase did not have an obligation to fund capital calls. AmBase, however, feared that Sponsor would attempt to further dilute Investment's interest in the Joint Venture if it declined to fund the capital call.

158.     Sponsor represented that the capital it had requested was urgently needed to cover expenses until construction financing had been secured. Sponsor represented that Investment would face further punitive dilution if it failed to contribute its share.

159.     For example, in an April 27, 2015, email, Stern informed Bianco that Sponsor could not "push back the cap call" because "we have bills to pay."

160.     Based on these representations, AmBase borrowed from Bianco to fund the capital call.

161.     AmBase later discovered that Sponsor's representations concerning the urgency of the Company's need for the money were false.

162.     In June 2015, AmBase learned that Atlantic did not contribute any capital in connection with the April 2015 Capital Call. AmBase was not informed of this fact at the time and was therefore deprived of its contractual right to make up the shortfall amount. *See* Joint Venture Agreement § 3.3(a). Moreover, Sponsor's failure to call for shortfall contributions to cover the $2,472,640.36 shortfall demonstrates that its representations concerning the Joint Venture's urgent need for the amount of cash demanded in the April 2015 Capital Call were false.

163.     Sponsor further represented that it had paid its entire share of the April 2015 Capital Call.

164.     On June 25, 2015, Bianco confronted Stern about Atlantic's failure to contribute its share and demanded that the members' percentage interests in the Company be adjusted accordingly. By an email on the same date, Stern confirmed that the percentages would be adjusted accordingly. [JDS_0090354]

165.     Bianco followed up in late June or early July to learn about adjustments to the percentage interests, and on July 9, 2015, Phillips responded as follows: "There is a mechanism in the JV to deal with this scenario, the new percentages are below." He then proceeded to represent that Atlantic's ownership interest had been reduced to 17.48%, and AmBase's had been increased to 44.08%. [JDS_0023075]

166.     Meanwhile, unbeknownst to AmBase, Stern and Heitner had extended a secret deal to Becker in connection with the closing of the Construction Loan: if the Construction Loan included any cash that could be distributed to the Members of the Company as a return of equity, then a portion of Atlantic's distribution would be withheld to cover its April shortfall, and Becker's percentage interest in the Company *would not be reduced*. [BECK0004797]

167.    Becker declined this offer on June 24, 2015, [BECK0004797], but Sponsor did not cause the Company or its subsidiaries to dilute Atlantic's interests in the organizational chart it certified to the lenders at the loan closing on June 30.

168.    AmBase was never informed of the offer extended to Atlantic, nor was it offered similar terms with respect to the April 2015 Capital Call. [BECK0004797]

169.    Throughout the ensuing months, representatives of Sponsor repeatedly represented to AmBase that the percentage interests had been changed.

170.    Sponsor eventually was able to secure $25,702,319.70 million in excess proceeds from the Construction Loan, which the lenders authorized it to distribute to the Company's members as a return of equity ("July 2015 Distribution").

171.    Due to ongoing disputes about the propriety of the punitive dilution based on the October and December 2014 Capital Calls, Sponsor held back $2 million of that amount in escrow. It distributed the remaining $23,681,572.21 in July 2015.

172.    In trying to understand the percentage interests that had been used to calculate each Member's share of the July 2015 Distribution, and to reconcile the Company's financial statements concerning the April 2015 Capital Call, AmBase discovered a $979,434.59 discrepancy.

173.    On August 7, 2015, Ferrara emailed Phillips about this discrepancy.

174.    On August 12, 2015, Phillips sent Ferrara an email once again representing that Atlantic had been diluted based on its failure to contribute in April. However, unlike in past instances when AmBase had declined to fund capital calls, Atlantic was not punitively diluted. The table also revealed that, at the time of the July 2015 Distribution, Control owed the Company $979,434.59, which was held back from its share of the July 2015 distribution.

175.    AmBase would later determine that Control's debt was due to Maloney's undisclosed failure to contribute his full share of the April 2015 Capital Call. As with Atlantic's failure to meet the capital call, Maloney's shortfall was not disclosed to AmBase, nor was AmBase offered the deferred contribution opportunity extended to Atlantic and Maloney. Instead, as set forth above, Stern falsely informed AmBase that the funding was urgently needed and that its failure timely to contribute would result in a further punitive dilution.

176.    Control's indirect ownership of the Company was not adjusted based on the shortfall. AmBase still does not know whether Atlantic's percentage interest has been adjusted, as that information is in Sponsor's exclusive control, and it has made contradictory statements.

177.    Upon information and belief, many of the development expenses reflected in the 2014 and April 2015 Capital Calls were fabricated for the purpose of either forcing AmBase to put more money into the Project or to incur a punitive dilution, so that Stern and Maloney could reap an early profit out of proportion with their actual cash contributions in the form of a "return of equity" immediately upon closing the Construction Loan, and before they had actually developed the Property.

178.    Transmission of each of these capital calls via interstate mail carrier therefore constituted mail fraud under 18 U.S.C. § 1341.

179.    This scheme would not only cause immediate injury to AmBase but would also have drastic consequences for its investment in the Project, which, as later events would reveal, could ill-afford the $25.7 million Stern and Maloney removed from its coffers in July 2015.

180.    Due to Defendants' persistent refusal to provide AmBase information to which it is entitled under the various joint venture agreements and Delaware law, the full impact of the various capital calls on Project ownership interests remains unknown to AmBase.

181.    During a meeting with Maloney, Stern, and the principal of non-party Atlantic in or about September 2015, AmBase finally learned that the funds used to pay Sponsor's Additional Capital Contributions, the December 2014 Shortfall Contribution, and/or the February 2015 Shortfall Contribution, and possibly even its Initial Capital Contribution, were obtained from undisclosed third parties.

182.    By letter dated September 25, 2015, Investment requested, pursuant to Sections 2.8(a) and 9.1(b)(i) of the Joint Venture Agreement, that Sponsor provide information concerning, among other things, "reports that the funding of Sponsor's and/or its beneficial owners' capital calls was provided by foreign sources, including the identity of such sources and copies of all relevant documentation concerning any such funding." A copy of the September 25, 2015 letter is annexed hereto as **Exhibit J**.

183.    Investment also requested that Sponsor provide information about the change in Control's ownership percentages as between Stern and Maloney.

184.    In an October 2015 letter, Stern and Maloney conceded that one of its indirect members, Control, had contributed its share of the December 2014 and February 2015 Shortfall Contributions with the use of funds from third parties. Defendants refused to disclose the identity of those parties or to provide additional information about the change of Control's ownership percentages. Stern and Maloney wrongly contended that Investment was not entitled to such information.

185.    At least some of the funding for Control's February contribution and possibly others came from "Russian debt," which Defendants sought to obscure by labeling it as "JDS loan repayment" on financial models. [JDS_0023136, PMG00051005]

186.    In addition, the letter acknowledged that "one of the principals of PMG"

42

(separately identified as Maloney) "did not contribute his full portion" of Sponsor's February 2015 Shortfall Contribution. Instead, JDS LLC "elected to cover that principal's shortfall."

187.    Stern and Maloney conceded that this shortfall contribution "chang[ed] the ownership percentages of PMG [LLC] and JDS [LLC]" in Control.

188.    Sponsor's refusal to disclose further information breached Sections 2.8, 4.2, and 9.1 of the Joint Venture Agreement, all of which entitled Investment to information about changes in direct and indirect investors in Sponsor's holdings, as well as encumbrances upon those holdings.

189.    Control's failure to notify Manager Funding of the change of its members' ownership percentages and failure to obtain Manager Funding's approval for such a transfer of interest similarly constitutes a breach of Section 9.1 of the Manager LLC Agreement.

### The Joint Venture Obtains a $725 Million Construction Loan

190.    In June 2015, the Joint Venture obtained a $725 million Construction Loan, meant to finance the completion of the Project.

191.    As relevant, the Construction Loan took the following form:

  a.    A $400 million mortgage loan (the "Mortgage Loan") issued by American General Life Insurance Company, the Variable Annuity Life Insurance Company, the United States Life Insurance Company in the City of New York, AIG Property Casualty Company, National Union Fire Insurance Company of Pittsburgh, PA, (collectively, "AIG" or "Mortgage Lender") to 111 West 57th Property Owner LLC ("Mortgage Borrower"), the owner of the Property and a wholly owned subsidiary of 111 West 57th Holdings, LLC.  This non-recourse loan was secured by, *inter alia*, Mortgage Borrower's primary asset, its interests in the Property.

  b.    A $325 million mezzanine loan (the "Original Mezzanine Loan") issued by ACREFI Mortgage Lending, LLC and Apollo Credit Opportunity Fund III AIG I LP (together with AGRE Debt I – 111 W 57, LLC, "Apollo," or "Senior Mezzanine Lender") to 111 West 57th Holdings, LLC ("Original Mezzanine Borrower" or "Senior Mezzanine Borrower"), the owner and manager of Mortgage Borrower and a wholly owned subsidiary of 111 West 57th Mezz 1

43

LLC, which in turn is owned by the Company.[4] This non-recourse loan was secured by, *inter alia*, Original Mezzanine Borrower's primary asset, its equity interest in the Mortgage Borrower.

    c.    As alleged in greater detail below, the Original Mezzanine Loan has since been split into a Senior Mezzanine Loan with an original principal amount of $300,000,000.00 ("Senior Mezzanine Loan") and a junior mezzanine loan in the principal amount of $25,000,000.00 ("Junior Mezzanine Loan").

192.    In connection with the Construction Loan, Sponsor, Stern, and Maloney made various representations, warranties, or covenants on their own behalf or on behalf of the Company or the respective subsidiary borrowers. AmBase and Investment relied on these representations, warranties, and covenants in approving the Construction Loan and any other Major Decisions contemplated thereby. Each of the lenders also relied on these representations, warranties and covenants in entering into the Construction Loans.

193.    Sponsor, Stern, and Maloney either knew these representations, warranties, and covenants to be false at the time they were given or knew that they could not be honored. These representations were made over the interstate wires the form of executed contracts and other communications to the lenders that traveled interstate. These communications therefore constituted wire fraud.

194.    First, Sponsor, Stern, and Maloney made or caused the Joint Venture entities to make, the following covenants concerning Stern's and Maloney's net worth and liquidity:

    a.    In the Joint Venture Agreement, Sponsor, Stern, and Maloney, covenanted that each would comply with any applicable financial net worth and liquidity covenants under the Construction Loan. Joint Venture Agreement § 2.11(c).

    b.    In the Construction Loan agreements, Sponsor caused each borrower to covenant that the borrower would cause Stern and Maloney, as guarantors for the respective loans,

---

[4] On December 1, 2015, one of the promissory notes evidencing this loan, Promissory Note A-2 (Mezzanine Loan), in the principal amount of $200,000,000.00 was assigned to AGRE Debt I – 111 W 57, LLC.

to maintain adequate net worth and liquidity. *See, e.g.*, Mezzanine Construction Loan Agreement, dated as of June 30, 2015, § 5.1.31.

c. Finally, in the guaranties themselves, Stern and Maloney covenanted to maintain minimum levels of net worth and liquidity. *See, e.g.*, Mortgage Guaranty Agreement (Non-Recourse Carveout) § 12.

195.    In fact, at least Maloney was aware that he was unable to maintain minimum levels of net worth and liquidity due to excessive financial commitments on other projects.

196.    Second, Sponsor caused each borrower to represent and warrant that the organizational chart attached to each loan agreement was "a true, complete and correct organizational chart of Borrower, Mortgage Borrower and the entities and individuals that own, directly or indirectly, any interest in Borrower." *See, e.g.*, Mezzanine Construction Loan Agreement § 4.1.2(iv) ("Loan Organizational Chart," attached as Exhibit B).

197.    In fact, however, the organizational chart included at least the following inaccuracies, known to Sponsor at the time:[5]

a. It did not reflect the adjustment to Control's direct and indirect ownership interests in Sponsor necessitated by Atlantic's entry into the Joint Venture, to which the parties agreed during the summer of 2014 when, in reliance on Stern's and Maloney's representations that it was adjusting the percentage interests, Manager Funding contributed additional capital to the Joint Venture.

b. It reflected the wrongful punitive dilution to Investment's percentage interest in connection with the Shortfall Contributions on the October and December 2014 Loans.

c. It did not reflect an adjustment to the members' percentage interests in the Company based on Atlantic's failure to contribute its share of the April 2015 Capital Call, despite JDS's contemporaneous representations that the members' percentage interests had been adjusted accordingly.

d. It did not reflect an adjustment to the members' indirect percentage interests in Sponsor based on Maloney's (and therefore Control's) failure to contribute his share of the April 2015 Capital Call.

---

[5] In approving the Construction Loan and any other Major Decisions contemplated thereby, Investment reserved its rights with respect to this ownership chart.

198.    Third, Sponsor—at the direction of Stern and Maloney—caused each borrower to represent and warrant that contracts listed on Schedules 4.1.3(xiii) of the respective loan agreements were "valid, binding and enforceable upon Mortgage Borrower, Construction Manager and/or any the [sic] applicable Major Contractor and each other party thereto in accordance with their respective terms," and "provide[d] for not less than seventy-four percent (74%) of the aggregate cost of the Construction" ("74% Covenant"). *See, e.g.*, Mezzanine Construction Loan Agreement § 4.1.3(xiii).  In reliance on these representations, the lenders approved the relevant contracts.

199.    In fact, as set forth in greater detail below, certain contracts contained in Schedule 4.1.3(xiii) were "fictional," and/or had not been reviewed or approved by PMG. [PMG00070433]  In addition, in part because they did not cover all of the work required for the listed line item, Stern, Phillips, Maloney, and White, were aware that the contracts provided for less than 74% of the aggregate cost of the Construction. [PMG00059126]

200.    Finally, Sponsor—at the direction of Stern and Maloney and with Phillips' and White's knowledge and assistance—caused each borrower to represent and warrant that the budget attached to each loan agreement, as adjusted at Closing, was "a true, correct and complete copy of the Construction Budget." *See, e.g.*, Mezzanine Construction Loan Agreement § 4.1.3(xv).[6] This representation and warranty was repeated with respect to each advance request Defendants made under the loans between June 2015 and at least August 2017. *See, e.g.*, Mezzanine Construction Loan Agreement § 2.1.2.A(ii). In connection with each of the monthly advances, Sponsor further caused the relevant borrower to represent, with respect to "direct

---

[6] The "Construction Budget" is defined as "the budget for the Construction Costs . . . to be incurred in connection with the Construction of the Project, certified by Borrower and reasonably approved by Lender . . . ." Building Loan Agreement § 1.1, at 9.

costs," "that the Construction Costs incurred to date are consistent with the Construction Budget

and that, to Borrower's knowledge, no matter has been identified as indicating that the Project

will in the future not be proceeding in accordance with the Plans and Specifications, the

Construction Schedule or the Construction Budget," Mezzanine Construction Loan Agreement

§ 2.1.2.C(v)(a).

201.    In fact, as set forth further below, Stern, Maloney, and White were aware prior to

closing that the budget approved in connection with the loans vastly understated the costs to be

incurred in connection with the construction of the project.  [PMG00013271]

202.    Defendants used the interstate wires to consummate the fraud on the Construction

Loan lenders. For example, on June 26, 2015, counsel for Defendants exchanged emails with

representatives of the lenders in Colorado and Arizona concerning the terms of the Mezzanine

Loan. [PMG00054255] Counsel for Defendants also transmitted executed copies of loan

documents to representatives of the lenders in Colorado and Arizona on June 29, 2015.

[PMG00054549] Each such use of the interstate wires in furtherance of Defendants' fraud

violated the federal wire fraud statute.

203.    Furthermore, Defendants negotiated the Construction Loan in a manner that

prioritized their short-term need for cash over the long-term interests of Plaintiffs and the

Company.

204.    In July 2015—almost immediately after obtaining hundreds of millions of dollars

from the Construction Loan and tens of millions in additional Capital Contributions—the

Company, at Sponsor's direction, distributed $26.7 million to members. The July Distribution

was purportedly made possible due to the overfunding of the Construction Loan.

205.    Yet when the Company made this distribution, Defendants knew of impending

47

and already incurred budget overruns that have since come to fruition.

206.    In fact, at the time Defendants made the distribution, Liberty Mutual was

threatening to cancel the insurance policy covering the project due to late payments.

[JDS_0081843, JDS_0081939]

207.    In connection with that distribution, AmBase received approximately $11.9

million, which payment was based on Sponsor's calculation that Investment's Interest

Percentage had been diluted from 59% to 44%.

208.    Had the payment been based on AmBase's aggregate 60.3% Interest Percentage,

it would have included an additional distribution of approximately $4 million. Instead, those

additional amounts were improperly distributed to the other members of the Joint Venture and

their members.

### Development Phase: The Project Encounters Massive Budget Overruns That Either Were or Should Have Been Foreseen By Sponsor

209.    At the same time that it approved the Construction Loan, Investment approved a

Budget of $855,000,000.00 ("June 2015 Budget"), which had also been submitted to and

approved by the Lenders (in relevant part) upon closing. This budget purportedly encompassed

all expenses required to complete the project, including expenses not directly related to the

construction of the building, such as financing costs. But the budget contained numerous

misrepresentations and inaccuracies. Stern, Maloney, JDS, and PMG caused a draft of the budget

to be transmitted to Plaintiffs via the interstate wires through Plaintiffs' counsel in late June 2015

from New York to Connecticut, thus once more committing wire fraud.

210.    From the start, the Joint Venture faced budget overruns on a massive scale.

211.    The Project has likewise fallen significantly behind schedule.

212.     As set forth in greater detail below, Defendants attempted to conceal this mismanagement from Plaintiffs and the lenders by, *inter alia*, failing to produce updated budgets as required by the Joint Venture Agreement, by denying repeated requests for information and reports pursuant to Delaware law and the Joint Venture Agreement, by failing to account for the source of cost overruns once Plaintiffs discovered them, by presenting costs in a way that obscured impending overruns.

### *JDS Signs Key Construction Contracts without PMG's Approval and Uses "Fictional" Contracts to Defraud the Construction Loan Lenders*

213.     For over a year before the Construction Loan closed, Stern and Maloney had purportedly been engaging in a competitive bidding process to award contracts to various trades to construct the building.

214.     During this period, Maloney and PMG failed to participate in or were excluded from the process of awarding contracts for certain key trades, while Stern and JDS awarded contracts without the requisite economizing or competitive bidding.

215.     Stern and JDS sought to exclude Maloney and PMG from the contracting process so that they would have the latitude to negotiate deals with subcontractors on other JDS projects.

216.     For example, JDS repeatedly failed to provide PMG with a copy of the prevailing concrete superstructure proposal or to give additional contractors an opportunity to bid. In an April 2015 email sent by PMG employee Sal Sciortino to officers employees of JDS, Sciortino warned that "PMG will . . . not approve any contractor for award until PMG believes the trade has been adequately de-scoped and alternate bids reviewed." [BECK0006836] Yet JDS continued to refuse to provide the requested proposals for at least another month and a half. [PMG00013271]

49

217.    PMG's lack of access to basic information about the status of negotiations over key construction contracts was a major point of contention between PMG and JDS during the first half of 2015, but JDS was at last forced to provide PMG with some such information in connection with negotiations over the Construction Loan in late June 2015. The lenders required that the borrower produce copies of key construction contracts, and in preparing to satisfy that requirement JDS sent PMG documents that purported to be construction contracts on June 23, 2015—the day before the Construction Loan was originally scheduled to close. [PMG00054222]

218.    An attorney for PMG would subsequently write to JDS's lawyers that it was only at that point that PMG learned that JDS had "entered into over a dozen 'Construction Contracts'"—some of which had to be shared with the lenders under the terms of the Construction Loan—"totaling over ▮▮▮▮▮▮▮▮▮▮▮ ($▮▮▮▮▮) dollars, without obtaining PMG's written consent or knowledge." In view of JDS's repeated efforts to exclude PMG from managing the project and "incomplete and misleading information" provided by JDS to PMG, PMG LLC informed JDS LLC that it would not agree to the Construction Loan unless JDS LLC agreed to share with PMG LLC joint responsibility for the project's accounting functions. [PMG00054222]

219.    Despite having been excluded from the contracting process, by the time of the closing of the Construction loan, Maloney, White, and PMG were aware that Stern and JDS had pushed the contracts through in an effort to satisfy the lender's requirements and that the contracts did not in fact satisfy those requirements. [PMG00013271]

220.    After the closing of the Construction Loan, PMG employees undertook an investigation of the construction contracts that had been presented to the Construction Loan lenders. Through this investigation, Maloney would later explain in a January 26, 2016 email to

Becker, PMG **"learned that [JDS] made deals with subs with fictional contracts in order to induce the Banks to close and we are now something more tha[n] $██████ over budget and months late, that he was blaming on the union issue that does not exist."** In other words, through a fraud perpetrated by Stern and JDS, by way of the joint venture entities, the Construction Loan lenders had been presented with "fictional" construction contracts that "induced" them to make the $725 million loan based on material misrepresentations about the project's status. [PMG00070433]

221.    Rather than alerting the lenders and Plaintiffs to this fraud when he discovered it, however, Maloney continued to sign monthly requisitions to the lenders certifying that "the Construction Costs incurred to date are consistent with the Construction Budget." These false monthly certifications were uploaded from New York to a file sharing system and accessed by the lenders from various states, including by Denise Harris in Pennsylvania. In addition, many of the fraudulent requisitions were signed by Maloney in Florida and electronically transferred to PMG and JDS officials in New York. Among others, Maloney approved, signed and electronically transmitted fraudulent requisitions from Florida on September 4, 2015, October 26, 2015, November 20, 2015, February 20, 2016, and March 4, 2016. White also signed a fraudulent requisition on June 16, 2016, that was subsequently transmitted via the interstate wires to the lenders. Each of these transmissions constituted a separate act of wire fraud.

222.    In continuing to provide monthly funding to the Joint Venture under the Construction Loan, the lenders relied on the fraudulent monthly certifications and other false or misleading information in the monthly requisitions described in greater detail below.

223.    The requisitions were also sent to Sterling Project Development ("Sterling"), Plaintiffs' construction consultant, to fulfill Defendants' obligation under Section 4.2(a)(3)(x) of

the Joint Venture Agreement to provide Plaintiffs with a monthly log "showing how the contingency and any reallocated cost savings in [the] Budget have been used and reallocated during the prior month." Plaintiffs relied on this information after it was sent to Sterling by not seeking to sooner exercise their contractual right to remove Sponsor as the project's manager or to call for funding of manager overruns.

224.    Fraudulent conduct by both JDS and PMG is laid bare by an August 2015 email exchange between Stern and Maloney. Stern begins this exchange by telling Maloney: "You have done the exact opposite of whats in the best interest of the partnership from the onset and have not been personally involved in any meaningful way to even form a reasonable opinion on what is. . . . If you would attend a meeting, respond to email, or pick up or return a phone call on a reasonably consistent basis then perhaps we could resolve these issues." Maloney responded by complaining that Stern had "entered into [a] contract with out my consent or approval and then hid it from me and my company." Stern then countered that Maloney "deliberately failed to sign contracts and engage on the project for over a year and [JDS is] the only party that has fulfilled our obligation to the partnership." Stern also alleged that Maloney "paid [him]self and [his] affiliates large sums of money" and had not "provided any backup" for these payments. "If you have clean hands and nothing to hide," Stern continued, "you would instruct your staff to turn over books and records that you are required to provide. . . . Other investors in the deal have expressed similar concerns to us about your poor record keeping and self dealing." In another email in the same chain, Stern stated: "You have concealed records to frustrate our ability to complete an audit. Much of your staff is incompetent – particularly Ned White – and you have them tasked with obstructing the project rather than assisting with it. . . . We already have some

documents which show monies being inappropriately paid to your firm despite incomplete and inadequate information." [PMG00059799]

### Defendants Induce Plaintiffs and the Construction Loan Lenders to Rely on the Fraudulent June 2015 Budget

225. Defendants were aware at least as early as June 2015 that the Budget they would submit for Investment's and the lenders' approval, and on which Investment and the lenders relied in approving or entering into the Construction Loan, fell millions of dollars short of the actual costs needed to complete construction. [PMG00016532]

226. As early as the week after closing, Defendants were trading internal financial models with scenarios in which there were $███–$████████ of overruns. [PMG00055947]

227. Many of Defendants' external representations concerning the budget were categorically false.

228. For example, Defendants budgeted $15.4 million for the building's HVAC system. In fact, Stern, Maloney, and others at JDS and PMG were aware *before* they completed the June 2015 Budget that this amount was millions of dollars less than the costs of constructing an HVAC system for the type of building contemplated by the Joint Venture.

229. Representatives of JDS would later explain to Sterling after awarding a *$████████* contract for HVAC [JDS-PMG_0005713], that the overrun was attributable "to the 4-pipe HVAC system costing more than expected due to the building's height, 15' typical floor-to-slab heights and heavy demand loads for heating and cooling large spans of curtainwall glass." Although these features of the building may well explain the high cost of HVAC, JDS's representation that these expenses were unanticipated at the time Defendants created the June 2015 Budget were false and, upon information and belief, intended to induce AmBase to approve a forthcoming, much higher budget and to shield Sponsor from liability for Manager Overruns.

53

230.    As early as 2014, JDS had projected that HVAC would cost $▇▇▇▇ and had relied on that number for the purpose of calculating the Project's insurance coverage. [JDS_0023946]

231.    JDS and PMG had reason to believe that even this prediction was low. Before they completed the June 2015 Budget, Defendants had already received a $▇▇▇▇ bid from the leading contender for HVAC, which was itself a reduction from a higher preliminary bid. [PMG00016673, PMG00013271] Indeed, when a contractor would ultimately submit a bid for $▇▇▇▇ six months after the budget was approved, PMG would conclude that the bid must be faulty, if not fraudulent. [PMG00068622]

232.    For this reason, as JDS was developing the budget Sponsor would submit for Investment's and the lender's approval, JDS principal Simon Koster warned Defendants Stern and Phillips that HVAC would be a "big early bust." Stern agreed to add one million dollars but insisted that "we have no more money to move." [JDS_0079426]

233.    PMG, Maloney, and White were sufficiently confident that HVAC could not be brought within range of the budget figure that, on July 1, 2015—one day after the Construction Loan closed—they were prepared to award the contract to a contractor that had bid $▇▇▇▇ ▇▇▇▇, over twice the amount Defendants budgeted for this line item in a budget that was finalized with the lenders one day before. [PMG00013271, PMG00054204]

234.    As another example, Defendants represented in the June 2015 Budget that they believed electrical work would cost $12.35 million.

235.    By the time the Construction Loan closed, they had already awarded an electrical work contract for $▇▇▇▇. This means that Defendants budgeted only $▇▇▇▇ for change

54

orders on this contract and for electrical work outside the scope of this contract. [JDS-PMG_0005896]

236.    Defendants knew at the time that they finalized the June 2015 Budget that the contract they had awarded excluded low-voltage work from its scope, and that low-voltage work would cost millions of dollars more. Defendants misrepresented to the lenders that the contracts for this line item had been completely (or almost completely) awarded, when in fact work worth millions of dollars had yet to be awarded. In doing so, they also misrepresented to Plaintiffs that electrical work would cost less than $███████, when they knew this was not the case. [PMG00059126]

237.    As yet another example, Defendants represented in the June 2015 Budget that plumbing would cost $9.6 million.

238.    By the time the Construction Loan closed, they had already awarded a plumbing contract for $███████. This means that Defendants budgeted only $█████ for change orders on this contract and for plumbing work outside the scope of this contract. [JDS-PMG_0005558]

239.    Defendants knew at the time that they finalized the June 2015 Budget that the contract they had awarded excluded plumbing fixtures from its scope, and that fixtures would cost millions of dollars more. Defendants misrepresented to the lenders that this line item was completely (or almost completely) bid out, when in fact work worth millions of dollars had yet to be awarded. In doing so, they also misrepresented to Plaintiffs that plumbing work would cost less than $███████, when they knew this was not the case. [PMG00013271]

240.    As yet another example, Defendants represented in the June 2015 Budget that structural metal framing would cost $7 million, down from $9 million in the previously approved budget.

241. By the time the Construction Loan closed, they had already awarded a structural metal framing contract for $█████. This means that Defendants budgeted only $█████ for change orders on this contract and for structural metal framing work outside the scope of this contract. [JDS-PMG_0000869]

242. Defendants knew at the time they finalized the June 2015 Budget that the contract they had awarded covered only structural metal framing for the restored Steinway Building, not for the 1,400-foot tower that would rise from it. When Defendants were later preparing to award a $5 million contract for the tower top, Stern represented that $5 million was a "great price" and that there was uncertainty about the tower top in June 2015 because the structural metal framing had to be coordinated with the façade. Yet despite this uncertainty and their expectations that the tower top would cost even more than $5 million, Defendants represented in the June 2015 Budget that structural metal framing would cost only $█████ more than the amount already awarded.

243. As yet another example, Defendants budgeted $63.9 million for the exterior façade.

244. By the time the Construction Loan closed, they had already awarded two contracts for the façade: one for $█████ to fabricate and install the tower façade, and another for $█████ to restore the façade of the Steinway building. This means that Defendants not only failed to budget for change orders on these contracts and for work outside the scope of these contracts, but they actually underbudgeted by $█████ as compared to the total value of contracts already awarded. [JDS-PMG_0004495, JDS-PMG_0004093]

245. Defendants have offered no explanation for this false statement in the June 2015 budget, but their explanations of the millions of dollars in overruns they have since projected for

56

this line item reveal just how grossly inaccurate the statement was. First, Stern explained the hundreds of thousands of dollars of change orders on the façade restoration contract by claiming that the scope of restoration work is notoriously difficult to predict. Second, Defendants have defended the tower façade overruns on the ground that the contract was awarded long before the building design was complete. In the face of this alleged uncertainty, it makes no sense for Defendants not to provide any cushion for overruns of the contract prices unless they were understating anticipated costs to obtain the necessary approvals to close the Construction Loan.

246.    Defendants have also had to award at least one additional contract for nearly $█ █████ under this line item. [JDS-PMG0004225]

247.    As a final example, the line item that reflects the most egregious inaccuracy and pattern of fraudulent statements from Defendants is the concrete/superstructure line item.

248.    In the June 2015 Budget, Defendants budgeted $40 million for this line item.

249.    By the time the Construction Loan closed, they had already awarded a contract for concrete work under this line item for $█████████. This means that Defendants budgeted only $██████ for change orders on this contract and for concrete/superstructure work outside the scope of this contract. [JDS-PMG_0002929]

250.    In addition to concrete work, included under this line item are the following two costs: the construction crane, and the PERI Cocoon system (a critical safety device to prevent accidents while floor slabs are being poured). [PMG00115530] Defendants were aware at the time that they developed the June 2015 Budget that the costs of these two items would far exceed $██████.

251.    Defendants claim that they simply failed to budget for the PERI Cocoon system, despite the fact that, by their own account, it is a long-term cost-saver as it reduces stop work

57

orders and liability resulting from construction site accidents. And internal communications show that they had not priced out the cocoon system until Plaintiffs began inquiring about the concrete line item in early 2016. [JDS_0074131]

252.    But contrary to their representations, Defendants intended to use a cocoon system all along and knowingly excluded it from cost projections when they developed the budget. Indeed, when it was shopping for insurance policies over a year earlier, in 2014, JDS represented to insurers that "building netting (cocoon system) on all sides of the buildings will be utilized at most projects." [JDS_0091002]

253.    And there is no doubt that Defendants were aware of crane costs when they developed the June 2015 Budget. By then, Defendants had already spent $██████ on deposits to reserve the crane [JDS_0086637] and were close to finalizing a crane contract for nearly $███ ██████.[7] [JDS-PMG_0003218]

254.    Due to the scale of the overrun, the crane was an early focus of Plaintiffs' inquiries into spiraling construction costs and was the subject of multiple false statements by Defendants intended to induce Plaintiffs to approve various versions of the budget.

255.    Plaintiffs became aware of a $9.2 million overrun on the concrete/superstructure line item in November 2015.

256.    AmBase CFO Ferrara asked Investment's construction consultant, Sterling Project Development, to look into this line item further, and representatives of Sterling relayed by email the following contradictory responses from representatives of JDS.

    a.    At some point, representatives of Sterling were informed that the construction crane was initially carried in a different line item and subsequently reallocated to

---

[7] Although Plaintiffs believe that the costs for this line item are artificially inflated, their construction consultant has informed them that a developer would reasonably expect to pay at least $5 million for a crane.

the concrete line item, so they asked JDS to identify cost-savings elsewhere in the budget.

b.  Then, in a February 16, 2016, email to Sterling, Stern claimed that the $██ ██████ overrun on the concrete line item was attributable not to the crane but to additional concrete and reinforcement required in the building's design as a result of wind tunnel tests.[JDS_0089625] At the time, Sterling was led to believe that the crane had always been carried in the concrete line item.

c.  At a March 16, 2016, in-person meeting, Stern and/or another representative of JDS claimed that the crane was initially carried in the General Conditions line item.[8]

d.  After repeated requests for back-up, in early April 2016, Sterling reached the conclusion that crane costs were omitted from the June 2015 Budget altogether, either deliberately or accidentally. On April 18, 2016, Sterling expressed this view in a letter to Stern and JDS Development, stating as follows: "We have been told that the main reason for the variance is due to the furnishing, installation and operation of the tower crane, which was apparently omitted from the original project budget and any subsequent updates. We are requesting your written explanation as to whether this very significant and predictable item was contemplated in the original project budget and if not, why was it not?"

e.  On April 20, 2016, Stern responded with a letter sent via interstate wire stating, evasively, that "[t]he superstructure/concrete line item was included in the original budget." He denied that the variance in that line item was "due to the furnishing installation and operation of the tower crane" and once again attributed the overruns to the structural changes in the building. His explanation, however, made it clear that Sponsor was including crane costs under the concrete/superstructure line item. Thus, even if there was also a $9.2 million overrun attributable to the structural changes, it was also the case that there was a greater than $9 million overrun attributable to the crane contract that had by that point been awarded, and Stern's denial was false.

257.    At a February 8, 2017, meeting between the Joint Venture principals in which Stern and Maloney sought to convince Investment to approve a new, higher budget, Stern once again asserted that Defendants budgeted for the crane under the concrete/superstructure line item. Maloney was present and contributing to the conversation but did not contradict him.

---

[8] This explanation was implausible because there was no corresponding downward adjustment of the General Conditions line item when the crane was shifted to the concrete line item. And in fact, early project requisitions reveal that Defendants were including crane-related costs under the concrete line item under earlier versions of the budget.

Although Stern, Maloney, and Bianco attended this meeting in person, various participants joined by telephone, and the meeting was organized by an exchange of letters over interstate wires, thus violating the federal wire fraud statute. *See* 18 U.S.C. § 1343.

258.   As set forth further below, each of the above line items—and many more besides—in fact resulted in millions of dollars of overruns.

259.   At a minimum, each of these overruns was "reasonably expected to have been anticipated and budgeted for by a developer acting in good faith and in a commercially reasonable and prudent manner in the planning and oversight of projects similar in size, type, and scope as the development of the Property . . . ," and therefore constitutes a Manger Overrun for which Sponsor was solely responsible. *See* Joint Venture Agreement §§ 1.83, 3.2(e).

260.   In fact, Defendants had actual knowledge of these overruns at the time they proposed the June 2015 Budget to the lenders and Investment for their approval, but did not disclose them and affirmatively misrepresented the amount they believed it would cost to construct the building.

261.   Had even a small portion of the overruns been included in the June 2015 Budget, Plaintiffs could have and would have exercised their Equity Put Right. Instead, on the basis of Defendants' misrepresentations, Investment approved the June 2015 budget.

### *Defendants Drive Up Development Costs with Fraudulent Charges and Self-Dealing*

262.   Despite critical shortfalls prior to the closing of the Construction Loan, and despite knowing that the project was millions of dollars over budget the day the Construction Loan closed, Defendants ran up costs on the project with fraudulent charges and self-dealing.

<u>General Conditions</u>

60

263.    In addition to their significant Development and Construction Management Fees, and despite budget shortfalls that threatened the survival of the Project, between June 2013 and July 2017, JDS and PMG collected over $10.8 million in payroll and reimbursements.

264.    As noted above, JDS and PMG were not entitled to payroll reimbursement for their work on behalf of Sponsor as Manager of the Company, or (except through their set Development fee) for their work on behalf of Developer, but they were entitled to payroll reimbursement for their construction management work.

265.    Yet they paid themselves over $3 million in payroll for work performed before the Construction Management Agreement went into effect in June 2015.

266.    Stern, Phillips, and others at JDS sought to hide this fact from Plaintiffs.

267.    In November 2014, as AmBase was attempting to reach a decision about whether it would fund various capital calls, AmBase CFO Ferrara contacted Defendant Phillips with several accounting related questions, including a request to provide additional detail for a $1.4 million entry in the partnership's accounts for "construction service." Although Phillips promised a response by the following week, JDS dodged his request for nearly two months.

268.    In January 2015, Ferrara renewed his request, and Stern responded by denying that AmBase was entitled to the information under the Joint Venture Agreement but agreeing to provide it as "a courtesy." [JDS_0008846] Stern then directed Sherryann Persad of JDS to alter the partnership's general ledger to replace entries for payments to "JDS Construction" with "General Payroll/Construction Expense." Phillips was aware of and participated in the alteration of the general ledger entries. [JDS_0083077]

269.    On January 9, 2015, Phillips provided a copy of the altered general ledger to Ferrara by over the interstate wires, thus committing wire fraud under 18 U.S.C. § 1343.

270.    In reliance on these misrepresentations, AmBase, among other things, contributed an additional $6.2 million to the Joint Venture in response to the April 2015 Capital Call, some of which was used to pay JDS payroll.

271.    Even after the Construction Management Agreement was in effect, Defendants refused to provide documentation to support their payroll reimbursement requests that would enable the lenders or AmBase to confirm that the payroll was for construction management work instead of work for which they were not authorized to be reimbursed.

272.    As discussed above, in connection with the closing of the construction loan at the end of June 2015, PMG LLC became a required co-signatory on all project banking transactions, and shortly thereafter its accountants began to more closely monitor the project's finances. One of the issues of greatest concern to PMG's accountants was JDS's payroll figures. JDS was charging the Company hundreds of thousands of dollars in payroll every month but providing the lenders and PMG with payroll invoices that failed to specify which of its employees had done what work for the project. [PMG00055667] Moreover, the number of employees listed on the timesheets exceeded the number of employees listed on daily reports JDS circulated to individuals at JDS and PMG on a regular basis. [PMG00059126]

273.    Starting in July 2015, PMG employees repeatedly asked JDS to provide documentation to explain and support its outsized payroll charges, but Stern and other JDS employees refused. Despite grave concerns about the veracity of the JDS payroll invoices that were being submitted to the lenders for reimbursement, PMG ultimately approved several months of JDS payroll without any backup. [PMG00055837, PMG00057530, JDS_0023286, PMG00030569]

274.    JDS also used the occasion of the transition to funding under the construction loan to bilk the Company out of additional funds through bogus payroll charges that were paid out of the Company's equity and never submitted for approval by PMG or any lender. Summing up JDS's actions in an October 20, 2015 email, one of PMG's accountants stated that Stern and JDS had "paid themselves for payroll much more than we've seen invoices for, part of which they reallocated to direct work and have never shown on the [bank requisitions] submitted to us." [PMG00041944] To conceal these payroll expenses from the Construction Loan lenders, Stern directed JDS accountants to reallocate $██████ in JDS payroll expenses to a different line item before sending an accounting of past joint venture expenses to the lenders. [JDS_0010232]

275.    With PMG continuing to complain about the lack of documentation supporting JDS's payroll invoices and threatening to block further reimbursement of these invoices, Stern sent PMG officials an email on October 21, 2015 with documentation that purported to support JDS's payroll expenses for the month of September 2015. [PMG00041966] But in at least one instance the total number of JDS laborers for whom reimbursement was sought exceeded the number of JDS laborers who were at the worksite according to other JDS records. And the documentation provided by Stern made no attempt to show that the project needed the number of JDS laborers who were present or that these laborers actually did any work. [PMG00041966, PMG00033220]

276.    Stern and Maloney eventually agreed that their accountants should meet to work through the continuing dispute over JDS's payroll invoices, and Jenn Hesson of PMG eventually met with Daniel Stern of JDS in mid-November 2015. Even after this meeting, JDS would only provide PMG with documentation to support its monthly payroll invoices after additional prodding from PMG. [JDS_0078639] Although Plaintiffs have had limited access to the payroll

documentation ultimately provided by JDS, on information and belief, this documentation would not match JDS and PMG records regarding the number of JDS employees who were actually at the worksite on each day.

277.     It was clear to Maloney and PMG that JDS was padding its payroll invoices by charging the Company for laborers who either were not needed and did no meaningful work or who did not go to the worksite at all. [PMG00041739] But rather than exposing this fraud to Plaintiffs and the lenders, PMG—acting through Maloney and with White's knowledge and assistance—participated in the fraud by approving monthly requisitions that were transmitted via the interstate wires to the lenders for reimbursement of project expenses, including JDS payroll.

278.     Indeed, PMG began to look for ways to pad its own payroll charges. [PMG00041598] Expressing incredulity at PMG's plans to match JDS's excessive payroll rather than controlling costs, one PMG employee asked in an October 16, 2015 email: "Has anyone had a conversation on what the real number of people should be on this project; not just matching body for body?" [PMG00064831]

279.     On information and belief, both JDS and PMG knowingly billed the Company for work that was unnecessary or not done at all.

280.     Phillips oversaw the JDS accounting department's efforts to overbill the Company for payroll and also participated in efforts by Stern and JDS to conceal this fraud from PMG and the Construction Loan lenders.

281.     The hundreds of thousands of dollars in expenses for which JDS and PMG sought reimbursement were not, as required by the Joint Venture Agreement, separately documented in an approved budget.  Instead, all were claimed under the umbrella of "General Conditions"—a

category of expenses that Maloney acknowledged in a February 2015 email were "continually very high." [PMG00009319]

282.    The project in which Plaintiffs invested is not the only real estate construction project for which Maloney has used the General Conditions line item to perpetrate fraud.

<u>Sales Center</u>

283.    Another budget category in which Defendants needlessly drove up costs is the "Sales Center."

284.    Stern and Maloney sought to persuade Investment to approve renting a sales office on the top floor of the 9 West Building at an extremely high price.  Investment rejected this proposal and later learned that the rental space in question was owned by a former partner of Stern.

285.    Without consulting Investment further, and before construction began in earnest, Defendants spent millions of dollars to construct a lavish sales office on Fifth Avenue, complete with a full-scale model of a sample luxury apartment. At a time when the project was strapped for cash, Defendants spent almost $███ on two custom end tables, over $███ on a gypsum, palmwood, and bronze cabinet, and paid to have a chair covered in gold leaf. [PMG00081872] Sponsor never obtained Investment's approval for the sales office even though it constituted a Major Decision under Section 7.2 of the Joint Venture Agreement.[9]

286.    JDS also generated "fake external" documentation for money spent on the sales center (as well as on other trades). [JDS_0045627]

---

[9] Relatedly, Sponsor set condominium prices and filed the Condominium Offering Plan for the Property without notifying Investment or obtaining Investment's approval, as it was required to do under Section 7.2 of the Joint Venture Agreement.

287.     Perhaps in order to cover up this deception, during the same time period, Stern gave strict orders: "dont copy PMG on sales center stuff." [JDS_0092081]

<u>Insurance</u>

288.     As set forth above, Defendants needlessly drove up costs, committed fraud, and engaged in self-dealing in connection with the Project's insurance coverage.

<u>Other Contracting</u>

289.     Defendants engaged in further self-dealing when awarding contracts for the construction of the Project.

290.     For example, Defendants contracted with U.S. Crane to furnish, install, and operate the construction cranes. At Stern's instigation, and with Maloney's and White's knowledge and approval [JDS_0087062], the Joint Venture reserved the cranes in 2013, paying hundreds of thousands of dollars in deposits long before a crane was needed and before the necessary financing had been obtained. [JDS_0086721] It did so despite the fact that U.S. Crane's initial quote was shockingly high, [JDS_0086519], despite the fact that the logistics of operating a crane on such a small lot size had yet to be determined, [JDS_0087062], and despite the potential adverse consequences that using U.S. Crane would have on insurance coverage, [JDS_0085185].

291.     The contract for the crane was nearly twice as expensive as the usual cost of furnishing a crane on a building of this type, and U.S. Crane's monthly requests to augment its contract price due to new expenses have been, by Stern's own account, "insane" and "out of control." [JDS_0077128, JDS_0074307] Further, the Joint Venture has had to disapprove some requests on the ground that U.S. Crane was seeking payment for work not performed. [JDS_0073054]

292.     According to the latest projections Defendants provided, the cranes will ultimately cost the project more than $██████.

293.     Upon information and belief, despite these serious disadvantages, Stern pressed for the Joint Venture to contract with U.S. Crane because he has a financial stake in the company.

294.     As another example, Defendants selected Parkside Construction Builders Corporation to perform Foundation work.  It performed the work poorly—providing inadequate manpower and materials and failing properly to manage subcontractors and equipment—resulting in costly delays for the project and damage to neighboring properties.  [JDS_0065766, PMG00077238] Stern and JDS nevertheless insisted on awarding the concrete/superstructure to Parkside in the next phase of the project. This is one of the larger contract awards at over $39 million.  Stern and JDS awarded it without performing competitive bidding or providing copies of the contract to PMG.  [BECK0006836] Parkside continued its dismal performance, missing deadline after deadline and repeatedly requesting early payments to make up shortfalls. [PMG00088350] And JDS continued to approve early payments, even at times when the Joint Venture faced critical cash shortages. [JDS_0081137]

295.     Despite Park Side's poor performance, Stern pressed for the Joint Venture to contract with them because he was motivated by considerations other than the good of the Joint Venture.

296.     Stern also sought to control contracting in order to be able to hire contractors JDS was using on other projects, presumably to leverage the Joint Venture's money for deals on those projects.

67

Case 1:18-cv-05482-AT    Document 1-1    Filed 06/18/18    Page 71 of 238

297.    Architectural design, for example, was performed by SHoP Architects, which also designed American Copper Buildings at 626 First Avenue for JDS. JDS gave SHoP leeway to charge the project large sums of money.  In one instance, it permitted SHoP to charge extra for services that were provided standard on the First Avenue project. [JDS_0093337]

298.    In a rare email pushing back on their charges, Simon Koster of JDS wrote "I'll let almost any revision slide" but pointed out that he could not approve payment for work that had not yet been performed. A representative for SHoP responded with an apparent proposal to mislead JDS's partners: "If you are having conflict with your investors or internally, then we should approve a 'reasonable amount' for the final month." [JDS_0066075]

299.    As another example, FJM-Ferro, the steel contractor, offered JDS $███ in savings on its   Project X   project in exchange for approving millions of dollars in change orders on 111 West 57th.  When Stern, Phillips, and other executives at JDS were preparing for a meeting with PMG to explain the change orders, Stern instructed them not to mention the deal with   Project X  . [JDS_0076133]

<u>Failure to Devote Sufficient Time</u>

300.    In addition to implementing a fraudulent scheme, both Stern and Maloney neglected critical details of the project, resulting in delays and additional costs.

301.    Maloney's lack of attention permitted Stern to carry out self-dealing and fraud, which Maloney later blessed and profited from, and did "real damage to the job" by preventing the project from moving forward at critical stages. [JDS_0073170]

302.    Stern, among other things, mismanaged contractors, incurred costly stop work orders [JDS_0074918, PMG00046333, PMG00046397], exposed the Project to significant liability to neighboring buildings [JDS_0087913], failed to catch discrepancies in contractor

billing [PMG00100353], and missed important payments. Stern himself acknowledged internally that his failure to secure sufficient funds to cover past due insurance payments at the time of the July 2015 Distribution was a "major screwup." [JDS_0081561]

303.    Throughout this period, Investment and AmBase repeatedly requested information from Sponsor concerning the status of the Project—information to which they were entitled under Article 4 of the Joint Venture Agreement and the Delaware Limited Liability Company Agreement. Defendants repeatedly ignored or provided incomplete or false information in response to these requests. Defendants' refusal to share information facilitated their fraud by depriving AmBase and Investment of critical information about the status of the Project and Defendants' activities.

### Defendants Continue To Fraudulently Conceal Overruns in an Effort To Deprive Plaintiffs of Equity Put Right and Induce the Lenders To Continue Disbursements

304.    Over the next year and a half after Plaintiffs approved the June 2015 Budget, Defendants sought to conceal the massive budget overruns from AmBase and the lenders alike.

305.    Defendants obscured these overruns through a variety of techniques, including but not limited to:

a.    Defendants provided only "snippets" of the budget in monthly loan requisition packages so the lenders never had a complete view of the costs impacting the budget. [PMG00034131]

b.    Defendants would move expenses from one line item to another to avoid triggering certain types of caps in the loan documents. Once, the lender's consultant inquired about a resulting discrepancy between the two most recent requisitions, and Defendant Phillips misleadingly stated that the original classification had been a mistake. [JDS_0076978, JDS_0020559]

c.    Defendants drew money into an "imprest" account, which Defendants could spend at their discretion in between draws. This technique enabled JDS and PMG to reimburse themselves for payroll in a way that was more difficult to track. [JDS_0047024, JDS_0010733]

69

    d.   Defendants included a hidden credit in the budget in anticipation of a return of the collateral paid into the Liberty Mutual Loss Fund. When the lenders finally learned about this tactic over a year later, they warned "counting on the cash collateral to reduce the budget presents its own set of issues due to the uncertainty of such a premise at this early stage of the Project and the lack of back up provided." [JDS_0017858]

306.    In October 2015, less than four months after closing, one of the lenders' consultants asked JDS to provide more detailed information with the monthly requisitions. A JDS employee sounded the alarm to Defendant Phillips: "They want us to show reallocations for soft cost. Something to discuss since we are over budget on several items, which they don't know about yet." [JDS_0077304]

307.    Around that time, on October 13, 2015, at a meeting in Miami, FL, Maloney disclosed to Bianco that there were $25–50 million in budget overruns on the project. Yet Defendants still did not report these overruns to the lenders or submit a new budget for AmBase's approval.

308.    Internal projections reveal that even Maloney's astounding disclosure was low. In December 2015, draft anticipated cost reports prepared by PMG projected that overruns amounted to more than $███████, excluding the financing costs that would accompany any loans the Joint Venture took out to cover this shortfall. [PMG00047760]

309.    This massive overrun was attributable in part to the overruns that were foreseeable by and in fact known to Defendants in June 2015, including:

    a.   An overrun of $███████ on the HVAC line item, attributable in part to a $████████ "hold" for the HVAC contract, which had not yet been awarded.

    b.   An overrun of $███████ on the electrical work line item, attributable in part to a $███████ "hold" for low voltage work and a $███████ "hold" for lighting fixtures.

    c.   An overrun of $███████ on the plumbing line item, attributable in part to a $███████ "hold" for plumbing fixtures.

     d.   An overrun of $▮▮▮▮ on the concrete line item, attributable in part to a $▮▮▮▮ contract that had been awarded to U.S. Crane & Rigging. [PMG00047760]

310.    Correspondence between a representative of PMG and Becker in the spring of 2016 reveals that Maloney and his colleagues at PMG believed the overruns ranged from $▮▮ to $▮▮▮. [BECK0003199]

311.    Sometime during the first half of 2016, and without notifying Investment, Defendants prepared an offering memorandum for prospective investors in the Joint Venture, advertising $▮▮▮ in budget overruns.  [BECK0000014] Defendants continued to use these projections in communications with potential investors as late as November 2016. [PMG00106170]

312.    In addition to concealing the overruns from Plaintiffs, Sponsor caused the Original Mezzanine Borrower to conceal them from the lenders.

313.    As noted above, the Original Mezzanine Borrower was required on a regular basis to certify to Apollo "that the Construction Costs incurred to date are consistent with the Construction Budget and that, to Borrower's knowledge, no matter has been identified as indicating that the Project will in the future not be proceeding in accordance with the Construction Budget." These certifications were transmitted via the interstate wires.

314.    Stern and Maloney in fact caused the Original Mezzanine Borrower to make these certifications in monthly requisitions submitted by interstate wire to Apollo in connection with the Original Mezzanine Loan beginning during the summer of 2015. Phillips and White oversaw preparation of these requisitions by other JDS and PMG employees. Stern, Maloney, Phillips, and White all knew that these certifications were false when they were made. The requisitions were transmitted from New York, and all of these Defendants knew that they would be accessed from other states, including Pennsylvania.

315.     Despite having identified matters indicating that the project would not be
proceeding in accordance with the construction budget as early as June 2015 [PMG00013271],
neither Stern nor Maloney, nor any of the entities on whose behalf they worked, had informed
the lenders of the budget overruns as of March 16, 2016. [BECK0003199]

316.     When Stern finally disclosed the overruns to the lenders in late May or early April
2016—after this litigation had commenced—he continued to dissemble about the nature, extent,
and source of those overruns. For example, in a May 3, 2016, email to the lenders, Stern
explained: "We know that HCAV [sic] is going to come in high and we are running a bit high on
GCs. We are also holding for the possibility of some exposure on superstructure for added rebar
and duration. Beyond that, we are still finishing up purchasing and working on overall exposure
so are not yet ready to get granular by line item." [JDS_0019418]

317.     Defendants had been aware that HVAC was going to "come in high" for nearly
two years, and in part due to inflated payroll, General Conditions would be more than "a bit
high" to the tune of $███████. Defendants were also aware—and had been since before the
construction loan closed—that superstructure "exposure" was more than a "possibility." It was a
certainty, and not just because of the "added rebar and duration," but because the combined
value of the superstructure contracts exceeded the amount allocated to the line item. Defendants
were also aware of many certain overruns "beyond that," including on the electrical work and
plumbing line items. [JDS_0019418, JDS_0079426, PMG00013271, PMG00041598]

318.     In June 2016, without notifying Investment or obtaining its approval as required
under Section 7.2 of the Joint Venture Agreement, Defendant Stern proposed a revised budget to
the lenders. [APOLLO0000185]

319.    The lenders and their consultants began to perform due diligence to confirm that the revised budget would be adequate to cover the remaining costs of construction. [APOLLO0000173] To facilitate this review, they repeatedly asked Defendants Stern and Phillips to provide additional information to back up Sponsor's budget projections, only to be put off by evasive assurances that JDS was "working through potential liabilities," and later ignored. [APOLLO0000212, APOLLO0000174, APOLLO0000179, APOLLO0000166, APOLLO0000042, APOLLO0000097, APOLLO0000049, APOLLO0000010, APOLLO0000012, APOLLO0000045, APOLLO0000110] The documents Defendants did provide continued to obscure and understate costs, inhibiting the lenders' ability to validate the budget. [APOLLO0000094, APOLLO0000059]

320.    Internally, the lenders expressed surprise and dismay that Stern and JDS were not more responsive and questioned their degree of confidence in their proposed budget. [APOLLO0000074]

321.    Apparently in response to the lenders' concerns about the adequacy of the June budget, on October 5, 2016, Defendant Phillips provided a new proposed budget to the lenders, once again without notifying Plaintiffs or obtaining Investment's approval. [APOLLO0000213]

322.    The lenders' consultants remained concerned about the lack of back-up for the proposed budget and the Project's exposure to further cost overruns. [JDS_0017858]

323.    Phillips provided yet another proposed budget on October 27, 2016, once more without notifying Plaintiffs or obtaining Investment's approval. [APOLLO0000215]

324.    Throughout this period, Stern and Phillips continued to fail to provide the requested back-up for the budget, and the lenders became increasingly impatient with Defendants' intransigence. [APOLLO0000089, APOLLO0000084]

325.     On November 21, 2016, Stern assured the lenders that he would be seeking his equity partners' approval for the revised proposed budget before Thanksgiving. [APOLLO0000180] In fact, Stern never proposed this budget to Investment.

326.     Indeed, even though the budget overruns necessitated a new project budget under Section 8.2(b) of the Joint Venture Agreement, at no point between June 2015 and December 2016 did Sponsor propose a Budget for Investment's approval.

327.     Even after the turn of the fiscal year, when Sponsor was contractually required to provide a budget revision or update under Section 8.2(b) of the Joint Venture Agreement, it failed to do so.

328.     Even after representing to the Project's lenders that he would seek Investment's approval, Stern failed to cause Sponsor to provide a budget revision or update.

329.     Costs associated with developing a construction project are generally divided into four categories: hard costs, soft costs, financing costs, and acquisition costs.  As noted above, if Sponsor ever proposed a budget in which hard costs exceed an amount equal to 110% of the hard costs set forth in the prior approved budget, and Investment disapproved it, Investment would have the right to require Sponsor to purchase its equity interest in the Company for a purchase price equal to an amount that would give Investment a 20% return on its Investment. *See* Joint Venture Agreement § 11.5.

330.     No later than December 2015, Defendants were aware that hard cost overruns well exceeded that 110% threshold. [PMG00047760] Indeed, for the reasons set forth above, Defendants were likely aware of overruns in excess of this threshold even in June 2015. [PMG00013271]

331.    Most importantly, every budget Defendants proposed to the lenders after disclosing the budget overruns and before December 2016 would have triggered Plaintiffs' Equity Put Right. [APOLLO0000186, APOLLO0000235, APOLLO0000214, APOLLO0000216]

332.    Upon information and belief, Sponsor avoided producing a budget in order to deprive Investment of its rights under Section 11.5 of the Joint Venture Agreement. Had Sponsor provided a proposed budget in a timely manner pursuant to the Joint Venture Agreement, Investment would have exercised its Equity Put Right in light of the harm to the Project caused by Defendants' actions.

**Alleged Loan Default and Foreclosure: Budget Overruns Cause the Project to be "Out of Balance," and Defendants Foil Cure with Further False Statements**

333.    On December 9, 2016, Sponsor sent a notice via interstate carrier from New York to Connecticut seeking Investment's approval by December 23 for two Major Decisions: (1) a new proposed Budget ("December Proposed Budget"), and (2) additional, dilutive financing to cover the budget increases.

334.    Despite the professed urgency of the need for financing, Investment did not receive this notice until December 12, 2016.  Investment studied the proposed Major Decisions and, on December 15, sent a response urgently requesting information sufficient to enable it to make a responsible, informed decision about the matters for which Sponsor sought its approval.

335.    Meanwhile, Defendants had been sharing detailed financial information with Becker for approximately a year to enable him to assess and pursue various solutions to the budget overruns. [BECK0003631, JDS_0070627] In October 2016, for example, Stern, Maloney, and Jason Algaze from PMG provided Becker with a financial model based on the terms of the

proposed financing and a more realistic "higher budget" that would necessitate a full $ ███

███ of additional financing. [BECK0002723]

336.    Despite insisting that additional financing was urgently needed to ward off a potential foreclosure, Defendants refused to provide any of the requested information to Investment until early February, and only then under the shadow of an order to show cause issued by this Court.

337.    The information Defendants provided confirmed Investment's suspicion that (1) a significant portion of the budget overruns Defendants sought to cover with the proposed financing were in fact Manager Overruns for which Defendants were responsible under the Joint Venture Agreement § 3.2(e), and (2) JV Defendants had manipulated the December Proposed Budget in an effort to avoid triggering Investment's Equity Put Right.

### *Manager Overruns*

338.    As set forth above, any funding required on account of Manager Overruns was to be provided exclusively by Sponsor, not by the members of the Company in proportion to their percentage interests in the form of dilutive financing. *See* Joint Venture Agreement § 3.2(e).

339.    The December Proposed Budget reflected overruns on the concrete, HVAC, plumbing, and electrical work line items, among others.

340.    As set forth in greater detail above, these overruns were "reasonably expected to have been anticipated and budgeted for by a developer acting in good faith and in a commercially reasonable and prudent manner in the planning and oversight of projects similar in size, type, and scope as the development of the Property . . . ," and therefore constitute Manger Overruns for which Sponsor was solely responsible. *See* Joint Venture Agreement §§ 1.83, 3.2(e).

341.     Numerous other actual overruns reflected in or omitted from the December Proposed Budget were also Manager Overruns. The information needed to determine precisely which overruns facing the Project are Manager Overruns is in Defendants' exclusive control.

342.     Based on the information that was then available to it, on February 21, 2017, Investment issued a notice to Sponsor calling for $35,430,010.30, in Manager Overrun Contributions, and asking for Sponsor to issue an additional call for $21,336,842.70 in Additional Capital Contributions, to cover the overruns reflected in the December Proposed Budget. ("Manager Overrun Notice," attached as **Exhibit K**.)

343.     On February 24, 2017, Sponsor responded to Investment's Notice, in a letter delivered via interstate wire, "entirely and emphatically disput[ing] that there have been Manager Overruns," and refusing to call for Additional Capital Contributions.[10] (Attached as **Exhibit L**.)

344.     To date, Sponsor has not contributed any capital to the Company to cover any Manager Overruns.

### *Equity Put Right*

345.     Properly calculated, the December Proposed Budget included hard costs in excess of 110% of the hard costs reflected in the "prior approved budget," Joint Venture Agreement § 11.5, which was the budget approved in connection with the Construction Loan in June 2015.

346.     Sponsor, however, represented that hard costs had increased by only 9.54%.  It supported this conclusion by manipulating the budget and once again misrepresenting the costs of completing construction.

---

[10] One reason Sponsor gave for refusing to issue a capital call was that Investment lacked the financial wherewithal to meet it. In fact, Investment located a funding source to meet its portion of the proposed capital call.

347.    First, despite repeatedly representing to Plaintiffs that a lower, reallocated budget finalized at the closing of the Construction Loan was the operative budget for the project, Sponsor represented in the December Proposed Budget document that an earlier, *draft* budget was the "Last Approved Budget."  Had the accurate "prior approved budget" been used as the baseline, the hard cost increases in the December Proposed Budget would have triggered Investment's Equity Put Right, even accepting all of Defendants' other manipulations.

348.    Second, Sponsor included a different set of line items in the category of "hard costs," than it had included in that category in any prior representations concerning "hard costs." Sponsor had previously treated "hard costs" as including only so-called "trade costs" or as including all so-called "direct costs," which includes trade costs, General Conditions, a hard cost contingency, certain fees and a few additional categories of expenses. In the December Proposed Budget, Sponsor represented that "hard costs" included "trade costs" and a "Construction Contingency." This enabled them to magnify the effect of the precipitous (and, as explained below, artificial) drop in the Construction Contingency from the June 2015 Budget to the December Proposed Budget to counteract large overruns in trade costs.

349.    Finally, Sponsor manipulated the Budget by artificially depressing hard costs, by once again understating the costs they anticipated to complete construction, by reallocating certain costs from hard cost line items to soft cost line items, or by cutting certain costs out of the budget altogether.  For example:

    a.    Construction Contingency: The construction contingency is a line item in the budget for uncommitted money intended to be used to cover unanticipated overruns on enumerated trade costs. As noted, the amount of the construction contingency declined steeply from the June 2015 Budget ($28,219,120) to the December Proposed Budget ($8,000,000). Although some reduction in the contingency is to be expected at a later stage of the project, the parties' subsequent discussions reveal that Defendants intended to rely heavily on the contingency to cover change orders from trade contracts that had already been

awarded or were expected to be awarded. Even the lenders' construction consultant took the position that a $14.2 million construction contingency was more appropriate. Whenever challenged on the inadequacy of the construction contingency, Stern and Maloney pointed out that they had negotiated additional tranches of borrowing from the proposed lender, which could cover further overruns in the future, effectively acknowledging that the construction contingency was inadequate.

b.  Plumbing and Electricity: Despite significant overruns on these line items since June 2015, Defendants acknowledged that they budgeted no money in these line items for change orders from existing trades or additional work outside the scope of existing contracts.

c.  Structural Damper: The amount budgeted for this hard cost line item dropped from $4.5 million in the June 2015 Budget to $3 million in the December Proposed Budget. There was a corresponding increase in the associated soft cost line item, "Structural/Wind Engineer." Upon information and belief, Defendants simply reallocated costs from the hard cost line item to the soft cost line item in order to create an illusion of a savings on hard costs.

d.  Temp Protection: The amount budgeted for this hard cost line item dropped from $3.25 million to $3 million despite the fact that, upon information and belief, the Joint Venture incurred at least $1 million in *additional* overhead protection costs in the interim due to a settlement with a neighboring condominium building. Defendants hid these hard cost overruns by accounting for them in the soft cost "Legal and Accounting" line item.

e.  Lobby Work/Amenities: Although the amount budgeted for this hard cost line item ($4 million) remained the same, Defendants subsequently acknowledged that it no longer included the scope of work that they reallocated to the soft cost FF&E line item. Upon information and belief, that reallocation resulted in a $6.75 million increase in the FF&E budget.

350.    Upon information and belief, Defendants manipulated the December Proposed Budget in other ways that are currently not known to Plaintiffs.

351.    Hard costs in the December Proposed Budget are lower than in any of the other budgets submitted during 2016 for the lenders' review. [APOLLO0000186, APOLLO0000235, APOLLO0000214, APOLLO0000216]

352.    Defendants misrepresented the costs of construction for the purpose of inducing Plaintiffs to forego their contractual Equity Put Right and to approve expensive, dilutive new

financing. Because Defendants did not present Plaintiffs with a realistic budget, Plaintiffs were neither able to approve the new financing nor exit the project to safeguard their investment.

353.    Nevertheless, the information they were able to discover persuaded Plaintiffs that the December Proposed Budget included hard costs in excess of the Equity Put Right threshold, and on February 14, 2017, Investment sent a notice disapproving the December Proposed Budget and exercising its Equity Put Right.

354.    On February 24, 2017, Sponsor sent a letter to Investment refusing to honor Investments' exercise of the Equity Put Right.

355.    Sponsor has yet to honor Investment's exercise of the Equity Put Right. As of the date of filing, Sponsor would owe Investment more than $155 million under the Equity Put Right.

### The Original Mezzanine Loan is Declared Out of Balance

356.    Without obtaining Investment's approval for the December Proposed Budget, Stern provided a copy of that budget to the lenders for their review and approval. [APOLLO0000188]

357.    Meanwhile, on January 3, 2017, Apollo issued a formal notice to the Original Mezzanine Borrower with the following warning: "As you have previously advised the Lenders, and as the Lenders have previously communicated to the Borrower Parties on numerous occasions, the loan has and continues to be 'out of balance' " due to budget overruns.

358.    Stern and Phillips continued to refuse to provide the lenders' consultants the information they needed to validate the budget. [APOLLO0000081, APOLLO0000032, APOLLO0000084, APOLLO0000063, APOLLO0000007] The lenders finally lost patience and directed their consultants to provide a preliminary opinion on the adequacy of the December

Proposed Budget. [APOLLO0000195] The consultants concluded that the budget was "lower than recommended for the Project," and that the "Project has an above average probability for a cost overrun." Among other things, they recommended a higher hard cost contingency. [APOLLO0000196]

359.     Based on that opinion, on January 25, 2017, Apollo issued a notice to Original Mezzanine Borrower demanding that it pay a Borrower's Shortfall Contribution to correct an out-of-balance condition in the mezzanine loan ("First Borrower's Shortfall Contribution Notice," attached as **Exhibit M**).

360.     The estimated remaining construction costs reflected in the First Borrower's Shortfall Contribution Notice would have triggered Investment's Equity Put Right had they been properly incorporated into Defendants' proposed budget, even accepting all the other manipulations Defendants employed in an effort to avoid triggering that right.

361.     Although, upon information and belief, they had no intention of paying the Borrower's Shortfall Contribution in any event, Defendants nevertheless protested the calculations reflected in the First Borrower's Shortfall Contribution Notice.

362.     Although it concluded that the dispute had "no merit," Apollo nevertheless withdrew the First Borrower's Shortfall Contribution Notice on February 1, 2017, and issued a second notice requesting a Borrower's Shortfall Contribution ("Second Borrower's Shortfall Contribution Notice," attached as **Exhibit N**) based on the December Proposed Budget, which had not (and has not) yet been approved pursuant to the Joint Venture Agreement.

363.     To date, neither the Original Mezzanine Borrower nor Stern and Maloney as guarantors have paid the Borrower's Shortfall Contribution.

364.    After the deadline to pay the Borrower's Shortfall Contribution passed, Defendants negotiated a forbearance agreement with Apollo. Sponsor reported to Investment that this forbearance agreement was amended on numerous occasions, and that the forbearance period continued, with some disruptions, until June 29, 2017.

365.    Plaintiffs were not permitted to participate in the forbearance negotiations, have been denied access to communications between Defendants and the lenders, and were usually notified of extensions of the forbearance period only shortly before they purportedly occurred.

366.    In the meantime, Defendants persistently threatened Plaintiffs that a foreclosure or devastating construction stoppage was imminent, but provided them with no information that would permit them to assess this threat or to develop a strategy for mitigation or cure in an informed manner.

367.    For example:

a.    On December 21, 2016, Stern and Maloney caused Sponsor to transmit a letter via interstate wire representing that "it is crucial for the viability of the project that we . . . focus on the immediate approval and closing of the refinancing." Although they later acknowledged that Apollo had approached them about the out of balance condition on the loan months before, Stern and Maloney claimed in the letter that *after December 9, 2016*, "the current project lenders advised us that because the loan is out of balance, they are considering their options with respect to the project if we do not promptly secure financing." They threatened that "in the event that you continue to delay and obstruct the refinancing process by withholding approval without any valid ground to do so . . . you will jeopardize the entire project . . . ."

b.    On January 7, 2017, Stern emailed Bianco to inform him that "we received notice from Apollo late yesterday that they will not fund any requisitions moving forward." He asserted that Investment's "immediate consent to the refinancing with Baupost is necessary to keep the project moving forward. If we do not close the loan immediately, we will be forced to halt all construction on the project incurring substantial additional costs and causing irrevocable harm to the project."

c.    On January 31, 2017, Stern and Maloney caused Sponsor to transmit a formal notice via interstate wire renewing its request for Investment's approval of the proposed financing and budget. In that notice, they referred to the financing as "crucial" and "extreme[ly] time sensitiv[e]." The notice advised that "if

[Investment did] not timely return [the enclosed] written consents in connection with the refinancing, [Stern and Maloney would] be left with little alternative but to issue Additional Capital Calls in order to attempt to keep the project moving forward."

d.  At a February 8, 2017, meeting of the principals in New York, which certain participants attended by telephone from Florida and which was organized by means of interstate wires, Stern represented that the Joint Venture was "out of time" and had "just a couple of days to keep the lights on." He represented that there was "no time to play with" the February 15 deadline to close on the proposed financing.

e.  In a February 10, 2017, follow up letter, transmitted via interstate wire, Stern and Maloney, on behalf of Sponsor, reiterated that "we need your signed consents to the refinancing no later than February 14, 2017."

368.    In fact, upon information and belief, Defendants had been engaged in negotiations with the lenders concerning the out of balance condition on the loan since at least May 2016 [JDS_0019418] and believed that foreclosure and other adverse consequences were not as imminent as they represented.

369.    Indeed, Stern was "caught . . . a bit off guard" by Apollo's January 2017 threat not to fund any further requisitions and had represented to Becker that he was "manag[ing]" "some of the pressure . . . to compel Dick [Bianco]" to approve the financing. [BECK0007318]

370.    After Apollo relented and agreed to continue funding the requisitions, none of Defendants informed Plaintiffs of this fact. Specifically, on January 23, 2017, Apollo, the Original Mezzanine Borrower, Stern, and Maloney executed an agreement whereby the lender agreed to fund the requisition. Plaintiffs never received a copy of this agreement and only learned of its existence and the funding it resulted in on March 2, 2017.

371.    Defendants' failure to disclose this development was material in the context of Stern and Maloney's repeated representations between January 23 and March 2 that adverse consequences were imminent if Investment refused to approve the proposed budget and financing.

372.     Defendants' belief that the lenders would not act immediately to stop funding or foreclose is demonstrated by the fact that they were continuing to solicit investors who could provide alternatives to the refinancing they were simultaneously attempting to coerce Investment into approving.

373.     Indeed, in early February, JDS and PMG prepared an offering memorandum soliciting new equity investors, in which they represented that the costs of construction were $5 million more than what they were simultaneously representing to Plaintiffs. [BECK0007346]

374.     Defendants not only failed to disclose these alternatives to Plaintiffs but actively concealed them.

375.     For example, on February 7, 2017, representatives of PMG held a meeting with prospective investors from China, who promised to take a "fresh" and "good hard look" at investing in the joint venture.  Their interest was so acute that Robert Mundry of PMG reached out to Corcoran to schedule a meeting for the investors the following Monday—one day before the new deadline Sponsor had given Investment to approve the Baupost loan. Upon information and belief, Stern was aware of and may even have attended this meeting.  [BECK0007343; BECK0007378]

376.     The very next day, on February 8, 2017, at the meeting of the principals attended by some participants over the phone and scheduled via interstate wire, Bianco asked Stern the status of prospective Chinese investors about whom he had heard rumors.  Stern represented that the opportunity was "deader than dead" and that there was "nothing serious going on right now."

377.     Upon information and belief, Stern and Maloney misled Plaintiffs not only to coerce them into surrendering their contractual rights by approving the loan and budget, but also

because the loan included favorable terms for the lender, which was working with Stern on other projects.

378.   As a consequence of these repeated misrepresentations, Plaintiffs had no way of knowing how much time remained to them to cure the default and were unable to pursue solutions with longer time horizons.

379.   Plaintiffs have nevertheless continued to endeavor to cure the default, including by pursuing additional sources of funding and searching for a solution to the parties' disagreement concerning Sponsor's proposed budget and financing. These efforts were necessarily impaired by Plaintiffs' mistaken belief that they would need to close within a matter of weeks, if not days.

380.   Plaintiffs also continued to attempt to reach an accommodation with Defendants on the proposed financing and proposed budget that would enable them to preserve their contractual rights. Starting in March 2017, however, Defendants falsely represented to Plaintiffs that the proposed financing was no longer on the table unless Plaintiffs surrendered additional contractual rights, including almost all measure of control over their investment in the Project.

### *The Junior Mezzanine Lender Purportedly Forecloses*

381.   As a condition of Apollo's forbearance, Borrower, the Original Mezzanine Borrower, Apollo, Stern, and Maloney entered into an agreement dated March 2, 2017 to split the Original Mezzanine Loan into the Senior Mezzanine Loan and the Junior Mezzanine Loan.

382.   The Junior Mezzanine Loan is governed by the Junior Mezzanine Construction Loan Agreement dated as of March 28, 2017, by and among the Borrower and Apollo, and secured by the Collateral, as that term is defined in the Pledge and Security Agreement (Junior Mezzanine Loan) ("Junior Mezzanine Loan Collateral"). The Junior Mezzanine Loan Collateral

includes, *inter alia*, Borrower's principal asset, 100% of its interest in the Original Mezzanine Borrower.

383.     On June 28, 2017, upon information and belief, Apollo assigned the Junior Mezzanine Loan to the Junior Mezzanine Lender. Shortly thereafter, the Junior Mezzanine Lender declared an Event of Default and instigated "strict foreclosure" proceedings, pursuant to which it purported to take over the Junior Mezzanine Collateral in full satisfaction of the Borrower's debt.

384.     In other words, the strict foreclosure, if valid, would wipe out almost all of the value of Plaintiffs' investment.  Plaintiffs are challenging the validity of that foreclosure in a separate action before this Court, *AmBase Corp., et al. v. Spruce Capital Partners, et al*., No. 655031/2017.

385.     By the time of the purported foreclosure, even though the building was only halfway built, Stern and Maloney had received all of their $6,412,359 Construction Management Fee and at least $8,852,000 of their $9,852,000 Development Fee.

### *Investment Seeks To Remove Sponsor as Manager*

386.     On September 7, 2017, Investment served Sponsor with a notice that several Causes had occurred and reserved its rights to remove Sponsor as manager. *See* Joint Venture Agreement § 8.10. Under the Joint Venture Agreement, Sponsor must cure the Causes within a set period of time, or Investment's right to remove it as manager ripens. *Id.* In the event that Sponsor disagrees that Cause has occurred, it has the right to submit the dispute to arbitration within a certain number of days of the expiration of the cure period.

387.     At or near the close of the cure period, Sponsor sent Investment a letter denying that the Causes had occurred.

Case 1:18-cv-05482-AT Document 1-1 Filed 06/18/18 Page 90 of 238

388.    Sponsor neither cured the Causes nor submitted its dispute concerning the existence of Cause to arbitration.  It therefore conceded the existence of Cause, and Investment is entitled to remove it as manager of the Company at any time by serving a Termination Notice.

### The Books and Records Requests

389.    As set forth above, the Joint Venture Agreement requires Sponsor, in its capacity as Manager of the Company, to keep accurate books and records and to provide certain reports and information relating to the development, construction, and finances of the Property to other members upon request.

390.    On July 16, 2015, Investment sent Sponsor a written demand seeking certain books and records relating to the development, construction, and finances of the Property.

391.    Sponsor did not provide Investment with any books or records in response to Investment's request.

392.    Since its initial demand, Investment sent Sponsor several similar demands. Although Sponsor provided some records on August 2, 2016, after the initial Complaint in this suit was filed, Investment has not received all of the information it has requested.

393.    Among the records still being sought, as detailed in a letter dated November 9, 2015 and attached hereto as **Exhibit O**, are documents concerning loans closed by the Company in June 2015, an explanation for why Sponsor called for over $42 million in Additional Capital Contributions months before distributing approximately $25 million to members, information concerning the source of funding for Sponsor's Capital Contributions, and details of construction fees claimed by Sponsor, including amounts paid to JDS and PMG.

394.    Upon information and belief, Sponsor is withholding such books and records, in part to conceal the participation of undisclosed third parties in Sponsor's past Capital Contributions and Shortfall Contributions—participation that would render the resulting

87

dilutions in Investment's Percentage Interest invalid—to nullify the Equity Put Right, and to conceal other financial irregularities which have resulted in benefits to Defendants at the expense of Plaintiffs.

### Demand Futility Allegations

395.    Investment brings claims not only directly on its own behalf but also derivatively on behalf of and for the benefit of the Company to redress injuries suffered by the Company as a direct and proximate result of the wrongdoing alleged herein. The Company is named as a nominal defendant in a derivative capacity.

396.    Investment has continuously owned an equity interest in the Company since its formation. Investment will adequately and fairly represent the interests of the Company and its other equity investors in enforcing and prosecuting their rights.

397.    The wrongdoing and violations of law complained of herein subject, and will persist in subjecting, the Company to continuing harm because the adverse consequences of the injurious actions are still in effect and ongoing.

398.    Investment has not made a demand upon the Company to bring derivative claims against Developer nor sought the consent of the managing member of the Company, Sponsor, to bring derivative claims because such demand would be futile. Developer is an alter-ego of Sponsor. Both Developer and Sponsor are owned and controlled by the same principals, namely, Control, JDS, Stern, PMG, and Maloney.

399.    As detailed above, the Company's management has engaged in egregious self-dealing. Among other misconduct, the Company's management defrauded the Company by padding payroll, used the Company's negotiations with contractors to obtain advantages for management on other projects in which the Company was not involved, diverted insurance

benefits from the Company to JDS, and made a series of misrepresentations to lenders and equity investors that were aimed at concealing the true state of the Company's finances and thus perpetuating a fraud through which management benefitted at the Company's expense.

400.    The allegations above also show gross negligence by the Company's management. By knowingly authorizing false budgets and other misrepresentations about the Company's finances, management exposed the Company to loss of financing and recklessly imperiled the real estate project for which the Company was formed. In addition, rather than exposing various frauds by Stern when they were discovered, Maloney and PMG actively worked to conceal these frauds and participated in them.

401.    Demand is excused because Defendants' conduct is so egregious on its face that it cannot be the product of sound business judgment and constitutes blatant self-dealing and gross negligence.

### CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### VIOLATION OF 18 U.S.C. § 1962(c)
**(Investment, Derivatively on Behalf of the Company, and Investment and AmBase Corporation Directly Against all Defendants)**

402.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

403.    RICO creates a private right of action for "[a]ny person injured in his business or property by reason of a violation of [18 U.S.C. § 1962]." 18 U.S.C. § 1964(c). All of the Defendants violated this provision by engaging in numerous acts of mail fraud under 18 U.S.C. § 1341 and wire fraud under 18 U.S.C. § 1343—crimes that constitute "racketeering activity" under RICO.

404.    The Defendants formed an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4) by establishing contractual and other relationships with each other and

89

collaborating in the development of the Property. This enterprise enables the Defendants to more efficiently achieve their collective purposes.

405. Funding, goods, and services procured by the enterprise have moved in interstate commerce, and the enterprise's activities have affected interstate commerce.

406. Each of the Defendants has some part in directing the enterprise's affairs.

407. Each of the Defendants conducted or participated in the conduct of the affairs of the enterprise through a pattern of racketeering activity. As detailed above, Defendants have committed numerous acts of mail fraud in violation of 18 U.S.C. § 1341 and numerous acts of wire fraud in violation of 18 U.S.C. § 1343. This pattern of racketeering activity has continued over a period of more than two years and reflects Defendants' regular way of doing business.

408. Among other acts of racketeering activity alleged above, Defendants committed mail and wire fraud by:

a. Inducing Plaintiffs to invest in the project by falsely representing that they would be able to maintain the necessary net worth and liquidity to obtain a timely construction loan and then causing communications integral to AmBase's investment to be transmitted through the interstate wires and mail in violation of the federal mail and wire fraud statutes;

b. Falsely representing through capital calls transmitted through the mail that budget shortfalls were not the result of Manager Overruns and that Sponsor was a Contributing Member that was contractually permitted to punitively dilute Plaintiffs' investment in the project and denying Plaintiffs access to information Plaintiffs needed to discover Defendants' fraud;

c.  Making JDS the beneficiary of an insurance policy paid for by the Company and fraudulently concealing this diversion of Company assets from Plaintiffs and electronically transferring false representations about the insurance policy through the interstate wires in violation of the federal wire fraud statute;

d.  Presenting the June 2015 budget with numerous material misstatements to induce the Construction Loan lenders to lend money to the Company and to prevent Plaintiffs from protecting their investment by exercising their contractual Equity Put Right and transmitting the budget through the mail and interstate wires in violation of the federal mail and wire fraud statutes;

e.  Causing the Company to pay and the lenders to fund excessive payroll expenses for work that was unnecessary or not done through monthly requisitions transferred through the interstate wires in violation of the federal wire fraud statute; and

f.  Fraudulently concealing numerous budget overruns in a further effort to prevent Plaintiffs from exercising their Equity Put Right and taking steps in furtherance of this fraudulent scheme through use of the mail and interstate wires in violation of the federal mail and wire fraud statutes.

409.    The racketeering activities of Defendants have directly and proximately injured Plaintiffs by diminishing the value of Plaintiffs' investment and ultimately depriving Plaintiffs of their investment.

410.    The racketeering activities of Defendants have directly and proximately injured the Company by diminishing the value of its business and property.

**SECOND CLAIM FOR RELIEF**
**VIOLATION OF 18 U.S.C. § 1962(c)**

91

**(Investment, Derivatively on Behalf of the Company, and Investment and AmBase
Corporation Directly Against Stern, JDS, Maloney, and PMG)**

411.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

412.    RICO creates a private right of action for "[a]ny person injured in his business or
property by reason of a violation of [18 U.S.C. § 1962]." 18 U.S.C. § 1964(c). Stern, JDS,
Maloney, and PMG violated this provision by engaging in numerous acts of mail fraud under 18
U.S.C. § 1341 and wire fraud under 18 U.S.C. § 1343—crimes that constitute "racketeering
activity" under RICO.

413.    An "enterprise" for purposes of RICO "includes any . . . partnership, corporation,
association, or other legal entity." *Id.* § 1961(4). Because Sponsor is a limited liability company,
it is an "enterprise" under RICO.

414.    Funding, goods, and services procured by Sponsor have moved in interstate
commerce, and Sponsor's activities have affected interstate commerce.

415.    As principals of Sponsor, Stern and Maloney both have some part in directing
Sponsor's affairs. JDS, PMG, Control, JDS LLC, PMG LLC, KM Group, and KM Equity also
have roles in directing Sponsor's affairs.

416.    Stern, Maloney, JDS, PMG, Control, JDS LLC, PMG LLC, KM Group, and KM
Equity conducted or participated in the conduct of the affairs of Sponsor through a pattern of
racketeering activity. As detailed above, Stern, Maloney, JDS, PMG, Control, JDS LLC, PMG
LLC, KM Group, and KM Equity have committed numerous acts of mail fraud in violation of 18
U.S.C. § 1341 and numerous acts of wire fraud in violation of 18 U.S.C. § 1343. This pattern of
racketeering activity has continued over a period of more than two years and reflects the regular
way of doing business of Stern, Maloney, JDS, PMG, Control, JDS LLC, PMG LLC, KM
Group, and KM Equity.

417.    The racketeering activities of Stern, Maloney, JDS, PMG, Control, JDS LLC, PMG LLC, KM Group, and KM Equity have directly and proximately injured Plaintiffs by diminishing the value of Plaintiffs' investment and ultimately depriving Plaintiffs of their investment.

418.    The racketeering activities of Stern, Maloney, JDS, PMG, Control, JDS LLC, PMG LLC, KM Group, and KM Equity have directly and proximately injured the Company by diminishing the value of its business and property.

### THIRD CLAIM FOR RELIEF
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Investment, Derivatively on Behalf of the Company, and Investment and AmBase Corporation Directly Against Stern)

419.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

420.    RICO creates a private right of action for "[a]ny person injured in his business or property by reason of a violation of [18 U.S.C. § 1962]." 18 U.S.C. § 1964(c). Stern violated this provision by engaging in numerous acts of mail fraud under 18 U.S.C. § 1341 and wire fraud under 18 U.S.C. § 1343—crimes that constitute "racketeering activity" under RICO.

421.    An "enterprise" for purposes of RICO "includes any . . . partnership, corporation, association, or other legal entity." *Id.* § 1961(4). Because JDS Development is a limited liability company, it is an "enterprise" under RICO.

422.    Funding, goods, and services procured by JDS Development have moved in interstate commerce, and JDS's activities have affected interstate commerce.

423.    As JDS Development's manager, Stern has a part in directing JDS Development's affairs.

424.    Stern conducted or participated in the conduct of the affairs of JDS Development through a pattern of racketeering activity. As detailed above, Stern has used JDS Development to

commit numerous acts of mail fraud in violation of 18 U.S.C. § 1341 and numerous acts of wire

fraud in violation of 18 U.S.C. § 1343. This pattern of racketeering activity has continued over a

period of more than two years and reflects Stern's regular way of doing business.

425.     The racketeering activities of Stern have directly and proximately injured

Plaintiffs by diminishing the value of Plaintiffs' investment and ultimately depriving Plaintiffs of

their investment.

426.     The racketeering activities of Stern have directly and proximately injured the

Company by diminishing the value of its business and property.

## FOURTH CLAIM FOR RELIEF
## VIOLATION OF 18 U.S.C. § 1962(d)
### (Investment, Derivatively on Behalf of the Company, and Investment and AmBase Corporation Directly Against Stern and Phillips)

427.     Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

428.     RICO creates a private right of action for "[a]ny person injured in his business or

property by reason of a violation of [18 U.S.C. § 1962]." 18 U.S.C. § 1964(c). Under 18 U.S.C.

§ 1962(d), it is "unlawful for any person to conspire to violate any of the provisions of

subsection (a), (b), or (c) of this section." Stern and Phillips agreed and conspired to violate 18

U.S.C. § 1962(c).

429.     An "enterprise" for purposes of RICO "includes any . . . partnership, corporation,

association, or other legal entity." 18 U.S.C. § 1961(4). Because JDS Development is a limited

liability company, it is an "enterprise" under RICO.

430.     Funding, goods, and services procured by JDS Development have moved in

interstate commerce, and JDS Development's activities have affected interstate commerce.

431.     Stern and Phillips are both associated with JDS Development and agreed and conspired, working through JDS Development, to engage in a pattern of racketeering activity in the form of multiple acts of mail and wire fraud.

432.     Racketeering activities undertaken in furtherance of this conspiracy have directly and proximately injured Plaintiffs by diminishing the value of Plaintiffs' investment and ultimately depriving Plaintiffs of their investment.

433.     Racketeering activities undertaken in furtherance of this conspiracy have directly and proximately injured the Company by diminishing the value of its business and property.

<div align="center">

**FIFTH CLAIM FOR RELIEF**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(Investment, Derivatively on Behalf of the Company, and Investment and AmBase**
**Corporation Directly Against Maloney)**

</div>

434.     Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

435.     RICO creates a private right of action for "[a]ny person injured in his business or property by reason of a violation of [18 U.S.C. § 1962]." 18 U.S.C. § 1964(c). Maloney violated this provision by engaging in numerous acts of mail fraud under 18 U.S.C. § 1341 and wire fraud under 18 U.S.C. § 1343—crimes that constitute "racketeering activity" under RICO.

436.     An "enterprise" for purposes of RICO "includes any . . . partnership, corporation, association, or other legal entity." *Id.* § 1961(4). Because PMG is a limited liability company, it is an "enterprise" under RICO.

437.     Funding, goods, and services procured by PMG have moved in interstate commerce, and PMG's activities have affected interstate commerce.

438.     Maloney indirectly controls PMG and thus has a part in directing its affairs.

439.     Maloney conducted or participated in the conduct of the affairs of PMG through a pattern of racketeering activity. As detailed above, Maloney has used PMG to commit numerous

<div align="center">95</div>

acts of mail fraud in violation of 18 U.S.C. § 1341 and numerous acts of wire fraud in violation of 18 U.S.C. § 1343. This pattern of racketeering activity has continued over a period of more than two years and reflects Stern's regular way of doing business.

440.     The racketeering activities of Maloney have directly and proximately injured Plaintiffs by diminishing the value of Plaintiffs' investment and ultimately depriving Plaintiffs of their investment.

441.     The racketeering activities of Maloney have directly and proximately injured the Company by diminishing the value of its business and property.

<div align="center">

**SIXTH CLAIM FOR RELIEF**
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(Investment, Derivatively on Behalf of the Company, and Investment and AmBase Corporation Directly Against Maloney and White)**

</div>

442.     Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

443.     RICO creates a private right of action for "[a]ny person injured in his business or property by reason of a violation of [18 U.S.C. § 1962]." 18 U.S.C. § 1964(c). Under 18 U.S.C. § 1962(d), it is "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." Stern and Phillips agreed and conspired to violate 18 U.S.C. § 1962(c).

444.     An "enterprise" for purposes of RICO "includes any . . . partnership, corporation, association, or other legal entity." *Id.* § 1961(4). Because PMG is a limited liability company, it is an "enterprise" under RICO.

445.     Funding, goods, and services procured by PMG have moved in interstate commerce, and PMG's activities have affected interstate commerce.

446.    Maloney and White are both associated with PMG and agreed and conspired, working through PMG, to engage in a pattern of racketeering activity in the form of multiple acts of mail and wire fraud.

447.    Racketeering activities undertaken in furtherance of this conspiracy have directly and proximately injured Plaintiffs by diminishing the value of Plaintiffs' investment and ultimately depriving Plaintiffs of their investment.

448.    Racketeering activities undertaken in furtherance of this conspiracy have directly and proximately injured the Company by diminishing the value of its business and property.

### SEVENTH CLAIM FOR RELIEF
### DECLARATORY JUDGMENT: EXERCISE OF EQUITY PUT RIGHT
### IN FEBRUARY 2017
### (Investment and AmBase Corporation Against Sponsor)

449.    Plaintiffs repeat and re-allege each of the foregoing allegations as if fully set forth herein.

450.    Section 11.5 of the Joint Venture Agreement entitles Investment to require Sponsor to purchase its equity interest in the Company for a purchase price equal to an amount that would give Investment a 20% Priority Distribution, as that term is defined in the Joint Venture Agreement.

451.    The conditions precedent to the exercise of the Equity Put Right have been met, and Investment exercised that right on February 14, 2017.

452.    A ripe and justiciable controversy exists between Plaintiffs and Defendants concerning the parties' respective rights under these provisions of the Joint Venture Agreement.

453.    Plaintiffs do not have an adequate remedy at law.

454.    Plaintiffs are therefore entitled to a declaration pursuant to DEL. CODE ANN. tit. 10, § 6501 and CPLR § 3001 necessary to preserve their rights in the Joint Venture that Sponsor

was required to close on the Equity Put Right no later than June 14, 2017.

### EIGHTH CLAIM FOR RELIEF
### DECLARATORY JUDGMENT: MANAGER OVERRUNS
#### (Investment and AmBase Corporation Against Sponsor)

455.    Plaintiffs repeat and re-allege each of the foregoing paragraphs as if fully set forth herein.

456.    The Joint Venture Agreement § 3.2(e) requires Sponsor to fund one hundred percent of calls for funding required on account of Manager Overruns.  It further provides that, "the funding of Manager Overruns shall not constitute Additional Capital Contributions and shall not adjust Percentage Interests."

457.    Many of the overruns for which Sponsor called for a capital contribution constituted Manager Overruns.

458.    To the extent of these Manager Overruns, Sponsor's contributions did not constitute Additional Capital Contributions or adjust Percentage Interests.

459.    A ripe and justiciable controversy exists between Plaintiffs and Defendants concerning the parties' respective rights under these provisions of the Joint Venture Agreement.

460.    Plaintiffs do not have an adequate remedy at law.

461.    Plaintiffs are entitled to a declaration pursuant to DEL. CODE ANN. tit. 10, § 6501 and CPLR § 3001 that Investment's equity interest in the Joint Venture was not diluted by its refusal to fund capital calls made as a result of Manager Overruns.

### NINTH CLAIM FOR RELIEF
### DECLARATORY JUDGMENT: REMOVAL OF SPONSOR AS MANAGER
#### (Investment Against Sponsor)

462.    Plaintiffs repeat and re-allege each of the foregoing allegations as if fully set forth herein.

463.    The following Causes have occurred within the meaning of Section 8.10 of the

Joint Venture Agreement, among others:

    a.   Sponsor has failed to honor Investment's exercise of its Equity Put Right in violation of Section 11.5.

    b.   Sponsor has frustrated Investor's exercise of its Equity Put Right in violation of Sections 8.2, 11.5, and the implied covenant of good faith and fair dealing.

    c.   Sponsor has failed to request funding required on account of Manager Overruns in violation of Section 3.2(e).

    d.   Stern and Maloney have failed to meet their completion guaranty obligations, in violation of Section 8.2(c) of the Agreement.

    e.   Sponsor has failed to provide reports and access to books and records concerning the state of the Company, in violation of Section 4.2.

464.    Each of these failures constituted a material breach of the Agreement and caused material damage to Investment.

465.    Investment delivered a valid Cause Notice to Sponsor.

466.    Sponsor failed to cure within the time period permitted by the agreement.

467.    A ripe and justiciable controversy exists between Plaintiffs and Defendants concerning the parties' respective rights under these provisions of the Joint Venture Agreement.

468.    Plaintiffs do not have an adequate remedy at law.

469.    Plaintiffs are therefore entitled to a declaration pursuant to DEL. CODE ANN. tit. 10, § 6501 and CPLR § 3001 necessary to preserve their rights in the Joint Venture, that Cause has occurred and that Plaintiffs are entitled to remove Sponsor as Manager in accordance with the procedures set forth in Section 8.10(a).

## TENTH CLAIM FOR RELIEF
## DECLARATORY JUDGMENT: INSURANCE LOSS FUND
### (Investment, Derivatively on Behalf of the Company, Against JDS Construction)

470.    Plaintiffs repeat and re-allege each of the foregoing allegations as if fully set forth herein.

471.     JDS Construction used the Company's money to purchase insurance coverage in JDS Construction's own name.

472.     JDS Construction has paid at least $16.5 million into a loss fund pursuant to agreements the terms of which provide for the excess in that fund to be returned to JDS Construction.

473.     JDS Construction has repeatedly represented to the members of the Company that any amounts refunded out of the loss fund shall be returned to the Company.

474.     Because Stern, the principal of JDS Construction, has taken the position that the Company dissolved, a ripe and justiciable controversy exists between Plaintiffs and Defendants concerning the parties' respective rights to these funds.

475.     Plaintiffs do not have an adequate remedy at law.

476.     Plaintiffs are therefore entitled to a declaration pursuant to DEL. CODE ANN. tit. 10, § 6501 and CPLR § 3001 necessary to preserve their rights in the Loss Fund that any money returned or refunded under any of the insurance policies purchased for the Project belongs to the Company.

## ELEVENTH CLAIM FOR RELIEF
## BREACH OF CONTRACT
### (Investment and AmBase Corporation Against Sponsor and Company)

477.     Plaintiffs Investment and AmBase Corporation repeat and re-allege each of the foregoing paragraphs as if fully set forth herein.

478.     The Joint Venture Agreement between Plaintiff Investment and Defendant Sponsor is a valid, legally enforceable written agreement.

479.     The Joint Venture Agreement was intended for the immediate, non-incidental benefit of AmBase Corporation.

480.     Plaintiffs Investment and AmBase Corporation substantially performed their obligations under the Joint Venture Agreement by, among other things, making an Initial Capital Contribution and millions of dollars of Additional Capital Contributions.

481.     Sponsor breached its obligations under the Joint Venture Agreement by:

a.     failing to uphold the representations and covenants contained in Section 2.11(b)(i) because Maloney and White failed to devote a substantial portion of their time to the development, construction management, asset management and operation of the Property;

b.     failing to uphold the representations and covenants contained in Section 2.11(c) because Stern and Maloney did not comply with certain financial net worth and liquidity covenants applicable to them under the Construction Loan;

c.     treating their additional contributions under the October and December Capital Calls as Shortfall Contributions despite their failure to qualify as Contributing Members with respect to those Capital Calls, in violation of Section 3.2(c);

d.     depriving Investment of distributions to which it was entitled under Section 6.1(a) according to its actual Percentage Interest;

e.     accepting distributions to which it was not entitled according to its actual Percentage Interest in violation of Section 6.4;

f.     failing to disclose and obtain Investment's approval for transfers of direct and indirect interests in Sponsor in violation of Section 9.1;

g.     failing to request funding required on account of Manager Overruns in violation of Section 3.2(e);

h.     failing to contribute funding required on account of Manager Overruns in violation of Section 3.2(e);

i.     making "Major Decisions" under the Joint Venture Agreement without obtaining Investment's prior written approval in violation of Section 7.2;

j.     failing to provide and seek Investment's approval of regular updated budgets, as required in Sections 7.2(a)(ii) and 8.2(b);

k.     attempting to prevent Investment from exercising its Equity Put Right under

Section 11.5 by failing to produce a budget for Investment's approval as required Sections 7.2(a)(ii) and 8.2(b);

l.       manipulating the budget it finally produced in December 2016 to misrepresent the increase in hard costs in an effort to frustrate Investment's Equity Put Right;

m.      failing to provide Plaintiff Investment with access to books and records to which it is entitled under Sections 4.1 and 4.2;

n.       refusing to cooperate and share information with AmBase's construction consultant, Sterling in violation of Section 7.5;

o.       failing to carry out Sponsor's duties as Manager of the Company in good faith and concealing the fact that its calls for Additional Capital Contributions were due to Manager Overruns, which rendered improper any attempt by Sponsor to dilute Investment's shares;

p.       engaging in arbitrary and unreasonable conduct that prevented Investment from receiving the fruits of its bargain, including its Equity Put Right, in breach of the implied covenant of good faith and fair dealing;

q.       refusing to honor its obligation to fulfill Investment's exercise of the Equity Put Right in February 2017;

r.       failing to meet their guaranty obligations in violation of Section 8.2(c); and

s.       reimbursing themselves for payroll expenses in violation of Section 8.3(b).

482.    As a direct and proximate result of Sponsor's breaches, Plaintiffs have suffered damages, including consequential damages, in an amount to be determined at trial.

### TWELFTH CLAIM FOR RELIEF
### BREACH OF CONTRACT
**(Investment, Derivatively on Behalf of the Company, Against Developer)**

483.    Plaintiffs repeat and re-allege each of the foregoing allegations as if fully set forth herein.

484.    The Development Agreement between the Company and Defendant Developer is a valid, legally enforceable agreement.

485.    Pursuant to the Development Agreement, Developer is obligated to use

"Commercially Reasonable Efforts," as defined in the Development Agreement, to plan, design, develop, construct, and obtain permits for the Property "in a timely manner" and to devote "sufficient time and attention" to doing so.

486.    Developer's duties include obtaining necessary permits, maintaining complete financial records, and supervising architects, engineers, the construction manager, and other professionals involved in improving the Property. Development Agreement § 4.2.

487.    In return for performing under the Development Agreement, Developer is entitled to fees equal to 4% of certain costs. *Id.* § 8.1.

488.    The Company substantially performed its obligations under the Development Agreement by, among other things, paying Developer over $8.5 million in fees.

489.    Defendant Developer breached its obligations under the Development Agreement by, among other things, failing to use "Commercially Reasonable Efforts" to plan, design, develop, construct and obtain permits for the Property in a timely manner and failing to devote sufficient time and attention to its obligations under the Development Agreement.

490.    As a consequence of Developer's breaches of the Development Agreement, the Joint Venture is in mortal peril. As a direct and proximate result of Developer's breaches, the Company has suffered damages, including unearned fees paid to Developer and consequential damages in an amount to be determined at trial.

### THIRTEENTH CLAIM FOR RELIEF
### FRAUDULENT MISREPRESENTATION OR OMISSION
**(Investment and AmBase Against Sponsor, Control, Stern, Phillips, Maloney, and White)**

491.    Plaintiffs repeat and re-allege each of the foregoing allegations as if fully set forth herein.

492.    Defendants fraudulently induced Investment and AmBase to invest in the project

through numerous material misstatements.

493.    On the occasion of each capital call seeking funds to pay for the insurance policy, and in response to specific insurance-related inquiries, Sponsor, Stern, and Phillips fraudulently misrepresented that the insurance policy was for the benefit of the Company and fraudulently omitted to disclose that JDS Construction was the beneficiary of the Loss Fund.

494.    Defendants Sponsor, Control, Stern, and Phillips made these representations with knowledge of their falsity or with recklessness as to whether they were true or false and with the intent to mislead Plaintiffs into relying on them.

495.    These false representations and omissions were material to Plaintiffs' continued participation in the Joint Venture, including specifically their decisions concerning whether and to what extent to participate in the Additional Capital Contributions, and whether to approve the June 2015 Budget and Construction Loan.

496.    Plaintiffs justifiably relied on these misrepresentations and omissions.

497.    As a direct and proximate result of their reliance on these misrepresentations and omissions, Plaintiffs have suffered damages in an amount to be determined at trial.

498.    During the end of 2013 and the first half of 2014, including on the occasion of the March 2014 Capital Call, Sponsor, Stern, Maloney, Phillips and White misrepresented to AmBase that the Joint Venture was being operated in accordance with the last approved budget.

499.    Defendants Sponsor, Control, Stern, Maloney, Phillips, and White made these representations with knowledge of their falsity or with recklessness as to whether they were true or false and with the intent to mislead Plaintiffs into relying on them.

500.    These false representations and omissions were material to Plaintiffs' continued participation in the Joint Venture, including specifically their decisions concerning whether and

to what extent to participate in the Additional Capital Contributions.

501.     Plaintiffs justifiably relied on these misrepresentations and omissions.

502.     As a direct and proximate result of their reliance on these misrepresentations and omissions, Plaintiffs have suffered damages in an amount to be determined at trial.

503.     On the occasion of the February 2015 Shortfall Capital Call, Sponsor, Stern, and Maloney omitted the material fact that Maloney had not made his contribution under the October 2014 Capital Call by the Tender Date and therefore did not qualify as a Contributing Member under the Joint Venture Agreement.

504.     Defendants Sponsor, Stern, and Maloney made these representations with knowledge of their falsity or with recklessness as to whether they were true or false and with the intent to mislead Plaintiffs into relying on them.

505.     These false representations and omissions were material to Plaintiffs' continued participation in the Joint Venture, including specifically their decisions concerning whether and to what extent to participate in the April 2015 Capital Call.

506.     Plaintiffs justifiably relied on these misrepresentations and omissions.

507.     As a direct and proximate result of their reliance on these misrepresentations and omissions, Plaintiffs have suffered damages in an amount to be determined at trial.

508.     Defendants Sponsor, Stern, Maloney, Phillips, and White further fraudulently misrepresented their belief about the remaining costs of construction when they submitted a budget for Investment's approval in June 2015 and on each occasion that they shared loan requisitions with Sterling.  They fraudulently omitted to disclose overruns that were known to them at the time.

509.     Defendants Sponsor, Stern, Maloney, Phillips, and White made these

105

representations with knowledge of their falsity or with recklessness as to whether they were true or false and with the intent to mislead Plaintiffs into relying on them.

510.    These false representations and omissions were material to Plaintiffs' continued participation in the Joint Venture, including specifically their decisions about whether to approve the June 2015 Budget and Construction Loan and whether to call for manager overrun contributions.

511.    Plaintiffs justifiably relied on these misrepresentations and omissions.

512.    As a direct and proximate result of their reliance on these misrepresentations and omissions, Plaintiffs have suffered damages in an amount to be determined at trial.

## FOURTEENTH CLAIM FOR RELIEF
## BREACH OF FIDUCIARY DUTY
### (Investment Against Sponsor, Stern, and Maloney)

513.    Plaintiff Investment repeats and re-alleges each of the foregoing allegations as if fully set forth herein.

514.    As a co-participant in the Joint Venture and manager of the Company, Sponsor owed Investment fiduciary duties, including the duties of loyalty and care.

515.    As Principals of Sponsor and the Company, Stern and Maloney owed Investment fiduciary duties, including the duties of loyalty and care.

516.    Sponsor, Stern, and Maloney breached their fiduciary duties of loyalty by:

   a.    Using Company money to purchase insurance coverage in the name of Stern's personal companies and naming that company as the beneficiary of a $16.5 million Loss Fund;

   b.    Artificially inflating payroll expenses and reimbursing themselves with partnership funds;

   c.    Managing the contracting process with an eye toward their independent

106

financial interests instead of those of the Project.

517.    Although Section 8.5 of the Joint Venture Agreement purports to waive its members' fiduciary duties, the waiver does not apply for acts or omissions that involve "fraud, intentional misconduct or a knowing and culpable violation of law" or for any transaction not authorized under the Joint Venture Agreement from which a party derives personal benefit.

518.    Sponsor, Stern, and Maloney breached their fiduciary duties to Investment by engaging in fraud and intentional misconduct and entering into transactions not permitted or authorized under the Joint Venture Agreement and deriving a personal benefit therefrom.

519.    Sponsor benefited from these breaches in a number of ways, including that its affiliates received higher payments out of partnership funds and obtained more favorable insurance coverage and lower trade costs on other projects. As a direct and proximate result of Sponsor's breaches, Investment has suffered damages in an amount to be determined at trial.

### FIFTEENTH CLAIM FOR RELIEF
### DEMAND FOR BOOKS AND RECORDS
### PURSUANT TO DEL. CODE ANN. TIT. 6, § 18-305
#### (Investment Against Sponsor and the Company)

520.    Plaintiff Investment repeats and re-alleges each of the foregoing allegations as if fully set forth herein.

521.    Investment seeks the information specified in Exhibit O and subsequent books and records requests for purposes reasonably related to its interest as a member of the Company.

522.    Specifically, Investment seeks the information for the purpose of "assess[ing] the status of the Company, the circumstances surrounding purported capital calls, changes that may have a material impact on [Investment's] investment, and the financial condition of the Project."

523.    As alleged above, Investment has a credible basis for believing that Sponsor and the other Defendants devised an unlawful scheme to obtain profits from the Joint Venture to

which they were not entitled, to dilute Investment's rights, and to frustrate AmBase's Equity Put Right.

524.    The records would show, *inter alia*, the causes of the budget overruns, the necessity of the October 2014 and subsequent capital calls, the terms of the third-party funding on which Sponsor relied to meet the capital calls, the circumstances surrounding the dilution of Investment's ownership of the Company, and the arrangements surrounding the June 2015 loans. They are therefore essential for confirming and remedying the wrongful conduct alleged in this amended complaint.

525.    Investment is entitled to an order from this Court requiring Sponsor to produce the requested books and records.

526.    Investment has complied with the provisions of the Joint Venture Agreement and Section 18-305 of the Delaware Limited Liability Company Act relating to the form and manner of making a demand for the right to inspect, copy and take extracts of the requested information.

## SIXTEENTH CLAIM FOR RELIEF
## ACCOUNTING
### (Investment and Manager Funding Against Sponsor and Control)

527.    Plaintiffs repeat and re-allege each of the foregoing allegations as if fully set forth herein.

528.    As a co-participant in the Joint Venture and manager of the Company, Sponsor owed Investment certain fiduciary duties, including the duties of loyalty and care.

529.    As fellow members of Manager LLC, Control and Manager Funding owed each other certain fiduciary duties, including the duties of loyalty and care.

530.    Under the Joint Venture Agreement, Sponsor was entrusted with money or property in which Investment has an interest. Sponsor therefore is subject to the burden of accounting.

531.     Under the Manager LLC Agreement, Control was entrusted with money or
property in which Manager Funding has an interest. Control therefore is subject to the burden of
accounting.

532.     Sponsor has not responded to Investment's demands for an accounting.

533.     Control has not responded to Manager Funding's demands for an accounting.

534.     There is no adequate remedy at law.

<div align="center">

**SEVENTEENTH CLAIM FOR RELIEF**
**CONTRACTUAL INDEMNIFICATION**
**(Investment and AmBase Corporation Against Sponsor, Stern, and Maloney)**

</div>

535.     Plaintiffs repeat and re-allege each of the foregoing allegations as if fully set forth
herein.

536.     Under Section 8.7(b) of the Joint Venture Agreement, Sponsor, Stern, and
Maloney indemnify Investment and AmBase Corporation "for any loss, damage or claim
incurred by such Persons by reason of (i) the gross negligence, criminal acts, willful misconduct
or fraud by [Stern, Maloney], Sponsor or any of their respective Affiliated Persons, and/or (ii) in
respect of any loss, damage or claim resulting from a material breach by Sponsor or any of its
Affiliated Persons of any provision or representation and warranty contained in this Agreement
or any other agreement of the Company or its Subsidiaries with respect to any act or omission
performed or omitted by such Person unless such Person cures such material breach within thirty
(30) days of receiving written notice of such material breach from" Investment.

537.     Under Limited Joinders annexed to the Joint Venture Agreement, and in exchange
for acknowledged good and valuable consideration, Stern and Maloney agreed to indemnify
Investment and AmBase Corporation for Cause and under Section 8.7 on a joint and several
basis with each other and with Sponsor.

538.     As alleged above, Stern, Maloney, and Sponsor and its Affiliates engaged in

<div align="center">109</div>

willful misconduct and fraud.

539.    As alleged above, Investment and AmBase Corporation have incurred claims and have suffered loss and damage in an amount to be proven at trial by reason of that willful misconduct and fraud.

540.    As alleged above, Sponsor and its Affiliates have materially breached the Joint Venture Agreement by performing acts that are contrary to the Joint Venture Agreement and by omitting to perform acts required by the Joint Venture Agreement, including without limitation by failing to honor Investment's Equity Put Right.

541.    As alleged above, Investment and AmBase Corporation have incurred claims and have suffered loss and damage in an amount to be proven at trial as a result of these material breaches.

542.    Investment has given Sponsor notice of these breaches and Causes, and Sponsor has refused to cure them.

543.    Investment and AmBase are therefore entitled to indemnification from Sponsor, Stern, and Maloney, on a joint and several basis, for loss and damages in an amount to be proven at trial.

544.    Investment and AmBase are also entitled to a declaration pursuant to DEL. CODE ANN. tit. 10, § 6501 and CPLR § 3001, that Sponsor, Stern, and Maloney must indemnify them for all losses, damages, and claims resulting from Stern's, Maloney's, Sponsor's, or an Affiliated Person's willful misconduct, fraud, contractual breaches, and Causes.

**EIGHTEENTH CLAIM FOR RELIEF**
**BREACH OF CONTRACT**
**(Manager Funding Against Control)**

545.    Plaintiff Manager Funding repeats and re-alleges each of the foregoing paragraphs as if fully set forth herein.

546.    The Manager LLC Agreement between Manager Funding and Control is a valid, legally enforceable written agreement.

547.    Under the Manager LLC Agreement, Control is generally prohibited from making permitting transfers of or encumbrances upon its direct or indirect membership interests without obtaining the prior written approval of Manager Funding. Manager LLC Agreement § 9.1(a).

548.    Plaintiff Manager Funding substantially performed its obligations under the Manager LLC Agreement by, among other things, making an Initial Capital Contribution and Additional Capital Contributions.

549.    Defendant Control breached its obligations under the Manager LLC Agreement by, among other things, effectuating direct or indirect transfers of interests in Control in connection with PMG LLC's shortfalls without seeking or obtaining Manager Funding's prior written approval.

550.    Defendant Control further breached its obligations under the Manager LLC Agreement by permitting transfers of or encumbrances upon its membership interests in connection with third party financing without seeking or obtaining Manager Funding's prior written approval.

551.    As a direct and proximate result of Control's breaches, Manager Funding has suffered damages, including consequential damages, in an amount to be determined at trial.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiffs pray for relief against Defendants as follows:

(i)     Judgment pursuant to DEL. CODE ANN. tit. 10, § 6501 and CPLR § 3001 declaring the rights and other legal relations of the parties hereto with respect to the Joint Venture Agreement;

(ii)     Granting Plaintiffs damages in an amount to be proven at trial;

(iii)    Ordering Defendants Sponsor and Control to perform accountings;

(iv)    Awarding Plaintiffs three times the damages they have sustained to their business

and property by reason of Defendants' racketeering activity;

(v)     Awarding Plaintiffs their reasonable costs, including attorneys' fees, incurred in

bringing their RICO claims;

(vi)    Awarding Plaintiffs punitive damages in an amount to be determined at trial;

(vii)   Awarding Plaintiffs indemnification for their losses, damages, claims, costs, and

attorneys' fees, in an amount to be determined at trial;

(viii)  Granting Plaintiffs such other and further relief as the Court may deem just and

proper.

Date:   April 26, 2018
        New York, New York

**COOPER & KIRK, PLLC**                     **MEISTER SEELIG & FEIN LLP**
        David H. Thompson*
        Peter A. Patterson*
        Brian W. Barnes**                   By:_____
        Nicole J. Moss*
        Haley N. Proctor*                           Stephen B. Meister, Esq.
*Pro Hac Vice*                                       Stacey M. Ashby, Esq.
**Pro Hac Vice Forthcoming*                        Kevin A. Fritz, Esq.
1523 New Hampshire Avenue, N.W.                    Eugene Meyers, Esq.
Washington, D.C. 20036                      125 Park Avenue, 7th Floor
Phone: (202) 220-9600                       New York, New York 10017
dthompson@cooperkirk.com                    Phone: (212) 655-3500
*Attorneys for Plaintiffs*                  sbm@msf-law.com
                                            *Attorneys for Plaintiffs*

# EXHIBIT A

EXECUTION VERSION

111 West 57th Partners LLC

Amended and Restated

Limited Liability Company Agreement

Dated as of December 17, 2013

111 West 57th Partners LLC

Amended and Restated

Limited Liability Company Agreement

<u>TABLE OF CONTENTS</u>

| | | |
|---|---|---|
| Article I. | DEFINITIONS | 1 |
| Article II. | FORMATION OF LIMITED LIABILITY COMPANY | 13 |
| Article III. | CAPITALIZATION | 18 |
| Article IV. | BOOKS; REPORTS; TAX ELECTIONS; ACCOUNTS | 27 |
| Article V. | ALLOCATIONS | 31 |
| Article VI. | DISTRIBUTIONS | 33 |
| Article VII. | RIGHTS AND OBLIGATIONS OF THE MEMBERS | 37 |
| Article VIII. | RIGHTS AND OBLIGATIONS OF MANAGER | 40 |
| Article IX. | TRANSFERS OF INTERESTS | 49 |
| Article X. | TERMINATION | 51 |
| Article XI. | LIQUIDITY EVENTS | 52 |
| Article XII. | MISCELLANEOUS | 59 |

Index of Exhibits

Exhibit A – Initial Business Plan and Budget

Exhibit B – Development Agreement

Index of Schedules

Schedule 2.8 – List of Manager's Members

Schedule 2.12 – Side Agreements

i

Schedule 3.1 – Initial Capital Contributions of the Members

Amended and Restated Limited Liability Company Agreement

This Amended and Restated Limited Liability Company Agreement (this "Agreement") of 111 West 57th Partners LLC (the "Company"), is dated as of December 17, 2013, by and among 111 West 57th Sponsor LLC, a Delaware limited liability company ("Sponsor"), as Manager and a Member, 111 West 57th Investment LLC, a Delaware limited liability company ("Investor"), as a Member, and Atlantic 57 LLC, a Delaware limited liability company ("Atlantic"), as a Member (Sponsor, Investor and Atlantic in their capacities as Members are collectively referred to herein as the "Members").

WITNESSETH THAT:

WHEREAS, Sponsor and Investor entered into that certain Limited Liability Company Agreement of the Company, dated as of June 28, 2013, between Sponsor and Investor (the "Original Company Agreement");

WHEREAS, Sponsor and Investor desire to admit Atlantic as a Member (pursuant to a Transfer of a portion of Sponsor's membership interests in the Company to Atlantic); and

WHEREAS, the Members desire to amend and restate the Original Company Agreement in its entirety as set forth herein and to continue the existence of the Company pursuant to the Delaware Limited Liability Company Act, 6 Del. C. § 18-101 et seq. (as from time to time amended and including any successor statute, the "Act").

NOW, THEREFORE, in consideration of the mutual covenants herein contained and other valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto do hereby agree as follows:

## ARTICLE I.

## DEFINITIONS

Certain capitalized terms used in this Agreement shall have the meanings set forth below or in the Section of this Agreement referred to below:

1.1.    "20% Priority Distribution" means, as of any date with respect to any Member, an amount which, if distributed to such Member as of such date, would cause the aggregate amount of Capital Contributions (other than Additional Capital Contributions made on account of Manager Overruns) made by such Member to the Company to have yielded an IRR of twenty percent (20%).

1.2.    "Accountant(s)" means such firm of independent certified public accountants for the Company and any Subsidiaries as may be engaged from time to time by Manager subject to the prior approval of Investor, it being agreed that either Cornerstone Accounting Group LLP and/or Cywiak & Co. CPA are hereby preapproved.

1

1.3.   "Act" is defined in the recitals to this Agreement.

1.4.   "Additional Capital Contributions" is defined in Section 3.2.

1.5.   "Additional Member Entity" is defined in Section 2.8.

1.6.   "Affiliated Person" or "Affiliate" means, with respect to any Person, any other Person controlling or controlled by or under common control with such Person.  For purposes of this definition, the term "control" when used with respect to any Person means the power to direct the management and policies of such Person, directly or indirectly, whether as an officer, director, member, or otherwise through the ownership of voting securities, by contract or otherwise, and the terms "controlling" and "controlled" shall have meanings correlative to the foregoing.

1.7.   "Agreement" means this Agreement, as it may be amended, restated or supplemented from time to time.

1.8.   "Anticipated Additional Equity Amount" is defined in Section 3.2(d).

1.9.   "Asset" or "Assets" means the real and personal property from time to time owned or held by the Company or any Subsidiary (including all right, title and interest of the Company or any Subsidiary in and to all or any portion of any property (real, personal, tangible or intangible) or estate acquired in connection therewith).

1.10.  "Assumed Tax Rate" means a rate equal to the sum of (a) the highest federal income tax rate applicable to either corporations or individuals, plus (b) the highest combined marginal state and local income or franchise tax rates applicable to corporations or individuals, whichever is higher.

1.11.  "Atlantic" is defined in the first paragraph of this Agreement.

1.12.  "Atlantic Principal" means Arthur Becker.

1.13.  "Atlantic's Additional Equity Notice" is defined in Section 3.2(d).

1.14.  "Book Value" means, as of any particular date with respect to an Asset, the adjusted tax basis of such Asset, except as otherwise provided herein.  The initial Book Value of each Asset shall be its cost, unless such Asset was contributed to the Company by a Member, in which case the initial Book Value shall be the fair market value of such Asset as stated in Section 3.1 (or, if no such value is stated in Section 3.1, as otherwise reasonably determined by the Members).  The Book Values of the Property shall be adjusted to equal its fair market value, as reasonably determined by the Members, as of the following times: (i) the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a de minimis additional Capital Contribution; (ii) the acquisition of an additional interest (other than a de minimis interest) in the Company as consideration for the provision of services as described in Regulations Section 1.704-1(b)(2)(iv)(f)(5)(iii); and (iii) the distribution by the Company to a Member of more than a de minimis amount of Assets, including money, as

consideration for an interest in the Company; and (iii) the liquidation of the Company within the meaning of Regulations Section 1.704-1(b)(2)(iv)(5)(ii). Unless otherwise reasonably determined by the Members, the making of Additional Capital Contributions and the resulting adjustments to Percentage Interests under Article 3 hereof shall not be treated as the acquisition of an additional interest in the Company for purposes of the preceding clause (i) and will therefore not cause an adjustment to the Book Value of Assets. The Book Values of the Assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such Assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Regulation Section 1.704- 1(b)(2)(iv)(m); provided, however, that the Book Values shall not be adjusted pursuant to this sentence to the extent that the Members determine that such an adjustment would be duplicative of an adjustment made pursuant to the preceding sentences.

If the initial Book Value of an Asset is not its cost, or if the Book Value of an Asset is adjusted pursuant to either of the two preceding sentences, such Book Value shall thereafter be adjusted for Depreciation with respect to such Asset rather than for the cost recovery deductions to which the Company is entitled for income tax purposes with respect thereto. The Book Value of any Asset distributed to a Member shall be adjusted to equal the fair market value of such Asset on the date of the distribution, as reasonably determined by the Members.

1.15. "Budget" is defined in Section 8.2(b).

1.16. "Business Day" means any day except a Saturday, Sunday or other day that in New York, New York is a legal holiday or a day on which banking institutions are authorized by law or executive action to close.

1.17. "Business Plan" is defined in Section 8.2(b).

1.18. "Buying Election" is defined in Section 11.1(a).

1.19. "Buying Member" is defined in Section 11.1(a).

1.20. "Buy-Sell Closing Date" is defined in Section 11.1(b).

1.21. "Buy-Sell Deposit" is defined in Section 11.1(b).

1.22. "Buy-Sell Election Period" is defined in Section 11.1(a).

1.23. "Buy-Sell Value" is defined in Section 11.1(a).

1.24. "Capital Account" is defined in Section 3.4.

1.25. "Capital Contributions" means the total amount of cash and other property contributed or deemed contributed to the Company by the Members in accordance with the terms of this Agreement, other than on account of Manager Overruns.

3

1.26.  "Cash" shall mean money, currency or a credit balance in any demand or deposit account, other than an account evidenced by a negotiable certificate of deposit.

1.27.  "Cash Equivalents" shall mean any of the following:  (A) marketable direct obligations issued by, or unconditionally guaranteed by, the United States of America or issued by any agency or instrumentality thereof and backed by the full faith and credit of the United States of America; (B) time deposits, demand deposits, certificates of deposit, Eurodollar time deposits, time deposit accounts, term deposit accounts or bankers' acceptances maturing within two years from the date of acquisition thereof or overnight bank deposits; (C) investments in money market funds which invest substantially all their assets in securities of the types described in clauses (A) through (B) above; and (D) marketable securities publicly-traded on a recognized stock exchange or traded over the counter and listed in the National Association of Securities Dealers Automatic Quotations.

1.28.  "Cause" is defined in Section 8.10(c).

1.29.  "Cause Notice" is defined in Section 8.10.

1.30.  "Certificate" means the Certificate of Formation of the Company as provided for pursuant to the Act, as originally filed with the office of the Secretary of State of the State of Delaware and as amended, supplemented and restated from time to time.

1.31.  "Clawback Obligation" is defined in Section 6.2(b).

1.32.  "Closing Date" means June 28, 2013.

1.33.  "Code" means the Internal Revenue Code of 1986, as amended and in effect from time to time.

1.34.  "Company" means the limited liability company formed under this Agreement, as such company may from time to time be constituted.

1.35.  "Company Overruns" means all Cost Overruns that are not Manager Overruns.

1.36.  "Competitor" shall mean any Person with an economic interest in a new construction or development project for residential, hotel or retail condominiums within the geographical area of Manhattan bound by the west side of Ninth Avenue to the West, the south side of 47th Street to the South, the east side of Park Avenue to the East, and the north side of 67th Street to the North (as if 67th Street ran contiguously through Central Park).

1.37.  "Contributing Member" is defined in Section 3.3(a).

1.38.  "Construction Loan" is defined in Section 3.2(d).

1.39.  "Construction Loan Notice" is defined in Section 3.2(d).

1.40.  "Consultation Period" is defined in Section 3.9.

4

1.41.   "Cost Overruns" means the amounts by which any and all costs of every kind or nature that are required to be incurred by the Company or a Subsidiary, as reasonably determined by Manager, to obtain and maintain proper entitlements for, pre-develop, develop, construct and/or operate the Property exceed the amounts allocated therefor in the applicable the Budget that is then in effect, subject in each case only to Permitted Variances; for the avoidance of doubt Cost Overruns shall not include scope changes to the design of the development of the Property.

1.42.   "Credit Enhancements" is defined in Section 8.2(c).

1.43.   "Deadlock Notice" is defined in Section 8.9.

1.44.   "Depreciation" means, for each fiscal year or other period, an amount equal to the depreciation, amortization or other cost recovery deduction allowable with respect to an Asset for such year or other period, except if the Book Value of an Asset differs from its adjusted basis for federal income tax purposes at the beginning of any such year or other period, Depreciation shall be an amount that bears the same relationship to the Book Value of such Asset as the depreciation, amortization or other cost recovery deduction computed for tax purposes with respect to such Asset for the applicable period bears to the adjusted tax basis of such Asset at the beginning of such period, or if such Asset has a zero adjusted tax basis, Depreciation shall be an amount determined under any reasonable method selected by the Members.

1.45.   "Development Agreement" means that certain Development Agreement, attached hereto as Exhibit B, entered into as of the date hereof between the Company or a Subsidiary and an Affiliate of Sponsor pertaining to the Property, as such Development Agreement may be amended, modified, replaced or supplemented from time to time.

1.46.   "Disposition" means any sale, transfer, repayment or assignment of all or any portion of any Asset.

1.47.   "Distributable Cash" is defined in Section 6.1(a).

1.48.   "Dollars" or "$" means United States dollars.

1.49.   "Emergency" means an event that reasonably requires immediate action in order to avert or mitigate significant physical harm to any individual or significant physical damage to the Property.

1.50.   "Entity" means any general partnership, limited partnership, limited liability partnership, corporation, professional corporation, joint venture, limited liability company, professional limited liability company, trust, business trust, cooperative or association or other similar entity constituted under the laws of any state, the United States or any foreign country.

1.51.   "Equity Purchase Agreement" shall mean that certain Purchase and Sale Agreement, dated March 25, 2013, between Equity Seller and the Company.

1.52.   "Equity Put Closing Date" is defined in Section 11.5.

5

1.53.  "Equity Put Notice" is defined in Section 11.5.

1.54.  "Equity Put Option Notice" is defined in Section 11.6(a).

1.55.  "Equity Put Option Period" is defined in Section 11.6(b).

1.56.  "Equity Put Purchase Price" is defined in Section 11.5.

1.57.  "Equity Put Tag-Along Exercise Notice" is defined in Section 11.6(b).

1.58.  "Equity Put Tag-Along Price" is defined in Section 11.6(a).

1.59.  "Equity Put Tag-Along Right" is defined in Section 11.6(a).

1.60.  "Equity Seller" shall mean 57th Street Partners NY, L.L.C.

1.61.  "Excess Distributions" means the excess, if any, of (a) the cumulative distributions of Net Cash Flow and Net Proceeds received or deemed received by Manager over the life of the Company under Section 6.1(a)(iii)(b) (or Section 6.1(b)(v)(b), as applicable) over (b) the Target Carried Interest.

1.62.  "Exercise Period" is defined in Section 3.2(d).

1.63.  "Fees" means the fees payable by the Company or any Subsidiary pursuant to Section 8.8 of this Agreement.

1.64.  "Force Majeure" shall mean any circumstances resulting from any unforeseen causes or conditions beyond Sponsor's reasonable control, including, without limitation, (i) strikes or labor troubles, (ii) governmental preemption in connection with a national emergency, (iii) any rule, order or regulation of any government agency or any department or subdivision thereof, whether in connection with a drought, energy shortage or other like event or otherwise, (iv) any fact, condition or circumstance related to war, terrorism or other local or national emergency, (v) fire, casualty or other acts of God (including the time necessary to repair any damage caused thereby) or (vi) other like circumstances.

1.65.  "Forced Sale Option Notice" is defined in Section 11.4(a).

1.66.  "Forced Sale Option Period" is defined in Section 11.4(b).

1.67.  "Forced Sale Exercise Notice" is defined in Section 11.4(b).

1.68.  "Forced Sale Tag-Along Price" is defined in Section 11.4(a).

1.69.  "Forced Sale Tag-Along Right" is defined in Section 11.4(a).

1.70.  "Immediate Family" means (i) Investor Representative's wife and/or children, (ii) a wholly owned limited liability company by any of Investor Representative, his wife and/or

children or (iii) a trust in which Investor Representative's wife and/or children is the beneficiary thereto.

1.71. "Initial Capital Contribution" is defined in Section 3.1.

1.72. "IRR" means, with respect to any Member, an internal rate of return (stated as an annual percentage rate), calculated using the XIRR function in Microsoft Excel (which incorporates monthly compounding), based on all Capital Contributions (other than Additional Capital Contributions made on account of Manager Overruns) made or deemed made by such Member to the Company including amounts contributed or deemed contributed prior to the date of formation of the Company, as of the respective dates on which such Capital Contributions are received or deemed received by the Company, and taking into account all Applicable Distributions (as hereinafter defined) made by the Company to such Member as of the respective dates received or deemed received by such Member. As used herein, the term "Applicable Distributions" shall mean when determining whether or not a distribution would yield an IRR of twenty percent (20%), the aggregate distributions made under Section 6.1(a)(i) (whether by reason of a distribution under Section 6.1(a) or a distribution under Section 6.2(a)(iii)) or 6.1(b)(i) or (iii) (whether by reason of a distribution under Section 6.1(b) or a distribution under Section 6.2(a)(iii)), as applicable.

1.73. "Investor" is defined in the first paragraph of this Agreement.

1.74. "Investor Principal" means AmBase Corporation a publicly traded corporation and its successors.

1.75. "Investor Representative" means Richard A. Bianco.

1.76. "Investor's Additional Equity Notice" is defined in Section 3.2(d).

1.77. "Landmarks Certificate" means a Certificate of Appropriateness issued by the Landmarks Preservation Commission approving a building which consists of the existing Steinway Building located on lot 25 of the Property, and an enlargement that shall have a height of 970 feet; shall have a zoning floor area of no less than 306,000 square feet; of which no less than a zoning floor area of 168,000 square feet shall be used for residential use, shall be located in the tower portion of the enlargement, and shall be no lower than 200 feet above average curb level in front of the Preferred Building on West 57th Street; provided that the time for appeal of the Landmark Preservation Commission's decision has expired. Zoning floor area shall mean floor area as such term is defined in the Zoning Resolution of the City of New York.

1.78. "Liquidating Transaction" is defined in Section 6.2(a).

1.79. "Liquidity" means, as of any date, the amount of Unrestricted Cash held by such Person on such date.

1.80. "Lockout Date" is defined in Section 11.1(a).

1.81. "Major Decision Dispute" is defined in Section 8.9.

1.82.    "Manager" means the Person designated as Manager in the preamble of this Agreement, together with any Person who becomes a substituted or an additional Manager as provided herein, in each instance in such Person's capacity as a Manager of the Company.

1.83.    "Manager Overruns" shall mean Cost Overruns that are (i) reasonably expected to have been anticipated and budgeted for by a developer acting in good faith and in a commercially reasonable and prudent manner in the planning and oversight of projects similar in size, type, and scope as the development of the Property and (ii) not attributable to Force Majeure.

1.84.    "Member" means the Persons designated as Members in the first paragraph of this Agreement, together with any Person who becomes a substituted or an additional Member as provided herein.

1.85.    "Member Loan" is defined in Section 3.3(b).

1.86.    "Member Loan Rate" means twenty percent (20%) per annum compounded monthly.

1.87.    "Net Cash Flow" means, with respect to any calendar month or other period, all cash revenues, released reserves and other funds received by the Company (other than funds received as Capital Contributions and other funds received from third-party lenders unless the lender of such funds and the Company intend that such funds be distributed to the Members), reduced by the sum of the following: (i) all sums paid to lenders by the Company during such calendar month or other period, (ii) all cash expenditures and reserves made during such calendar month or other period which are provided for in the Business Plan and Budget (or any updates thereto) approved by Sponsor and Investor pursuant to Section 7.2(a), subject to the Permitted Variances, (iii) any other cash expenditures of the Company approved or expressly permitted hereunder and (iv) any expenses or expenditures incurred by Manager or any Affiliated Person with respect to Manager, to the extent reimbursement of such expenses is included in the approved Business Plan and Budget, subject to the Permitted Variances, or has been approved by Sponsor and Investor pursuant to Section 7.2(a).  There shall not be included as reasonable and necessary cash expenditures of the Company during any calendar month or other period, or otherwise charged against Net Cash Flow, any amount representing overhead or payroll costs of Manager or of any Affiliated Person with respect to Manager (except to the extent set forth in the Budget, subject to the Permitted Variances, and except that cash expenditures shall include Fees provided for in this Agreement).

1.88.    "Net Excess Distributions" means (a) the Excess Distributions minus (b) the aggregate amount of taxes payable thereon calculated based on the Assumed Tax Rate plus (c) the aggregate amount of any income tax benefit deemed realized or reasonably expected to be realized by Sponsor and the individual members of Sponsor, as applicable, as a result of any contribution or repayment to the Company of such Net Excess Distributions.

1.89. "<u>Net Proceeds</u>" means the gross proceeds from a Disposition less all costs and expenses (including broker fees, closing costs, repayment of indebtedness and related prepayment penalties) incurred in connection therewith.

1.90. "<u>Net Worth</u>" means, as of a given date, (x) the total assets of such Person as of such date, less (y) such Person's total liabilities as of such date.

1.91. "<u>Non-Contributing Member</u>" is defined in <u>Section 3.3(a)</u>.

1.92. "<u>Notice</u>" is defined in <u>Section 12.1(b)</u>.

1.93. "<u>OFAC</u>" means the United States Treasury's Office of Foreign Assets Control.

1.94. "<u>Offeree</u>" is defined in <u>Section 11.1(a)</u>.

1.95. "<u>Offeror</u>" is defined in <u>Section 11.1(a)</u>.

1.96. "<u>Original Company Agreement</u>" is defined in the recitals to this Agreement.

1.97. "<u>Partnership Reserve</u>" means the one-time reserve held by the Company in the amount of Ten Million and No/100 Dollars ($10,000,000.00), which was funded on the Closing Date. For purposes of clarity, any funds deposited in this reserve after the Closing Date and/or any funds deposited in any other reserve at any time shall not be deemed a part of the "Partnership Reserve".

1.98. "<u>Patriot Act</u>" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, P.L. 107-56 and the regulations issued thereunder, all as amended and in effect.

1.99. "<u>Percentage Interest</u>" means, subject to the express terms of this Agreement (including <u>Section 3.7</u>), with respect to a Member, a fraction (expressed as a percentage) equal to such Member's aggregate Capital Contributions divided by the aggregate Capital Contributions of all Members; and as of the date hereof, with respect to Sponsor, fourteen and seven-tenths percent (14.7%), with respect to Atlantic, twenty-six and three-tenths percent (26.3%) and with respect to Investor, fifty-nine percent (59%), in each case as more particularly specified in <u>Schedule 3.1</u> and as such percentage may be adjusted from time to time pursuant to the provisions of this Agreement, including by reason of any transfer of an interest in the Company (including a transfer pursuant to <u>Section 3.7</u>).

1.100. "<u>Permitted Variance</u>" with respect to the matters contained in any Budget that is then in effect, (a) increases to all non-discretionary line items (i.e., real estate taxes, insurance costs, etc.) equal to the actual cost increases for such line items, (b) reallocation of any line item realized cost savings and/or (c) any expenditure that does not cause the aggregate amount of expenditures in the line item reflecting the total aggregate costs contained in such Budget to be exceeded by (A) if prior to the closing of the Construction Loan, more than seven and a half percent (7.5%) of the amount approved for such line item in such Budget or (B) if after the closing of the Construction Loan, more than five percent (5%) of the amount approved for such

line item in such Budget, provided, however, that for purposes of this clause (c), the Partnership Reserve shall not be deemed to be included in (x) aggregate costs and/or (y) line item costs contained in such Budget.

1.101. "Person" means any individual or Entity, and the heirs, executors, administrators, legal representatives, permitted successors and assigns of such individual or Entity where the context so admits.

1.102. "Principal" is defined in Section 2.8.

1.103. "Profit" or "Loss" will be determined for each taxable year or other relevant period by calculating the sum of (i) an amount equal to the Company's income or loss for such year or period for federal income tax purposes, including all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1), plus (ii) any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profit or Loss pursuant to this provision, and minus (iii) any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Regulation Section 1.704-1(b)(2)(iv)(i) and not otherwise taken into account in computing Profit or Loss pursuant to this provision. In the event the Book Value of any Asset is adjusted pursuant to the definition of Book Value, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such Asset and allocated in the same manner as Profit or Loss would be allocated.

For purpose of calculating Profit or Loss: (i) gain or loss resulting from any disposition of an Asset shall be computed by reference to the Book Value of the Asset rather than the adjusted tax basis of such Asset; and (ii) in lieu of depreciation, amortization, and other cost recovery deductions taken into account in computing taxable income or loss, there shall be taken into account Depreciation.

If the amount calculated in the manner provided above is a positive amount, such amount shall be the Company's Profit for such fiscal year or other period; and if negative, such amount shall be the Company's Loss for such fiscal year or other period.

1.104. "Prohibited Person" means any Person that is named on the most current list of "Specially Designated Nationals and Blocked Persons" published by the United States Treasury Department, Office of Foreign Assets Control.

1.105. "Promoted Interest" means the portion of the interest in the Company represented by distributions made or to be made to Sponsor under Section 6.1(a)(iii)(b) or 6.1(b)(v)(b), as applicable.

1.106. "Property" means the real property located at 105 through 111 West 57th Street in New York, New York acquired by the Company pursuant to the Purchase Agreement.

1.107. "Protective Company Overrun" is defined in Section 3.9.

10

1.108. "Purchase Agreement" means, collectively, (i) that certain Purchase and Sale Agreement, dated March 25, 2013, between 57th Street Partners NY, LLC, as seller, and the Company, as buyer, as amended by that certain First Amendment to Purchase and Sale Agreement, dated May 30, 2013, between 57th Street Partners NY, LLC and the Company, (ii) that certain Purchase and Sale Agreement dated March 25, 2013, by and between Steinway, Inc., as seller, and 111 West 57th LH LLC, as buyer, as amended by (a) that certain First Amendment to Purchase and Sale Agreement, dated May 30, 2013, between Steinway, Inc. and 111 West 57th LH LLC and (b) that certain Second Amendment to Purchase and Sale Agreement, dated June 20, 2013, between Steinway, Inc. and 111 West 57th LH LLC, and (iii) that certain Purchase and Sale Agreement dated March 25, 2013, by and between 111 West 57th Street Associates, L.P., as seller, and 111 West 57th FE LLC, as buyer, as amended by that certain First Amendment to Purchase and Sale Agreement, dated May 30, 2013, between 111 West 57th Street Associates, L.P. and 111 West 57th FE LLC.

1.109. "Qualified Investor" means any Person with a minimum Net Worth of $100,000,000 and available Liquidity of $50,000,000, or an entity wholly owned and controlled by such Person.

1.110. "Regulation" or "Regulations" means the federal income tax regulations promulgated under the Code, as such Regulations may be amended from time to time.

1.111. "Removal Date" is defined in Section 8.10(a).

1.112. "Removing Member" is defined in Section 8.10.

1.113. "ROFO Deposit" is defined in Section 11.2(b).

1.114. "ROFO Offer" is defined in Section 11.2(b).

1.115. "ROFO Price" is defined in Section 11.2(b).

1.116. "ROFO Withdrawal Notice" is defined in Section 11.4(e).

1.117. "Selling Election" is defined in Section 11.1(a).

1.118. "Selling Member" is defined in Section 11.1(a).

1.119. "Selling Member Guarantors" is defined in Section 11.1(c).

1.120. "Shortfall Contribution" is defined in Section 3.3(a).

1.121. "Sponsor" is defined in the first paragraph of this Agreement.

1.122. "Sponsor's Additional Equity Notice" is defined in Section 3.2(d).

1.123. "Subsidiary" means a Delaware limited liability company wholly and directly owned by the Company that has been established to own all or a part of the Property.

11

1.124. "Substantial Completion Date" means the first date on which the only items of development of the Property pursuant to the Budget remaining to be performed are minor or insubstantial details of construction, mechanical adjustment or decoration, the non-completion of which does not materially interfere with the proposed use of the Property.

1.125. "Target Capital Account" means, with respect to any Member for any taxable period, an amount equal to the hypothetical distribution such Member would receive (minus the amount the Member would be required to contribute, if any) if all the Assets held by the Company (including cash) were sold for cash equal to the Book Value of such Assets (taking into account any depreciation allowable for such period), all liabilities of the Company, including all liabilities encumbering or associated with Assets directly or indirectly held by the Company, were satisfied in cash according to their terms (limited, with respect to each nonrecourse liability of each entity, to the Property securing such liability), and the net proceeds of such hypothetical transactions and all cash otherwise available (after satisfaction of such liabilities) were distributed in full pursuant to Section 6.1 hereof.

1.126. "Target Carried Interest" means the amount that Sponsor would have received from the Promoted Interest in accordance with Sections 6.1 and 6.2 if (a) the cumulative Capital Contributions made to the Company by the Members over the life of the Company had been made by the Members on the respective dates on which such Capital Contributions were actually made and (b) Net Cash Flow, Net Proceeds and other distributions received by the Members over the life of the Company had been distributed to the Members in accordance with Sections 6.1 and 6.2 on the date such amounts were actually paid, but the amounts distributed in respect of the Promoted Interest were paid to Sponsor on the date on which the Target Carried Interest is determined.

1.127. "Tax Matters Member" means the "tax matters partner" for purposes of Section 6231 of the Code.

1.128. "Tender Date" is defined in Section 3.2.

1.129. "Termination Notice" is defined in Section 8.10(a).

1.130. "Transfer" means, as a noun, any transfer, sale, assignment, exchange, charge, pledge, gift, hypothecation, conveyance, encumbrance or other disposition, voluntary or involuntary, by operation of law or otherwise and, as a verb, voluntarily or involuntarily, by operation of law or otherwise, to transfer, sell, assign, exchange, charge, pledge, give, hypothecate, convey, encumber or otherwise dispose of.

1.131. "Unrestricted Cash" shall mean, as of any date, Cash and Cash Equivalents, as valued on a cash basis, held by such Person that are not subject to any lien (excluding statutory liens in favor of any depositary bank where such cash is maintained).

1.132. "Venue" is defined in Section 12.16.

## ARTICLE II.

## FORMATION OF LIMITED LIABILITY COMPANY

2.1.  Formation.  The Company was formed by the filing of the Certificate.  The Company was originally governed by the Original Company Agreement. The Members, by execution of this Agreement, hereby amend and restate the Original Company Agreement in its entirety and enter into and join together in the Company as a limited liability company under and pursuant to the Act.  The rights and liabilities of the Members shall be determined pursuant to the Act and this Agreement.  To the extent that the rights or obligations of any Member are different by reason of any provision of this Agreement than they would be in the absence of such provision, this Agreement shall, to the extent permitted by the Act, control.

2.2.  Company Name.  The name of the Company shall be 111 West 57th Partners LLC.  The business of the Company shall be conducted under such name or such other name as the Members may mutually agree in writing.

2.3.  The Certificate, Etc.  The Certificate was filed with the Secretary of State of the State of Delaware on June 27, 2013, and each Member has been provided with a copy thereof. The Members hereby agree to execute, and Manager agrees to file and record, all such other certificates and documents, including amendments to the Certificate, and, subject to the terms of this Agreement, to do such other acts as may be appropriate to comply with all requirements for the formation, continuation and operation of the Company, the ownership of property and the conduct of business under the laws of the State of Delaware and any other jurisdiction in which the Company may own property or conduct business, including, without limitation, qualification of the Company as a foreign limited liability company in any state in which such qualification is required.

2.4.  Principal Business Office, Registered Office and Registered Agent.  The principal business of the Company will be located at c/o Property Markets Group, Inc., 5 East 17th Street, 2nd Floor, New York, New York 10003 or at such other location as may hereafter be determined by Manager.  The initial registered office of the Company will be c/o The Corporation Trust Company, 1209 Orange Street, Wilmington, Delaware, 19801.  The initial registered agent for service of process on the Company will be The Corporation Trust Company, 1209 Orange Street, Wilmington, Delaware, 19801.  The registered office and the registered agent of the Company may be changed by Manager from time to time in accordance with the then applicable provisions of the Act and any other applicable laws.  Manager shall notify the Members of any change in such principal business office, registered office or registered agent for service of process within five (5) days of the date of such change.

2.5.  Term of Limited Liability Company.  The term of the Company commenced on the date of the initial filing of the Certificate with the office of the Secretary of State of the State of Delaware (i.e., on June 27, 2013) and shall continue until dissolved and terminated pursuant to the provisions of Section 10.1.

2.6.   <u>Purposes</u>.   The purposes of the Company are to acquire, own, finance, develop, entitle, construct, service, repair, maintain, improve, lease, operate and/or dispose of the Property, and to engage in all actions necessary, convenient or incidental thereto.

2.7.   <u>Powers</u>.   In furtherance of its purposes, but subject to all of the provisions of this Agreement, the Company shall have the power and is hereby authorized:

(a)   to organize one or more Subsidiaries and to acquire any other real or personal property which may be necessary, appropriate, convenient or incidental to the accomplishment of the purposes of the Company, or to cause any Subsidiary to do the same;

(b)   to own, hold, operate, maintain, finance, service, improve, lease, sell, convey, mortgage, pledge, or dispose of any real or personal property, including, without limitation, the Property, that may be necessary, convenient or incidental to the accomplishment of the purposes of the Company or to cause any Subsidiary to do the same;

(c)   to enter into all such agreements, and to execute, acknowledge and deliver all such documents, certificates and other instruments, as shall be necessary, appropriate or convenient in connection with the acquisition improvement and/or disposition of any Property or to cause any Subsidiary to do the same;

(d)   to take any and all action necessary or appropriate as the holder of the Property, including, without limitation, the granting or approval of waivers, consents or amendments of rights or powers relating thereto and the execution of appropriate documents evidencing such waivers, consents or amendments or to cause any Subsidiary to do the same;

(e)   to borrow money and issue evidences of indebtedness in furtherance of any or all of the purposes of the Company, and, if necessary, to secure the same by mortgage, pledge or other lien on the Property of the Company or any Subsidiary and to cause any Subsidiary to do the same;

(f)   to invest any funds of the Company pending distribution or payment of the same pursuant to the provisions of this Agreement;

(g)   to prepay in whole or in part, refinance, recast, increase, modify or extend any indebtedness of the Company or any Subsidiary, and in connection therewith execute any extensions, renewals or modifications relating thereto and to cause any Subsidiary to do the same;

(h)   to enter into partnerships or other ventures with other Persons in furtherance of the purposes of the Company; and

(i)   to do such other things and engage in such other activities related to the foregoing as may be necessary, convenient or advisable with respect to the conduct of the business of the Company, and have and exercise all of the powers and rights conferred upon limited liability companies formed pursuant to the Act, or to cause any Subsidiary to do the same.

14

2.8.   Beneficial Ownership of Members.  (a) Sponsor represents and warrants that, as of the date hereof, (i) it has no members other than those set forth on Schedule 2.8 attached hereto, which contains a complete and accurate ownership chart of Sponsor and its direct and indirect equity holders; (ii) it has disclosed to Investor and Atlantic the identities and requested information regarding the backgrounds of all direct and indirect investors in Sponsor; (iii) Kevin Maloney and Michael Stern (collectively, the "Principals") hold the percentage of the equity of Sponsor as reflected on Schedule 2.8 and control of Sponsor; and (iv) an entity whose members are Masood Bhatti or his Affiliate and Investor Principal (the "Additional Member Entity") collectively hold the percentage of the equity of Sponsor as reflected on Schedule 2.8.  Sponsor covenants that throughout the term of this Agreement, (1) all Initial Capital Contributions made by Sponsor to the Company have been funded by Sponsor out of personal assets and resources indirectly contributed to Sponsor by the Principals, including any such personal assets and resources obtained by a loan that is not secured directly or indirectly by the Property; (2) all Capital Contributions made by Sponsor to the Company have not, and will not, include any capital contributions to Sponsor from third parties or managed funds; and (3) Sponsor shall disclose to Investor and Atlantic any changes to the direct and indirect investors in its holdings.

(b) Investor represents and warrants that, as of the date hereof, (i) it has no members other than those set forth on Schedule 2.8 attached hereto, which contains a complete and accurate ownership chart of Investor and its direct equity holders; (ii) it has disclosed to Sponsor and Atlantic the identities and requested information regarding the backgrounds of all direct investors in Investor; and (iii) Investor Principal holds one hundred percent (100%) of the equity of and controls one hundred percent (100%) of Investor. Investor covenants that throughout the term of this Agreement, (x) all Initial Capital Contributions made by Investor to the Company have been funded by Investor out of assets and resources contributed to Investor by Investor Principal; (y) all Capital Contributions made by Investor to the Company have not, and will not, include any capital contributions to Investor from third parties or managed funds; and (z) Investor shall disclose to Sponsor and Atlantic (1) any changes to the direct and indirect holdings of Investor (other than changes in the ownership of publicly traded shares in Investor Principal) and (2) any changes in the holdings or title of Investor Representative, in each case provided that such change would cause Investor Representative to breach the provisions of Section 9.1(b).

(c) Atlantic represents and warrants that, as of the date hereof, (i) it has no members other than those set forth on Schedule 2.8 attached hereto, which contains a complete and accurate ownership chart of Atlantic and its direct equity holders; (ii) it has disclosed to Sponsor and Investor the identities and requested information regarding the backgrounds of all direct investors in Atlantic, and (iii) Atlantic Principal indirectly holds one hundred percent (100%) of the equity of and controls one hundred percent (100%) of Atlantic. Atlantic covenants that throughout the term of this Agreement, (1) all Capital Contributions made by Atlantic to the Company have not, and will not, include any capital contributions to Atlantic from third parties or managed funds; and (2) Atlantic shall disclose to Sponsor and Investor any changes to the direct and indirect investors in its holdings.

2.9.   Representations by Members.  Each Member represents, warrants, agrees and acknowledges as to itself only that:

15

(a)  it is a limited liability company, corporation or partnership, as applicable, duly organized or formed and validly existing and in good standing under the laws of the state of its organization or formation; it has all requisite corporate, partnership or limited liability company power and authority to enter into this Agreement, to acquire and hold its Percentage Interest and to perform its obligations hereunder; the execution, delivery and performance of this Agreement has been duly authorized by all necessary corporate, partnership or limited liability company action; the Person executing this Agreement on such Member's behalf is duly authorized to do so; and this Agreement is binding upon it and enforceable against it in accordance with the terms hereof;

(b)  its execution and delivery of this Agreement and the performance of its obligations hereunder will not conflict with, result in a breach of or constitute a default (or any event which, with notice or lapse of time, or both, would constitute a default) or result in the acceleration of any obligation under any of the terms, conditions or provisions of any other agreement or instrument to which it is a party or by which it is bound or to which any of its property or assets are subject, conflict with or violate any of the provisions of its organizational documents, or violate any statute or any order, rule or regulation of any court or governmental or regulatory agency, body or official, which would materially and adversely affect the performance of its duties hereunder; such Member has obtained any consent, approval, authorization or order of any court or governmental agency or body required for the execution, delivery and performance by such Member of its obligations hereunder;

(c)  there is no action, suit or proceeding pending against such Member or, to its knowledge, threatened in any court or by or before any other governmental agency or instrumentality which would prohibit its entering into or performing its obligations under this Agreement; and

(d)  it and its Affiliates are (i) not Prohibited Persons, (ii) in compliance with the Patriot Act, (iii) not in violation of any legal requirement related to money laundering or anti-terrorism and (iv) not located in or transacting business in any countries listed as embargoed countries under OFAC regulations.

2.10.  <u>Representations Regarding Commissions and Fees</u>.  Other than PMA Real Estate, LLC, which received a placement fee in connection with Investor's Initial Capital Contribution, each Member (a) represents and warrants to each other Member that neither it nor its Affiliates have dealt with any brokers, consultants, finders or other third parties who are entitled to receive a commission or other compensation in connection with (i) acquiring the Property, (ii) constructing, developing or disposing of the Property or (iii) forming and capitalizing of the Company or the Subsidiaries or the negotiation or completion of this Agreement, and (b) agrees to indemnify, defend and hold the Company and each other Member harmless from and against any loss, damage or claim or other obligations arising out of or relating to any claims for commissions or any other fees due in connection with the transactions described in this Agreement and arising or resulting from the actions of such Member or its Affiliates.

2.11.  <u>Additional Representations and Covenants of Members</u>.    Each Member represents, warrants, agrees, covenants, and acknowledges as to itself only that:

16

(a) other than as has been paid and/or satisfied in full on the date of this Agreement, it has no material direct or indirect indebtedness, liability, claim, loss, damage, deficiency, obligation or responsibility, fixed or unfixed, choate or inchoate, liquidated or unliquidated, secured or unsecured, accrued, absolute, contingent or otherwise; provided, however, the Members hereby acknowledge that Atlantic represents that Atlantic is indebted pursuant to the loan from Grenda Investments Limited, a BVI company;

(b) (i) with respect Sponsor and subject to the terms hereof, Principals (or in the case of Kevin Maloney, either Kevin Maloney or Ned White) shall be the sole persons principally responsible, on behalf of Sponsor, for the development, construction management, asset management and operation of the Property, and no other person acting on behalf of or in the name of Sponsor or any Affiliate thereof is (or is intended to be) principally responsible, on behalf of Sponsor or any Affiliate thereof, for the development, construction management, asset management, or operation of the Property. Principals (or in the case of Kevin Maloney, either Kevin Maloney or Ned White) shall devote a substantial portion of their time to such development, construction management, asset management and operation of the Property, including, without limitation, active oversight of the construction manager and active involvement in all phases of development of the Property, (ii) with respect to Investor, Investor Principal shall be the sole person principally responsible, on behalf of Investor, for the decisions made by Investor with respect to the Company, and no other person acting on behalf of or in the name of Investor or any Affiliate thereof is (or is intended to be) principally responsible, on behalf of Investor or any Affiliate thereof, for the decisions made by Investor with respect to the Company and (iii) with respect to Atlantic, Atlantic Principal shall be the sole person principally responsible, on behalf of Atlantic, for the decisions made by Atlantic with respect to the Company, and no other person acting on behalf of or in the name of Atlantic or any Affiliate thereof is (or is intended to be) principally responsible, on behalf of Atlantic or any Affiliate thereof, for the decisions made by Atlantic with respect to the Company; and

(c) Sponsor and Principals, as applicable, covenant that each shall comply with any financial net worth and liquidity covenants specifically applicable thereto under any loan.

2.12.   <u>Representations Regarding Additional Agreements</u>.   Except as set forth on <u>Schedule 2.12</u> hereof, Sponsor and Atlantic represent, warrant, and covenant to Investor that there are no agreements and/or understandings (written or oral) between Sponsor, Atlantic, Principals and/or Atlantic Principal and/or any of their Affiliates (or any combination of any of the foregoing) in any way related to the subject matter hereof, including without limitation, the Company and/or the Property, that are not fully set forth in this Agreement, and that no such agreements and/or understandings shall be entered into by any of them.

2.13.   <u>Cure Payments Not Capital Contributions</u>.   In the event of a breach of <u>Section 2.8</u>, <u>Section 2.9</u>, <u>Section 2.10</u>, <u>Section 2.11</u> or <u>Section 2.12</u> any amounts paid to cure such breach by the breaching party shall not constitute Capital Contributions or loans to the Company, any Subsidiary or any Member and shall not increase the Capital Account of such Member.

17

## ARTICLE III.

## CAPITALIZATION

3.1.   <u>Initial Capital Contributions</u>.  (a)  On the Closing Date, (i) Sponsor contributed cash and property in an aggregate amount equal to Thirty-Nine Million and No/100 Dollars ($39,000,000.00) and (ii) Investor contributed cash in an amount equal to Fifty-Six Million and No/100 Dollars ($56,000,000.00).  On the date hereof, Sponsor is Transferring to Atlantic a portion of Sponsor's membership interests in the Company.  The Members agree that Atlantic shall be deemed to have made a Twenty-Five Million and No/100 Dollars ($25,000,000.00) capital contribution to the Company as of the Closing Date.  Each Member's contribution pursuant to this <u>Section 3.1(a)</u> is an "Initial Capital Contribution".

(b) The Initial Capital Contributions of the Members are in proportion to Percentage Interests and are set forth on <u>Schedule 3.1</u> hereto.  <u>Schedule 3.1</u> shall be amended from time to time by Manager after any Additional Capital Contributions are made.

3.2.   <u>Additional Capital Contributions</u>.

(a) (i) Additional funds ("<u>Additional Capital Contributions</u>") may be called by Investor or Manager as expressly set forth in this <u>Section 3.2(a)(i)</u> in such Member's reasonable determination pursuant to the procedure set forth in <u>Section 3.2(a)(ii)</u> and only for the following purposes: (1) by Manager or Investor, in accordance with the Budget, (2) by Manager, on account of any Company Overrun (or by Manager or Investor, on account of Protective Company Overruns pursuant to <u>Section 3.9</u>), and (3) by Manager or Investor, in the event one or more Members has agreed to make Capital Contributions pursuant to <u>Section 3.2(d)</u>.

(ii) In order to call Additional Capital Contributions for the purposes set forth in <u>Section 3.2(a)(i)</u> (or funding for Manager Overruns), Investor or Manager expressly permitted to make such capital call pursuant to <u>Section 3.2(a)(i)</u> shall give Notice to the other Members (A) stating the aggregate amount of such Additional Capital Contributions (or Manager Overrun contributions), (B) stating in reasonable detail the reasons such Additional Capital Contributions (or Manager Overrun contributions) are required, the intended use thereof and such other information as any Member may reasonably request and (C) stating the date proposed for payment of such Additional Capital Contributions (or Manager Overrun contributions) to the Company (which date, the "<u>Tender Date</u>", shall not be less than thirteen (13) days after the date on which such Notice is given except in the case of Emergencies in which case the Member making such capital call shall endeavor to provide as much Notice as possible).

(b) The Members shall be obligated to contribute to the Company on the Tender Date, in cash, the aggregate amount of Additional Capital Contributions to be made on the Tender Date, in proportion to their respective Percentage Interests.  The Percentage Interests of the Members shall be re-calculated and, if appropriate, adjusted in accordance with <u>Section 3.7</u>, upon the making of any Additional Capital Contributions by any one or

more of the Members pursuant to this Section 3.2 (but excluding, for the avoidance of doubt, any Shortfall Contributions which are recharacterized as Member Loans).

(c) If any Member fails to pay to the Company on the Tender Date its entire share of any Additional Capital Contribution required pursuant to this Section 3.2, then Manager shall give notice to the Contributing Members and any Contributing Member shall have the right to make Shortfall Contributions within ten (10) days after receipt of such notice by funding the Shortfall Contribution to the Company. In the event that more than one (1) Contributing Member funds the Shortfall Contribution, the Shortfall Contribution shall be funded pro rata in accordance with the Contributing Members' relative Percentage Interests and the Company shall return any excess funding to the applicable Contributing Members (e.g., if the first Contributing Member has a 50% interest in the Company and the second Contributing Member has a 25% interest in the Company, then the first Contributing Member shall fund 66.6% of the Shortfall Contribution and the second Contributing Member shall fund 33.3% of the Shortfall Contribution). At the election of any Contributing Member providing Shortfall Contribution funding, either (i) the Shortfall Contribution funded by such Contributing Member shall be treated as a Member Loan pursuant to Section 3.3(c), or (ii) the associated dilution remedy under Section 3.7 shall govern. Any Contributing Member providing Shortfall Contribution funding shall deliver written Notice to the other Members as to such Contributing Member's election of the foregoing remedies within five (5) days after funding of the Shortfall Contribution and if such Contributing Member fails to send such Notice such Contributing Member shall be deemed to have elected to have the Shortfall Contribution treated as a Member Loan. No Member shall be entitled or required to make any Capital Contributions to the Company other than as required or allowed under Section 3.1, Section 3.2, Section 3.3(b), Section 6.1 or Section 6.2. Notwithstanding anything herein to the contrary, but subject to Manager's right to fund a Shortfall Contribution and any election by Investor or Atlantic under Section 3.2(d) to fund the Anticipated Additional Equity Amount, (A) Investor shall have no obligation to fund any Additional Capital Contributions which would cause the aggregate Capital Contributions made by Investor to exceed Fifty-Seven Million and No/100 Dollars ($57,000,000.00) and (B) Atlantic shall have no obligation to fund any Additional Capital Contributions which would cause the aggregate Capital Contributions made by Atlantic to exceed Twenty-Five Million and No/100 Dollars ($25,000,000.00).

(d) Sponsor shall send a written notice (the "Construction Loan Notice") to Investor and Atlantic not later than two hundred ten (210) days prior to Sponsor's reasonable estimation as to the date the Company will enter into definitive loan documents for the initial construction loan with respect to the development of the Property (the "Construction Loan"), which Construction Loan Notice shall set forth (i) the amount that Sponsor reasonably believes that the Company or such Subsidiary will be required to draw under the Construction Loan and (ii) the amount (the "Anticipated Additional Equity Amount") of additional equity that Sponsor reasonably believes the Company will be required to fund under the Construction Loan and the material economic terms the Company is willing to agree to with respect to such additional equity. Within thirty (30) days of receipt of the Construction Loan Notice (the "Exercise Period"), Investor shall have the right to elect (which election shall be irrevocable) to fund an Additional Capital Contribution, when called pursuant to Section 3.2(a)(i), for the

entire Anticipated Additional Equity Amount by giving written notice of such election within the Exercise Period (the "Investor's Additional Equity Notice"). If Investor does not timely deliver the Investor's Additional Equity Notice or affirmatively waives its right of first offer, Investor shall be deemed to have elected not to fund such Additional Capital Contribution pursuant to this Section 3.2. If no timely Investor's Additional Equity Notice is delivered by Investor or Investor affirmatively waives its right of first offer, then within ten (10) days of the earlier to occur of (x) expiration of the Exercise Period or (y) Investor's affirmative waiver of its right of first offer, Atlantic shall have the right to elect (which election shall be irrevocable) to fund an Additional Capital Contribution, when called pursuant to Section 3.2(a)(i), for the entire Anticipated Additional Equity Amount by giving written notice of such election within the Exercise Period (the "Atlantic's Additional Equity Notice"). If Atlantic does not timely deliver Atlantic's Additional Equity Notice, Sponsor shall, on behalf of the Company, seek additional financing from Persons who are not Affiliates of either Member (whether in the form of common or preferred equity or financing that is subordinate to (and permitted by) the Construction Loan) to fund such Additional Capital Contribution on terms that are not materially worse for the Company than the terms offered to Investor and Atlantic pursuant to the Construction Loan Notice (and, notwithstanding the terms of Section 7.2(a), Investor shall have no right under Section 7.2(a) to refuse to grant its approval to such additional third party financing provided that terms thereof are not materially worse for the Company than the terms offered to Investor pursuant to the Construction Loan Notice). If Sponsor fails to obtain additional financing to fund such Additional Capital Contribution on terms that are not materially worse for the Company than the terms offered to Investor and Atlantic pursuant to the Construction Loan Notice within one hundred eighty (180) days after the expiration of the Exercise Period, then any attempt to procure such Additional Capital Contribution thereafter shall again be subject to the provisions of this Section 3.2(e). If Investor has timely and properly delivered the Investor's Additional Equity Notice, then (I) (A) Sponsor shall deliver to Investor a written notice ("Sponsor's Additional Equity Notice") within thirty (30) days after the delivery to Sponsor of Investor's Additional Equity Notice whether or not Sponsor desires to fund an Additional Capital Contribution in the amount of Sponsor's pro rata share (based on its Percentage Interest) of the Anticipated Additional Equity Amount and (B) Atlantic shall deliver to Investor a written notice ("Atlantic's Additional Equity Notice") within thirty (30) days after the delivery to Sponsor of Investor's Additional Equity Notice whether or not Atlantic desires to fund an Additional Capital Contribution in the amount of Atlantic's pro rata share (based on its Percentage Interest) of the Anticipated Additional Equity Amount, (II) (A) if Sponsor fails to timely deliver to Investor Sponsor's Additional Equity Notice, then Sponsor shall be deemed not to have elected to fund an Additional Capital Contribution in the amount of Sponsor's pro rata share (based on its Percentage Interest) of the Anticipated Additional Equity Amount and (B) if Atlantic fails to timely deliver to Investor Atlantic's Additional Equity Notice, then Atlantic shall be deemed not to have elected to fund an Additional Capital Contribution in the amount of Atlantic's pro rata share (based on its Percentage Interest) of the Anticipated Additional Equity Amount, (III) (A) if Sponsor timely delivers to Investor Sponsor's Additional Equity Notice that provides that Sponsor does not desire to fund an Additional Capital Contribution in the amount of Sponsor's pro rata share (based on its Percentage Interest) of the Anticipated Additional Equity Amount (or Sponsor is deemed to have made such election not to fund an

Additional Capital Contribution under clause (II)(A) above), then Investor shall be required to fund an Additional Capital Contribution for Sponsor's share of the entire Anticipated Additional Equity Amount when called pursuant to the provisions of Section 3.2(a) and (B) if Atlantic timely delivers to Investor Atlantic's Additional Equity Notice that provides that Atlantic does not desire to fund an Additional Capital Contribution in the amount of Atlantic's pro rata share (based on its Percentage Interest) of the Anticipated Additional Equity Amount (or Atlantic is deemed to have made such election not to fund an Additional Capital Contribution under clause (II)(B) above), then Investor shall be required to fund an Additional Capital Contribution for Atlantic's share of the entire Anticipated Additional Equity Amount when called pursuant to the provisions of Section 3.2(a) and (IV) (A) if Sponsor timely delivers to Investor a Sponsor's Additional Equity Notice that provides that Sponsor desires to fund an Additional Capital Contribution in the amount of Sponsor's pro rata share (based on its Percentage Interest) of the Anticipated Additional Equity Amount, then each of Investor and Sponsor shall fund an Additional Capital Contribution equal to its pro rata share (based on its Percentage Interest) of the entire Anticipated Additional Equity Amount when called pursuant to the provisions of Section 3.2(a) and (B) if Atlantic timely delivers to Investor an Atlantic's Additional Equity Notice that provides that Atlantic desires to fund an Additional Capital Contribution in the amount of Atlantic's pro rata share (based on its Percentage Interest) of the Anticipated Additional Equity Amount, then each of Investor and Atlantic shall fund an Additional Capital Contribution equal to its pro rata share (based on its Percentage Interest) of the entire Anticipated Additional Equity Amount when called pursuant to the provisions of Section 3.2(a). If Atlantic has timely and properly delivered Atlantic's Additional Equity Notice, then (1) Sponsor shall deliver to Atlantic Sponsor's Additional Equity Notice within thirty (30) days after the delivery to Sponsor of Atlantic's Additional Equity Notice whether or not Sponsor desires to fund an Additional Capital Contribution in the amount of Sponsor's pro rata share (based on its Percentage Interest) of the Anticipated Additional Equity Amount, (2) if Sponsor fails to timely deliver to Atlantic Sponsor's Additional Equity Notice, then Sponsor shall be deemed not to have elected to fund an Additional Capital Contribution in the amount of Sponsor's pro rata share (based on its Percentage Interest) of the Anticipated Additional Equity Amount, (3) if Sponsor timely delivers to Atlantic Sponsor's Additional Equity Notice that provides that Sponsor does not desire to fund an Additional Capital Contribution in the amount of Sponsor's pro rata share (based on its Percentage Interest) of the Anticipated Additional Equity Amount (or Sponsor is deemed to have made such election not to fund an Additional Capital Contribution under clause (2) above), then Atlantic shall be required to fund an Additional Capital Contribution for the entire Anticipated Additional Equity Amount when called pursuant to the provisions of Section 3.2(a) and (4) if Sponsor timely delivers to Atlantic a Sponsor's Additional Equity Notice that provides that Sponsor desires to fund an Additional Capital Contribution in the amount of Sponsor's pro rata share (based on its Percentage Interest) of the Anticipated Additional Equity Amount, then Sponsor shall fund an Additional Capital Contribution equal to its pro rata share (based on its Percentage Interest) of the entire Anticipated Additional Equity Amount and Atlantic shall fund the balance of the Anticipated Additional Equity Amount when called pursuant to the provisions of Section 3.2(a).

(e) Any funding to the Company required on account of Manager Overruns shall be requested by Manager or the Members not then affiliated with Manager (or if no Member is affiliated with Manager the Member who appointed Manager pursuant to Section 8.10) pursuant to the provisions of Section 3.2(a)(ii) (but in no event shall Atlantic have the right to request such funding). Any such costs shall be funded one hundred percent (100%) by the Member then affiliated with Manager (or if no Member is affiliated with Manager the Member who appointed Manager pursuant to Section 8.10) and no other Member shall be required to contribute additional funds on account of such Manager Overrun. Notwithstanding anything to the contrary contained herein, the funding of Manager Overruns shall not constitute Additional Capital Contributions and shall not adjust Percentage Interests. Manager Overruns shall be repaid to Manager out of Net Cash Flow or Net Proceeds pursuant to Sections 6.1(a)(ii) or 6.1(b)(iv), as applicable, and 6.2. If Sponsor fails to pay to the Company within the forty-five (45)-day period immediately following the Tender Date the entire amount of Manager Overruns as required pursuant to this Section 3.2, then Investor shall have the right to remove Sponsor as Manager for cause pursuant to Section 8.10; it being understood that the remedies set forth in this Article 3 for the failure to fund Additional Capital Contributions shall not apply to the failure to fund contributions on account of Manager Overruns.

3.3.    Failure to Make Additional Capital Contributions.

(a) Shortfall Contributions. In the event that Additional Capital Contributions are required to be made by the Members under Section 3.2, and a Member has tendered its entire share of the required Additional Capital Contributions on or before the Tender Date (a "Contributing Member"), and a Member has failed to tender its entire share of the required Additional Capital Contributions on or before the Tender Date (each, a "Non-Contributing Member"), a Contributing Member shall have the right to make Additional Capital Contributions to cover the shortfall amount. The amount of an Additional Capital Contribution made by a Contributing Member equal to the amount of an Additional Capital Contribution that a Non-Contributing Member failed to fund is the "Shortfall Contribution". In the event there is more than one (1) Contributing Member and each is willing to make a Shortfall Contribution, the Shortfall Contribution shall be made in proportion to their respective Percentage Interests.

(b) Member Loans. If any Member elects to treat a Shortfall Contribution as a member loan (a "Member Loan") pursuant to Section 3.2(c), Manager shall notify the Non-Contributing Member of the amount and date of the Member Loan and the Capital Account of the Non-Contributing Member shall be credited to reflect the payment of the proceeds of the Member Loan to the Company. Each Member Loan shall be deemed to be made to the Non-Contributing Member, with the proceeds of each Member Loan being delivered to the Company in immediately available funds by the Contributing Member on such Non-Contributing Member's behalf. A Member Loan shall be deemed to have been advanced on the applicable Tender Date on which such Shortfall Contribution was due from the Non-Contributing Member. Member Loans shall earn interest on the outstanding principal amount thereof through the date of repayment at a rate equal to the Member Loan Rate from the date deemed to have been advanced.

22

(c) <u>Member Loan Terms</u>.  Member Loans shall be secured as provided in this Section 3.3(c) and Section 3.3(d) (but otherwise non-recourse) and be repayable by and collectible from the Non-Contributing Member only as set forth in this Section 3.3. While a Member Loan is outstanding, the Non-Contributing Member's distributions of Net Cash Flow and Net Proceeds or any proceeds from the transfer of all or any part of its interests in the Company shall (until all Member Loans made to such Non-Contributing Member and interest thereon shall have been repaid in full) be paid to the Contributing Members in accordance with the applicable Member Loan. Such payments shall be applied first to the payment of interest on such Member Loans and then to the repayment of the principal amounts thereof, but shall be considered, for all other purposes of this Agreement, to have been distributed to the Non-Contributing Member. Distributions of Net Cash Flow and Net Proceeds to such Non-Contributing Member shall be immediately reinstated prospectively upon the full repayment of a Member Loan and interest thereon to the Contributing Members. The Non-Contributing Member shall be liable for the reasonable fees and expenses incurred by the Contributing Members (including, without limitation, reasonable attorneys' fees and disbursements) in connection with any enforcement or foreclosure upon any Member Loan and such costs shall, to the extent enforceable under applicable law, be added to the principal amount of the applicable Member Loan; provided that a Member Loan may only be foreclosed if a Non-Contributing Member receives distributions of Net Cash Flow and Net Proceeds prior to repayment of the Member Loan. In addition, at any time during the term of such Member Loan, the Non-Contributing Member shall have the right to repay, in full, the Member Loan (including interest).  If the Non-Contributing Member receives distributions of Net Cash Flow and Net Proceeds prior to repayment of the Member Loan, the Contributing Members shall have all rights and remedies available to them at law or in equity. All outstanding amounts payable under the Member Loan shall be settled no later than upon dissolution of the Company, but in all events shall only be recourse as set forth in the first sentence of this Section 3.3(c).

(d)  If a Member Loan has been made, the Non-Contributing Member shall be deemed to have pledged to the Contributing Member, and granted to such Contributing Member a continuing first priority security interest in, all of the Non-Contributing Member's interest in the Company to secure the payment of the principal of, and interest on, such Member Loan in accordance with the provisions hereof, and for such purpose this Agreement shall constitute a security agreement. The Non-Contributing Member shall promptly execute, acknowledge and deliver such financing statements, continuation statements or other documents and take such other actions as the Contributing Member shall request in order to perfect or continue the perfection of such security interest; and, if the Non-Contributing Member shall fail to do so within seven (7) days after demand therefor, the Contributing Member is hereby appointed the attorney-in-fact of, and is hereby authorized on behalf of, the Non-Contributing Member, to execute, acknowledge and deliver all such documents and take all such other actions as may be required to perfect such security interest. Such appointment and authorization are coupled with an interest and shall be irrevocable. Any Contributing Member holding a security interest in the interest of the Company of a Non-Contributing Member shall, prior to exercising any right or remedy (whether at law, in equity or pursuant to the terms hereof) available to such Contributing Member in connection with such security

23

interest provide to the Non-Contributing Member written notice, in reasonable detail, of the right or remedy to be exercised and the intended timing of such exercise. Following the foreclosure by a Contributing Member of the security interest granted pursuant to this Section 3.3(d) (or a similar transfer in lieu thereof), Investor or Manager or their designees (i) shall be entitled to exercise and benefit from any and all management and other rights (including designation as Manager, if applicable) attendant upon the interests in the Company previously possessed by the applicable Non-Contributing Member hereunder, and such interest shall not be limited solely to the right to possess the economic interest in the Company previously held by such Non-Contributing Member and (ii) shall use commercially reasonable efforts to cause the principals of such Non-Contributing Member to be prospectively released from any guaranty under any loan as of the date of such foreclosure; provided that in the event that Contributing Member is unsuccessful in obtaining such release, the principals affiliated with Contributing Member shall fully indemnify, defend and hold harmless the principals affiliated with Non-Contributing Member for any liability under the guaranties attributable to claims arising on or after the date of foreclosure.

    3.4.   Capital Accounts. A separate capital account (each, a "Capital Account") shall be established and maintained for each Member, including any substituted Member who shall hereafter acquire an interest in the Company, in accordance with the following provisions:

    (a) To each Member's Capital Account there shall be credited the amount of cash and the fair market value of any other property actually contributed to the Company by such Member in accordance with Article 3, such Member's allocable share of Profit, the amount of any Company liabilities that are assumed by such Member or that are secured by any Company Asset distributed to such Member, and any items in the nature of income or gain which are specially allocated to such Member pursuant to Sections 5.2 or 5.6 to the extent that Sections 5.2 or 5.6 and applicable Regulations provide for such a Capital Account adjustment.

    (b) From each Member's Capital Account there shall be debited the amount of cash and the fair market value of any Company Asset distributed to such Member in its capacity as a Member pursuant to any provision of this Agreement, such Member's allocable share of Loss, the amount of any liabilities of such Member that are assumed by the Company or that are secured by any property contributed by such Member to the Company, and any items in the nature of expenses or losses which are specially allocated to such Member pursuant to Sections 5.2 or 5.6 to the extent that Sections 5.2, 5.6 and applicable Regulations provide for such a Capital Account adjustment.

    (c) The provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with the Regulations under 704(b) of the Code, and shall be interpreted and applied in a manner consistent with such Regulations.

    (d) A Member shall not be entitled to withdraw any part of the Capital Account of such Member or to receive any distributions from the Company except as provided in Article 6; nor shall a Member be entitled to make any loan or Capital Contribution

to the Company other than as expressly provided herein. No loan made to the Company by any Member shall constitute a Capital Contribution to the Company for any purpose.

(e) Except as expressly required by this Agreement or the Act, no Member shall have any liability for the return of the Capital Contribution of any other Member. A Member who has more than one interest in the Company shall have a single Capital Account that reflects all such interests, regardless of the class of interest owned and regardless of the time or manner in which the interests were acquired.

3.5.   <u>Transfer of Capital Accounts</u>.  In the event all or any portion of an interest in the Company is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred interest in the Company, and reference in this Agreement to a Capital Contribution of or an allocation or distribution to a Member who is a transferee shall include a Capital Contribution of or allocation or distribution previously made to its transferor Member on account of the transferred interest in the Company.

3.6.   <u>Deficit Capital Accounts</u>.  Except as otherwise provided in <u>Section 6.2(b)</u>, no Member with a deficit in its Capital Account shall be obligated to restore such deficit balance or make a Capital Contribution to the Company solely by reason of such deficit.

3.7.   <u>Adjustments to Member Interests</u>.

(a) <u>Reduction of Non-Contributing Member's Percentage Interests; Recalculation of Percentage Interests</u>. If at any time any one or more of the Members makes a Shortfall Contribution pursuant to <u>Section 3.2</u> and a Contributing Member has elected to treat such Shortfall Contribution as dilutive capital under this <u>Section 3.7</u>, the Percentage Interests of a Contributing Member shall be re-calculated and adjusted, as appropriate, so that any Contributing Member's Percentage Interests as of the date such Additional Capital Contribution is made (or is deemed to be re-characterized as a Shortfall Contribution) equals the number of percentage points equal to the product of: (i) 100 multiplied by (ii) a fraction, (a) the numerator of which shall be an amount equal to (X) all Capital Contributions which have been made by such Member and which do not constitute Shortfall Contributions, *plus* (Y) an amount equal to (I) one and one-half (1.5) multiplied by (II) the aggregate amount of all Shortfall Contributions previously funded by such Member (if any), *minus* (Z) an amount equal to (A) one and one-half (1.5) multiplied by (B) the aggregate amount of all Shortfall Contributions previously funded by the other Members (if any), and (b) the denominator of which shall equal the sum of all Capital Contributions (including, without limitation, Shortfall Contributions) made by the Members up to and including the date of calculation.

(b) <u>Adjustment of a Non-Contributing Members' Interest</u>. Any increase in the Percentage Interest of any Contributing Member under this <u>Section 3.7</u> shall be reflected in a simultaneous reduction of the Percentage Interests of any Non-Contributing Member in a like amount. Any such aggregate increase in interests of such other Members shall be automatic and without the necessity of any further action by any Member. Notwithstanding the foregoing, each Member agrees to execute such documents and take such additional actions as

may be necessary to effectuate or evidence such adjustments, and each such Member hereby constitutes and appoints each of Manager, Atlantic and Investor, and their respective successors and permitted assigns, including, if applicable, the officers and directors of any such Person(s) or the general partner of such Person(s) (and its officers and directors), to act alone as the attorney-in-fact of each such Member with full power of substitution in the names and stead of each such Member to execute, acknowledge, swear to and deliver such instruments as may be necessary or appropriate to carry out the foregoing provisions of this Section 3.7. The grant of power of attorney by each of the Members under this Section 3.7 is coupled with an interest and is and shall be irrevocable, whether by reason of such Member's dissolution or for any reason whatsoever.

(c) Notice of Adjustment of Interest. Manager shall give Notice to all the Members within thirty (30) days after the adjustment of any Member's interest pursuant to this Section 3.7, informing the Members of such adjustment and of their revised Percentage Interests after giving effect to such dilution.

(d) No Prior Agreement to Adjust Interest. The parties to this Agreement acknowledge and agree that there is no prior agreement, understanding or plan to change Members' Percentage Interests, and that such a change is not expected given the structure of the transactions contemplated by this Agreement.

3.8. Prohibition on Loans by Company. In no event shall the Company, directly or indirectly, make any form of loan or advance to or directly or indirectly guaranty or secure the obligations of any Member or to any Affiliated Person of any Member (excluding any Subsidiary).

3.9. Company Overruns. In the event that Investor reasonably believes there is a need for Additional Capital Contributions on account of Protective Company Overruns, Investor shall give Notice thereof to Manager (with a copy to Atlantic) together with reasonable detail as to such Protective Company Overrun. After receipt of such Notice, Manager, Atlantic and Investor shall promptly review and discuss the Protective Company Overrun for a consultation period of fifteen (15) days (unless the Protective Company Overrun relates to (i) a violation of law that needs to be cured within such fifteen (15) days, or (ii) an Emergency, in which cases the fifteen (15) day period shall be shortened accordingly) (the "Consultation Period"). If, after the expiration of the Consultation Period, Manager does not desire to make a capital call on account of such Protective Company Overrun, Investor shall have the right, at any time within thirty (30) days after the expiration of the Consultation Period, (i) to make a capital call pursuant to Section 3.2(a) on account of the Protective Company Overrun and (ii) to use the proceeds of such capital call to make payments, institute legal proceedings and/or take such other actions as may be necessary or desirable to cure the circumstances underlying the need for the Protective Company Overrun. "Protective Company Overrun" means Company Overruns on account of (i) curing and/or remedying any then existing material defaults under any material contractual obligations of the Company or any Subsidiary (including, without limitation, under any documents or instruments evidencing and/or securing any Company or Subsidiary indebtedness), (ii) complying with material applicable law and/or any court orders, judgments or other judicial or governmental proceedings applicable to the Property or any portion thereof, the Company or any

26

Subsidiary, (iii) paying any real estate taxes, utility charges and other amounts which may be imposed by any governmental authority or which may be reasonably necessary to protect the Property or any portion thereof, or Investor's investment therein, and (iv) paying all reasonable attorneys' fees, costs and disbursements relating to any of the foregoing.

## ARTICLE IV.

### BOOKS; REPORTS; TAX ELECTIONS; ACCOUNTS

    4.1.   <u>Books and Records</u>.  Manager shall keep, or cause to be kept, complete, up-to-date and accurate books of account and records of the Company and each Subsidiary. The books of the Company shall be kept on a cash basis and an accrual basis, and all such books and records shall at all times be maintained or made available at the principal business office of the Company. Each of (a) a current list of the full name and last known business address of each Member, set forth in alphabetical order, (b) a copy of the Certificate, including all certificates of amendment thereto, (c) copies of the federal, state and local income tax and information returns and reports of the Company, if any, for the seven (7) most recent years and (d) copies of this Agreement and of any financial statements of the Company for the six (6) most recent years, will be maintained at the principal business office of the Company. All books and records will be maintained by Manager (and will be available to the Members upon reasonable request and reasonable prior notice) for a period of not less than seven (7) years after the dissolution of the Company.

    4.2.   <u>Required Reports</u>.

        (a)  Manager will prepare, or cause to be prepared, and furnish to each Member:

        (i)   within forty (40) days after the end of each fiscal year of the Company the audited financial statements of the Company for such fiscal year accurately reflecting the financial condition and results of operations of the Company, including a balance sheet, a statement of changes in Members' capital and a profit and loss statement, all prepared and audited by the Accountants;

        (ii)   within twenty (20) days after the end of each fiscal quarter of the Company a copy of the unaudited quarterly financial statements of the Company for such fiscal quarter accurately reflecting the financial condition and results of operations of the Company, including a balance sheet, a statement of changes in Members' capital and a profit and loss statement, all certified by Manager to be complete and accurate;

        (iii)   within ten (10) days after the end of each month of the Company (x) with respect to the Budget then in effect, a log showing how the contingency and any reallocated cost savings in such Budget have been used and reallocated during the prior month and setting forth the remaining balance of the contingency and actual cost savings not previously reallocated in such Budget; (y) a report detailing any events that materially and detrimentally impact the Company's ability to implement the then current Business

Plan, and (z) such additional information and reports as may be reasonably requested by the Members in connection with the Property, including, without limitation, the development and/or construction thereof, and the investment made by Investor;

(iv)   promptly upon the request of any Member from time to time, any additional information such Member may reasonably request to assist such Member or a third party engaged by such Member in appraising or assessing the value of the Property; and

(v)   promptly upon the request of any Member from time to time, any additional information such Member may reasonably request with respect to the Company and Property.

Notwithstanding the foregoing, the foregoing reports shall be submitted to Investor sufficiently in advance of the reporting deadline set forth above such that the public filing deadlines applicable to Investor or Investor Principal shall be satisfied.

(b)   Manager will prepare, or cause to be prepared, and furnish to each Member (i) an estimate of taxable income for each fiscal year at least twenty-five (25) days prior to the end of such fiscal year, reporting ordinary income items separate from items of capital gain, (ii) Schedule K-1's within seventy-five (75) days after the end of such fiscal year and (iii) detailed supporting schedules of Schedule K-1 to report (A) any "unrecaptured section 1250 gain" within the meaning of the Code and the Regulations, recognized on the date of the sale of real estate assets, if applicable, and (B) the state sources of each item of income, gain, loss and deduction, as applicable. All financial statements and reports furnished pursuant to Sections 4.2(a) and (b) will be in a form approved by the Members in writing.

(c)   Member Access to Books and Records. Each Member shall have the right at all reasonable times during usual business hours to audit, examine and make copies of or extracts from the books and records of the Company. Such right may be exercised through any agent or employee of such Member designated by it or by a certified public accountant designated by such Member. A Member shall bear all expenses incurred in any examination made for such Member's account. Promptly upon request, Manager shall also furnish to the Members such other information bearing on the financial condition and operations of the Company as any Member may from time to time reasonably propose.

(d)   Costs. All reasonable third-party and out-of-pocket costs and expenses of compliance with the foregoing provisions of this Section 4.2 (other than Section 4.2(c)) shall be borne by the Company.

(e)   Confidentiality. The Members hereby agree to consider as proprietary to the Company, keep confidential, and not disclose to any third party, any and all information relating to the operations of the Company and the Subsidiaries and the Property; provided, however, that any Member may disclose such information to any Person if such Person is party to a confidentiality agreement which adequately protects the Company against disclosures which could adversely affect its business; and provided, further, that any Member

28

may disclose such information, on an "as needed" basis (i) to such the lawyers, accountants or agents of such Member, or such Member's Affiliates or investment manager(s), in connection with the ordinary conduct of the business affairs of such Member (or, if applicable, such Member's Affiliates or investment manager(s)), or (ii) as required by law or pursuant to regulatory or supervisory requests or requirements; provided, however, that to the extent legally permissible and reasonably practicable, upon complying with any such request the Member shall request that the Person or regulatory or supervisory authority requesting or requiring disclosure shall treat such information confidentially. Nothing in this Section 4.2(e) shall (a) be construed as prohibiting any Member from communicating general financial information concerning the operating results of the Company to the direct or indirect beneficial owners of interests in such Member, or (b) from making any disclosures or filings required or prudent (in the disclosing Member's reasonable judgment) by such Member under the Securities and Exchange Commission or other federal or state securities' Laws or the rules and regulations of the NYSE or NASDAQ, or the inclusion of any information in a prospectus, prospectus supplement or other offering circular or memorandum in connection with public or private capital raising activities undertaken by any Member or its Affiliates or any quarterly earnings press release. Except as otherwise required by law, each Member and Manager agrees that, without the consent of Investor, it shall not, and shall cause its Affiliates to not, make reference to, or use, the name of Investor, Investor Principal or Richard A. Bianco including in connection with the interest of such Person in the Company and any Property or other Asset and, including, but not limited to, in any public statement, press release or governmental filing.

4.3.    Filing of Returns and Other Writings; Tax Matters Member.

(a)    Tax Matters Member. Sponsor shall serve as the Tax Matters Member for so long as it is Manager. The Tax Matters Member shall cause the preparation and timely filing of all Company tax returns and shall, on behalf of the Company, timely file all other writings required by any governmental authority having jurisdiction to require such filing, including all state and local withholding tax requirements on distributions and/or income allocations and shall cause the timely filing and reporting of such information to the governmental authorities and to Members. At least ten (10) days prior to the filing of any material income tax return, the Tax Matter Member will provide a draft thereof to Atlantic and Investor for review, comment and consent, such consent not to be unreasonably withheld and such consent deemed to be given absent written objection. The Tax Matters Member shall give prompt Notice to each Member upon receipt of advice that the Internal Revenue Service or any state or local taxing authority intends to examine or audit any income tax returns of the Company. Sponsor shall not take any material action in its capacity as the Tax Matters Member in a manner that shall bind Atlantic or Investor without the consent of Atlantic or Investor, as applicable, (unless the failure to give consent will have a material adverse effect with respect to Sponsor and the consent will not have a material adverse effect with respect to Atlantic or Investor, as applicable), including without limitation the following:

(i)    agree to extend any statute of limitations with respect to the Company under Section 6229 of the Code;

(ii)    file a request for administrative adjustment (including a request for substituted return treatment) under Section 6227 of the Code;

(iii)    file a petition for judicial review, or any appeal with respect to any judicial determination, under Section 6226 or 6228 of the Code;

(iv)    take any action to consent to, or to refuse to consent to, a settlement reflected in a decision of a court; or

(v)    enter into any tax settlement agreement affecting the Company.

The Tax Matters Member shall promptly give Notice to the Members of the contents of any material communication (oral or written) from the Internal Revenue Service or any state or local taxing authority within two (2) Business Days of receiving such communication (or on the same day, if any action is required in response to such communication within fewer than thirty (30) days of receipt of such communication). The Tax Matters Member shall also promptly give Notice to the Members of the commencement of any administrative or judicial proceedings involving the tax treatment of any items of Company income, loss, deduction or credit, and shall further keep them fully informed of, and provide the Members an opportunity to participate fully in, all material developments involved in such proceedings. In addition, the Tax Matters Member shall give the Members prompt Notice of, and provide the Members an opportunity to participate in the preparation of, any material submission to the Internal Revenue Service, any state or local taxing authority, or to any court in connection with any such proceedings. The Tax Matters Member shall also give Notice to the Members of its intention to meet with any representative of the Internal Revenue Service or any state or local taxing authority at least thirty (30) days prior to such meeting (or immediately upon arranging such meeting if such meeting is arranged fewer than thirty (30) days prior to such meeting), and shall provide the Members or their agents, legal counsel, employees or accountants with an opportunity to participate in such meeting (and shall inform any Members who do not participate in the meeting of the results of the meeting within two (2) Business Days after such meeting). The Tax Matters Member shall also provide to the Members, at least ten (10) Business Days prior to filing with any governmental authority, a copy of all Company tax returns and supporting documentation.

(b)    <u>Legal Uncertainties</u>. Manager shall, and any Member may, inform the Members of any legal issues or uncertainties relating to the preparation of the Company's federal, state and local income tax returns. If the Members do not agree on the proper tax treatment of any such item, Manager shall submit the relevant alternatives to the Members and shall prepare the Company's returns in accordance with the treatment approved by the Members.

(c)    <u>Member Returns</u>. Each Member shall file tax returns consistent with the tax treatment shown on the Company's tax returns, which tax treatment shall be established by the Members prior to the filing of the first required Company tax return and thereafter, as applicable. For U.S. federal income tax purposes, this Agreement will be treated as creating a

single partnership and, to the extent permitted by the Code and Regulations, the Assets and liabilities of each Subsidiary will be treated as the Assets and liabilities of the partnership.

4.4.    Fiscal Year.    The fiscal year of the Company shall end on December 31 of each year.

4.5.    Reserves.    Manager shall establish in the Business Plan such reasonable cash reserves, to provide for expenses contained in the Business Plan approved by Sponsor and Investor pursuant to Section 7.2(a)(i), as Manager reasonably determines, and as approved by Sponsor and Investor in their reasonable discretion, to be necessary to permit timely payment of such expenses.    If Manager reasonably expects to request an Additional Capital Contribution within ninety (90) days following a contemplated distribution, Manager shall instead propose a reserve for the Investor's approval in lieu of distributing the expected amount of such anticipated additional funds that would require Additional Capital Contributions.

4.6.    Bank Accounts; Payments; Investments.

(a)    Bank Accounts; Payments.    With the consent and upon the direction of the Members, Manager shall cause the Company and the Subsidiaries: (i) to open, maintain and close bank accounts on behalf of such party, (ii) to timely make any and all required payments on behalf of such party (to the extent of funds available to such party), and (iii) to promptly deposit any and all payments received by such party for the benefit of that party; it being hereby acknowledged and agreed, for the avoidance of doubt, that, except as otherwise expressly provided herein or in the Budget and Business Plan, under no circumstances shall Manager cause or permit any of the Company or the Subsidiaries to incur any material expenses and/or liabilities without the prior written approval of the Members, which approval may be granted or withheld in each Member's sole discretion.    Bank account withdrawals shall be made only in the regular course of Company business on such signature or signatures as Manager may from time to time determine and shall be in accordance with the Budget.

(b)    Allowable Investments.    The Company shall from time to time invest funds not required currently for its operations or for distribution to the Members in any money market, checking or savings account at any of JPMorgan Chase, Bank of America, National Association, Citibank, N.A. or any other financial institution approved by the Members.

## ARTICLE V.

## ALLOCATIONS

5.1.    Allocations of Profit and Loss.    The income, gains, losses, deductions and credits of the Company shall be allocated for Capital Account purposes and for federal, state and local income tax purposes among the Members in accordance with this Article 5, in a manner so as to comply with the Code and Regulations.    Except as otherwise provided in this Agreement, Manager shall have the power and authority to make all accounting, tax and financial determinations and decisions with respect to the Company, provided, further, if a Member

31

objects to any such determination or decision, the same shall be determined by the independent tax counsel employed by the Company under Section 5.6(b).

5.2.    Section 754 Election.  Upon the request of any Member and with the consent of the Members, the Company shall elect, pursuant to Section 754 of the Code, to adjust the basis of Company property as permitted and provided in Sections 734 and 743 of the Code.  Except to the limited extent otherwise provided in the Regulations promulgated under Section 704(b) of the Code, in the event that the Company makes an election under Section 754 of the Code, the amounts of any adjustments to the basis of the Assets of the Company made pursuant to Section 743 of the Code (relating to transfers of interests in the Company) shall not be reflected in the Capital Accounts of the Members, but the amounts of any adjustments to the basis of the Assets of the Company made pursuant to Section 734 (relating to distributions) of the Code as a result of the distribution of property by the Company to a Member shall be reflected in the Capital Accounts of the Members in the manner provided by the Regulations under Section 704(b) of the Code.

5.3.    Tax Allocations: Code Section 704(c).  Allocations of items of taxable income, gain, loss and deduction shall be made for tax purposes in accordance with allocations to Capital Accounts set forth above, except as otherwise provided herein.  In accordance with Code Section 704(c) and the Regulations thereunder, income, gain, loss and deduction with respect to any property contributed to the capital of the Company shall, solely for income tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its fair market value at the time of contribution.  In the event that the Book Value of any Asset is subsequently adjusted in accordance with the third sentence of the definition of Book Value, any allocation of income, gain, loss and deduction with respect to such Asset shall thereafter take account of any variation between the adjusted tax basis of the Asset to the Company and its Book Value in the same manner as under Section 704(c) of the Code and any Regulations promulgated thereunder.  Any elections or other decisions relating to such allocations shall be made by Manager with the consent of the Members in a manner that reasonably reflects the purpose and intention of this Agreement.  Allocations pursuant to this Section 5.3 are solely for purposes of federal, state and local taxes.

5.4.    Allocations for Tax and Book Purposes.  Except as otherwise provided herein or required by law, any allocation to a Member for a fiscal year or other period of a portion of the Profit or Loss of the Company shall be determined to be an allocation to that Member of the same proportionate part of each item of income, gain, loss, deduction or credit, as the case may be, as is earned, realized or available by or to the Company.

5.5.    Certain Accounting Matters.  For purposes of determining the Profit, Loss or any other items allocable to any period, Profit, Loss and any such other items shall be determined on a daily, monthly or other basis, as determined by Manager using any permissible method under Code Section 706 and the Regulations thereunder.

5.6.    Special Allocations.

(a) <u>Qualified Income Offset, Etc.</u>  To the extent the allocation provisions of <u>Section 5.1</u> would not comply with the Regulations promulgated under Section 704(b) of the Code, there is hereby included in this Agreement such special allocation provisions governing the allocation of Profit and Loss and items thereof as may be necessary to provide herein a so-called "qualified income offset," limit the allocation of losses that would cause a capital account to become negative to an impermissible extent, and ensure that this Agreement complies with all other provisions, including "minimum gain" provisions, relating to the allocation of so-called "nonrecourse deductions" and "Member nonrecourse deductions" and the charge back thereof as are required to comply with the Regulations under Section 704 of the Code.  A Member's "interest in partnership profits" for purposes of determining its share of the nonrecourse liabilities of the Company within the meaning of Regulation Section 1.752-3(a)(3) shall be its Percentage Interest in the Company.

(b) <u>Interpretation</u>.  In furtherance of the foregoing, Manager is hereby directed to interpret this Agreement and to resolve any ambiguity in the provisions of this Agreement in a manner that will preserve, protect and further the intention of the Members to cause this Agreement to comply with the aforesaid provisions for federal income tax purposes and, subject to the last sentence hereof, to adjust the Capital Account and allocation provisions and adopt such curative provisions to this Agreement as the Members may deem necessary.  In the event of any dispute, the decision of the independent tax counsel (reasonably approved by the Members) employed by the Company shall be final.

## ARTICLE VI.

## DISTRIBUTIONS

6.1. <u>Distributions Other Than in Liquidation</u>.

(a) <u>Distributions of Net Cash Flow and Net Proceeds</u>.  Subject to <u>Section 6.2</u> (regarding distributions in liquidation) and <u>Sections 3.2</u>, <u>3.3</u> and <u>4.5</u> (regarding maintenance of appropriate reserves), Net Cash Flow for each fiscal year (or part thereof) and Net Proceeds derived from any transaction that is not a Liquidating Transaction (such amounts, the "<u>Distributable Cash</u>") shall each be distributed not less frequently than monthly with respect to Net Cash Flow and not less than five (5) Business Days after the receipt of Net Proceeds, as follows:

(i) <u>first</u>, one hundred percent (100%) to the Members in proportion to their respective Percentage Interests at the time of such distribution, until each of Investor and Atlantic has received distributions under this clause (i) equal to the 20% Priority Distribution;

(ii) <u>second</u>, to Sponsor as a return of (but not on) any Additional Capital Contributions made by Sponsor on account of Manager Overruns pursuant to <u>Section 3.2(d)</u>; and

33

(iii) __thereafter__, (a) fifty percent (50%) to the Members in proportion to their respective Percentage Interests at the time of such distribution, and (b) fifty percent (50%) to Sponsor.

(b) __Landmarks Certificate__. Notwithstanding anything to the contrary contained in Section 6.1(a), prior to the Landmarks Certificate being obtained, (but subject to Section 6.2 (regarding distributions in liquidation) and Sections 3.2, 3.3 and 4.5 (regarding maintenance of appropriate reserves)), Distributable Cash shall be distributed not less frequently than monthly with respect to Net Cash Flow and not less than five (5) Business Days after the receipt of Net Proceeds, as follows:

(i) __first__, Eighty-Two Million Five Hundred Thousand and No/100 Dollars ($82,500,000) to Investor and Atlantic in the following percentages: sixty-nine and seven tenths percent (69.7%) and thirty and three tenths percent (30.3%), respectively, until Investor has received Fifty-Seven Million Five Hundred Thousand and No/100 Dollars ($57,500,000) and Atlantic has received Twenty-Five Million and No/100 Dollars ($25,000,000);

(ii) __second__, to Sponsor, until Sponsor has received Twelve Million Five Hundred Thousand and No/100 Dollars ($12,500,000);

(iii) __third__, one hundred percent (100%) to the Members in proportion to their respective Percentage Interests at the time of such distribution, until each of Atlantic and Investor has received distributions under clause (i) and this clause (iii) equal to the 20% Priority Distribution;

(iv) __fourth__, to Sponsor as a return of (but not on) any Additional Capital Contributions made by Sponsor on account of Manager Overruns pursuant to Section 3.2(e); and

(v) __thereafter__, (a) fifty percent (50%) to the Members in proportion to their respective Percentage Interests at the time of such distribution, and (b) fifty percent (50%) to Sponsor.

(c) __Interpretation and Application__.

(i) No interest or other compensation shall be allowed to any Member by reason of the amount of its Capital Contribution except its share of distributions as set forth above. All Net Cash Flow and Net Proceeds derived from any transaction that is not a Liquidating Transaction received by the Company, if any, attributable to each calendar quarter of each fiscal year (or portion thereof) and distributable other than in connection with the liquidation of the Company shall be applied and distributed as provided above. All distributions shall be made to the Members entitled thereto based on Manager's best estimate of the financial results of the Company through the date of the distribution, but shall be subject to adjustment as between the Members promptly

34

following the availability of the audited financial statements of the Company for the taxable and fiscal year.

(ii)     Manager shall make any permitted distributions of Net Cash Flow and Net Proceeds derived from any transaction that is not a Liquidating Transaction under this Section 6.1 within fifteen (15) days after the end of each calendar month during any fiscal year (if and to the extent of Distributable Cash and not otherwise) on the basis of estimated Net Cash Flow and Net Proceeds derived from any transaction that is not a Liquidating Transaction for such calendar month (or the applicable portion thereof), after taking into account any remaining discrepancy between actual and estimated Net Cash Flow and Net Proceeds derived from any transaction that is not a Liquidating Transaction for any preceding month.  Subject to Section 6.1(a) and (b), thirty (30) days following final determination of actual Net Cash Flow and Net Proceeds derived from any transaction that is not a Liquidating Transaction for each fiscal year, there shall be a final distribution to the Members to the extent that actual Net Cash Flow and Net Proceeds derived from any transaction that is not a Liquidating Transaction for such fiscal year exceeds interim distributions of estimated Net Cash Flow and Net Proceeds derived from any transaction that is not a Liquidating Transaction, or the Members shall recontribute their respective shares of the excess of any interim distributions of estimated Net Cash Flow and Net Proceeds derived from any transaction that is not a Liquidating Transaction over the actual Net Cash Flow and Net Proceeds derived from any transaction that is not a Liquidating Transaction for such fiscal year.

6.2.    Distributions in Liquidation.

(a) General Rule.  Net Proceeds derived from any transaction involving the sale or other disposition of all or substantially all of the Assets (a "Liquidating Transaction"), together with any Net Cash Flow during the period of winding up of the Company, shall be applied and distributed in the following order of priority:

(i)     first, to the payment of any debts and liabilities of the Company;

(ii)    second, to the setting-up of reserves (the amount of which shall be subject to the approval of Sponsor and Investor) to provide for any contingent, conditional or unmatured liabilities or obligations of the Company; and

(iii)   third, as set forth in Section 6.1(a) or (b) as applicable.

(b) Excess Distributions.  If, at the end of the Company's term and after the final liquidating distribution described in Section 6.2(a), a Member has received Excess Distributions, such Member (to the extent not offset against the amount distributable to such Member pursuant to the final liquidating distribution described in Section 6.2(a)) shall contribute cash to the Company in the amount equal to the Net Excess Distributions (the "Clawback Obligation"), which contributions shall, subject to the Act, be distributed to the Members in proportion to their respective Percentage Interests.  Manager shall use all reasonable efforts to enforce such Clawback Obligation on behalf of the Company.

35

(c) <u>Timing of Payments</u>. All payments under this <u>Section 6.2</u> shall be made as soon as reasonably practicable and in any event by the end of the fiscal year in which such liquidation or winding up occurs, or, if later, within ninety (90) days after the date of such liquidation or the date such winding up occurs.

(d) <u>Self-Help</u>. Each Member is a third-party beneficiary of the Clawback Obligation. The provisions of <u>Section 6.2(b)</u> are for the benefit of each of the Members and shall be enforceable by each of them. If Manager does not promptly and diligently do so on behalf of the Company, then any one or more Members may, in its or their own names(s), or in the name of the Company, or both, bring one or more actions to enforce the Clawback Obligation.

6.3. <u>Distributions in Kind</u>. Except as may be otherwise required by law, no distribution of property in kind by the Company shall be permitted without the prior written consent of the Members.

6.4. <u>No Distributions in Violation of Agreement</u>. No Member shall be entitled to receive any distribution from the Company that is a direct or indirect violation of the terms of this Agreement.

6.5. <u>Withholding</u>. Notwithstanding any other provision of this Agreement, Manager is authorized to and will take all actions that it reasonably determines to be necessary or appropriate to cause the Company to comply with any foreign or United States federal, state or local withholding requirement with respect to any allocation, payment or distribution by the Company to any Member or other Person. Except as otherwise required by law, (i) all taxes or amounts withheld from distributions to any Member will be treated as a distribution to such Member, (ii) all taxes or other amounts withheld from payments to the Company shall be treated as a reduction in the proceeds received by the Company and shall not be treated as a distribution to any Member, and (iii) all refunds of withheld taxes that are received by any Member shall be treated (without duplication) as a distribution to such Member. Manager shall use commercially reasonable efforts to determine whether any exemptions, waivers or reductions of any applicable withholding requirement may be available (including as a result of the status of any direct or indirect equity holder in any Member) and to provide sufficient advance notice of such available exemptions, waivers and reductions to allow a Member (or its direct or indirect equity holders) to meet any requirements necessary to obtain such exemption, waiver or reduction.

6.6. <u>Restricted Distributions</u>. Notwithstanding any provision to the contrary contained in this Agreement, the Company, and Manager on behalf of the Company, shall not make a distribution to any Member on account of such Member's interest in the Company if such distribution would violate the Act or other applicable law.

# ARTICLE VII.

## RIGHTS AND OBLIGATIONS OF THE MEMBERS

7.1.  Limited Liability.  Except to the extent provided in Sections 8.2(c) and 8.6 hereof, no Member shall be personally liable for any of the debts, liabilities, obligations or contracts of the Company, nor shall a Member be required to lend any funds to the Company.  A Member shall only be liable to make payment of such Member's Capital Contributions as and when due hereunder.  If and to the extent a Member's Capital Contributions shall be fully paid, the Member shall not, except as required by the express provisions of Sections 3.2 and 6.2(b) or as required by the express provisions of the Act regarding repayment of sums wrongfully distributed to the Member, be required to make any further contributions to the Company.

7.2.  Control.  Manager shall have day-to-day authority to act for the Company.  The Members shall, however, have the Notice, direction, consultation and, in the case of Investor only, approval rights expressly set forth elsewhere in this Agreement, as well as the direction and approval rights set forth in Section 7.2(a) below.  In connection with any agreement, including the Development Agreement, entered into by the Company or any Subsidiary, on the one hand and any Member or any Affiliated Person as to any Member, on the other hand, the unaffiliated Members shall have the full right, power and authority (but not the obligation) to take any and all actions, in the name of the Company, which the Company is permitted to take pursuant to the terms of this Agreement, in each case without the consent of the affiliated Member unless otherwise provided herein.

(a)  Approval Rights.  In addition to the other direction and approval rights specifically set forth in this Agreement, the following matters with respect to the Company or a Subsidiary may be proposed by either Manager or Investor but shall be subject to the prior written approval of both Manager and Investor in each instance (each a "Major Decision"):

(i)  the Business Plan, including all quarterly, annual and other updates and modifications thereto, provided to the Members in accordance with Section 8.2(b), including, without limitation, any changes to the scope of the project development;

(ii)  subject to Permitted Variance, any Budget, including such amendments to any Budget as may be proposed by Manager from time to time, provided to the Members in accordance with Section 8.2(b);

(iii)  any sale, transfer or other disposition (other than pursuant to Article 11 and other than sales of individual residential condominium units in accordance with the Business Plan and Budget, any loan documents and the condominium documents), any financing or refinancing, or any payment or other discharge of indebtedness by the Company or any Subsidiary relating to any material portion of any of the Assets, or securitized transactions involving the Property (as well as all terms and documentation relating to such transactions), and any modification of documents evidencing the foregoing;

37

(iv)     expenditures in excess of (i) the Permitted Variance with respect to the matters contained in any Budget as updated from time to time, other than on account of Protective Company Overruns or Manager Overruns;

(v)     entering into or modifying any agreement with a term of greater than two (2) years or with an aggregate value of greater than Two Hundred Fifty Thousand and No/100 Dollars ($250,000.00) to the extent such agreement is, and the terms thereof are, not (A) expressly provided for in the Business Plan or (B) a design or construction related agreement;

(vi)     use of Company funds or the funds of any Subsidiary to extend credit or make loans other than in the customary and ordinary course of extending credit to trades in connection with the development of the Property;

(vii)     any reimbursement by the Company or any Subsidiary pursuant to Section 8.3(b) of out of pocket expenses incurred by Manager to the extent such expenses are not included in the Business Plan or any Budget;

(viii)     any request for Additional Capital Contributions other than pursuant to Section 3.2(a)(i);

(ix)     entering into, modifying, amending, terminating, supplementing, pledging, hypothecating, assigning or exercising or delegating any rights or granting any waivers under any agreement to which the Company or any Subsidiary is a party to acquire additional properties; provided however Investor hereby consents to the acquisition of inclusionary air rights for the Project (as contemplated by the Business Plan and in accordance with the Budget);

(x)     any material modification to the zoning, use or permitting of the Property other than in accordance with the Business Plan and Budget;

(xi)     any matters regarding the landmark status of the Property;

(xii)     converting the Property to a condominium and entering into any condominium documents;

(xiii)     Intentionally Omitted;

(xiv)     any lease or rental agreement; provided that the Members shall not have any approval right over Manager entering into lease termination agreements on behalf of a Subsidiary unless and until the aggregate amount of payments under all lease termination agreements with respect to the Property exceed $10,000,000; provided further that Manager shall deliver copies of all executed lease termination agreements to the Members promptly after execution thereof;

(xv) any delegation by Manager of its duties or obligations under this Agreement; provided, however, that the Company may enter into the Development Agreement with an affiliate of Manager;

(xvi) the selection of the Accountant for the Company or any Subsidiary, other than the pre-approved accountants pursuant to Section 1.2;

(xvii) the selection of legal counsel for the Company or any Subsidiary, other than Kasowitz, Benson, Torres & Friedman LLP and Gibson, Dunn & Crutcher LLP;

(xviii) the selection of condominium sales agents;

(xix) the guaranty by the Company, any Subsidiary, any Member, Manager or any Affiliate of any of the foregoing of the obligations of any third party in connection with the Property;

(xx) making any material decisions with respect to environmental matters other than actions necessary to obtain environmental permits or approvals set forth in the Business Plan;

(xxi) the commencement of any insolvency proceedings by the Company or any Subsidiary; provided, however, that such commencement shall also be subject to the prior approval of Manager if Manager or any Affiliate of Manager will become liable under any loan non-recourse carveout provisions as provided in Section 8.2(c) as a result of any such insolvency filing;

(xxii) the commencement, prosecution or settlement of any litigation or arbitration by the Company or any Subsidiary for a sum in excess of Two Hundred Fifty Thousand and No/100 Dollars ($250,000.00);

(xxiii) the purchase of any interest in the direct or indirect, secured or unsecured, debt of the Company by any Member or any Affiliate of a Member;

(xxiv) making any decisions regarding any material tax matters (whether related to reporting, structure, treatment or otherwise);

(xxv) the organization or formation of any Subsidiary;

(xxvi) use of the Partnership Reserve; and

(xxvii) any other action requiring the approval of the Members under this Agreement.

(b)  Manner of Consent.  Manager or Investor shall give to the other Members a Notice requesting any such approval, accompanied by a description in reasonable detail of the matters as to which such approval is requested.  The Members shall communicate by Notice to Manager their approval or non-approval of any matters described in the Notice

requesting such approval within ten (10) Business Days of the date of such Notice. Any Member not so responding shall be deemed to have given its disapproval of the matters contained in the Notice. Notwithstanding anything to the contrary contained herein, Manager shall consult with Atlantic with respect to any Major Decision, but Atlantic shall have no approval rights with respect to any Major Decision.

7.3.     No Dissolution. Without the consent of all of the Members, no Member shall take any actions, or permit any actions within its control to be taken, that would cause the dissolution of the Company pursuant to the Act.

7.4.     No Resignation. No Member shall have the right to resign as a Member of the Company and no Member shall have the right to demand a return of capital.

7.5.     Development Consultant. Investor shall have the right to engage, appoint and/or replace (i) one (1) construction consultant to advise Investor and consult with Manager and Principals, with respect to development-and-construction-related issues that arise in the course of the Company's conduct of business and (ii) one (1) asset manager to advise Investor and consult with Manager and Principals, with respect to pre-development and post-development related issues, which are distinct from those issues and the role of the construction consultant in clause (i) above. The cost of such construction consultant and asset manager shall not exceed the market rate for such services at such time, and such cost shall be paid by the Company and included in (or, if appropriate, added to) the applicable Budget(s) then in effect. Manager, on behalf of itself and its Affiliates, shall, and shall use commercially reasonable efforts to cause any third parties to meet, consult and otherwise cooperate with all such construction consultants and provide such consultants copies of minutes of meetings between Manager and any third party construction managers, developers and general contractors.

## ARTICLE VIII.

## RIGHTS AND OBLIGATIONS OF MANAGER

8.1.     Responsibilities of Manager. Manager shall have full responsibility in the management and control of the business and affairs of the Company for the purposes herein stated, shall make all day-to-day decisions affecting the Company's affairs and business, and shall take any and all action that the Company is authorized to take (subject, however, in all cases to the express requirements of this Agreement regarding directions by and required approvals of Investor and Notice to the Members). Manager's obligations are subject to the availability of Company funds in sufficient amounts and on a timely basis to discharge its obligations to supervise the operations of the Company. Manager shall provide or arrange for such personnel as may be necessary to accomplish the performance of the Company's obligations under the Development Agreement, the ownership, construction, development, entitlement, operation, maintenance and disposition of the Property and the operations and management of the Company in accordance with this Agreement, as limited to the extent such personnel costs are set forth in the Budget. Manager shall act at all times in good faith and in such manner as may be required to promote the best interests of the Company and subject to the Major Decisions, Manager shall, and shall cause the Company to, comply with this Agreement,

the Budget, the Business Plan (subject to the Permitted Variance) and all other agreements to which the Company and its Subsidiaries are a party.

8.2. <u>Management</u>.

(a) <u>In General</u>.   Manager shall supervise the operations of the Company, including, without limitation, the construction, development, entitlement, operation, maintenance and disposition of the Property.   Manager shall provide sufficient professional resources for the supervision of the construction, development, entitlement, operation, maintenance and disposition of the Property, as limited to the extent such resources costs are set forth in the Budget.

(b) <u>Business Plans and Budgets</u>.   Attached hereto as <u>Exhibit A</u> is the business plan for the Company which has been approved by Sponsor and Investor (as so approved, and to the extent revised or updated from time to time with the approval of Sponsor and Investor in accordance with <u>Section 7.2(a)</u>, the "<u>Business Plan</u>") and includes a consolidated pre-development, development, capital expenditure and/or operating budget for Company income and expense which has been approved by Sponsor and Investor (as so approved, and to the extent revised or updated from time to time with the approval of Investor in accordance with <u>Section 7.2(a)</u>, each, a "<u>Budget</u>", and collectively, the "<u>Budgets</u>").

Manager will prepare and submit (i) proposed updates and revisions to the Business Plan and Budgets that are then in effect to (A) Atlantic for its consultation pursuant to <u>Section 7.2(b)</u> and (B) Investor for its approval pursuant to <u>Section 7.2(a)</u> within thirty (30) days after the end of each fiscal quarter of the Company if necessary and (ii) a proposed new Business Plan and Budget within sixty (60) days of the end of each fiscal year or at such other times if necessary.   Such proposed updates and revisions are subject to Investor's approval pursuant to <u>Section 7.2(a)</u>, and to the extent so approved, shall constitute a part of the Business Plan and/or the applicable Budget(s) for the Company.   Until Manager and Investor have approved a revised and updated Business Plan or Budget, as the case may be, pursuant to <u>Section 7.2(a)</u>, the Company will be operated in accordance with the most recently approved Business Plan and/or Budget for the Company, subject to the Permitted Variance.

(c) <u>Leverage and Loan Guarantees</u>.   The acquisition and development of the Property may be partially financed by third-party lenders pursuant to terms approved by Investor as set forth in <u>Section 7.2(a)</u>, and any borrowing by the Company or any of its Subsidiaries will be non-recourse to the Company or its Subsidiaries and any Member unless specifically consented to in writing by Investor.   Notwithstanding the foregoing, Manager and Principals will be personally liable for providing any necessary guarantees, indemnities, or credit enhancements, including, without limitation, any completion, non-recourse, limited or springing recourse guarantees and environmental indemnities (collectively, "<u>Credit Enhancements</u>") as any mortgage or mezzanine lender may customarily require with respect to the Property.   Manager, Principals or their respective Affiliates shall not be entitled to any fee or other compensation in consideration of their issuance of such Credit Enhancements.   To the extent any payments made by Manager, Principals or their respective Affiliates under any such Credit Enhancements are determined by a court of competent jurisdiction located in the

41

Venue to be attributable to affirmative acts of (i) Investor or its Affiliates and such affirmative acts were not approved by Manager in writing, then Investor shall reimburse Manager, Principals, or their respective Affiliates, as the case may be, the amounts so paid to the extent the same are attributable to such affirmative acts and/or (ii) Atlantic or its Affiliates and such affirmative acts were not approved by Manager in writing, then Atlantic shall reimburse Manager, Principals, or their respective Affiliates, as the case may be, the amounts so paid to the extent the same are attributable to such affirmative acts and each of Investor Principal and Atlantic Principal, as the case may be, by execution of this Agreement, severally and not jointly, hereby guaranties to the Company, Manager and Principals, the obligations of (x) with respect Investor Principal, Investor and (y) with respect to Atlantic Principal, Atlantic set forth in this sentence. Furthermore, to the extent any payments made by Manager, Principals or their respective Affiliates under any customary "bad boy" guaranty or environmental indemnity are determined by a court of competent jurisdiction located in the Venue to be attributable to actions expressly approved by Investor in writing pursuant to the terms of this Agreement, and Manager advised Investor in writing in advance of obtaining Investor's consent that the same would be reasonably likely to trigger recourse liability, then Investor and Atlantic shall reimburse Manager, Principals or their respective Affiliates, as the case may be, pro rata in accordance with their Percentage Interests, the amounts so paid to the extent the same are attributable to such actions so approved (for the avoidance of doubt, in the case of a payment by Manager, Principals or their respective Affiliates as described in this sentence, each of Manager, Investor and Atlantic shall each be severally responsible for its own Percentage Interest of such payment). Except as set forth herein, under no circumstances shall any secured or unsecured loans with respect to the Property, any Assets, or otherwise, require Investor, Atlantic or any of their Affiliates to give any guaranty or other credit enhancement. Indebtedness (whether secured or unsecured, and whether in the form of mortgage debt, mezzanine debt, preferred equity or other financing) shall be prohibited without the prior written consent of Investor in each instance. To the extent provided in the Limited Joinder annexed hereto, Atlantic Principal guaranties Atlantic's obligations under this <u>Section 8.2(c)</u>. To the extent provided in the Limited Joinder annexed hereto, Investor Principal guaranties Investor's obligations under this <u>Section 8.2(c)</u>.

8.3.    <u>Other Business; Reimbursement</u>.

(a)    The Members and any Affiliated Person of any Member may engage in or possess an interest in other business ventures (unconnected with the Company) of every kind and description, independently or with others, including, but not limited to, serving as general partner of partnerships and participating in competitive real estate businesses in all of their phases. Neither the Company nor the other Members shall have any rights in or to such independent ventures or the income or profits therefrom by virtue of this Agreement.

(b)    The Company (or applicable Subsidiary) will from time to time reimburse Manager for its reasonable out-of-pocket expenditures incurred in connection with the performance of its duties hereunder, including all third-party asset-specific and administrative costs such as legal, accounting, appraisal, environmental and structural review, and including in-house legal expense at actual cost. All reimbursement of expenses pursuant to this <u>Section 8.3(b)</u> will be subject to inclusion in and approval of such item in a Budget and, subject to

Section 8.8, will not include any expenses representing payroll (except actual in-house legal costs) or overhead costs of Manager or of any Affiliate of Manager. Expenses not included in the Business Plan or any Budget are subject to the approval of Sponsor and Investor, as provided in Section 7.2(a) of this Agreement.

8.4.    Authority of Manager.

(a)    Subject to the express provisions of this Agreement, Manager shall have the authority to execute on behalf of the Company such agreements, contracts, instruments and other documents as it shall from time to time approve, such approval to be conclusively evidenced by its execution and delivery of any of the foregoing, including, without limitation: (a) all such agreements, instruments, certificates or other documents as shall be necessary or appropriate in connection with the maintenance of the Property; (b) checks, drafts, notes and other negotiable instruments; (c) deeds of trust and assignments of rights; (d) contracts for the sale of Assets, deeds, leases, assignments and bills of sale; and (e) loan agreements, mortgages, security agreements, pledge agreements, interest rate swap or rate cap contracts, and financing statements. The signature of Manager on all such instruments, agreements, contracts, leases, conveyances or documents, and (subject to the provisions of Section 4.6(a)), upon any checks, drafts, notes and other negotiable instruments, shall be sufficient to bind the Company in respect thereof and conclusively evidence the authority of Manager with respect thereto, and no third person need look to the application of funds or authority to act or require joinder or consent of any other party.

(b)    Any Person dealing with the Company or Manager may rely on a certificate signed by Manager:

(i)    as to who are Manager or the Members hereunder;

(ii)    as to the existence or nonexistence of any fact or facts which constitute conditions precedent to acts by Manager or are in any other manner germane to the affairs of the Company;

(iii)    as to who is authorized to execute and deliver any instrument or document on behalf of the Company;

(iv)    as to the authenticity of any copy of this Agreement and amendments hereto; or

(v)    as to any act or failure to act by the Company or as to any other matter whatsoever involving the Company or any Member.

(c)    Any Person relying upon this Section 8.4 shall be informed of the provisions of Section 4.6 and Section 7.2(a) of this Agreement, which contain limits on the authority of Manager to bind the Company or to do, or cause to be done, certain acts; provided that the foregoing shall not be deemed to constitute a waiver or modification of any other provisions of this Agreement which contain limits on the authority of Manager to bind the Company or to do, or cause to be done, certain acts, and Manager acknowledges and agrees

43

that it shall be obligated to comply with all such provisions whether in connection with the performance of its rights and duties under this Section 8.4, or otherwise.

8.5.   Waiver of Fiduciary Duties.   Except as otherwise expressly provided in this Agreement, none of the Members shall have any duties or liabilities to the Company or any other Member (including any fiduciary duties), whether or not such duties or liabilities otherwise arise or exist in law or in equity, and each Member hereby expressly waives any such duties or liabilities; provided, however, that this Section 8.5 shall not eliminate or limit the liability of such parties (i) for acts or omissions that involve fraud, intentional misconduct or a knowing and culpable violation of law, or (ii) for any transaction not permitted or authorized under or pursuant to this Agreement from which such party derived a personal benefit unless all of the Members have approved in writing such transaction; provided further, however, that the duty of care of each of such parties is to not commit fraud, intentional misconduct or a knowing and culpable violation of law.

8.6.   Liability of Manager.

(a)   Liability to Third Parties.   Except for Sponsor pursuant to Sections 8.2(c) and Principals pursuant to the terms of the Limited Joinder annexed hereto and the applicable Sections of this Agreement referenced therein, neither Sponsor nor its Affiliated Persons shall be personally liable for any of the debts, liabilities, obligations or contracts of the Company, nor shall Sponsor or its Affiliated Persons be required to lend any funds to the Company. Sponsor shall only be liable to make payment of Sponsor's Capital Contributions and contributions on account of Manager Overruns as and when due hereunder.   If and to the extent Sponsor's Capital Contributions and contributions on account of Manager Overruns shall be fully paid, Sponsor and its Affiliated Persons shall not, except as required by the express provisions of written agreements among the Members or their Affiliated Persons including this Agreement that are binding on the party against whom enforcement of any such agreement is sought, or as required by the express provisions of applicable law including the Act regarding repayment of sums wrongfully distributed to Sponsor or its Affiliated Persons, be required to make any further contributions to the Company.

(b)   Liability to the Company and Other Members.   Except to the extent otherwise required by the express provisions of applicable law including the Act or as required by the express provisions of written agreements among the Members or their Affiliated Persons including this Agreement that are binding on the party against whom enforcement of any such agreement is sought, Manager and its Affiliated Persons shall have no liability to the Company or to any other Member for any loss suffered by the Company which arises out of any action or inaction of Manager or its Affiliated Persons, if (i) Manager or its Affiliated Person reasonably determined in good faith, that such conduct was in the best interest of the Company, (ii) such course of conduct did not constitute fraud, criminal acts, gross negligence or willful misconduct of such Person, (iii) such course of conduct did not constitute a material breach of any provision or representation and warranty contained in this Agreement or any other agreement of Manager or any Manager's Affiliated Person with the Company or a Subsidiary.

44

8.7.    Indemnification.

(a)    To the fullest extent permitted by applicable law, Manager and any Manager's Affiliated Person is hereby indemnified by the Company for any loss, damage or claim by reason of any act or omission performed or omitted by it on behalf of the Company and in good faith and in a manner reasonably believed to be within the scope of the authority conferred on it by this Agreement, except that, without limitation, Manager and Manager's Affiliated Person shall not be entitled to be indemnified in respect of any loss, damage or claim incurred by it by reason of Manager's or an Affiliate of Manager's gross negligence, criminal acts, willful misconduct, or in respect of any loss, damage or claim resulting from a material breach by Manager or an Affiliate of Manager of any provision or representation and warranty contained in this Agreement or any other agreement of Manager or an Affiliate of Manager with the Company or a Subsidiary, fraud, or the bankruptcy or insolvency of Manager or any of its Affiliates which is a Member; provided, however, that any indemnity under this Section 8.7 shall be provided out of and to the extent of Assets only, and no Member shall have personal liability on account thereof.

(b)    To the fullest extent permitted by applicable law, the Company, Investor, Atlantic and its Affiliated Persons are hereby indemnified by Sponsor, and, to the extent provided in the Limited Joinder annexed hereto, Principals, on a joint and several basis, for any loss, damage or claim incurred by such Persons by reason of (i) the gross negligence, criminal acts, willful misconduct or fraud by Principals, Sponsor or any of their respective Affiliated Persons, and/or (ii) in respect of any loss, damage or claim resulting from a material breach by Sponsor or any of its Affiliated Persons of any provision or representation and warranty contained in this Agreement or any other agreement of the Company or its Subsidiaries with respect to any act or omission performed or omitted by such Person unless such Person cures such material breach within thirty (30) days of receiving written notice of such material breach from the Company, Atlantic and/or Investor, as the case may be.

(c)    To the fullest extent permitted by applicable law, the Company, Investor, Sponsor and its Affiliated Persons are hereby indemnified by Atlantic, and, to the extent provided in the Limited Joinder annexed hereto, Atlantic Principal, on a joint and several basis, for any loss, damage or claim incurred by such Persons by reason of (i) the gross negligence, criminal acts, willful misconduct or fraud by Atlantic Principal, Atlantic or any of their respective Affiliated Persons, and/or (ii) in respect of any loss, damage or claim resulting from a material breach by Atlantic or any of its Affiliated Persons of any provision or representation and warranty contained in this Agreement or any other agreement of the Company or its Subsidiaries with respect to any act or omission performed or omitted by such Person unless such Person cures such material breach within thirty (30) days of receiving written notice of such material breach from the Company, Investor and/or Sponsor, as the case may be.

(d)    To the fullest extent permitted by applicable law, the Company, Sponsor, Atlantic and its Affiliated Persons are hereby indemnified by Investor, and, to the extent provided in the Limited Joinder annexed hereto, Investor Principal, on a joint and several basis, for any loss, damage or claim incurred by such Persons by reason of (i) the gross

45

negligence, criminal acts, willful misconduct or fraud by Investor, Investor Principal or any of their respective Affiliated Persons, and/or (ii) in respect of any loss, damage or claim resulting from a material breach by Investor or any of its Affiliated Persons of any provision or representation and warranty contained in this Agreement or any other agreement of the Company or its Subsidiaries with respect to any act or omission performed or omitted by such Person unless such Person cures such material breach within thirty (30) days of receiving written notice of such material breach from the Company, Atlantic and/or Sponsor, as the case may be.

(e) To the fullest extent permitted by applicable law, the Company, Investor, Atlantic and any of their Affiliated Persons are hereby indemnified by Sponsor, and, to the extent provided in the Limited Joinder annexed hereto, on a joint and several basis, Principals for any loss, damage or claim incurred by such persons by reason of any action (or inaction) or conduct by Principals, Sponsor or any of their respective Affiliated Persons in connection with the acquisition of the Property which occurred on or prior to the Closing Date.

The provisions of Sections 8.7(b), (c), (d) and (e) are for the benefit of each of the Members and the Company, as applicable, and shall be enforceable by each of the foregoing.

8.8. **Fees**. Any fees payable by the Company or any Subsidiary to Manager or any of its Affiliates for management and development or pursuant to a management agreement, if any, will be agreed upon in advance by Manager and the Members in accordance with the Budget, and will be invoiced monthly (as so approved, the "Fees"). The Fees payable under the Development Agreement (as set forth on Exhibit B) are hereby agreed upon. In no event shall the Fees exceed the amount of such fees approved by any lender to the Company or any Subsidiary.

8.9. Member Disagreement. In the event that there is a disagreement between Sponsor, on the one hand, and Investor, on the other hand, with respect to a Major Decision, then either Sponsor or Investor shall have the right to deliver a notice to the other (the "Deadlock Notice") stating that a disagreement exists. Principals and Investor Representative and their advisors shall hold a meeting or series of meetings, either telephonically or at the Company's principal place of business, to attempt, in good faith, to resolve such disagreement. If the parties are unable to resolve the dispute regarding a Major Decision within thirty (30) days following delivery of a Deadlock Notice, a "Major Decision Dispute" will be deemed to exist and either Member may proceed under the provisions set forth in Section 11.1.

8.10. Removal of Manager. In the event that Investor (the "Removing Member") believes that an occurrence of "Cause" as defined in Section 8.10(c) has taken place, Removing Member shall deliver written notice thereof to Manager, together with reasonable backup documentation specifying the nature of the Cause (the "Cause Notice"). A copy of the Cause Notice shall be sent simultaneously to Atlantic (for the avoidance of doubt, failure to deliver a copy of the Cause Notice simultaneously to Atlantic shall not affect the effectiveness of the Cause Notice). Manager shall have a period of time (not to exceed thirty (30) days unless expressly set forth otherwise herein) after receipt of the Cause Notice, to cure the alleged cause. In the event Manager fails to cure such cause, Manger may, after expiration of the cure period set

46

forth above, on written notice delivered to Removing Member within ten (10) days after the end of such cure period (with a simultaneous copy sent to Atlantic), submit such dispute to arbitration, in which event such dispute shall be finally resolved by binding expedited arbitration, conducted in New York, New York, by three (3) arbitrators applying Delaware law, and shall otherwise be conducted in accordance with the National Rules of the American Arbitration Association governing real estate disputes; provided that only the Cause events set forth in clauses (i) (unless the alleged fraud was theft from the Company or its Subsidiaries or Manager or its principals have been charged or indicted for a criminal act), (ii) and (iii) in Section 8.10(c) hereof are subject to the foregoing arbitration. In agreeing to arbitrate any such dispute, Manager and Removing Member agree, recognize and understand that they are mutually waiving their right to a jury trial and that their decision to do so is voluntary and with full knowledge of all pre-existing and future rights and entitlements as may otherwise be provided by law. In any such arbitration, Manager and Removing Member agree that the costs and fees of the arbitrators shall be paid by the non-prevailing party within ten (10) days after such determination. If a Cause has been finally determined to have occurred then Removing Member shall be entitled to proceed as provided in Section 8.10(a) below. Notwithstanding anything to the contrary contained herein, if Removing Member delivers a Cause Notice in bad faith, as determined by binding arbitration as set forth above, then Removing Member shall no longer have the right to deliver a subsequent Cause Notice. Notwithstanding anything to the contrary contained herein, Atlantic shall not have the right to deliver a Cause Notice to Manager at any time.

(a) Right to Remove. Upon the occurrence of cause (defined below):

(i) Removing Member shall have the right to appoint, and cause the admission to the Company of, a new Manager and to determine such new Manager's economic interest (if any) in the Company; provided, however, that (i) such new Manager shall have the appropriate knowledge and experience necessary for the management, development and construction with respect to the Property and (ii) the fees and distributions to such new Manager shall not be in excess of the fees and distributions provided to a manager of a construction and development project similar to the construction and development project with respect to the Property at such time.

(ii) Removing Member shall have the further right after admission of a new Manager pursuant to clause (i), to cause the removal of Manager and the termination of any agreement under which any Fees are paid or any property or asset management agreements, servicing agreements, construction management agreements, development agreements and other services agreements between the Company or any Subsidiary and the removed Manager or any of its Affiliates, in each case without any termination fee or penalty.

(iii) Removing Member shall exercise the rights set forth in this Section 8.10(a) by giving Notice thereof (a "Termination Notice") to Manager. A copy of the Termination Notice shall be sent simultaneously to Atlantic (for the avoidance of doubt, failure to deliver a copy of the Termination Notice simultaneously to Atlantic shall not affect the effectiveness of the Termination Notice). Any removal of Manager pursuant to this Section 8.10(a) shall be effective as of the date (the "Removal Date") which is five

(5) days after the date of the Termination Notice or, if later, the date on which all third-party consents (if any) required for such removal (and which have been documented in written agreements that have been expressly approved by Removing Member in writing) are obtained and the new Manager has been admitted to the Company.  Nothing in this Section 8.10(a)(iii) shall require the consent of the non-Removing Member or any Affiliate thereof.

(iv)    Upon the appointment of a successor Manager and the removal of Manager, as provided in this Section 8.10(a), this Agreement shall be amended to the extent necessary to reflect such appointment and removal, and a Certificate of Amendment to the Certificate shall be filed in accordance with the Act.  Manager and the other Members agree to execute and deliver such further instruments and do such further acts and things as may be required to carry out the intent of this Section 8.10(a), including without limitation effectuating the admission to the Company of any new Manager appointed by Removing Member hereunder, but the failure to do so shall not influence the effectiveness of the removal.

(v)    The Removing Member shall use commercially reasonable efforts to cause the principals of the removed Manager to be prospectively released from any Guaranty under any loan as of the date of such foreclosure; provided that in the event that Removing Member is unsuccessful in obtaining such release, the principals affiliated with the Members remaining in the Company shall fully indemnify, defend and hold harmless the principals affiliated with removed Manager for any liability under the guaranties attributable to claims arising on or after the Removal Date.

(b)    Unpaid Fees.  In the event that Manager is removed by Investor pursuant to Section 8.10(a), any accrued but unpaid Fees with respect to any period prior to the Removal Date shall be paid in accordance with this Agreement.  Except as provided in the preceding sentence, neither  removed Manager nor any of its Affiliates shall be entitled to any Fees that would otherwise arise or accrue subsequent to the Removal Date.

(c)    "Cause".  For purposes of this Section 8.10, the term "Cause" shall mean (i) that Manager or any of its Affiliates has committed fraud or a criminal act with respect to the Property, (ii) Manager or any of its Affiliates has committed an act in violation of law or willful misconduct or has been grossly negligent with respect to the Property, (iii) Manager or any of its Affiliates has materially breached its obligations under this Agreement, or materially breached its obligations under any other agreement with the Company or a Subsidiary, and such breach has caused material damage to the Company or Investor, (iv) Manager has withdrawn as the manager of the Company, (v) Manager or any of its Affiliates has resigned or has been terminated pursuant to the Development Agreement, any property or asset management agreement, construction management agreement, or other services agreement between it and the Company or a Subsidiary, unless replaced by a Person satisfactory to Investor, (vi) the bankruptcy or insolvency of Manager or any of its Affiliates which is a Member, or (vii) the failure of Manager or any of its Affiliates which is a Member to make any contributions on account of Manager Overruns following a forty-five (45)-day

48

period during which Manager or such Member shall have a right to cure such failure in accordance with Sections 3.2 and 3.3.

(d) Consequences of Removal of Manager. With respect to the removed Manager from and after the Removal Date, the removed Manager shall have no right to act on behalf of or for the Company and shall have the status only of a Member (to the extent the removed Manager is also a Member) but without any approval over the Major Decisions except the right to (i) take all actions set forth in the second sentence of the introductory paragraph of Section 7.2 with respect to Affiliate agreements and (ii) approve those Major Decisions set forth in Section 7.2(a)(vii), (xix) and (xxi).

Upon removal of Manager for cause, from and after the Removal Date, Section 6.1(a)(iii) or 6.1(b)(v), as applicable, shall be deemed amended as follows:

"one hundred percent (100%) to the Members in proportion to their respective Percentage Interests at the time of such distribution."

Upon the occurrence of the foregoing, appropriate adjustments will be made to the allocation, distribution, Capital Account, and other provisions of this Agreement to give effect to the revision to Section 6.1(a) or (b) described above. Subject to the foregoing, from and after the Removal Date, Section 6.1 shall be applied as amended above for purposes of the definition of Target Capital Account (relating to allocations of Profit under Section 5.1). In addition, the definition of Target Carried Interest shall be deemed revised in a manner consistent with the foregoing modified distribution provisions.

8.11. No Dissolution. Without the consent of all of the Members, Manager shall not take any actions, or permit any actions within its control to be taken, that would cause the dissolution of the Company pursuant to the Act.

8.12. No Resignation. Manager shall not have the right to resign as either Manager or a Member of the Company.

## ARTICLE IX.

## TRANSFERS OF INTERESTS

9.1. General Limitations.

(a) Transfers Restricted. The Members shall not make, suffer, or permit (i) any Transfer, encumbrance or lien upon such Member's interest in the Company, (ii) any Transfer, encumbrance or lien upon the direct or indirect shares of stock, membership interest, partnership interest or other equity interest in the Members, or (iii) any involuntary Transfer of any such direct or indirect shares or interests by reason of merger, death or divorce of, or any other event affecting, a constituent Person of a Member, without, in each instance, obtaining the prior written approval of the Members, which approval may be withheld in such Member's absolute discretion.

(b) Permitted Transfers. Notwithstanding the foregoing provisions of Section 9.1(a):

(i) Principals and the other permitted direct and indirect shareholders, members and limited partners of Sponsor may Transfer their respective direct and indirect interests in Sponsor without obtaining the prior approval of Investor for the purposes of (A) their personal estate planning to the spouse or descendants of the transferor or to one or more trusts for the primary benefit of one or more of the transferor, the spouse of the transferor, and the descendants of the transferor by will or under the laws of descent and distribution and (B) Transfers to employees of Property Markets Group, Inc. and JDS Development Group pursuant to employee incentive arrangements with no voting or control rights; provided that under this clause (B) Principals shall not transfer more than twenty-five percent (25%) of the direct and indirect legal and beneficial interests, held by Principals as of the date hereof, in Sponsor; and provided further that neither Principal nor any of such other shareholders, members or limited partners of Sponsor may Transfer such direct or indirect interests for any purpose to the sibling(s) of the transferor or the descendants of such sibling(s).

(ii) Investor Principal and any other owner of direct or indirect interests in Investor (other than holders of publicly traded shares in Investor Principal whose transfer rights are contained in Section 9.1(b)(iii)) may Transfer their respective membership interests in Investor to any Qualified Investor; provided that (1) Investor Principal shall at all times retain unilateral control (as defined in the definition of "Affiliate") of Investor and at least fifty-one percent (51%) of the direct membership interests in Investor and (2) no Transfer of the direct membership interests in Investor may be made to a Person who is a Competitor.

(iii) Investor Representative and any other owner of publicly traded shares in Investor Principal may Transfer their respective shares in Investor Principal; provided that, (1) Investor Representative or his Immediate Family shall at all times own no less than twenty percent (20%) of shares of Investor Principal, (2) Investor Representative shall at all times be the chairman of the board of directors of Investor Principal.

(iv) Atlantic Principal and any other owner of direct or indirect interests in Atlantic may Transfer their respective membership interests in Atlantic to any Qualified Investor; provided that (1) Atlantic Principal shall at all times retain unilateral control (as defined in the definition of "Affiliate") of Atlantic and at least fifty-one percent (51%) of the direct membership interests in Atlantic and (2) no Transfer of the direct membership interests in Atlantic may be made to a Person who is a Competitor.

9.2. Obligations and Rights of Transferees and Assignees. Any Person who acquires in any manner whatsoever the Company interest (or any part thereof) of any Member of the Company, irrespective of whether such Person has accepted and assumed in writing the terms and provisions of this Agreement, shall be deemed, by acceptance of the benefit of the acquisition thereof, to have agreed to be subject to and bound by all of the obligations of this Agreement, with the same force and effect as any predecessor in interest in the Company, shall

50

have only such rights as are provided in this Agreement, and, without limiting the generality of the foregoing, shall not have the value of such Person's interest separately ascertained or receive the value of such interest, or, in lieu thereof, profits attributable to any right in the Company, except as set forth in this Agreement.

9.3.    Non-Recognition of Certain Transfers.  Notwithstanding any other provision of this Agreement, any Transfer, sale, alienation, assignment, encumbrance or other disposition in contravention of any of the provisions of this Agreement shall be void and ineffective, and shall not bind, or be recognized by, the Company.

9.4.    Required Amendments; Continuation.  If and to the extent any Transfer of an interest in the Company is permitted hereunder, this Agreement shall be amended to reflect the admission to the Company of the transferee Member and, if such Transfer is a Transfer of all of the transferor Member's interest in the Company, the elimination of the transferor Member.  Any Person who shall become an additional or substituted Manager of the Company in accordance with this Agreement is hereby expressly authorized and directed to continue the business of the Company, subject to the terms and conditions of this Agreement.

9.5.    Withdrawal.  Except upon Transfer of a Member's entire interest in the Company and the admission of the transferee as a substituted Member in compliance with the terms of this Agreement, no Member shall have the right to withdraw from the Company except with the approval of all of the Members.

9.6.    Compliance with Securities Laws.  Any provision of this Agreement to the contrary notwithstanding, no Transfer, sale, assignment or other disposition of any Company interest in the Company may be made except in compliance with the then applicable federal and state securities laws.

9.7.    Continuing Liability of Transferor.  Notwithstanding anything in this Article 9 to the contrary, unless a transferee or assignee is admitted as a substitute Member, the transferor shall not be relieved or released of any liability hereunder.

9.8.    Lender Consent.  Notwithstanding anything to the contrary contained in this Article 9 to the contrary, in no event shall any Member consummate a Transfer that is prohibited pursuant to the terms of any loan documents of the Company or any Subsidiary, without the lender's approval thereof or the pay-off of the loan requiring consent prior to or simultaneously with the Transfer.

## ARTICLE X.

## TERMINATION

10.1.    Events of Dissolution.

(a)    The Company shall be dissolved and its affairs wound up upon a decision of all the Members to dissolve the Company.

(b)   The Company shall be dissolved if all or substantially all of the Property is sold.

(c)   The death, retirement, resignation, expulsion, bankruptcy or dissolution of a Member or the occurrence of any other event that terminates the continued membership of a Member shall not cause, or give rise to any right of less than all of the remaining Members to cause, the dissolution of the Company.

(d)   Dissolution of the Company shall be effective on the day on which the event occurs giving rise to the dissolution, but the Company shall not terminate until the Assets shall have been distributed as provided herein and a certificate of cancellation shall have been filed with the Secretary of State of the State of Delaware.

10.2.   Application of Property.   In the event of dissolution, the Company shall conduct only such activities as are necessary to wind up its affairs (including the sale of the Property an orderly manner), and the Assets shall be applied and distributed in the manner and in the order of priority set forth in Section 6.2.

## ARTICLE XI.

## LIQUIDITY EVENTS

11.1.   Buy/Sell.

(a)   If a Major Decision Dispute occurs at any time after the date that is twelve (12) months following the Substantial Completion Date (such date, the "Lockout Date"), then either Sponsor or Investor (in either case, the "Offeror"), may make an offer in writing to the other Members (each, an "Offeree"), which shall state an amount (the "Buy-Sell Value") determined in the sole and absolute discretion of the Offeror that the Offeror believes is the value of the Assets.   An offer made pursuant to this Section 11.1 shall constitute an irrevocable offer by the Offeror to each Offeree either (I) to sell all, but not less than all, of the Offeror's interest in the Company to each Offeree or (II) to purchase all, but not less than all, of each Offeree's interests in the Company.   Each Offeree shall have thirty (30) days after receipt of an offer made pursuant to this Section 11.1(a) (the "Buy-Sell Election Period") to elect to:

(i)   sell its interest in the Company to the Offeror for a price equal to the amount such Offeree would have received if the Company caused all of the Assets to be sold to a third party for the Buy-Sell Value on the Buy-Sell Closing Date and distributed the resulting Net Proceeds (and any other funds then held by the Company and the Subsidiaries) pursuant to Section 6.2, assuming that no reserves are established pursuant to Section 6.2(a)(ii) (the "Selling Election"); or

(ii)   buy the Offeror's interest in the Company, in proportion to its Percentage Interest in the Company at a price equal to the amount the Offeror would have received if the Company caused all of the Assets to be sold to a third party for the Buy-Sell Value on

the Buy-Sell Closing Date and distributed the resulting Net Proceeds (and any other funds then held by the Company and the Subsidiaries) pursuant to <u>Section 6.2</u>, assuming that no reserves are established pursuant to <u>Section 6.2(a)(ii)</u> (the "<u>Buying Election</u>").

Notwithstanding anything in this Agreement to the contrary, in the event that (x) Sponsor is the Offeror and Investor, as an Offeree, elects the Buying Election, then Atlantic, regardless of its actual election or deemed election, shall sell to Investor, and Investor shall buy, Atlantic's interest in the Company at a price equal to the amount Atlantic would have received if the Company caused all of the Assets to be sold to a third party for the Buy-Sell Value on the Buy-Sell Closing Date and distributed the resulting Net Proceeds (and any other funds then held by the Company and the Subsidiaries) pursuant to <u>Section 6.2</u>, assuming that no reserves are established pursuant to <u>Section 6.2(a)(ii)</u>, and (y) Investor is the Offeror and Sponsor, as an Offeree, elects, or is deemed to have elected, the Selling Election, then Atlantic shall be deemed to have elected the Selling Election notwithstanding any election actually made by Atlantic.

In the event that only one (1) Offeree elected the Buying Election, then such Offeree shall buy (a) the Offeror's interest in the Company and (b) the interest in the Company of the other Offeree at a price equal to the amount the Offeror and the Offeree that did not elect the Buying Election would have received if the Company caused all of the Assets to be sold to a third party for the Buy-Sell Value on the Buy-Sell Closing Date and distributed the resulting Net Proceeds (and any other funds then held by the Company and the Subsidiaries) pursuant to <u>Section 6.2</u>, assuming that no reserves are established pursuant to <u>Section 6.2(a)(ii)</u>.

In the event that both Offerees elect the Buying Election, then the Offerees shall buy the Offeror's interest in the Company in proportion to their Percentage Interests in the Company at a price equal to the amount the Offeror would have received if the Company caused all of the Assets to be sold to a third party for the Buy-Sell Value on the Buy-Sell Closing Date and distributed the resulting Net Proceeds (and any other funds then held by the Company and the Subsidiaries) pursuant to <u>Section 6.2</u>, assuming that no reserves are established pursuant to <u>Section 6.2(a)(ii)</u>.

If either Offeree fails to make such an election within the Buy-Sell Election Period, then such Offeree shall be deemed to have elected to sell its interest in the Company. The sale of a Member's interest in the Company pursuant to this <u>Section 11.1(a)</u> shall proceed in accordance with <u>Section 11.1(b)</u>. Manager shall disclose to the Members, within fifteen (15) days of the offer made pursuant to this <u>Section 11.1(a)</u>, all information concerning the Property and any other Assets that the Members request, and the failure of Manager to make such disclosure shall be deemed a material breach by Manager of its obligations under this Agreement.

      (b)  Each Member that is determined to be a purchaser (a "<u>Buying Member</u>") shall, within fifteen (15) Business Days, deposit into escrow a cash deposit equal to ten percent (10%) of the aggregate purchase price of each selling Member's interests (a "<u>Selling Member</u>") (the "<u>Buy-Sell Deposit</u>"). The Buy-Sell Deposit shall be placed in an interest-bearing account at a bank mutually acceptable to the Members and any interest thereon shall be added to, and constitute a portion of, the Buy-Sell Deposit for purposes of this Section. The closing pursuant to this <u>Section 11.1</u> shall occur on the one hundred twentieth (120th) day

after receipt of the offer made by the Offeror pursuant to <u>Section 11.1(a)</u>, or at such earlier date as a Buying Member may specify on ten (10) Business Days prior written notice (the "<u>Buy-Sell Closing Date</u>"); provided, however, that each of the following (unless and except to the extent waived by all of the Buying Members) shall be a condition of a Buying Member's obligations to proceed with any such purchase: (i) that the Company shall have continued to be operated in accordance with this Agreement and all other applicable agreements in all material respects through the Buy-Sell Closing Date, (ii) that a Buying Member shall have obtained all third-party consents required in connection with such sale and (iii) that there shall be no suit, action or proceeding pending on the Buy-Sell Closing Date before or by any court or governmental body seeking to restrain or prohibit, or seeking material damages or other relief in connection with, the sale.

(c) A Selling Member shall transfer all of its interests in the Company to all of the Buying Members by instrument of assignment or bill of sale and such other instruments as shall be reasonably requested by a Buying Member. The interests in the Company of a Selling Member shall be purchased and the purchase price shall be paid at a closing to be held at the principal business office of the Company. At the closing, the interests in the Company of a Selling Member shall be duly conveyed, free of all liens and encumbrances, and the purchase price shall be paid by wire transfer of immediately available federal funds. At the election of a Buying Member, the interests to be purchased may be acquired in the name of a nominee (whether or not such nominee is an Affiliated Person of the respective Buying Member); <u>provided</u>, that (x) a Buying Member shall have designated such nominee by written notice given to all of the Selling Members at least five (5) Business Days prior to the date of purchase, and (y) unless a Selling Member shall otherwise elect, both such nominee and the respective Buying Member shall be required to join in any indemnities required to be given pursuant to this paragraph. In connection with any sale pursuant to this <u>Section 11.1</u>, (i) a Selling Member shall receive a release, solely with respect to matters that arise after the consummation of such sale, from the lender(s) under all guaranties which have been approved by all of the Buying Members and given by all of the Selling Members or any of their Affiliates (the "<u>Selling Member Guarantors</u>") in connection with any third party indebtedness of the Company or any Subsidiary which has been approved by all of the Buying Members, or, in the alternative, (ii) an Affiliate of the respective Buying Member, which is reasonably acceptable to all of the Selling Members, shall indemnify, protect, defend and hold harmless the Selling Member Guarantors solely with respect to matters that arise after the consummation of such sale, under all guaranties which have been approved by all of the Buying Members and given by all of the Selling Member Guarantors in connection with any third party indebtedness of the Company or any Subsidiary which has been approved by all of the Buying Members.

(d) In the event of the failure of a Selling Member to proceed with the sale of its interests in the Company at the closing as provided in this <u>Section 11.1</u>, the same shall constitute a default under this Agreement, the Buy-Sell Deposit shall be returned to the Buying Member who deposited such funds promptly after request from such Buying Member, and each Buying Member shall be entitled at its election, by written notice given to such Selling Member within thirty (30) days after the date of such failure, either (i) to receive from such Selling Member, pro rata, as liquidated damages and as its exclusive remedy an amount

equal to the Buy-Sell Deposit, or (ii) to pursue any and all other remedies available under this Agreement or at law or equity, including specific performance; provided, that if a Buying Member fails to give notice of such election as herein provided, such Buying Member shall be deemed to have elected the remedy set forth in the preceding clause (i) of this sentence. In the event of the failure of a Buying Member (or its respective nominee) to proceed with the purchase of the interests of a Selling Member at the closing as provided in this <u>Section 11.1</u>, a Selling Member may elect, by written notice given to such Buying Member within thirty (30) days after the date of such failure, to cause such Buying Member to sell all of its interests in the Company to the Selling Member (or its respective nominee) at a purchase price which is the amount that such Buying Member would have received if the Company caused all of the Assets to be sold to a third party for the Buy-Sell Value on the Buy-Sell Closing Date and distributed the resulting Net Proceeds (and any other funds then held by the Company and the Subsidiaries) pursuant to <u>Section 6.2</u>, assuming that no reserves are established pursuant to <u>Section 6.2(a)(ii)</u>. If a Selling Member elects within the aforesaid thirty (30) day period to cause such Buying Member to sell all of its interests in the Company, the closing of such sale shall occur on the forty-fifth (45th) day after such election has been given, or at such earlier date as such Selling Member may specify on ten (10) days prior written notice; <u>provided, however</u>, that it shall be a condition of the obligation to proceed, in the case of the other Members, as buyers, that the conditions set forth in clauses (i), (ii) and (iii) in <u>Section 11.1(b)</u> above are satisfied and, in the case of the former Buying Member, as seller, that the conditions set forth in clauses (i) and (ii) in <u>Section 11.1(c)</u> above are satisfied.

11.2. <u>Forced Sale</u>.

(a)   From and after the Lockout Date, Investor may send Notice to Sponsor (a "<u>Forced Sale Notice</u>") requiring the sale of the Property to a third party in accordance with this <u>Section 11.2</u>. A copy of the Forced Sale Notice shall simultaneously be delivered to Atlantic. The Forced Sale Notice shall contain the material economic terms of Investor's proposed sale (the "<u>Terms</u>"). Investor shall have the right on behalf of the Company and the applicable Subsidiaries to engage the services of an independent institutional real estate brokerage firm with at least five (5) years of experience in the commercial real estate market in the general New York City area to determine the offer price for the purchase of the Property prior to marketing the Property for sale and to solicit offers from third parties unaffiliated with any Member or such brokerage firm to purchase the Property in accordance with this <u>Section 11.2</u>.

(b)   Subject to the provisions of this <u>Section 11.2(b)</u> and <u>Section 11.4(e)</u>, in the event Investor gives Sponsor a Forced Sale Notice, Sponsor shall have, for a period of sixty (60) days from the date of such Forced Sale Notice, a right of first offer to offer to purchase Investor's interests in the Company subject to the Terms. If Sponsor desires to purchase the Property on the Terms pursuant to this <u>Section 11.2(b)</u>, Sponsor shall provide Notice thereof to Investor (a "<u>ROFO Offer Notice</u>") within the aforementioned sixty (60) day period. If Sponsor does not give a ROFO Offer Notice, (i) Investor may proceed with the sale of the Property to a third party pursuant to <u>Section 11.2(a)</u> at a price greater than or equal to ninety-five percent (95%) of the price set forth in the Terms and the other material economic terms of such sale shall be not materially worse to the Company than the Terms and (ii) such sale of

the Property by Investor to a third party pursuant to Section 11.2(a) must be completed within a period of one hundred eighty (180) days after the date of the Forced Sale Notice. If Sponsor delivers a ROFO Offer Notice, then, subject to Section 11.4(e), Sponsor shall purchase Investor's interest in the Company as if Sponsor were purchasing Investor's interest in the Company pursuant to Section 11.1 (with ((a) Sponsor being the purchasing Member, (b) Investor being the seller Member, (c) the purchase price set forth in the Terms being the Buy-Sell Value and (d) a default by Sponsor in purchasing Investor's interest in the Company entitling Investor to (x) retain the ten percent (10%) deposit (the "ROFO Deposit") posted by Sponsor and (y) sell the Property to any third party without complying with the provisions of this Section 11.2.

(c) Manager shall provide (i) all reasonably necessary documentation and information about the Property to any brokerage firm selected in accordance with Section 11.2(a) and (ii) prospective purchasers with information about Property and access to the Property and to the relevant books and records of the Company or applicable Subsidiaries in confidence in accordance with customary industry practice.

(d) The sale procedures, time period for marketing the Property and the substantive terms of the purchase agreements (including, without limitation, any post-closing liability to be borne by any Subsidiary, the Company or any Member) in connection with the sale of the Property to a third party pursuant to this Section 11.2(a) shall be provided to all the Members and subject to the approval of the Members, which approval shall not be unreasonably withheld. The Company shall make customary representations and warranties with respect to the Property in such purchase agreements.

(e) Investor shall have the right to cause the Company or Subsidiary to execute, acknowledge and deliver such conveyance and other documents as shall be required to effectuate the sale in accordance with any sale of the Property pursuant to Section 11.2(a).

(f) Except to the extent provided in Section 11.2(b), no Member or any Affiliate thereof may purchase the Property under a sale conducted in accordance with this Section 11.2.

11.3. Notice of Buy-Sell and Forced Sale Transactions. Once a valid Notice is given under Section 11.1 to initiate a buy-sell transaction, a Forced Sale Notice shall not be given under Section 11.2 until the applicable buy-sell transaction has (i) lapsed, (ii) been nullified by agreement of the parties to the transaction or (iii) been completed. A Notice given under Section 11.1 to initiate a buy-sell transaction shall nullify any prior Forced Sale Notice given under Section 11.2 if, at such time, the Property is not then subject to an executed contract of sale pursuant to Section 11.1 which is binding on the Company, in which case, in which case, such Notice given under Section 11.1 to initiate a buy-sell transaction shall be deemed to be ineffective.

11.4. Forced Sale Tag-Along Right.

(a) In the event that Sponsor sends a ROFO Offer Notice to Investor, Sponsor shall give Atlantic written notice (the "Forced Sale Option Notice") of the existence of the ROFO Offer Notice together with a copy of the ROFO Offer Notice (simultaneous with the delivery of the ROFO Offer Notice to Investor) and Atlantic shall have the right, subject to Section 11.4(e), to require Sponsor to purchase Atlantic's interest in the Company on the same Terms set forth in the ROFO Offer Notice (in accordance with Atlantic's Percentage Interest) (the "Forced Sale Tag-Along Price") as more particularly set forth herein (the "Forced Sale Tag-Along Right"). Unless the ROFO Offer Notice is withdrawn in accordance with Section 11.4(e), the Forced Sale Tag-Along Right shall close simultaneous with a closing pursuant to the Forced Sale Notice and, unless otherwise provided in Section 11.4(c) below, a closing pursuant to the Forced Sale Notice shall be a condition precedent to a closing pursuant to the Forced Sale Tag-Along Right.

(b) The Forced Sale Tag-Along Right shall be exercisable by delivery of written notice to Sponsor and Investor (the "Forced Sale Tag-Along Exercise Notice") within ten (10) days after the date that the Forced Sale Option Notice is received (the "Forced Sale Option Period") by Sponsor. Once delivered, the Forced Sale Tag-Along Exercise Notice cannot be withdrawn by Atlantic.

(c) If (i) Atlantic fails to deliver the Forced Sale Tag-Along Exercise Notice during the Forced Sale Option Period, time being of the essence, or (ii) if Atlantic notifies Sponsor, in writing, during the Forced Sale Option Period, that Atlantic will not exercise the Forced Sale Tag-Along Right, then Atlantic shall be deemed to have irrevocably waived the Forced Sale Tag-Along Right.

(d) At the closing of any sale pursuant to the Forced Sale Tag-Along Right, Sponsor shall pay to Atlantic the Forced Sale Tag-Along Price (subject to customary closing prorations) and each of Sponsor and Atlantic shall execute and deliver such bills of sale, instruments of conveyance, assignments and other instruments as may reasonably be required, to give good and clear title to its interest in the Company that is being sold. In addition, Atlantic, as seller, shall pay any real property or other transfer taxes, if any, incident to such conveyance.

(e) If Atlantic delivers to Sponsor the Forced Sale Tag-Along Exercise Notice, Sponsor shall have, for a period of ten (10) days from the date of such Forced Sale Tag-Along Exercise Notice, a right to withdraw the ROFO Offer Notice by written notice to Investor and Atlantic (the "ROFO Withdrawal Notice"). If Sponsor fails to deliver the ROFO Withdrawal Notice within the aforementioned ten (10) day period, then Sponsor shall be deemed to have irrevocably waived its right to deliver the ROFO Withdrawal Notice and Sponsor, Investor and Atlantic shall proceed with the closing of the sales pursuant to the ROFO Offer Notice and the Forced Sale Tag-Along Exercise Notice pursuant to Sections 11.2(a) and 11.4(b). If Sponsor delivers the ROFO Withdrawal Notice within the aforementioned ten (10) day period, then (i) Atlantic's Forced Sale Tag-Along Exercise Notice sent pursuant to this Section 11.4 shall be deemed null and void, (ii) the ROFO Offer Notice sent pursuant to Section 11.2(b) shall be deemed null and void, (iii) Investor shall proceed with the sale of the Property to a third party pursuant to Sections 11.2(a) and (b) as if Sponsor did not deliver a

57

timely ROFO Offer Notice and (iv) Investor shall return the ROFO Deposit to Sponsor within ten (10) days after the date that the ROFO Withdrawal Notice is received by Investor.

11.5. <u>Equity Put Right</u>. In the event that (i) prior to the closing of the Construction Loan, Investor declines to approve a proposed Budget that exceeds the Permitted Variance applicable to the prior approved Budget, (ii) after the closing of the Construction Loan, Investor declines to approve a proposed Budget in which the hard costs exceed an amount equal to one hundred ten percent (110%) of the hard costs set forth in the prior approved Budget, (iii) Manager has not obtained, within twenty-four (24) months of the date hereof, an "Alteration 1" or "New Building" permit to construct a building on the Property with a height of at least nine hundred seventy-five (975) feet and a gross floor area of at least three hundred twenty thousand (320,000), of which at least one hundred ninety-two thousand (192,000) gross square feet shall be for residential use (with at least one hundred sixty-six thousand five hundred (166,500) square feet of such gross residential floor area located more than two hundred (200) feet above average curb level), or (iv) the amount of the Construction Loan is less than fifty percent (50%) of the applicable Budget for the development and construction of the Property approved by the construction lender, Investor, shall have the right, upon notice to Sponsor within sixty (60) days after the occurrence of the applicable event set forth in clauses (i), (ii) or (iii) above (the "<u>Equity Put Notice</u>"), to require Sponsor to purchase Investor's equity interest in the Company for a purchase price equal to an amount that would cause Investor to receive a 20% Priority Distribution (the "<u>Equity Put Purchase Price</u>").

(a) Sponsor shall be entitled to fix a closing date (the "<u>Equity Put Closing Date</u>") which is not later than one hundred and twenty (120) calendar days following the delivery of the Equity Put Notice.

(b) On the Equity Put Closing Date, provided that Sponsor has paid the Equity Put Purchase Price, Investor shall execute and deliver (or cause the Company to execute and deliver, as applicable) to Sponsor such deeds, bills of sale, instruments of conveyance, assignments and other instruments as Sponsor may reasonably require, to give it good, clear and marketable title to the interest of Investor in the Company. In addition, Investor shall pay any real property or other transfer taxes, if any, incident to such conveyance.

11.6. <u>Equity Put Tag-Along Right</u>.

(a) In the event that Sponsor receives an Equity Put Notice from Investor, Sponsor shall give Atlantic written notice (the "<u>Equity Put Option Notice</u>") of the existence of the Equity Put Notice together with a copy of the Equity Put Notice (within five (5) Business Days after receipt of the Equity Put Notice) and Atlantic shall have the right to require Sponsor to purchase Atlantic's interest in the Company in an amount equal to the Equity Put Purchase Price (in accordance with Atlantic's Percentage Interest) (the "<u>Equity Put Tag-Along Price</u>") as more particularly set forth herein (the "<u>Equity Put Tag-Along Right</u>"). The Equity Put Tag-Along Right shall close sixty (60) days after the closing pursuant to <u>Section 11.5</u>. A closing pursuant to <u>Section 11.5</u> shall be a condition precedent to a closing pursuant to the Equity Put Tag-Along Right.

(b) The Equity Put Tag-Along Right shall be exercisable by delivery of written notice to Sponsor (the "Equity Put Tag-Along Exercise Notice") within twenty (20) days after the date that the Equity Put Option Notice is received (the "Equity Put Option Period") by Sponsor. Once delivered, the Equity Put Tag-Along Exercise Notice cannot be withdrawn.

(c) If (i) Atlantic fails to deliver the Equity Put Tag-Along Exercise Notice during the Equity Put Option Period, time being of the essence, or (ii) if Atlantic notifies Sponsor, in writing, during the Equity Put Option Period, that Atlantic will not exercise the Equity Put Tag-Along Right, then Atlantic shall be deemed to have irrevocably waived the Equity Put Tag-Along Right.

(d) At the closing of any sale pursuant to the Equity Put Tag-Along Right, Sponsor shall pay to Atlantic the Equity Put Tag-Along Price (subject to customary closing prorations) and each of Sponsor and Atlantic shall execute and deliver such bills of sale, instruments of conveyance, assignments and other instruments as may reasonably be required, to give good and clear title to its interest in the Company that is being sold. In addition, Atlantic, as seller, shall pay any real property or other transfer taxes, if any, incident to such conveyance.

## ARTICLE XII.

## MISCELLANEOUS

12.1. <u>Expenses</u>. The Company shall reimburse Atlantic, Investor and Sponsor for all out-of pocket costs and expenses incurred for due diligence performed and legal expenses paid, in connection with the negotiation of this Agreement; provided however that such costs and expenses reimbursed to Atlantic shall not, in any event, exceed One Hundred Forty Thousand and 00/100 Dollars ($140,000).

12.2. <u>Notices</u>.

(a) Any and all notices, consents, approvals, offers, elections and other communications required or permitted under this Agreement ("Notice") shall be deemed adequately given only if in writing and the same shall be delivered either in hand or Federal Express or similar expedited commercial carrier, addressed to the recipient, as required below in <u>Section 12.2(c)</u>, or with all freight charges prepaid (if by Federal Express or similar carrier), or by electronic mail provided that the recipient either replies to such email or otherwise acknowledges receipt of such email in writing which can be through a separate email.

(b) All communications to be sent hereunder shall be deemed to have been given for all purposes of this Agreement upon the date of receipt or refusal.

(c) All Notices shall be addressed

If to Manager, to:

c/o JDS Development Group
104 Fifth Avenue, 9th Floor
New York, New York 10011
Attention: Michael Stern
Email: jdsdevelopment@gmail.com

and:

c/o Property Markets Group, Inc.
5 East 17th Street, 2nd Floor
New York, New York 10003
Attention: Franklin R. Kaiman, Esq.
Email: FKaiman@PropertyMG.com

with a copy to:

Kasowitz, Benson, Torres & Friedman LLP
1633 Broadway
New York, New York 10019
Attention: Douglas B. Heitner, Esq.
Email: DHeitner@kasowitz.com

If to Investor, to

c/o AmBase Capital
100 Putnam Green, 3rd Floor
Greenwich, CT 06830
Attention: Richard Bianco
Email: Rabco@live.com

with a copy to:

Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166
Attention: Steven D. Klein, Esq.
Email: sklein@gibsondunn.com

If to Atlantic, to

c/o Madison Partners, LLC
161 Bowery, 7th Floor
New York, New York 10002
Attention: Arthur Becker

60

Email: abecker@madisonptrs.com

with a copy to:

> Morse, Zelnick, Rose & Lander, LLP
> 405 Park Avenue, Suite 1401
> New York, New York 10022
> Attention: Joel J. Goldschmidt, Esq.
> Email: jgoldschmidt@mzrl.com

    (d)  By giving to the other parties written Notice thereof, the parties hereto and their respective successors and assigns shall have the right from time to time and at any time during the term of this Agreement to change their respective addresses effective upon receipt by the other parties of such notice and each shall have the right to specify as its address any other address within the United States of America.  Counsel to any Member is hereby authorized to give notices hereunder on behalf of its respective client.

    (e)  Copies of all Notices delivered under this Agreement shall be delivered to all parties hereto and their counsel.

    12.3.  <u>Certain Rules of Construction</u>.  Except as otherwise explicitly specified to the contrary or unless the context clearly requires otherwise, (a) the capitalized term "<u>Article</u>" refers to articles of this Agreement, (b) the capitalized term "<u>Section</u>" refers to sections of this Agreement, (c) the capitalized term "<u>Schedule</u>" refers to schedules to this Agreement, (d) the capitalized term "<u>Exhibit</u>" refers to exhibits to this Agreement, (e) references to a particular Article or Section include all subsections thereof, (f) the word "including" will be construed as "including without limitation", (g) references to a particular statute or regulation include all rules and regulations thereunder and any successor statute, regulations or rules, in each case as from time to time in effect, (h) references to a particular Person include such Person's successors and assigns to the extent not prohibited by this Agreement, (i) words such as "herein", "hereinafter", "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear and (j) the singular will include the plural and the masculine gender will include the feminine and neuter, and vice versa.

    12.4.  <u>Execution of Papers</u>.  The Members agree to execute such instruments, documents, and papers as Manager deems necessary or appropriate to carry out the intent of this Agreement.  Each Member, including each new and substituted Member, by the execution of this Agreement or by agreeing in writing to be bound by the provisions of this Agreement, irrevocably constitutes and appoints Manager, Atlantic and Investor, or any Person designated by Manager, Atlantic or Investor, to act on its behalf for purposes of this <u>Section 12.4</u> as its true and lawful attorney-in-fact with full power and authority in its name, place, and stead to execute, acknowledge, deliver, swear to, file, and record at the appropriate public offices such documents as may be necessary or appropriate to carry out the provisions of this Agreement, including but not limited to:

> (i)     all certificates and other instruments (specifically including counterparts of this Agreement), and any amendment thereof, that such Person deems appropriate to qualify or continue the Company as a limited liability company in any jurisdiction in which the Company may conduct business or in which such qualification or continuation is, in the opinion of such Person, necessary to protect the limited liability of the Members;

> (ii)    all amendments to this Agreement adopted in accordance with the terms hereof and all instruments that such Person deems appropriate to reflect a change or modification of the Company in accordance with the terms of this Agreement; and

> (iii)   all conveyances and other instruments that such Person deems appropriate to reflect the dissolution of the Company.

The appointment by each Member of Manager, Atlantic and Investor as its attorney-in-fact shall be deemed to be a power coupled with an interest, in recognition of the fact that each of the Members under this Agreement will be relying upon the power of Manager, Atlantic and/or Investor to act as contemplated by this Agreement in any filing and other action by him or her on behalf of the Company, and shall survive the bankruptcy, dissolution, death, adjudication of incompetence or insanity of any Member giving such power and the transfer or assignment of all or any part of such Member's interests; provided, however, that in the event of a transfer by a Member of all of its interest, the power of attorney given by the transferor shall survive such assignment only until such time as the assignee shall have been admitted to the Company as a substituted Member and all required documents and instruments shall have been duly executed, filed, and recorded to effect such substitution.

12.5.   Binding Provisions.   The covenants and agreements contained herein shall be binding upon, and inure to the benefit of, the heirs, legal representatives, and permitted successors and assigns of the respective parties hereto.

12.6.   Applicable Law.   This Agreement shall be construed and enforced in accordance with the laws of the State of Delaware (without regard for the conflict of laws principles thereof). In the event of a conflict between any provision of this Agreement and any non-mandatory provision of the Act, the provision of this Agreement shall control and take precedence.

12.7.   Separability of Provisions.   Each provision of this Agreement shall be considered separable and if for any reason any provision or provisions herein are determined to be invalid, unenforceable or illegal under any existing or future law, such invalidity, unenforceability or illegality shall not impair the operation of or affect those portions of this Agreement that are valid, enforceable and legal.

12.8.   Section Titles.   Section titles are for descriptive purposes only and shall not control or alter the meaning of this Agreement as set forth in the text.

12.9. <u>Further Assurances</u>.  The Members shall execute and deliver such further instruments and do such further acts and things as may be required to carry out the intent and purposes of this Agreement.

12.10. <u>Entire Agreement</u>.  Except for the Development Agreement, this Agreement and the schedules and exhibits attached hereto constitute the entire agreement between the parties hereto related to the subject matter hereof and supersedes all prior agreements and understandings related to the subject matter hereof.

12.11. <u>Remedies Cumulative</u>.  The rights and remedies given in this Agreement and by law to a Member shall be deemed cumulative, and the exercise of one of such remedies shall not operate to bar the exercise of any other rights and remedies reserved to a Member under the provisions of this Agreement or given to a Member by law.  In the event of any dispute between the parties hereto, the prevailing party shall be entitled to recover from the other party reasonable attorney's fees and costs incurred in connection therewith.

12.12. <u>Waiver</u>.  The failure by any party hereto to insist upon or to enforce any of its rights shall not constitute a waiver thereof, and nothing shall constitute a waiver of such party's right to insist upon strict compliance with the provisions hereof.  No delay in exercising any right, power or remedy created hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or remedy by any such party preclude any other or future exercise thereof or the exercise of any other right, power or remedy.  No waiver by any party hereto to any breach of or default in any term or condition of this Agreement shall constitute a waiver of or assent to any succeeding breach of or default in the same or any other term or condition hereof.  Each party hereto may waive the benefit of any provision or condition for its benefit contained in this Agreement, but only if such waiver is evidenced by a writing signed by such party.

12.13. <u>Amendment</u>.  This Agreement shall not be amended without the prior written consent of all the Members.

12.14. <u>Agreement in Counterparts</u>.  This Agreement may be executed in multiple counterparts, each of which shall be considered an original and together shall constitute one and the same Agreement, binding upon all of the parties hereto.

12.15. <u>Survival</u>.  Notwithstanding anything to the contrary in this Agreement, (a) Sections <u>2.8</u>, <u>2.9</u>, <u>2.10</u>, <u>2.11</u>, <u>2.12</u> <u>8.7</u>, <u>8.10</u>, <u>12.1</u>, <u>12.2</u>, <u>12.3</u>, <u>12.6</u> and this Section <u>12.15</u>, and Articles <u>5</u> and <u>6</u> will survive (i) the termination of this Agreement and (ii) the dissolution and termination of the Company and (b) each of Manager and the Members will continue to be subject to, and bound by, the terms and provisions of such Sections after (i) the resignation of such Person as a manager or a member of the Company, (ii) the termination of this Agreement and (iii) the dissolution and termination of the Company.

12.16. <u>Venue</u>.  Each of the parties hereto hereby submits to the exclusive jurisdiction of any state or federal court in the Southern District of New York, New York (the "<u>Venue</u>"), and any court hearing and any appeal therefrom, over any suit, action or proceeding against it arising

out of or based upon this Agreement. Each of the parties hereto hereby waives any objection to any related proceeding in such courts whether on the grounds of venue, residence or domicile or on the ground that the related proceeding has been brought in an inconvenient forum.

    12.17. WAIVER OF JURY TRIAL. TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW THAT CANNOT BE WAIVED, EACH MEMBER WAIVES, AND COVENANTS THAT IT WILL NOT ASSERT (WHETHER AS PLAINTIFF, DEFENDANT OR OTHERWISE), ANY RIGHT TO TRIAL BY JURY IN ANY FORUM IN RESPECT OF ANY ISSUE, CLAIM OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE CONDUCT OF THE PARTIES, WHETHER NOW EXISTING OR HEREAFTER ARISING AND WHETHER IN CONTRACT, TORT OR OTHERWISE. Each Member acknowledges that it has been informed by the other Members that the foregoing sentence constitutes a material inducement upon which the other Members have relied and will rely in entering into this Agreement. Each Member may file an original counterpart or a copy of this Agreement with any court as written evidence of the consent of the Members to the waiver of their rights to trial by jury.


    [THE BALANCE OF THIS PAGE HAS BEEN INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, each of the undersigned has caused this Agreement to be executed by a duly authorized officer as of the date first set forth above.

SPONSOR:

111 WEST 57TH SPONSOR LLC,
a Delaware limited liability company

By: _____
Name: Kevin Maloney
Title: Authorized Signatory

By: _____
Name: Michael Stern
Title: Authorized Signatory

INVESTOR:

111 WEST 57TH INVESTMENT LLC,
a Delaware limited liability company

By: _____
Name: Richard A. Bianco
Title: President & CEO

ATLANTIC:

ATLANTIC 57, LLC, a Delaware limited liability
company

By: 57 Madison LLC, a Delaware limited liability
company

By: _____
Name: Arthur Becker
Title: Managing Member

Signature Page – Amended & Restated 111 West 57th Partners LLC Agreement

IN WITNESS WHEREOF, each of the undersigned has caused this Agreement to be executed by a duly authorized officer as of the date first set forth above.

**SPONSOR:**

111 WEST 57TH SPONSOR LLC,
a Delaware limited liability company

By: _____
Name:  Kevin Maloney
Title:  Authorized Signatory

By: _____
Name:  Michael Stern
Title:  Authorized Signatory

**INVESTOR:**

111 WEST 57TH INVESTMENT LLC,
a Delaware limited liability company

By: _____
Name:  Richard A. Bianco
Title:  President & CEO

**ATLANTIC:**

ATLANTIC 57, LLC, a Delaware limited liability company

By:  57 Madison LLC, a Delaware limited liability company

By:_____
Name:  Arthur Becker
Title:  Managing Member

Signature Page – Amended & Restated 111 West 57th Partners LLC Agreement

IN WITNESS WHEREOF, each of the undersigned has caused this Agreement to be executed by a duly authorized officer as of the date first set forth above.

**SPONSOR:**

111 WEST 57TH SPONSOR LLC,
a Delaware limited liability company

By: _____
Name:  Kevin Maloney
Title:  Authorized Signatory

By: _____
Name:  Michael Stern
Title:  Authorized Signatory

**INVESTOR:**

111 WEST 57TH INVESTMENT LLC,
a Delaware limited liability company

By: _____
Name:  Richard A. Bianco
Title:  President & CEO

**ATLANTIC:**

ATLANTIC 57, LLC, a Delaware limited liability
company

By:  57 Madison LLC, a Delaware limited liability
company

By:_____
Name:  Arthur Becker
Title:  Managing Member

Signature Page – Amended & Restated 111 West 57th Partners LLC Agreement

IN WITNESS WHEREOF, each of the undersigned has caused this Agreement to be executed by a duly authorized officer as of the date first set forth above.

**SPONSOR:**

111 WEST 57TH SPONSOR LLC,
a Delaware limited liability company


By: _____
Name:  Kevin Maloney
Title:  Authorized Signatory


By: _____
Name:  Michael Stern
Title:  Authorized Signatory


**INVESTOR:**

111 WEST 57TH INVESTMENT LLC,
a Delaware limited liability company

By: _____
Name:  Richard A. Bianco
Title:  President & CEO

**ATLANTIC:**

ATLANTIC 57, LLC, a Delaware limited liability company

By:  57 Madison LLC, a Delaware limited liability company

By:_____
Name:  Arthur Becker
Title:  Managing Member


Signature Page – Amended & Restated 111 West 57th Partners LLC Agreement

This Limited Joinder is executed solely for the purposes of Atlantic Principal (A) agreeing to (i) the Transfer restrictions on Atlantic in Sections 9.1(a) and (b), (ii) the ownership and control representations of Atlantic as stated in Section 2.8, (iii) the representation and covenant set forth in Section 2.12, and (iv) the guaranty set forth in Section 8.2(c) and (B) making certain representations for the benefit of Sponsor and Investor.

Atlantic Principal acknowledges that it is the direct holder of the legal and beneficial interests in Atlantic, they will derive substantial benefits by reason of Atlantic's performance of its obligations hereunder.

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Atlantic Principal hereby represents, warrants, covenants and agrees:

(i)     to comply with the guaranty to the Company, Sponsor, and Principals, set forth in Section 8.2(c);

(ii)    to indemnify and hold the Company, Investor and Investor's Affiliated Persons harmless, as applicable, on a joint and several basis with Atlantic, in accordance with Section 8.7(c);

(iii)   to comply and cause Atlantic to comply with the provisions of Section 9.1(a) and (b);

(iv)    that, as of the date of this Agreement, the representation set forth in Section 2.8(c)(iii) is true, correct and complete;

(v)     that, as of the date of this Agreement, the representation set forth in Section 2.12 is true, correct and complete; and

(vi)    to comply and cause Atlantic to comply with the provisions of Section 2.12.

Each of Sponsor, Principals, Investor, Investor Principal and the Company are third-party beneficiaries of the covenants and agreements contained in this Limited Joinder and has the right to enforce this Limited Joinder and the terms and conditions hereof, in its name, or in the name of the Company, or both, and the right to bring one or more actions to enforce this Limited Joinder and the terms and conditions hereof.

ARTHUR BECKER

By: _____
Name:
Title:

This Limited Joinder is executed solely for the purposes of Investor Principal (A) agreeing to (i) the Transfer restrictions on Investor in Sections 9.1(a) and (b), (ii) the ownership and control representations of Investor as stated in Section 2.8, and (iii) the guaranty set forth in Section 8.2(c) and (B) making certain representations for the benefit of Sponsor and Atlantic.

Investor Principal acknowledges that it is the direct holder of the legal and beneficial interests in Investor, they will derive substantial benefits by reason of Investor's performance of its obligations hereunder.

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Investor Principal hereby represents, warrants, covenants and agrees:

(i)     to comply with the guaranty to the Company, Sponsor, and Principals set forth in Section 8.2(c);

(ii)    to indemnify and hold the Company, Atlantic and Atlantic's Affiliated Persons harmless, as applicable, on a joint and several basis with Investor, in accordance with Section 8.7(d);

(iii)   to comply and cause Investor to comply with the provisions of Section 9.1(a) and (b); and

(iv)    that, as of the date of this Agreement, the representation set forth in Section 2.8(b)(iii) is true, correct and complete.

Each of Sponsor, Principals, Atlantic, Atlantic Principal and the Company are third-party beneficiaries of the covenants and agreements contained in this Limited Joinder and has the right to enforce this Limited Joinder and the terms and conditions hereof, in its name, or in the name of the Company, or both, and the right to bring one or more actions to enforce this Limited Joinder and the terms and conditions hereof.

AMBASE CORPORATION

By: _____
Name:
Title:

This Limited Joinder is executed solely for the purposes of Principals (A) agreeing to (i) the Transfer restrictions on Sponsor in Sections 9.1(a) and (b), (ii) the ownership and control representations of Sponsor as stated in Section 2.8, and (iii) the representation and covenant set forth in Section 2.12 and (B) making certain representations for the benefit of Investor and Atlantic.

The Principals acknowledge, collectively, that they are the indirect holders of some of the legal and beneficial interests in Sponsor, they will derive substantial benefits by reason of Sponsor's performance of its obligations hereunder.

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Principals hereby represent, warrant, covenant and agree:

     (i)    to indemnify and hold the Company, Investor, Investor's Affiliated Persons, Atlantic and Atlantic's Affiliated Persons harmless on a joint and several basis with each other and Sponsor, from and against any loss, damage or claim incurred by such Persons by reason of Cause attributed to Sponsor as Manager;

     (ii)    to indemnify and hold the Company, Investor, Investor's Affiliated Persons, Atlantic and Atlantic's Affiliated Persons harmless, as applicable, on a joint and several basis with each other and Sponsor, in accordance with Section 8.7(b);

     (iii)    to reasonably cooperate with Investor in replacing Manager if Investor is permitted to remove Sponsor as Manager (after being provided with written notice thereof);

     (iv)    to comply and cause Sponsor to comply with the provisions of Section 9.1(a) and (b) (it being understood that Principals shall have no liability for a breach of Section 9.1(a) or (b) by Additional Member Entity);

     (v)    that, as of the date of this Agreement, the representation set forth in Section 2.8(a)(iii) is true, correct and complete;

     (vi)    that, as of the date of this Agreement, the representation set forth in Section 2.12 is true, correct and complete; and

     (vii)    to comply and cause Sponsor to comply with the provisions of Section 2.12.

Each of Investor, Investor Principal, Atlantic, Atlantic Principal and the Company are third-party beneficiaries of the covenants and agreements contained in this Limited Joinder and has the right to enforce this Limited Joinder and the terms and conditions hereof, in its name, or in the name of the Company, or both, and the right to bring one or more actions to enforce this Limited Joinder and the terms and conditions hereof.

               Michael Stern, individually

               Kevin Maloney, individually

This Limited Joinder is executed solely for the purposes of Principals (A) agreeing to (i) the Transfer restrictions on Sponsor in Sections 9.1(a) and (b), (ii) the ownership and control representations of Sponsor as stated in Section 2.8, and (iii) the representation and covenant set forth in Section 2.12 and (B) making certain representations for the benefit of Investor and Atlantic.

The Principals acknowledge, collectively, that they are the indirect holders of some of the legal and beneficial interests in Sponsor, they will derive substantial benefits by reason of Sponsor's performance of its obligations hereunder.

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Principals hereby represent, warrant, covenant and agree:

(i)    to indemnify and hold the Company, Investor, Investor's Affiliated Persons, Atlantic and Atlantic's Affiliated Persons harmless on a joint and several basis with each other and Sponsor, from and against any loss, damage or claim incurred by such Persons by reason of Cause attributed to Sponsor as Manager;

(ii)    to indemnify and hold the Company, Investor, Investor's Affiliated Persons, Atlantic and Atlantic's Affiliated Persons harmless, as applicable, on a joint and several basis with each other and Sponsor, in accordance with Section 8.7(b);

(iii)    to reasonably cooperate with Investor in replacing Manager if Investor is permitted to remove Sponsor as Manager (after being provided with written notice thereof);

(iv)    to comply and cause Sponsor to comply with the provisions of Section 9.1(a) and (b) (it being understood that Principals shall have no liability for a breach of Section 9.1(a) or (b) by Additional Member Entity);

(v)    that, as of the date of this Agreement, the representation set forth in Section 2.8(a)(iii) is true, correct and complete;

(vi)    that, as of the date of this Agreement, the representation set forth in Section 2.12 is true, correct and complete; and

(vii)    to comply and cause Sponsor to comply with the provisions of Section 2.12.

Each of Investor, Investor Principal, Atlantic, Atlantic Principal and the Company are third-party beneficiaries of the covenants and agreements contained in this Limited Joinder and has the right to enforce this Limited Joinder and the terms and conditions hereof, in its name, or in the name of the Company, or both, and the right to bring one or more actions to enforce this Limited Joinder and the terms and conditions hereof.

_____
Michael Stern, individually


_____
Kevin Maloney, individually

Exhibit A

Initial Business Plan and Budget



STEINWAY | WEST 57TH STREET
Preliminary Development Business Plan Summary

JDS Development Group ("JDS") and Property Markets Group ("PMG") (together the "Developer(s)" and/or "Sponsor(s)") are acquiring the two adjacent development sites located at 105 - 111 West 57th Street, New York, NY (the "Property" and/or "Project") with plans to build an approximate combined 346,000 gross square foot luxury residential tower, hotel and retail project.

The preliminary development plans call for a newly built high-rise luxury residential tower reaching approximately 900-feet high, providing full floor units with views of Central Park and the New York City skyline. In addition, the Sponsors plan on converting and adjoining the adjacent Steinway Building that will allow for a five-star hotel or additional luxury residential units as well as substantial retail space. The Sponsors also plan on creating a top-tier amenity package complimentary to the luxury product being developed.

The Sponsors will immediately begin pre-development, which is expected to take place over an approximate 12-14 month period. At such time when pre-development is completed, the Sponsors will seek construction financing in the approximate amount of $413.6 million, coupled with approximately $222.6 million of total equity invested, that will provide for the total development capitalization of approximately $636.2 million.

Construction is expected to take 24 – 36 months from the completion of the pre-development period, with marketing & pre-sales to begin prior to the completion date. The total gross sellout of the project is estimated to reach over $1.2 billion.

STEINWAY | 107 West 57th Street
Sources and Uses

 

## USES:

| | | Pre Development | | Total Project Costs |
|---|---|---|---|---|
| **Acquisition costs** | | | | |
| Cost of land | $ | 254,800,000 | $ | 254,800,000 |
| | $ | 254,800,000 | $ | 254,800,000 |
| | | | | |
| **Construction Costs** | $ | 9,249,591 | $ | 249,240,350 |
| | | | | |
| Soft costs | $ | 7,730,000 | $ | 52,500,000 |
| | | | | |
| **Financing costs - Acquisition and Construction** | | | | |
| **Construction Loan** | | | | |
| Financing Fees (Construction) | $ | - | $ | 4,200,000 |
| Interest Reserve (Construction) | $ | - | $ | 22,500,000 |
| Mortgage Recording tax (Construction) | $ | - | $ | 5,200,000 |
| Title Insurance (Construction) | $ | - | $ | 1,414,000 |
| Mortgage Broker Fee (Construction) | $ | - | $ | 1,616,000 |
| Lender Legal (Construction) | $ | - | $ | 500,000 |
| Borrower Legal (Construction) | $ | - | $ | 400,000 |
| Due Diligence (Construction) | $ | - | $ | 200,000 |
| **Bridge Loan** | | | | |
| Origination Fee (Acquisition) | $ | 2,491,667 | $ | 2,491,667 |
| Interest (Acquisition) | $ | 23,319,444 | $ | 28,750,000 |
| Extension Fee (Acquisition) | $ | 1,150,000 | $ | 1,150,000 |
| Exit Fee (Acquisition) | $ | - | $ | 2,300,000 |
| Mortgage Recording Tax (Acquisition) | $ | 5,233,193 | $ | 5,233,193 |
| Title Insurance and Fees (Acquisition) | $ | 849,938 | $ | 849,938 |
| Mortgage Broker Fee (Acquisition) | $ | 1,150,000 | $ | 1,150,000 |
| Debt Broker Fee | $ | 1,437,500 | $ | 1,437,500 |
| Lender Legal (Acquisition) | $ | 1,034,196 | $ | 1,034,196 |
| Due Diligence (Acquisition) | $ | 1,104,668 | $ | 1,104,668 |
| Borrow Legal (Acquisition) | $ | 1,149,803 | $ | 1,149,803 |
| | $ | 38,920,409 | $ | 82,680,965 |
| | | | | |
| Real Estate Tax Reserves | $ | 2,850,000 | $ | - |
| Insurance Reserve | $ | 450,000 | $ | - |
| Partnership Reserve | $ | 10,000,000 | | |
| Lease Buyout Deductable | $ | 1,000,000 | $ | - |

| **Total Uses:** | $ | 325,000,000 | $ | 639,221,315 |
|---|---|---|---|---|

## SOURCES:

| | | Bridge Loan | | | Construction Loan |
|---|---|---|---|---|---|
| Equity: | $ | 95,000,000 | 35% | $ | 223,727,460 |
| Acquisition Loan: | $ | 230,000,000 | 65% | $ | 415,493,854 |
| **Total** | $ | 325,000,000 | | $ | 639,221,315 |

Case 1:18-cv-05482-AT Document 1-1 Filed 06/18/18 Page 195 of 238

Exhibit B

Development Agreement

EXECUTION VERSION

---

## DEVELOPMENT AGREEMENT

-between-

111 WEST 57th PARTNERS LLC, as Owner

-and-

111 WEST 57TH DEVELOPER LLC, as Developer

---

105-111 West 57th Street
New York, New York

---

## DEVELOPMENT AGREEMENT

THIS DEVELOPMENT AGREEMENT ("**Agreement**") is made as of June 28, 2013, by and between 111 WEST 57th PARTNERS LLC, a Delaware limited liability company having its principal office at 5 East 17th Street, Second Floor, New York, New York 10003 ("**Owner**"), and 111 WEST 57TH DEVELOPER LLC, a Delaware limited liability company having its principal office at 5 East 17th Street, Second Floor, New York, New York 10003 ("**Developer**").

## R E C I T A L S

A.     Owner is the owner of certain subsidiaries that own the properties commonly known as 105-111 West 57th Street, New York, New York, as more particularly described in Exhibit A attached hereto and made a part hereof (such land, together with all improvements now or hereafter constructed thereon, and all tangible and intangible personal property owned by Owner from time to time in connection therewith, being herein called the "**Property**").

B.     Owner is a limited liability company formed under the laws of the State of Delaware existing pursuant to that certain Amended and Restated Limited Liability Company Agreement dated as of June 28, 2013 (as the same may hereinafter be amended from time to time, (the "**Owner's LLC Agreement**") between 111 West 57th Investment LLC ("**Investor**") and 111 West 57th Sponsor LLC.

C.     Owner desires to retain Developer to manage and supervise the completion of the "Project" (as hereinafter defined), and Developer has agreed to accept the engagement, on the terms and conditions set forth below.

D.     As used herein, the "**Project**" means the planning, design, permitting, development, construction, leasing and sale of a new mixed use tower with retail, hotel and residential components, all in accordance with the "**Business Plan**," and "**Budget**," (as such terms are defined in the Owner's LLC Agreement).   This Agreement shall govern the development of the Project.

IN LIGHT OF THE FOREGOING FACTS, and in consideration of the mutual agreements contained herein, Owner and Developer hereby agree as follows:

## ARTICLE I
## DEFINITIONS

1.1     <u>Definitions in Owner's LLC Agreement</u>.   Terms used but not defined in this Agreement shall have the meanings provided in Owner's LLC Agreement (as such meanings may be modified or added in any amendments or restatements of Owner's LLC Agreement).

1.2     <u>Specific Terms</u>.   The following terms shall, when used herein, have the meaning set forth below:

"**Architect**" means the architect for the Project designated by or approved from time to time by Owner.  The initial architect shall be SHoP Architects PC.

1

"**Authorized Representative**" of a person means any officer, agent, manager, employee, independent contractor or other representative of such person acting within the actual or apparent authority granted by such person or who is otherwise authorized to perform the act in question on behalf of such person.

"**Business Day**" means Monday through Friday, excluding holidays recognized by the United States government or the State of New York.

"**Certificates of Occupancy**" for the Project means certificates of occupancy permitting the occupancy of the Project (which may include temporary certificates of occupancy).

"**Claim**" means any obligation, liability, claim (including any claim for damage to property or injury to or death of any persons), lien or encumbrance, loss, damage, cost or expense (including any judgment, award, settlement, reasonable attorneys' fees and other costs and expenses incurred in connection with the defense of any actual or threatened action, proceeding or claim).

"**Commercially Reasonable Efforts**" means diligent, professional and reasonable efforts consistent with other operators performing similar services for projects similar to the Project.

"**Completion Evidence**" for the Project means all of the following items: (i) a certificate from the Architect, in the A.I.A. form satisfactory to and, addressed to Owner and certifying substantial completion in accordance herewith of the Project subject to Punch List Items; (ii) all material Permits necessary for operation of the Project, including, without, limitation, temporary Certificates of Occupancy shall have been obtained; (iii) final and unconditional lien waivers from the following parties with whom Developer and/or Owner has entered into a direct contract with: material contractors, subcontractors and materialmen subject to holdbacks and disputed amounts; and (iv) all evidence of completion as may be required by Project Lender under the Project Financing Documents.

"**Construction Manager**" means the construction manager of the Project designated by or approved by Owner, the initial Construction Manager shall be an affiliate of one or both of JDS Development Group or Property Markets Group, Inc.

"**Cure Period**" means (1) ten (10) days after written notice specifying the nature of a default or breach in connection with a monetary default; and (2) subject to the following sentence, thirty (30) days after written notice specifying the nature of a default or breach under this Agreement, in connection with a non-monetary default; provided, however, that if such non-monetary default cannot reasonably be cured within such 30-day period, and the defaulting party promptly commences the cure of such default and diligently pursues such cure to completion, then such 30-day period shall be extended to the extent reasonably necessary (but in no event after the date is 180 days after such written notice).

"**Development Fee**" is defined in <u>Section 8.1</u>.

2

"**Development Team**" means Developer, Owner, Architect, Construction Manager and Engineer.

"**Developer**" is defined in the first paragraph of this Agreement.

"**Drawings and Specifications**" for the Project means all blueprints, schematic renderings, architect's drawings, specifications, written descriptions and similar items for the Project, as the same may be revised from time to time.

"**Engineer**" means the engineer or engineers designated by or approved from time to time by Owner, for electrical, mechanical and plumbing. The initial consulting MEP engineer shall be Dagher Engineering, PLLC.

"**Final Completion**" of the Project means (1) the completion of construction of the Project (including all Punch List Items), and (2) delivery to Owner of the Completion Evidence.

"**Insurance Requirements**" means all terms of any insurance policies covering or applicable to the Property, all requirements of the issuer of any such policy and all orders, rules, regulations and other requirements of any insurance, regulatory or governing body applicable to the Property.

"**Investor**" is defined in the recitals to this Agreement.

"**Laws**" means all procedural and substantive federal, state and local laws, judicial decisions, statutes, constitutions, moratoria, initiatives, referenda, ordinances, resolutions, rules, regulations, standards, orders and other governmental requirements (including those relating to the environment, mold, health and safety, or handicapped persons), applicable to the Property, or the ownership, use, operation, maintenance, sale, lease or other disposition thereof or portion thereof.

"**Manager**" is defined in Section 2.1.2.

"**Owner**" is defined in the first paragraph of this Agreement.

"**Owner's LLC Agreement**" is defined in the recitals to this Agreement.

"**Party**" or "**Parties**" means Owner and Developer.

"**Permits**" means all permits, licenses, conditional use permits, zoning rights, easements, approvals, entitlements, Certificates of Occupancy, and other authorizations required (whether already issued or to be obtained) in connection with the ownership, land use, development, subdivision, sale, construction, use, excavation, demolition, leasing, operation or maintenance of the Property.

"**Person**" means a natural person, corporation, limited or general partnership, limited liability company, tenancy-in-common, joint venture, association, business trust, and any other organization and any combination of them.

3

"**Pre-Development Period**" is defined in <u>Section 8.1</u>.

"**Project**" is defined in the recitals to this Agreement.

"**Project Agreements**" means any and all loan agreements, mortgages, security instruments, easement agreements, restrictive covenants, construction contracts, and any other agreements relating to the construction or operation of the Project.

"**Project Lender**" shall mean the lender under any Project Financing.

"**Project Financing**" means any financing to be obtained by Owner in connection with the acquisition, development or operation of the Property, and any refinancing thereof.

"**Project Financing Documents**" means any and all documents evidencing, securing or otherwise governing any Project Financing.

"**Property**" is defined in the recitals to this Agreement.

"**Punch List Items**" for the Project means such items of work on the Project as in the judgment of Architect remain incomplete or incorrectly or inaccurately done at the time Architect advises Owner that the construction and equipping of the Project has been substantially completed in accordance with the Drawings and Specifications.

"**Requirements**" means the terms and conditions of this Agreement, the Business Plan, the Budget, Insurance Requirements, the Project Agreements, the Drawings and Specifications, Laws and Permits, collectively.

"**Term**" is defined in <u>Section 2.2</u>.

"**Unavoidable Delays**" means fire, earthquake, flood, explosion, war, insurrection, riot, mob violence, sabotage, inability to procure labor, equipment, facilities, materials or supplies, strikes, walk-outs, action of labor unions, condemnation, inability to obtain governmental permits or approvals, unusually inclement weather (including heavy rain or snow) in which work cannot proceed, acts of terror, and other matters not within the control of the Party in question which, with respect to Developer, could not have been reasonably foreseen or anticipated and mitigated by Developer exercising due diligence in accordance with the standards of a first class development and construction firm.

## ARTICLE II
## ENGAGEMENT AND TERM

2.1     <u>Appointment; Relationships</u>.

2.1.1   Owner hereby engages the services of Developer, and Developer hereby accepts the engagement, to coordinate and supervise the construction of the Project and to supervise the marketing and unit sales of the Project, subject to and in accordance with the terms of this Agreement.  Developer shall use Commercially Reasonable Efforts to discharge its

4

obligations and responsibilities hereunder and shall devote sufficient time and attention to the discharge of its duties under this Agreement.

2.1.2    The parties acknowledge that an affiliate of Developer, 111 West 57th Sponsor LLC, ("**Manager**") is the Manager of Owner.  Nothing herein shall increase or decrease the rights and obligations of Manager under Owner's LLC Agreement and nothing in Owner's LLC Agreement shall increase or decrease the rights and obligations of Developer hereunder; it being agreed that Manager's rights and obligations are set forth in Owner's LLC Agreement and Developer's rights and obligations are set forth in this Agreement and that the parties agree to respect the corporate autonomy of Manager and Developer.

2.1.3    Notwithstanding any provision contained in this Agreement to the contrary, Developer is not and shall not be a guarantor of the work done by any contractor or tradesman and Developer does not guaranty the timely completion of the Project and Developer does not guaranty the Budget and does not guaranty that the Project will be built in accordance with the Drawings and Specifications and nothing contained in this Agreement shall be construed to make Developer a guarantor of the work, the Budget, the timely completion and/or construction in accordance with the Drawings and Specifications although Developer shall use Commercially Reasonable Efforts to cause same to be accomplished.

2.1.4    Notwithstanding anything to the contrary herein in this Agreement, Developer acknowledges that pursuant to Section 7.2 of Owner's LLC Agreement, all rights of Owner hereunder may be exercised unilaterally by Investor on behalf of Owner but only in accordance with Investor's rights under Owner's LLC Agreement.

2.2    <u>Term</u>.  The term ("**Term**") of this Agreement as to the Project shall be deemed to commence as of the date hereof and, unless earlier terminated as provided herein, shall expire upon the Final Completion of the Project.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES

3.1    <u>Representations and Warranties of Developer</u>.  Developer hereby represents and warrants to Owner as follows:

3.1.1    <u>Formation; Qualification</u>.  Developer is a limited liability company, duly formed, validly existing and in good standing under the laws of the State of Delaware.

3.1.2    <u>Authorization; Binding Agreement</u>.    Developer has taken all action required to allow Developer to enter into this Agreement. This Agreement constitutes a legal, valid and binding obligation of Developer, and neither its execution nor performance violates the requirements of any other agreement to which Developer is a party or is otherwise bound.

3.1.3    <u>Experience</u>.  Developer is qualified to perform the services that are the subject matter of this Agreement.

3.2     Representations and Warranties of Owner.   Owner hereby represents and warrants to Developer as follows:

3.2.1    Formation; Qualification.   Owner is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware.

3.2.2    Authorization; Binding Agreement.   Owner has taken all action required to allow Owner to enter into this Agreement, and this Agreement constitutes a legal, valid and binding obligation of Owner.

## ARTICLE IV
## DUTIES AND SERVICES OF DEVELOPER

4.1     Project

4.1.1    Generally.   Developer shall use Commercially Reasonable Efforts to carry out in a timely manner the Project in its entirety in accordance with the Requirements, and shall represent Owner in connection with the planning, design, permitting, development and construction of the Project. Developer shall use Commercially Reasonable Efforts to perform all development functions necessary to complete the Project in accordance with the Requirements.

4.1.2    Budget.   The Budget is attached to Owner's LLC Agreement.

4.1.3    Drawings and Specifications.    Developer shall use Commercially Reasonable Efforts to cause the Project to be constructed pursuant to the Drawings and Specifications

4.2     Specific Duties and Services.   The duties and services of Developer during the Term shall include (without limiting the generality of the other responsibilities of Developer pursuant to this Agreement) the following:

4.2.1    Recommendations; Hiring and Replacing Professionals.   Hire, on behalf of Owner, all necessary laborers, tradesmen, suppliers, contractors, materialmen, project managers, assistant project managers, foremen, assistant foremen, project accountants, assistant project accountant, office workers and other personnel deemed necessary by Developer, and engage on behalf of Owner all necessary engineers, architects and consultants.   Prepare recommendations for the construction and development of the Project, and submit to Owner any and all recommendations relating to services to be performed by the Architect, Construction Manager, Engineer and any others for the Project, all of which shall be independent contractors.

4.2.2    Non-Construction Activities.   Use Commercially Reasonable Efforts to procure, coordinate, administer, supervise and implement all aspects of the Project planning, preparation, design and engineering, including all architectural work, all engineering (such as and structural engineering, if applicable) and all other non-construction activities required for the planning and construction of the Project in accordance with the Requirements.

4.2.3    Permits.   Use Commercially Reasonable Efforts to obtain or cause to be obtained and administer compliance with all applicable Permits as and when required.

Developer shall complete and present to Owner all proposed applications for Permits for Owner's signature or Developer shall sign such applications on behalf of Owner.

4.2.4   Bids.   Direct and supervise the procurement of bids for the development and construction of the Project, tabulate and analyze bid results, and submit recommendations to Owner regarding the award of construction contracts and subcontracts relating to the Project.

4.2.5   New Project Agreements.   Negotiate and prepare for the execution by Owner, all agreements as Developer recommends that Owner execute in connection with the development and construction of the Project.   Notwithstanding the foregoing or anything to the contrary contained in this Agreement, pursuant to 7.2(a)(v) of Owner's LLC Agreement Owner is authorized to enter into design and construction related agreements without the consent of Investor and Owner hereby authorizes Developer to execute such agreements on Owner's behalf as Developer shall deem appropriate in the ordinary course of Developer performing its duties under this Agreement.

4.2.6   Administering Construction Agreements.   Developer shall administer all construction agreements in accordance with the terms thereof.

4.2.7   Payments.   Developer shall establish procedures for the processing and payment of applications for payment by all contractors, subcontractors, and materialmen providing services, labor or material for construction of the Project.   Developer shall review and, as applicable, submit to the Architect for verification, all applications for payment submitted by contractors, engineers, subcontractors and materialmen in connection with the Project, and Developer shall use Commercially Reasonable Efforts to determine where same should be approved or disapproved.   Developer shall also use Commercially Reasonable Efforts to diligently prepare periodic draw requests for submittal to any construction lender for the Project, including all schedules, lien releases and other documents and information requested by the lender.   Developer shall use Commercially Reasonable Efforts to make to ensure that all such draw requests are consistent with the Requirements.

4.2.8   Supervision of Professionals.   Direct, coordinate, monitor and supervise the performance of (and make recommendations to) the Architect, Engineer, Construction Manager and other professionals providing services in connection with the development of the Project, and use Commercially Reasonable Efforts to verify that such activities and services are provided by such parties in accordance with the Requirements.

4.2.9   Regular Inspections by Developer.   Developer shall inspect the Project on a regular basis and recommend to Owner that Owner stop work or reject any work of which Developer is aware which fails to conform with the Drawings and Specifications or other Requirements.

4.2.10 Financial Records.   Developer shall maintain complete financial records and maintain a set of working Drawings and Specifications, and addenda and change orders thereto, at the Project or at Developer's offices.

4.2.11 Development Team Meetings.   Conduct regular meetings of the Development Team and any other appropriate parties during the course of development and

construction of the Project as often as reasonably necessary to provide continuing supervision and control of the Project. Developer shall notify Owner and Investor of each such and shall permit attendance by Owner, Investor, and the asset manager, construction consultants (including Investor's construction consultant), property management personnel, leasing representatives or other agents and representatives of Owner and Investor.

4.2.12  <u>Disputes</u>.  Promptly advise Owner of any material disputes or potential material disputes of which Developer is aware with any of the Development Team, any adjoining property owner or any other person relating to the Project or the Property.

4.2.13  <u>Change Orders</u>.  Arrange for, negotiate and supervise and execute (except to the extent limited by Owner's LLC Agreement) all change orders for the Project.

4.2.14  <u>Final Completion</u>.  Use Commercially Reasonable Efforts to cause the Final Completion of the Project to occur in a timely manner in compliance with the Budget.

4.2.15  <u>Claims</u>.  Notify and advise Owner in connection with any claims made against Owner by Construction Manager, Architect, Engineer or any other party providing services in connection with the development or construction of the Project promptly upon receipt of notice of such claims.

4.2.16  <u>Retainage</u>.  Administer retainage for the Project to the extent provided in contracts with contractors, architects, engineers, suppliers, subcontractors and others providing services or materials to the Project.

4.2.17  <u>Completion Inspections</u>.  Inspect the Project with the Architect and the Construction Manager and submit to Owner recommendations concerning the acceptance of the Project by Owner and the approval by Owner of any Punch List Items.

4.2.18  <u>Punch List Items</u>.  Use Commercially Reasonable Efforts to cause the prompt completion or correction of all Punch List Items, as the case may be.

4.2.19  <u>Mechanic's Liens</u>.  Promptly notify Owner of (A) any dispute over amounts owed any person that has the statutory authority to file a construction lien against the Property or (B) any filing of a construction lien claim against the Property, and use Commercially Reasonable Efforts to cause the prompt removal of any such lien at Owner's expense and without limitation promptly take such action as Owner reasonably determines to be necessary to protect the Property at Owner's expense after consultation with Owner.

4.2.20  <u>Lien Waivers</u>.  Use Commercially Reasonable Efforts to obtain appropriate affidavits and lien waivers from the Construction Manager, Architect, Engineer, subcontractors and materialmen providing services, labor or material for the Project.

4.3      <u>Limitations on Authority of Developer</u>.  Notwithstanding anything to the contrary herein, Developer shall not, without the prior approval of Owner, take or attempt to take any of the following actions:

4.3.1 <u>Liens and Encumbrances: Transfers</u>. Grant any mortgage, deed of trust, lien or other encumbrance on all or any portion of the Property or any other property of Owner, or transfer all or any portion of the Property.

4.3.2 <u>Business Plan and Budget</u>. Take any action that would result in any activity or expenditure related to the Project that is not consistent, in all material respects, with the Business Plan and Budget, subject to the Permitted Variance.

4.3.3 <u>Debt</u>. Borrow money or execute any promissory note, evidence of indebtedness, guaranty or the like in the name of or on behalf of Owner.

4.3.4 <u>Affiliate Transactions</u>. Except as expressly provided herein, take any action that results in any compensation or reimbursement to, any Affiliate of Developer, except as permitted by Owner's LLC Agreement.

4.4    <u>Employees and Project Staffing</u>.

4.4.1 <u>Local Office; Presence at Project</u>. Developer shall manage the construction of the Project through the Developer's office in New York City, it being understood that Developer may change the location of Developer's local office to another location in New York City upon reasonable prior written notice to Owner. Notwithstanding any provision contained herein to the contrary, Developer will hire various employees of the Project directly (or utilize employees affiliated with sponsor) such as project managers, assistant project managers, foremen, assistant foremen, project accountants, assistant project accountants, clerical workers and other personnel deemed necessary by Developer and Developer shall be reimbursed for same subject to any limitation contained in the Budget.

4.4.2 <u>Staffing</u>. Developer shall assign to the construction of the Project such staff as may be reasonably required to perform its duties hereunder with due diligence and to monitor the timely completion of the Project and may delegate any or all of such duties to staff. Developer shall appoint one or more senior executives (each, a "<u>Senior Executive</u>") to serve as the primary persons responsible for Developer's obligations hereunder and to serve as the principal points of contact with Owner with respect to the Project. The initial Senior Executives shall be Kevin Maloney, Ned White and Michael Stern, either of whom may only be changed with Owner's prior consent. Owner shall appoint one or more senior executives to serve as the principal point of contact on behalf of Owner with respect to the Project. The initial person appointed by Owner is Richard Bianco.

4.4.3 <u>Developer's Employees</u>. All matters pertaining to the employment, supervision, compensation, benefits, payment of taxes, promotion and discharge of Developer's employees (or employees affiliated with Sponsor) shall be the responsibility of, and shall be vested solely with, Developer, and Owner shall not have any rights or obligations with respect thereto. All personnel assigned to or used in connection with the Project pursuant to this Agreement will be Developer's or Sponsor's (and not Owner's) employees or consultants.

9

## ARTICLE V
## DUTIES OF OWNER

5.1    Construction Funds.  Subject to the Budget and the Owner's LLC Agreement, Owner shall provide funds for the completion of the Project upon its receipt of a funding request from Developer.  Owner will have the right to determine the nature, amount and source of financing (both permanent and construction) or other source of funding for the Project.

5.2    Funding Requests.  Developer shall comply with the requirements of construction lender and the Project Financing Documents with respect to funding requests and upon compliance with same, Owner shall provide such funds, subject to the terms of the Budget and the Owner's LLC Agreement.

5.3    Failure to Fund.  Developer shall not be in breach of this Agreement solely by reason of the failure to perform any obligation hereunder to the extent such failure is caused by Owner's failure (not caused by Developer or an Affiliate of Developer) to furnish to Developer the "**Required Funds**" (which shall mean the third party costs required to be paid by Owner in order to perform such obligation) within a reasonable time after the Required Funds are requested by Developer in accordance with this Agreement.

## ARTICLE VI
## MAINTENANCE OF ACCOUNTS; FINANCIAL REPORTING

6.1    Disbursement of Funds.  All funds for construction of the Project shall be advanced from an account maintained by Owner.  Developer shall not commingle the funds of Owner with any funds of Developer or any other person.

6.2    Records.  Developer shall keep, during the term of this Agreement and for at least three (3) years thereafter, all books of account and other records for the Project at the Developer's Office or at such other location as may be approved in writing by Owner.

6.3    Financial Accountability.  Developer shall use Commercially Reasonable Efforts to maintain such control over accounting and financial transactions as is reasonably necessary to protect the Owner's assets from theft, error or fraudulent activity.

6.4    Informing Owner; Reports.  Developer shall keep Owner fully informed on a regular basis of the progress of the construction of the Project.  Satisfaction by the Manager under Owner's LLC Agreement, of the requirements set forth in Section 4.2 of Owner's LLC Agreement shall be deemed satisfaction of Developer's reporting requirements hereunder.

6.5    Right to Audit.  Owner reserves the right, at any time, at Owner's sole cost and expense, during the period commencing on the date hereof through the date which is three (3) years after the termination of this Agreement to examine, copy and audit the books and records maintained by Developer in connection with the Project.  During the period commencing on the date hereof through the date which is three (3) years after the termination of this Agreement, Developer shall permit Owner and its Authorized Representatives access to all books, records and accounts relating to the Project and all correspondence pertaining thereto.  In connection with any such examination, audit or inspection, Owner and its Authorized

10

Representatives shall have the right to meet with Developer and its employees concerning the books and records.

      6.6    <u>Custody</u>. All books, records, accounts and other information relating to the Project and required to be maintained by Developer hereunder shall be the property of Owner. Upon request of Owner, or upon termination of this Agreement, Developer shall immediately deliver to Owner all books, records, accounts and other information relating to the Project, including all correspondence, without any charge or expense to Owner. Developer may retain a copy of all such information at its sole cost and expense.

      6.7    <u>Inspection</u>. Owner reserves the right for itself and its Authorized Representatives to inspect, examine and test the construction and development of the Project at Owner's expense. In connection with any such examination, inspection or test, Owner and its Authorized Representatives shall have the right to question Developer and its employees concerning such construction and development. In connection with any such examination, inspection or test, Developer shall make available to Owner and its Authorized Representatives such facilities and office or other working space within the office space at the Project used by Developer as may be reasonably requested. Notwithstanding anything contained herein to the contrary, the right of Owner to inspect, examine and test the construction and development of the Project shall not in any respect diminish, limit or impair the obligations of Developer under this Agreement.

<div align="center">

**ARTICLE VII**
**INDEMNIFICATION**

</div>

      7.1    <u>Indemnification by Developer</u>. Developer shall indemnify, defend and hold harmless Owner from and against any and all Claims in any matter related to, arising out of or resulting from (a) (c) any fraud, gross negligence or misconduct of Developer, its agents or employees. The rights of Owner under this <u>Section 7.1</u> shall inure to the benefit of any and all of Owner's officers, directors, partners, members, employees, agents and representatives, and to the benefit of any and all persons or legal entities which are Affiliates of Owner and who are, could be or are alleged to be, liable for the obligations of Owner and any and all of their respective officers, directors, partners, members, employees, agents and representatives.

      7.2    <u>Survival</u>. The provisions of this Article VII shall survive the termination or expiration of this Agreement.

<div align="center">

**ARTICLE VIII**
**COMPENSATION**

</div>

      8.1    <u>Development Fee</u>. Developer shall be entitled to a development fee (the "**Development Fee**") for the Project equal to four percent (4%) of all hard costs expended on the Project in the amounts and timing as set forth in this <u>Section 8.1</u>. For the period commencing on the date hereof and ending on the date upon which the Owner or its Subsidiaries enters into a construction loan for the development of the Project (such period, the "**Pre-Development Period**"), Owner shall pay Developer One Hundred Thousand and No/100 Dollars ($100,000.00) per month on the first Business Day of each calendar month commencing on July 1, 2013;

<div align="center">11</div>

provided however, that the aggregate Development Fee paid to Developer during the Pre-Development Period shall not exceed One Million and No/100 Dollars ($1,000,000.00). From and after the date that the Owner or its Subsidiaries enters into a construction loan for the development of the Project, Owner shall pay Developer the difference between (x) the total Development Fee and (y) any amounts of the Development Fee paid to Developer during the Pre-Development Period, in 18 equal monthly installments, such payments to be made on the first Business Day of each of the immediately following 18 calendar months in which Developer is actively performing its duties hereunder.

8.2     Other Payments.     Notwithstanding any provision contained herein to the contrary, nothing contained in this Agreement shall relieve Owner from reimbursing Developer for any general conditions or other expenses expended by Developer which amounts are provided for in the Budget and the Development Fees being paid by Owner to Developer hereunder are independent from such reimbursement and such reimbursement shall not reduce the Development Fee. Developer shall not be entitled to reimbursement for any of its overhead or similar expenses incurred in providing services under this Agreement (except to the extent such expenses are set forth in the Budget).

## ARTICLE IX
## TERMINATION

9.1     Developer Default.     Owner shall have the right to terminate this Agreement with respect to the Project or a portion thereof, by notice to Developer if any of the following events occurs:

9.1.1     Uncured Breach.     Any breach by Developer under this Agreement, which breach is not cured within the Cure Period;

9.1.2     Bankruptcy.     The bankruptcy or insolvency of Developer;

9.1.3     Suspension of Business.     Developer suspends or discontinues business being conducted under this Agreement without the prior approval of Owner, and fails to recommence business within ten (10) days after receipt of notice from Owner;

9.1.4     Bad Acts.     Developer or any of its Affiliates commits fraud, a criminal act, willful misconduct or gross negligence with respect to the Project as determined by binding arbitration pursuant to Section 8.10 of Owner's LLC Agreement, unless the alleged fraud was theft from Owner or Developer or the Senior Executives have been charged or indicted for a criminal act;

9.1.5     Manager Removal.     The Manager is removed pursuant to Section 8.10 of Owner's LLC Agreement;

9.1.6     Third Party Sale.     The sale of the Project or a portion thereof by Owner to a third party that is not an Affiliate of Owner;

9.1.7     Casualty or Condemnation.     The Project or a portion thereof is damaged by casualty or the Project is condemned or (except as contemplated by the Budget) a material

12

portion of the Project is condemned, and in any such event, Owner determines not to continue with construction of the Project;

        9.1.8  <u>Dissolution</u>  The occurrence of an event causing dissolution of Owner pursuant to Section 10.1 of Owner's LLC Agreement; or

        9.1.9  <u>Sponsor Transfer</u>.  Upon Sponsor ceasing to be a member of Owner, including, without limitation, the acquisition of all of Sponsor's interest in Owner pursuant to Section 11.1 of Owner's LLC Agreement.

    9.2    <u>Remedies Not Exclusive</u>.  Except as may otherwise be expressly provided in this Agreement:

        (1)    the rights and remedies of Owner and Developer under this Agreement shall not be mutually exclusive;

        (2)    the exercise of one or more of the rights and remedies under this Agreement shall not preclude the exercise of any other right or remedy under this Agreement, at law or in equity; and

        (3)    damages at law may not be an adequate remedy for a breach or threatened breach of this Agreement and in the event of a breach or threatened breach of any provision hereunder, the respective rights and obligations hereunder shall be enforceable by specific performance, injunction or other equitable remedy. Notwithstanding anything herein to the contrary, in no event shall Owner be liable for any special, consequential or punitive damages..

    9.3    <u>Development Fees Upon Termination</u>.  In the event of termination under <u>Section 9.1</u>, Developer shall be entitled to receive the Development Fee earned as of the date of the termination, together with any reimbursable expenses to which Developer is then entitled under this Agreement, payable when such sums would otherwise be due and payable under this Agreement.

    9.4    <u>Action Upon Termination</u>.  Upon the termination (whether by expiration of time or otherwise) of this Agreement as to the Project, Developer shall promptly (a) surrender and deliver to Owner any space in the Property or Project occupied by Developer broom clean and free of debris and Developer's personal property, (b) deliver to Owner or to Owner's designee any funds of Owner held by Developer, (c) deliver to Owner all Project Agreements, books and records, software, data, reports (including any of the foregoing stored on computers or diskettes), Drawings and Specifications, Permits, receipts for deposits, unpaid bills, canceled checks, bank statements, paid bills and all other records, papers, documents and keys which relate to the Project which are in Developer's possession or control, and (d) furnish all such information and take all such action as Owner shall reasonably require (including cooperating with a new developer for such time as may be required by Owner) to effectuate an orderly and systematic transfer of Developer's duties and obligations under this Agreement to a new person designated by Owner.  Developer shall deliver to Owner a final accounting (prepared in accordance with the terms of this Agreement) of the Project up to and including the effective date of the termination within thirty (30) days after such effective date of termination.

**ARTICLE X**
**MISCELLANEOUS**

10.1    <u>Successors and Assigns: Assignment</u>.    Subject to the provisions herein concerning assignment, this Agreement shall inure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns.    Neither this Agreement nor any rights hereunder shall be assigned, hypothecated or otherwise transferred (whether voluntarily, involuntarily, by operation of law or otherwise) by Developer without the prior approval in each instance of Owner. Any purported transfer by Developer made without first complying with this <u>Section 10.1</u> will be void and of no effect.    Owner shall have the right to assign its interest in this Agreement to any entity without the prior approval of Developer.

10.2    <u>Confidentiality: Press Release</u>.    Developer shall keep the terms of this Agreement and (except for public information) all information regarding the Project, the Property or Owner confidential.    Any press release relating to the Project shall require Owner's approval.

10.3    <u>Notices</u>.    Any and all notices or consents required or permitted to be given under any of the provisions of this Agreement shall not be effective unless given in writing and shall be delivered by personal service, by Federal Express, other reputable overnight delivery service, or by electronic mail provided that the recipient either replies to such email or otherwise acknowledges receipt of such email in writing which can be through a separate email.    Any such notice to a party shall be addressed at the address set forth below (subject to the right of a party to designate a different address for itself by notice similarly given).

<u>Developer:</u>

c/o JDS Development Group
104 Fifth Avenue, 9th Floor
New York, New York 10011
Attention: Michael Stern
Email: jdsdevelopment@gmail.com

and:

c/o Property Markets Group, Inc.
5 East 17th Street, 2nd Floor
New York, New York 10033
Attention: Franklin R. Kaiman, Esq.
Email: FKaiman@PropertyMG.com

with a copy to:

Kasowitz, Benson, Torres & Friedman LLP
1633 Broadway
New York, New York 10019
Attention: Douglas B. Heitner, Esq.

14

Email: DHeitner@kasowitz.com

Owner:

c/o AmBase Capital
100 Putnam Green, 3rd Floor
Greenwich, Connecticut 06830
Attention: Richard A. Bianco
Email: Rabco@live.com

with a copy to:

Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, New York 10019
Attention: Steven D. Klein, Esq.
Email: sklein@willkie.com

Service of any such notice or other communications so made shall be deemed effective on the day of actual delivery (whether accepted or refused) as confirmed by the courier service if by courier or by reply or other acknowledgement of receipt of email; provided, however, that if such actual delivery occurs after 5:00 p.m. (local time where received) or on a non-business day, then such notice or demand so made shall be deemed effective on the first business day after the day of actual delivery. Any notice from Owner under this Agreement may be given unilaterally by Investor.

   10.4    Entire Agreement; Amendments.    This Agreement, together with the agreements referenced herein, constitute the entire agreement of the Parties with respect to the subject matter hereof. The exhibits are hereby incorporated into this Agreement. There are no further agreements or understandings, written or oral, in effect between the Parties with respect to the subject matter hereof. All amendments of, or modifications to, the Agreement shall not be effective unless in writing signed by the Parties.

   10.5    No Waiver.    No waiver by either Party of any of the terms or provisions of this Agreement shall be enforceable unless expressly set forth in writing and signed by the Party against whom enforcement is sought. Without limitation on the foregoing: (1) no waiver by a Party of any breach of this Agreement by the other Party shall be deemed to be a waiver of any other breach by such other Party (whether preceding or succeeding and whether or not the same or similar nature); (2) no payment or acceptance of performance by a Party after any breach by the other Party shall be deemed to be a waiver of any breach of this Agreement by such other Party, whether or not the first party knows of such breach at the time it makes such payment or performance; and (3) no failure or delay by a Party to exercise any right it may have by reason of the default of the other Party shall operate as a waiver of default or modification of this Agreement or shall prevent the exercise of any right by the first Party while the other Party continues to be so in default.

10.6    Severability.  If any provision of this Agreement or the application thereof to any Person or circumstance shall be invalid or unenforceable to any extent, the remainder of this Agreement and the application of such provisions to any other Person or circumstance shall not be affected thereby and shall be enforced to the greatest extent permitted by Law.

10.7    Counterpart Execution.  This Agreement may be executed in separate counterparts.  It shall be deemed fully executed when each Party has signed at least one counterpart, even though no single counterpart contains the signature of all the Parties.

10.8    Interpretation.  All personal pronouns used in this Agreement, whether used in the masculine, feminine or neuter gender, shall include all other genders; the singular shall include the plural; and the plural shall include the singular.  Titles of articles, sections, subsections and paragraphs in this Agreement are for convenience only and neither limit nor amplify the provisions of this Agreement.  All references in this Agreement to exhibits, articles, sections, subsections or paragraphs shall refer to exhibits, articles, sections, subsections and paragraphs of this Agreement, unless specific reference is made to the exhibits, articles, sections or other subdivisions of another document or instrument.  This Agreement shall not be interpreted in favor of either Party by virtue of such Party not having prepared this Agreement. The words "herein", "hereof", "hereunder", "hereby", "this Agreement" and other similar references shall be construed to mean and include this Agreement and all amendments and supplements hereto unless the context shall clearly indicate or require otherwise. The words "include", "includes" and "including" shall be deemed to be followed by the words ", without limitation".

10.9    Governing Law.  This Agreement shall be governed by the laws of the State in which the Property is located.

10.10    Unavoidable Delays; Business Days; Time is of the Essence.  Each Party shall be excused from performing its obligations under this Agreement for so long as and to the extent that performance is prevented or delayed by Unavoidable Delays.  If any time period provided for in this Agreement ends on a day other than a Business Day, the time period shall be extended to the next Business Day.  Otherwise, time is of the essence of this Agreement.

10.11    Attorneys' Fees.  In the event suit or action is instituted to interpret or enforce the terms of this Agreement, the prevailing party shall be entitled to recover from the other party such sum as the court may adjudge reasonable either (i) out-of-pocket attorneys' and paralegals' fees and costs or (ii) the reasonable value of in-house legal services, whether at trial or on appeal of such suit or action or in connection with any petition for review or any action for rescission or in connection with any action or proceeding under the Federal Bankruptcy Code, in addition to all other sums provided by law, and such prevailing party shall also be entitled to recover reasonable out-of-pocket non-litigation attorneys' fees incurred in enforcing the terms of this Agreement prior to or separate from the trial or appeal or other action.

10.12    Consents and Approvals.  Except as otherwise expressly provided herein, any approval or consent provided to be given by a party hereunder may be given or withheld in the absolute discretion of such party and shall not be deemed to have been given unless given expressly in writing. In addition, any consent, approval, waiver or other determination to be

16

given or made by Owner in connection with this Agreement shall not be valid unless executed by Investor or its designated Affiliate on Owner's behalf.

10.13 <u>Documents and Information</u>. All documents and other items required to be delivered to Owner under this Agreement shall be delivered to Investor and any of Owner's rights to consult, be notified or request documents or information shall also run in favor of Investor.

10.14 <u>Limitation of Liability</u>. Notwithstanding anything to the contrary herein, Owner shall not be personally liable in any manner or to any extent under or in connection with this Agreement, and Developer shall look solely to the Property for the satisfaction of any claims or judgments against Owner. Owner shall have no liability for any period during which Owner does not hold title to the Property. The limitations of liability provided in this <u>Section 10.14</u> are in addition to, and not in limitation of, any limitations on liability applicable to Owner provided by law or by any other contract, agreement or instrument.

10.15 <u>Third Parties</u>. Except as expressly set forth in this Agreement, this Agreement shall not (1) confer any rights or remedies on any person other than the Parties and their respective successors and permitted assigns; (2) relieve or discharge the obligation or liability of any third persons to any party to this Agreement; or (3) otherwise create any third party beneficiary rights.

10.16 <u>No Recordation</u>. In no event shall this Agreement or any document or other memorandum related to the subject matter of this Agreement be recorded.

10.17 <u>Effectiveness</u>. In no event shall any draft of this Agreement create any obligation or liability, it being understood that this Agreement shall be effective and binding only when a counterpart hereof has been executed and delivered by each Party.

10.18 <u>No Construction Against Drafter</u>. This Agreement has been negotiated and prepared by Owner (on behalf of Sponsor and Investor) and Developer and their respective attorneys and, should any provision of this Agreement require judicial interpretation, the court interpreting or construing such provision shall not apply the rule of construction that a document is to be construed more strictly against one party.

10.19 <u>WAIVER OF JURY TRIAL</u>. TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW THAT CANNOT BE WAIVED, EACH PARTY WAIVES, AND COVENANTS THAT IT WILL NOT ASSERT (WHETHER AS PLAINTIFF, DEFENDANT OR OTHERWISE), ANY RIGHT TO TRIAL BY JURY IN ANY FORUM IN RESPECT OF ANY ISSUE, CLAIM OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE CONDUCT OF THE PARTIES, WHETHER NOW EXISTING OR HEREAFTER ARISING AND WHETHER IN CONTRACT, TORT OR OTHERWISE. Each Party acknowledges that it has been informed by the other Party that the foregoing sentence constitutes a material inducement upon which the other Party has relied and will rely in entering into this Agreement. Each Party may file an original counterpart or a copy of this Agreement with any court as written evidence of the consent of the Parties to the waiver of their rights to trial by jury.

[Remainder of this Page Intentionally Left Blank]

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the day and year first set forth above.

**OWNER:**

111 WEST 57th PARTNERS LLC,
a Delaware limited liability company

By: _____
Name: Kevin Maloney
Title: Authorized Signatory

By: _____
Name: Michael Stern
Title: Authorized Signatory

**DEVELOPER:**

111 WEST 57TH DEVELOPER LLC,
a Delaware limited liability company

By: _____
Name: Kevin Maloney
Title: Authorized Signatory

By: _____
Name: Michael Stern
Title: Authorized Signatory

Signature Page – Development Agreement

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the day and year first set forth above.

**OWNER:**

111 WEST 57th PARTNERS LLC,
a Delaware limited liability company

By: _____
Name:  Kevin Maloney
Title:  Authorized Signatory

By: _____
Name:  Michael Stern
Title:  Authorized Signatory

**DEVELOPER:**

111 WEST 57TH DEVELOPER LLC,
a Delaware limited liability company

By: _____
Name:  Kevin Maloney
Title:  Authorized Signatory

By: _____
Name:  Michael Stern
Title:  Authorized Signatory

Signature Page – Development Agreement

Exhibit A

Property Description

107 West 57th Street:

ALL THAT CERTAIN PLOT, PIECE OR PARCEL OF LAND, SITUATE, LYING AND BEING IN THE BOROUGH OF MANHATTAN, COUNTY, CITY AND STATE OF NEW YORK, BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE NORTHERLY SIDE OF 57TH STREET, DISTANT 100 FEET WESTERLY FROM THE CORNER FORMED BY THE INTERSECTION OF THE NORTHERLY SIDE OF 57TH STREET AND THE WESTERLY SIDE OF AVENUE OF THE AMERICAS (FORMERLY SIXTH AVENUE);

RUNNING THENCE NORTHERLY PARALLEL WITH AVENUE OF THE AMERICAS, 100 FEET 5 INCHES TO THE CENTRE LINE OF THE BLOCK;

THENCE WESTERLY ALONG SAID CENTRE LINE OF THE BLOCK, 43 FEET;

THENCE SOUTHERLY PARALLEL WITH AVENUE OF THE AMERICAS AND PART OF THE WAY THROUGH A PARTY WALL, 100 FEET 5 INCHES TO THE NORTHERLY SIDE OF 57TH STREET;

AND

THENCE EASTERLY ALONG THE NORTHERLY SIDE OF 57TH STREET, 43 FEET TO THE POINT OR PLACE OF BEGINNING.

Exhibit A-1

111 West 57th Street:

ALL THAT CERTAIN LOT, PIECE OR PARCEL OF LAND, EXCLUDING THE BUILDINGS AND IMPROVEMENTS ERECTED THEREON, SITUATE, LYING AND BEING IN THE BOROUGH OF MANHATTAN, CITY, COUNTY AND STATE OF NEW YORK, BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE SOUTHERLY SIDE OF 58TH STREET, DISTANT 100 FEET WESTERLY FROM THE CORNER FORMED BY THE INTERSECTION OF THE SOUTHERLY SIDE OF 58TH STREET WITH THE WESTERLY SIDE OF SIXTH AVENUE;

RUNNING THENCE SOUTHERLY AT RIGHT ANGLES TO 58TH STREET, 100 FEET 5 INCHES TO THE CENTER LINE OF THE BLOCK;

THENCE WESTERLY ALONG SAID CENTER LINE AT RIGHT ANGLES TO SIXTH AVENUE, 43 FEET;

THENCE SOUTHERLY AT RIGHT ANGLES TO 57TH STREET AND PART OF THE DISTANCE THROUGH A PARTY WALL, 100 FEET 5 INCHES TO THE NORTHERLY SIDE OF 57TH STREET;

THENCE WESTERLY ALONG THE NORTHERLY SIDE OF 57TH STREET, 63 FEET;

THENCE NORTHERLY AT RIGHT ANGLES TO 57TH STREET AND PART OF THE DISTANCE THROUGH A PARTY WALL, 85 FEET 7-5/8 INCHES TO THE DIVISION LINE BETWEEN LAND FORMERLY OF SARAH TALLMANS ON THE NORTH AND RACHEL COZINE ON THE SOUTH;

THENCE EASTERLY ALONG SAID DIVISION LINE TO A POINT DISTANT 200 FEET WESTERLY FROM THE WESTERLY SIDE OF SIXTH AVENUE ON A LINE DRAWN AT RIGHT ANGLES THERETO;

THENCE NORTHERLY ON A LINE AT RIGHT ANGLES TO 58TH STREET, 114 FEET 3 INCHES TO THE SOUTHERLY SIDE OF 58TH STREET;

THENCE EASTERLY ALONG THE SOUTHERLY SIDE OF 58TH STREET, 100 FEET TO THE POINT OF PLACE OF BEGINNING.

Exhibit A-2

Schedule 2.8

Ownership Chart

*[Attach Structure Chart]*

105-111 West 57th Street
*Organizational Chart*

Schedule 2.12

<u>Side Agreements</u>

None.

Schedule 3.1

Initial Capital Contributions of the Members

| Member | Member's Percentage Interest | Total Initial Capital Contributions made (or deemed made) as of the date of this Agreement |
|---|---|---|
| Sponsor | 14.7% | $14,000,000.00 |
| Atlantic | 26.3% | $25,000,000.00 |
| Investor | 59% | $56,000,000.00 |
| Cumulative Capital Contributions | 100.00% | $95,000,000.00 |

Case 1:18-cv-05482-AT Document 1-1 Filed 06/18/18 Page 223 of 238

# EXHIBIT B



# EXHIBIT A

## ORGANIZATIONAL STRUCTURE

*105-111 West 57th Street*
*Organizational Chart*

*Unless otherwise indicated, all entities are Delaware entities.*

Exhibit A

EAST\101238475.13

# EXHIBIT C

## JDS Construction Group LLC

VIA OVERNIGHT MAIL

October 23, 2015

111 West 57th Partners LLC

c/o JDS Development Group
104 5th Avenue, 9th Floor
New York, New York 10011

and

c/o Property Markets Group, Inc.
111 Fifth Avenue, 6th Floor
New York, New York 10003
Attention: Frank Kaiman

Re: 111 West 57th Street

Gentlemen:

This letter shall serve as an acknowledgement by JDS Construction Group
("JDS") that it has directed Liberty Mutual to make any reimbursements to the
extent attributable to premiums or loss fund amounts under the Insurance Policy
for 111 West 57th Street directly to 111 West 57th Partners LLC ("Partnership
Entity"). To the extent such reimbursements are not directed as instructed, JDS
shall return any reimbursements received pursuant to such policy to the
Partnership Entity.

Sincerely,

Michael Stern
Authorized Signatory

cc:     111 West 57th Investment LLC
        c/o Ambase Capital
        100 Putnam Green
        Greenwich, CT 06830
        Attn: Richard Bianco

        Gibson, Dunn & Crutcher LLP
        200 Park Avenue
        New York, NY 10166
        Attn: Steven Klein

# EXHIBIT D

111 West 57th Control LLC
c/o JDS Development Group
104 Fifth Avenue, 9th Floor
New York, NY 10011

March 19, 2014

111 West 57th Manager Funding LLC
c/o AmBase Capital
100 Putnam Green, 3rd Floor
Greenwich, CT 06830
Attention: Richard Bianco

111 West 57th Control LLC
c/o JDS Development Group
104 Fifth Avenue, 9th Floor
New York, NY 10011
Attention: Michael Stern

111 West 57th Control LLC
c/o Property Markets Group, Inc.
5 East 17th Street, 2nd Floor
New York, NY 10011
Attention: Franklin R. Kaiman, Esq.

Re:    Notice of Call for Capital Contribution

Gentlemen,

Pursuant to Section 3.2(a) of the Limited Liability Agreement (the "Agreement") of 111 West 57th Manager LLC (the "Company"), notice is hereby given of a call for Additional Capital Contributions. Capitalized terms set forth herein that are not defined herein have the meaning ascribed to them in the Agreement, unless otherwise stated.

This call for an Additional Capital Contribution is being made in connection with the Sponsor LLC Capital Call, attached hereto as Exhibit A. The Tender Date for the Additional Capital Contribution shall be not later than April 1, 2014. The Additional Capital Contribution shall be made in immediately available funds, in the amounts set forth on Exhibit B and by wire transfer in accordance with the wire instructions set forth on Exhibit B, attached hereto.

[Signature Page Follows]

Sincerely,

111 WEST 57ᵗʰ CONTROL LLC,
a Delaware limited liability company

By: _____
    Name:   Kevin Maloney
    Title:   Authorized Signatory

By: _____
    Name:   Michael Stern
    Title:   Authorized Signatory

cc:

Kasowitz, Benson, Torres & Friedman LLP
1633 Broadway
New York, New York 10019
Attention: Douglas B. Heitner, Esq.

Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166
Attention: Steven D. Klein, Esq.

INDEX NO. 652301/2016
Case 1:18-cv-05482-AT   Document 1-1   Filed 06/18/18   Page 230 of 238 RECEIVED NYSCEF: 04/27/2018

**EXHIBIT A**

Sponsor LLC Capital Call

[Attached]

111 West 57th Sponsor LLC
c/o JDS Development Group
104 Fifth Avenue, 9th Floor
New York, NY 10011

March 19, 2014

111 West 57th Investment LLC
c/o AmBase Capital
100 Putnam Green, 3rd Floor
Greenwich, CT 06830
Attention: Richard Bianco

Atlantic 57 LLC
c/o Madison Partners, LLC
161 Bowery 7th Floor
New York, New York 10002
Attention: Arthur Becker

111 West 57th Sponsor LLC
c/o JDS Development Group
104 Fifth Avenue, 9th Floor
New York, NY 10011
Attention: Michael Stern

111 West 57th Sponsor LLC
c/o Property Markets Group, Inc.
5 East 17th Street, 2nd Floor
New York, NY 10011
Attention: Franklin R. Kaiman

Re:    Notice of Call for Capital Contribution

Gentlemen,

        Pursuant to Section 3.2(a) of the Limited Liability Agreement (the "Agreement") of 111 West 57th Partners LLC (the "Company"), notice is hereby given of a call for Additional Capital Contributions. Capitalized terms set forth herein that are not defined herein have the meaning ascribed to them in the Agreement, unless otherwise stated.

        This call for an Additional Capital Contribution is being made in connection with the requirements of the financing applicable to the Property and such Additional Capital Contribution shall be used for the acquisition of certain inclusionary air rights, as a Company Overrun. The Tender Date for the Additional Capital Contribution shall be not later than April 1, 2014. The Additional Capital Contribution shall be made in immediately available funds, in the

amounts set forth on Exhibit A and by wire transfer in accordance with the wire instructions set forth on Exhibit A, attached hereto.

[Signature Page Follows]



**105-111 West 57th Street**
**CAPITAL CALL**

| | TRADE | TOTAL BUDGET | CAPITAL CALL March 19, 2014 |
|---|---|---|---|
| 1 | DEMOLITION | $4,000,000 | |
| 2 | ASBESTOS ABATEMENT | $500,000 | |
| 3 | HOIST/SWB | $4,500,000 | |
| 4 | FOUNDATION | $6,500,000 | |
| 5 | CONCRETE | $23,500,000 | |
| 6 | STRUCTURAL METAL FRAMING | $7,000,000 | |
| 7 | METAL FABRICATIONS | $1,750,000 | |
| 8 | STRUCTURAL DAMPER | $4,000,000 | |
| 9 | TEMP PROTECTION | $3,000,000 | |
| 10 | MILLWORK | $12,500,000 | |
| 11 | INTERIOR DUPLEX STAIRS | $1,000,000 | |
| 12 | MEMBRANE ROOFING | $1,700,000 | |
| 13 | APPLIED FIREPROOFING | $800,000 | |
| 14 | DOORS AND FRAMES | $1,500,000 | |
| 15 | HARDWARE | $1,600,000 | |
| 16 | GLAZING | $1,375,000 | |
| 17 | EXTERIOR FAÇADE | $34,000,000 | |
| 18 | BUILDING MAINTENANCE UNIT | $1,400,000 | |
| 19 | RETAIL SPACE/SPECIAL FINISHES | $4,000,000 | |
| 20 | LOBBY WORK/AMENITIES | $5,000,000 | |
| 21 | CARPENTRY | $11,000,000 | |
| 22 | STONE AND TILE | $6,500,000 | |
| 23 | WOOD FLOORING | $5,500,000 | |
| 24 | PAINTING | $2,000,000 | |
| 25 | SIGNAGE | $200,000 | |
| 26 | TOILET ACCESSORIES | $310,000 | |
| 27 | WASTE HANDLING EQUIPMENT | $500,000 | |
| 28 | RESIDENTIAL EQUIPMENT | $2,250,000 | |
| 29 | ELEVATORS | $5,700,000 | |
| 30 | FIRE PROTECTION | $4,000,000 | |
| 31 | PLUMBING | $8,850,000 | |
| 32 | HVAC | $13,775,000 | |
| 33 | ELECTRICAL WORK, incl. Façade Lighting | $11,300,000 | |
| 34 | | | |
| 35 | TRADE SUBTOTAL | $191,510,000 | |
| 36 | General Conditions (8.5%) | $16,278,350 | |

| | | |
|---|---|---|
| 37 | Sub-total | $207,788,350 |
| 38 | Subcontractor Bonds (1%) | $1,915,100 |
| 39 | Insurance (4.5%) | $8,617,950 |
| 40 | Sub-total | $218,321,400 |
| 41 | Escalation (1.5%) | $3,274,821 |
| 42 | Sub-total | $221,596,221 |
| 43 | Construction Management (2.25%) | $4,985,915 |
| 44 | Total CM Contract | $226,582,136 |
| 45 | Const. Contingency (10%) | $22,658,214 |
| 46 | CONSTRUCTION TOTAL | $249,240,350 |
| 47 | | |
| 48 | Development Fee | $7,660,400 |
| 49 | Real Estate Taxes | $10,800,000 |
| 50 | Sales and Marketing | $5,000,000 |
| 51 | Transaction Costs | $1,500,000 |
| 52 | Transfer Tax | $5,254,500 |
| 53 | | |
| 54 | Owner Direct Work and FF&E | |
| 55 | Sales Center/Mock-Ups | $2,500,000 |
| 56 | F.F&E | $500,000 |
| 57 | Artwork | $250,000 |
| 58 | Final Cleaning | $500,000 |
| 59 | | |
| 60 | Architecture and Engineering | |
| 61 | Architecture/Interior Design | $6,500,000 |
| 62 | MEP Engineer | $1,500,000 |
| 63 | Structural/Wind Engineer | $1,250,000 |
| 64 | Geotechnical/SOE | $500,000 |
| 65 | | |
| 66 | Consultants | |
| 67 | Acoustical | $100,000 |
| 68 | Facade | $250,000 |
| 69 | Lighting | $200,000 |
| 70 | AV/IT/Security | $200,000 |
| 71 | Vertical Transportation | $70,000 |
| 72 | Logistics and Estimating | $250,000 |
| 73 | Code Consultant/Permitting | $500,000 |
| 74 | | |
| 75 | Insurance (Builder's Risk/Contents, etc.) | $1,915,100 |
| 76 | Legal and Accounting | $1,500,000 |
| 77 | General Liability Casualty Insurance | $300,000 |
| 78 | Leasehold Buyout Deductible | $1,000,000 |
| 79 | Soft Cost Contingency | $2,500,000 |

| | | | |
|---|---|---|---|
| 80 | SOFT COST SUBTOTAL | $52,500,000 | |
| 81 | | | |
| 82 | Origination Fee (Acquisition) | $2,990,556 | |
| 83 | Interest (Acquisition) | $28,750,000 | |
| 84 | Extension Fee (Acquisition) | $1,150,000 | |
| 85 | Exit Fee (Acquisition) | $2,300,000 | |
| 86 | Mortgage Recording Tax (Acquisition) | $5,466,597 | |
| 87 | Title Insurance and Fees (Acquisition) | $849,267 | |
| 88 | Mortgage Broker Fee (Acquisition) | $1,150,000 | |
| 89 | Equity Broker Fee (Acquisition) | $1,437,500 | |
| 90 | Lender Legal (Acquisition) | $549,196 | |
| 91 | Borrow Legal (Acquisition) | $1,637,805 | |
| 92 | Due Diligence (Acquisition) | $13,035 | |
| 93 | | | |
| 94 | Financing Fees (Construction) | $4,200,000 | |
| 95 | Interest Reserve (Construction) | $22,500,000 | |
| 96 | Mortgage Recording tax (Construction) | $5,200,000 | |
| 97 | Title Insurance (Construction) | $1,414,000 | |
| 98 | Mortgage Broker Fee (Construction) | $1,616,000 | |
| 99 | Lender Legal (Construction) | $500,000 | |
| 100 | Borrower Legal (Construction) | $400,000 | |
| 101 | Due Diligence (Construction) | $200,000 | |
| 102 | | | |
| 103 | FINANCIAL COST SUBTOTAL | $82,323,956 | |
| 104 | | | |
| 105 | Acquisition | $255,630,586 | $1,800,000 |
| 106 | AQUISITION COST SUBTOTAL | $255,630,586 | $1,800,000 |
| 107 | | | |
| 108 | CAPITAL STACK TOTAL | $639,694,892 | $1,800,000 |

| | Percentage Interest | Capital Call |
|---|---|---|
| 111 West 57th Investment LLC | 59.0000% | $ 1,062,000.00 |
| Atlantic 57 LLC | 26.3000% | $ 473,400.00 |
| 111 West 57th Sponsor LLC | 14.7000% | $ 264,600.00 |



**105-111 West 57th Street**
**CAPITAL CALL**

| 111 West 57th Sponsor LLC Capital Call | | $264,600 |
| --- | --- | --- |
| Pursuant to 111 West 57th Partners LLC Capital Call Dated 3/19/2014 | | |

| | Percentage Interest | Capital Call |
| --- | --- | --- |
| 111 West 57th Manager Funding LLC | 0.5662% | $ 10,191.60 |
| PMG West 57th Street LLC | 7.0669% | $ 127,204.20 |
| 111 West 57th JDS LLC | 7.0669% | $ 127,204.20 |

**Wire Instructions:**

Bank: JP Morgan Chase
Bank Address: 230 Park Ave South, New York, NY 10003
Entity Name: 111 West 57th Partners LLC
Entity Address: 104 5th Ave, 9th Fl, New York, NY 10011
Account Number: 231202150
Routing Number 021000021



# TRIMONT
### REAL ESTATE ADVISORS

March 10, 2014

c/o JDS Development Group
104 Fifth Avenue, 9th floor
New York, New York 10011
Attention: Michael Stern

c/o PMG West 57th Street LLC
5 E 17th Street, 2nd Floor
New York, New York 10003
Attention: Kevin Maloney

111 West 57th Investment LLC
c/o AmBase Capital
100 Putnam Green, 3rd Floor
Greenwich, CT 06830
Attention: Richard Bianco

Dear Sirs:

Reference is made to that certain loan (the "Loan") made by Annaly CRE Holdings LLC ("Lender") to 111 West 57th LH LLC and 111 West 57th FE LLC (together, the "Borrower") pursuant to that certain Loan Agreement dated June 28, 2013 between the Lender and the Borrower (the "Loan Agreement"). Lender has appointed Trimont Real Estate Advisors, Inc. as the servicer and asset manager of the Loan.

Pursuant to section 3.9 of the Loan Agreement, if Borrower fails to enter into an Approved Inclusionary Air Rights Purchase Agreement within one hundred twenty (120) days after June 28, 2013, Borrower shall deposit an additional $1,800,000.00 into the Inclusionary Air Rights Reserve. Borrower did not enter into such an agreement within the 120 day period and the payment is now due.